**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| In re: | Case No. 15-22848 |
| Atna Resources Inc., *et al.*, | Chapter 11 |
| Debtors.[1] | **Jointly Administered Under Case No. 15-22848-SBB** |
| | **Re: Docket Nos. 13, 36 and 77** |

***INTERIM ORDER* (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II) AUTHORIZING THE USE OF CASH COLLATERAL, (III) GRANTING LIENS, INCLUDING PRIMING LIENS, AND SUPERPRIORITY CLAIMS, (IV) GRANTING ADEQUATE PROTECTION, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

Upon consideration of the *Motion for Interim and Final Orders: (I) Authorizing Debtors to Obtain Postpetition Financing, (II) Authorizing the Use Cash Collateral, (III) Granting Liens, Including Priming Liens, and Superpriority Claims, (IV) Granting Adequate Protection, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 13] (the "DIP Motion"), dated November 18, 2015 (the "Petition Date"), of the debtors and debtors in possession (collectively, the "Debtors"), in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), seeking entry of an interim order (this "Interim Order") and, after notice and a hearing, of the Final Order (as defined below), pursuant to sections 105, 361, 362, 363, 364, 506, 507, and 552 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rules 2081-1, 4001-3 and 9013-1 of the Local Rules of Bankruptcy Practice and

---

[1] The debtors and debtors in possession and their respective case numbers subject to this order are: Atna Resources Inc. (15-22848), Canyon Resources Corporation (15-22849), CR Briggs Corporation (15-22850), CR Montana Corporation (15-22851), CR Kendall Corporation (15-22852), Atna Resources Ltd. (15-22853) and Horizon Wyoming Uranium, Inc. (15-22854).

Procedure of the United States Bankruptcy Court for the District of Colorado (the "<u>Local Rules</u>"), that, among other things:

i. authorizes Canyon Resources Corporation (the "<u>Borrower</u>") to obtain, and each of the other Debtors, except for CR Kendall Corporation (collectively, the "<u>Guarantors</u>", and the Borrower and Guarantors being referred to herein collectively as the "<u>Obligors</u>") to unconditionally guaranty, jointly and severally, the Borrower's obligations in respect of, senior secured priming and superpriority post-petition financing, which if approved on a final basis would consist of post-petition financing in a total amount of $4,000,000 (the "<u>DIP Facility</u>"), provided pursuant to the terms of (x) this Interim Order and, on a final basis, the Final Order, (y) that certain Debtor-In-Possession Credit Agreement (as the same may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms, the "<u>DIP Credit Agreement</u>"), a true and correct copy of which is attached hereto as <u>Exhibit B</u>,[2] by and among the Borrower, the Guarantors and Waterton Precious Metals Fund II Cayman, LP, or such other affiliated entity designated by Waterton Precious Metals Fund II Cayman, LP, as lender under the DIP Credit Agreement (in such capacity, the "<u>DIP Lender</u>"), and (z) any and all other Credit Documents (as defined in the DIP Credit Agreement, and together with the DIP Credit Agreement, collectively, the "<u>DIP Loan Documents</u>");

ii. authorizes the use of the proceeds of the DIP Facility to, among other things, make payments, as permitted by the Approved Budget, for operating expenses, general and ordinary purposes of the Debtors, and for other restructuring and administrative expenses, including budgeted professional fees, all subject to the conditions set forth in the final DIP Loan Documents and in this Interim Order;

iii. approves an initial drawing in an aggregate principal amount not to exceed $1,265,000, inclusive of the Structuring Fee (the "<u>Interim Amount</u>"), and authorizes the Guarantors to unconditionally guaranty such obligations jointly and severally;

iv. approves the terms of, and authorizes the Obligors to execute and deliver, and perform under, the DIP Loan Documents and authorizes and directs the Obligors to perform such other and further acts as may be required in connection with the DIP Loan Documents and this Interim Order;

v. grants to the DIP Lender, (x) the DIP Liens (as defined below) on all of the DIP Collateral (as defined below) pursuant to sections 364(c)(1), 364(c)(2) and 364(d)(1) of the Bankruptcy Code, which DIP Liens are senior to and prime any and all other liens and (y) pursuant to section 364(c)(1) of the Bankruptcy Code, superpriority administrative claims having recourse to all pre-petition and post-

---

[2] Unless otherwise specified in this Interim Order, all capitalized terms used but not defined herein shall have the meanings given to such terms in the DIP Credit Agreement.

petition property of the Obligors' estates, now owned or hereafter acquired and the proceeds of each of the foregoing, including,[3] upon entry of this Interim Order, any Obligor's rights under section 549 of the Bankruptcy Code and the proceeds thereof, and upon entry of the Final Order, the proceeds of Avoidance Actions (as defined below);

vi.    authorizes the Obligors to use "cash collateral," as such term is defined in section 363 of the Bankruptcy Code (the "Cash Collateral"), including Cash Collateral in which the DIP Lender and the Pre-Petition Lender (as defined below) have a lien or other interest, in each case whether existing on the Petition Date, arising pursuant to this Interim Order or otherwise;

vii.    modifies the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and this Interim Order;

viii.    grants the Pre-Petition Lender, as of the Petition Date and in accordance with the relative priorities set forth herein, the Adequate Protection Liens (as defined below) and the Adequate Protection Priority Claims (as defined below);

ix.    schedules a final hearing on the DIP Motion (the "Final Hearing") to be held no later than fifty-five (55) calendar days after the entry of this Interim Order to consider entry of a final order that grants all of the relief requested in the DIP Motion on a final basis and which final order shall be in form and substance (including with respect to any subsequent modifications to the form or substance made in response to objections of other creditors or this Court) acceptable to the DIP Lender (the "Final Order");

x.    waives, upon entry of the Final Order, certain rights of the Debtors to surcharge against collateral pursuant to section 506(c) of the Bankruptcy Code, as may be provided for in the Final Order; and

xi.    provides for the immediate effectiveness of this Interim Order and waives any applicable stay (including under Bankruptcy Rule 6004) to permit such immediate effectiveness.

Having considered the DIP Motion, the *Supplemental Motion of Debtors and Debtors in Possession for Interim and Final Orders: (I) Authorizing Debtors to Obtain Postpetition Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Liens, Including Priming Liens, and Superpriority Claims, (IV) Granting Adequate Protection, (V) Scheduling a Final*

---

[3] As used herein, the words "including" or "include" and variations thereof shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation."

3

*Hearing, and (VI) Granting Related Relief* [Docket No. 36], the DIP Credit Agreement, the other

DIP Loan Documents, the *Declaration of Rodney D. Gloss in Support of First Day Pleadings*,

the *Notice of Filing DIP Financing Credit Agreement and Revised Proposed Interim Order*

[Docket No. 77], and the evidence submitted or proffered at the hearing on this Interim Order

(the "Interim Hearing"); and in accordance with Bankruptcy Rules 2002, 4001(b), 4001(c), and

4001(d), 6004(c) and 9014 and all applicable Local Rules, due and sufficient notice of the DIP

Motion and the Interim Hearing having been provided pursuant to Bankruptcy Rule

4001(b)(1)(C); the Interim Hearing having been held on November 20, 2015 and November 23,

2015; this Court having considered all the pleadings, motions and other papers filed in

connection therewith; this Court having overruled all unresolved objections to the interim relief

requested in the DIP Motion; this Court having considered the record made by the Debtors at the

Interim Hearing; and it appearing that approval of the interim relief requested in the DIP Motion

is necessary to avoid immediate and irreparable harm to the Debtors pending the Final Hearing

and otherwise is fair and reasonable and in the best interests of the Debtors, their creditors, their

estates and all parties in interest, and is essential for the continued operation of the Debtors'

business and the preservation of the value of the Debtors' assets; and it appearing that the

Obligors' entry into the DIP Credit Agreement and the other DIP Loan Documents is a sound

and prudent exercise of the Obligors' business judgment; and after due deliberation and

consideration, and good and sufficient cause appearing therefor:

**THIS COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[4]

      A.      **Petition Date**.  On the Petition Date, each of the Debtors filed voluntary

---

[4] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, as appropriate, pursuant to Bankruptcy Rule 7052.

petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Colorado (this "Court"). The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No statutory committee of unsecured creditors (to the extent such committee is appointed, the "Committee"), trustee, or examiner has been appointed in these Chapter 11 Cases.

B.   **Jurisdiction and Venue**. This Court has core jurisdiction over these Chapter 11 Cases, the DIP Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue for the Cases and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and other predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 506, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014 and the Local Rules.

C.   **Notice**. The Interim Hearing is being held pursuant to the authorization of Bankruptcy Rule 4001. Notice of the Interim Hearing and the emergency relief requested in the DIP Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, to certain parties in interest, including: (i) the Office of the United States Trustee for the District of Colorado (the "U.S. Trustee"), (ii) those entities or individuals included on the Debtors' consolidated list of top 30 unsecured creditors, (iii) counsel to the Pre-Petition Lender, (iv) counsel to the DIP Lender, (v) all other known lienholders, (vi) all parties that, as of the filing of the DIP Motion, have requested notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002, and (vii) the other parties identified in the DIP Motion and the certificate of service therefor. Under the circumstances, such notice of the DIP Motion, the relief requested therein and the Interim Hearing complies with Bankruptcy Rules 4001(b), (c) and (d),

and the Local Rules, and no other notice need be provided for entry of this Interim Order.

        D.       **Debtors' Stipulations Regarding the Pre-Petition Indebtedness**.

Subject only to the entry of the Final Order and the rights of parties in interest that are specifically set forth in Paragraph 8 below, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree (collectively, the "Debtors' Stipulations") as follows:

    (i)     *Pre-Petition Indebtedness*. As of the Petition Date, pursuant to the Pre-Petition Credit Agreement, and collectively with any other agreements and documents executed or delivered in connection therewith, including the "Credit Documents" as defined in the Pre-Petition Credit Agreement (each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Pre-Petition Credit Agreement Documents")[5] Debtors Canyon Resources Corporation and Atna Resources Ltd., and each of the other Guarantors (as defined Pre-Petition Credit Agreement) (collectively the "Pre-Petition Obligors") was truly and justly indebted to the Pre-Petition Lender, either as borrower or guarantor, in the aggregate principal amount of $19,080,800, *plus* accrued and unpaid interest and any additional fees, costs and expenses as provided for in the Pre-Petition Credit Agreement Documents, without defense, counterclaim, reduction or offset of any kind.

    (ii)     The first priority liens and security interests granted to the Pre-Petition Lender in all of the Pre-Petition Obligors' assets other than the Non-Core Assets (as defined in the Pre-Petition Credit Agreement) and the Excluded Assets (as defined in the Security Agreement entered into in connection with the Pre-Petition Credit Agreement) (the "Pre-Petition Collateral" and the liens securing the Pre-Petition Collateral, the "Pre-Petition Liens") (a) are legal, valid, binding, enforceable, and perfected liens, (b) were granted to, or for the benefit of, the Pre-Petition Lender for fair consideration and reasonably equivalent value, and (c) are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

    (iii)     The obligations under the Pre-Petition Indebtedness constitute legal, valid, and binding obligations of the Pre-Petition Obligors, enforceable in accordance with the terms of the Pre-Petition Credit Agreement Documents (other than in respect of the stay of enforcement arising from

---

[5] All obligations of the Pre-Petition Obligors arising under the Pre-Petition Credit Agreement Documents are referred to herein as the "Pre-Petition Indebtedness." Waterton Precious Metals Fund II Cayman, LP, in its capacity as provider of the Pre-Petition Indebtedness is referred to herein as the "Pre-Petition Lender."

section 362 of the Bankruptcy Code), (x) no setoffs, recoupments, offsets, defenses, or counterclaims to any of the Pre-Petition Indebtedness exist, (y) no portion of the Pre-Petition Indebtedness or any payments made to the Pre-Petition Lender are subject to avoidance, disallowance, disgorgement, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (z) each of the guarantees provided in the Pre-Petition Credit Agreement Documents shall continue in full force and effect to unconditionally guaranty the Pre-Petition Indebtedness notwithstanding any use of Cash Collateral permitted hereunder or any financing and financial accommodations extended by the DIP Lender to the Debtors pursuant to the terms of this Interim Order or the DIP Loan Documents.

E.      <u>Cash Collateral</u>.  All of the Debtors' cash, including any cash in deposit accounts of the Debtors, wherever located, constitutes Cash Collateral of the Pre-Petition Lender.

F.      **<u>Findings Regarding the DIP Facility</u>**.

(i)      <u>Need for Post-Petition Financing</u>.  The Debtors have an immediate need to obtain the DIP Facility and use Cash Collateral to, among other things, permit the orderly continuation of their businesses, to make payroll, to satisfy other working capital and operational needs, to complete the Debtors' marketing and sale process and to otherwise preserve the value of the Debtors' estates.  The Debtors' access to sufficient working capital and liquidity through the use of Cash Collateral and borrowing under the DIP Facility is vital to a successful reorganization and/or to otherwise preserve the value of the Debtors' estates.  If immediate financing is not obtained and permission to use Cash Collateral is not granted, in each case in accordance with the terms of this Interim Order and the DIP Loan Documents, the Debtors and their estates will incur immediate and irreparable harm.

(ii)      <u>No Credit Available on More Favorable Terms</u>.  The Debtors have been and continue to be unable to obtain financing on more favorable terms from sources other than the DIP Lender under the DIP Loan Documents and this Interim Order.  The Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as

7

an administrative expense or secured credit allowable only under sections 364(c)(1), 364(c)(2), or 364(c)(3) of the Bankruptcy Code.  The Debtors are unable to obtain secured credit under section 364(d)(1) of the Bankruptcy Code without (a) granting to the DIP Lender the rights, remedies, privileges, benefits, and protections provided herein and in the DIP Loan Documents, including the DIP Liens and the DIP Superpriority Claims (as defined below), (b) allowing the DIP Lender to provide the loans and other financial accommodations under the DIP Facility on the terms set forth herein and in the DIP Loan Documents, and (c) granting to the Pre-Petition Lender the rights, remedies, privileges, benefits, and protections provided herein and in the DIP Loan Documents, including the Adequate Protection Liens and the Adequate Protection Priority Claims (all of the foregoing described in clauses (a), (b), and (c) above, collectively, the "DIP Protections").

G.     **Interim Financing**.  During the Interim Period (as defined below), the DIP Lender and the Pre-Petition Lender are willing to provide financing to the Obligors and/or consent to the use of Cash Collateral by the Obligors, subject to (i) the entry of this Interim Order, and (ii) the terms and conditions of the DIP Loan Documents; provided, however, that the consent of the Pre-Petition Lender is limited to the present DIP Facility and shall not be applicable to any other debtor in possession loan facility even if such debtor in possession loan facility contains economic terms which are substantially similar to the economic terms of the DIP Facility.

H.     **Adequate Protection**.  The Pre-Petition Lender has agreed to permit the Obligors' use of the Pre-Petition Collateral, including the Cash Collateral, during the Interim Period, subject to the terms and conditions set forth herein.  In addition, the DIP Facility contemplated hereby provides for a priming of all liens on the Obligors' assets, including the

Pre-Petition Liens on the Pre-Petition Obligors' assets, pursuant to section 364(d) of the Bankruptcy Code, by the DIP Liens granted herein in favor of the DIP Lender.  The Pre-Petition Lender is entitled to the adequate protection as set forth herein pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code.  Based on the DIP Motion and on the record presented to this Court at the Interim Hearing, the terms of the proposed adequate protection arrangements, use of the Cash Collateral, and the DIP Facility contemplated hereby are fair and reasonable, consistent with the Bankruptcy Code, including section 506(b) thereof, reflect the Debtors' prudent exercise of business judgment consistent with their fiduciary duties, constitute reasonably equivalent value and fair consideration, and are reasonable to protect the interests of the Pre-Petition Lender.

I.        **Section 552**.  In light of the subordination of its liens and claims to the DIP Liens, and the imposition of the Carve-Out, the Pre-Petition Lender is entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and, subject to the entry of the Final Order, the "equities of the case" exception shall not apply.

J.        **Approved Budget**.  Attached hereto as Exhibit A is an Approved Budget (the "Approved Budget").  The Approved Budget is an integral part of this Interim Order and has been relied upon by the DIP Lender and the Pre-Petition Lender in consenting to this Interim Order, to provide the DIP Facility and to permit the use of the Cash Collateral.

K.        **Business Judgment and Good Faith Pursuant to Section 364(e)**.

(i)        The terms and conditions of the DIP Facility as set forth in the DIP Loan Documents and this Interim Order, and the fees, expenses and other charges paid and to be paid thereunder or in connection therewith, are fair, reasonable, and the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their

fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

(ii)     The DIP Facility was negotiated in good faith and at arms' length among the Obligors, the DIP Lender and the Pre-Petition Lender.

(iii)     Use of the proceeds to be extended under the DIP Facility will be so extended in good faith, and for valid business purposes and uses, as a consequence of which the DIP Lender and the Pre-Petition Lender are entitled to the protection and benefits of section 364(e) of the Bankruptcy Code.   The DIP Liens, DIP Superpriority Claims and other DIP Protections shall be entitled to the full protection of section 364(e) of the Bankruptcy Code.

L.     **Relief Essential; Best Interest**.  For the reasons stated above, the Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), and the Local Rules.  Absent granting the relief set forth in this Interim Order, the Debtors' estates, their businesses and properties and their ability to successfully sell their assets or otherwise preserve the value of their estates will be immediately and irreparably harmed.  The Court concludes that immediate entry of this Interim Order is therefore in the best interests of the Debtors' estates and creditors and will allow for the continued operation of the Debtors' existing businesses and enhance the Debtors' prospects for successful reorganization.

**NOW, THEREFORE**, based on the DIP Motion and the record before this Court with respect to the DIP Motion, and with the consent of the Debtors, the Pre-Petition Lender and the DIP Lender to the form and entry of this Interim Order, and good and sufficient cause appearing therefor:

**IT IS ORDERED** that:

1.     **Motion Granted**.  The DIP Motion is hereby granted in accordance with the terms and conditions set forth in this Interim Order and the DIP Loan Documents.   Any

objections to the DIP Motion with respect to the entry of this Interim Order that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby denied and overruled.  This Interim Order shall become effective immediately upon its entry.

2.      **DIP Loan Documents and DIP Protections**.

(a)      Approval of DIP Loan Documents.  The Obligors are expressly and immediately authorized to establish the DIP Facility, to execute, deliver, and perform under the DIP Loan Documents and this Interim Order, to incur the DIP Obligations[6] (including to immediately draw the Interim Amount), in accordance with, and subject to, the terms of this Interim Order and the DIP Loan Documents, and to execute, deliver, and perform under all other instruments, certificates, agreements, and documents that may be required or necessary for the performance by the applicable Debtors under the DIP Loan Documents and the creation and perfection of the DIP Liens described in, and provided for by, this Interim Order and the DIP Loan Documents. The Obligors are hereby authorized and directed to do and perform all acts and pay the principal, interest, fees, expenses, and other amounts described in the DIP Loan Documents as such become due pursuant to the DIP Loan Documents and this Interim Order, including, without limitation, all professional fees, the fees under the DIP Credit Agreement, (including the Structuring Fee), and disbursements arising under the DIP Loan Documents and this Interim Order, which amounts shall not be subject to further approval of this Court and shall be non-refundable and not subject to challenge in any respect.  Upon their execution and delivery, the DIP Loan Documents shall represent the legal, valid and binding obligations of the applicable Obligors enforceable against such Debtors in accordance with their terms.  No obligation,

---

[6] For purposes of this Interim Order, the term "<u>DIP Obligations</u>" shall mean all amounts and other obligations and liabilities owing by the respective Obligors under the DIP Credit Agreement, the other DIP Loan Documents (including, without limitation, all "Obligations" as defined in the DIP Credit Agreement) and to the DIP Lender or the Pre-Petition Lender under this Interim Order.

payment, transfer or grant of security under the DIP Loan Documents or this Interim Order shall be stayed, restrained, voided, voidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.  Each officer of an Obligor acting singly is hereby authorized to execute and deliver each of the DIP Loan Documents, such execution and delivery to be conclusive evidence of such officer's respective authority to act in the name of and on behalf of the Obligors.

(b)      Authorization to Incur DIP Obligations and Use Cash Collateral.  To enable the Debtors to continue to operate their business and preserve and maximize the value of their estates, during the period from the entry of this Interim Order through and including the earliest to occur of (i) the entry of the Final Order, or (ii) a Termination Event (as defined below), in each case unless extended by written agreement of the DIP Lender and the Pre-Petition Lender (the period from the entry of this Interim Order through and including such earliest date, the "Interim Period"), the Borrower is hereby authorized (x) to use Cash Collateral and (y) to borrow under the DIP Facility; provided that (i) during the Interim Period, the aggregate outstanding amount for all such borrowings shall not exceed the Interim Amount; and (ii) any proposed use of the proceeds of DIP Loans or use of Cash Collateral shall be consistent with the terms and conditions of this Interim Order and the DIP Loan Documents, including the Approved Budget. All DIP Obligations shall be unconditionally guaranteed, on a joint and several basis, by the Guarantors, as further provided in the DIP Loan Documents.

(c)      Perfection in Cash.  Subject to the Carve-Out and other provisions of this Interim Order, all financial institutions in which the Debtors' deposit accounts are located are authorized and directed to comply with any request of the DIP Lender to turn over to the DIP Lender all funds therein without offset or deduction of any kind, and the Debtors are authorized and

directed to enter into such blocked account agreements with cash dominion with the DIP Lender and such financial institutions as the DIP Lender may require.  Alternatively, the DIP Lender shall be entitled to enjoy the benefit of all control agreements to which the Pre-Petition Lender is a party without the need to enter into new blocked account agreements.

(d)     <u>Approved Budget; Cash Flow Reporting</u>.  The Borrower shall timely furnish the DIP Lender with each Weekly Actuals Report, Updated Budget, Approved Budget Variance Report and each other calculation and report as required by, and in accordance with, Section 10.1 of the DIP Credit Agreement.

(e)     <u>Interest, Fees, Costs and Expenses</u>.  The DIP Obligations shall bear interest at the rates, and be due and payable (and paid), as set forth in, and in accordance with the terms and conditions of, this Interim Order and the DIP Loan Documents, in each case without further notice, motion, or application to, order of, or hearing before, this Court.  In particular, all interest with respect to the DIP Obligations shall accrue as PIK interest, but shall only be payable, together with all fees (except for the Structuring Fee), costs, indemnities, expenses (including reasonable out-of-pocket legal and other professional fees and expenses of the DIP Lender) and other charges payable under the terms of the DIP Loan Documents on the Termination Date; <u>provided</u>, <u>however</u>, that the Structuring Fee shall be paid on the Closing Date.  All such fees, costs, indemnities, expenses and disbursements, whether incurred, paid or required to be paid pre-petition or post-petition and whether or not budgeted in the Approved Budget, are hereby affirmed, ratified, authorized and payable (and any funds held by the DIP Lender and/or its professionals as of the Petition Date for payment of such fees, costs, indemnities, expenses and disbursements may be applied for payment) as contemplated in this Interim Order and the DIP Loan Documents, and shall be non-refundable and not subject to

13

challenge in any respect. All such unpaid fees, costs, expenses, indemnities and disbursements that are payable under the terms of the DIP Loan Documents shall be secured by the DIP Collateral and afforded all of the priorities and protections afforded to the DIP Obligations under this Interim Order. Notwithstanding the foregoing, any and all interest, fees, costs, and expenses incurred by the Pre-Petition Lender, in its capacity as such, or under the Pre-Petition Credit Agreement Documents that are required to be paid hereunder as adequate protection or otherwise are to be paid on the Termination Date.

(f)     Use of DIP Facility and Proceeds of DIP Collateral. The Debtors shall only incur DIP Obligations and expend Cash Collateral and other DIP Collateral proceeds solely in accordance with this Interim Order and the DIP Loan Documents, and for the specific purposes, and at the specific time periods, set forth in the Approved Budget, subject to variances permitted in the DIP Credit Agreement (and in the case of the costs and expenses of the DIP Lender, in accordance with the DIP Loan Documents and this Interim Order without being limited by the Approved Budget). Without limiting the foregoing, the Debtors shall not be permitted to make any payments (from the DIP Collateral, the Loan or otherwise) on account of any pre-petition debt or obligation prior to the effective date of a confirmed chapter 11 plan or plans with respect to any of the Debtors, except (a) with respect to the Pre-Petition Indebtedness as set forth in this Interim Order and a Final Order; (b) as provided in the "first day orders" and as expressly agreed to by the DIP Lender; or (c) as expressly provided in other motions, orders, and requests for relief, each in form and substance acceptable to the DIP Lender prior to such motion, order, or request for such relief being filed.

(g)     DIP Liens. As security for the DIP Obligations, effective as of the Petition Date, the following security interests and liens, which shall immediately and without any further action

14

by any Person be valid, binding, permanent, perfected, continuing, enforceable, and non-avoidable upon the entry of this Interim Order, are hereby granted by each Obligor to the DIP Lender (all such security interests and liens granted to the DIP Lender pursuant to this Interim Order and the DIP Loan Documents, the "DIP Liens"), on all of its right, title and interest in, to and under all property and assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of such Obligor, whether owned or consigned by or to, or leased from or to, such Obligor, and regardless of where located, including, without limitation, all Collateral (as defined in Section 7.1 of the DIP Credit Agreement), all other "property of the estate" (as defined in section 541 of the Bankruptcy Code) of any kind or nature, real or personal, tangible, intangible, or mixed, now existing or hereafter acquired or created, and all rents, products, substitutions, accessions, profits, replacements, and cash and non-cash proceeds of all of the foregoing, in each case wherever located (all of the foregoing collateral collectively referred to as the "DIP Collateral"):

(I)      pursuant to section 364(c)(2) of the Bankruptcy Code, a fully perfected, binding, continuing, enforceable, and non-avoidable first priority lien on all unencumbered DIP Collateral, including, subject to the entry of the Final Order, the proceeds of the Obligors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state or municipal law (collectively, the "Avoidance Actions", which for avoidance of doubt, excludes Obligors' claims and causes of action under section 549 of the Bankruptcy Code or similar state or municipal law and the proceeds of each of the foregoing), whether received by judgment, settlement, or otherwise;

(II)      pursuant to section 364(d)(1) of the Bankruptcy Code, a fully perfected, binding, continuing, enforceable and non-avoidable first priority, senior priming lien on all other DIP Collateral (including Cash Collateral), which DIP Lien (x) shall, except for the Carve-Out, be senior to the Adequate Protection Liens and (y) shall, except for the Carve-Out, be senior to and prime any and all valid, perfected, enforceable and non-avoidable pre-petition and post-petition liens, tax liens, mechanics' liens, or other non-consensual or consensual liens in existence as of the Petition Date and properly perfected prior to the Petition Date (the liens referenced

15

in clauses (x) and (y), collectively, the "Primed Liens") and shall be subject only to the Carve-Out.

(h)     Superpriority Administrative Claim Status.  In addition to the DIP Liens granted herein, effective immediately upon entry of this Interim Order, all of the DIP Obligations shall constitute allowed superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code, which shall have priority, subject only to the Carve-Out, over all administrative expense claims, adequate protection and other diminution claims (including the Adequate Protection Priority Claims (as defined below)), priority claims and other unsecured claims, and all other claims against the Obligors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses or other claims of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, and 1114 or any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment (the "DIP Superpriority Claims").  The DIP Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each Obligor on a joint and several basis, and shall be payable from and have recourse to all pre-petition and post-petition property of the Obligors and all proceeds thereof, including, subject to the entry of the Final Order, the proceeds of Avoidance Actions.  Other than as expressly provided in the DIP Credit Agreement and/or this Interim Order with respect to the Carve-Out, no costs or expenses of administration, including professional fees allowed and payable under sections 328, 330, or 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings, or in any Successor Cases, and no priority claims are, or will be, senior to, prior to, or on a parity with the DIP Superpriority Claims or the DIP

16

Obligations, or with any other claims of the DIP Lender arising under the DIP Loan Documents and/or this Interim Order.

(i) <u>Priority of DIP Liens and DIP Superpriority Claims</u>.  The DIP Liens and the DIP Superpriority Claims: (A) shall not be subject to sections 506, 510, 549, 550, or 551 of the Bankruptcy Code or, subject to entry of the Final Order, the "equities of the case" exception of section 552 of the Bankruptcy Code, (B) shall not be subordinate to, or *pari passu* with, (x) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise or (y) any liens or claims of any Debtor or any direct or indirect subsidiary thereof against any Debtor or any of such Debtor's property, and (C) shall be valid and enforceable against any trustee or any other estate representative elected or appointed in the Chapter 11 Cases, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (each, a "<u>Successor Case</u>"), and/or upon the dismissal of any of the Chapter 11 Cases.

3. **Adequate Protection for the Pre-Petition Lender**.  In consideration for the use of the Pre-Petition Collateral (including Cash Collateral), the Pre-Petition Lender shall receive the following adequate protection (collectively referred to as the "<u>Adequate Protection</u>"):

(a) <u>Adequate Protection Liens</u>.  Only to the extent there is an actual diminution in value of the Pre-Petition Lender's interests in the Pre-Petition Collateral (including Cash Collateral) from and after the Petition Date, whether or not resulting from the use, sale, or lease by the Debtors of the applicable Pre-Petition Collateral (including Cash Collateral), the granting of the DIP Superpriority Claims, the granting of the DIP Liens, the imposition of the Carve-Out, or the imposition or enforcement of the automatic stay of section 362(a) of the Bankruptcy Code (a "<u>Diminution in Pre-Petition Collateral Value</u>"), the Pre-Petition Lender is hereby granted,

17

subject to the terms and conditions set forth below, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, replacement security interests in and liens and mortgages upon all of the Pre-Petition Collateral and security interest in and liens and mortgages upon all of the DIP Collateral, including, subject to the entry of the Final Order, the proceeds of Avoidance Actions, if any, but not the Avoidance Actions themselves (such adequate protection Liens, the "Adequate Protection Liens"), which Adequate Protection Liens on such Pre-Petition Collateral shall junior and subordinate only to the DIP Liens and subject to the Carve-Out.

(b)     Adequate Protection Priority Claims.  Only to the extent of a Diminution in Pre-Petition Collateral Value, the Pre-Petition Lender is hereby further granted allowed superpriority administrative claims (such adequate protection superpriority claims, the "Adequate Protection Priority Claims"), pursuant to section 507(b) of the Bankruptcy Code, with priority over all administrative expense claims and priority over other unsecured claims against the Debtors which are Pre-Petition Obligors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the entry of the Final Order to the extent provided in Paragraph 10), 507(a), 507(b), 546(c), 546(d), 726 , 1113, 1114 or any other provision of the Bankruptcy Code or otherwise, junior only to the DIP Superpriority Claims and subject to the Carve-Out, and payable from and having recourse to all pre-petition and post-petition property of the Debtors which are Pre-Petition Obligors and all proceeds thereof (including, subject to entry of the Final Order, the proceeds of Avoidance Actions); provided, however, that the Pre-Petition Lender shall not receive or retain any payments, property, or other amounts in respect of the Adequate Protection Priority Claims unless and until all DIP Obligations have been paid in full.  Subject to the relative priorities set forth above, the

Adequate Protection Priority Claims against each Debtor which is a Pre-Petition Obligor shall be allowed and enforceable against each such Debtor and its estate on a joint and several basis.

(c)     Priority of Adequate Protection Liens and Adequate Protection Priority Claims. The Adequate Protection Liens and the Adequate Protection Priority Claims (A) shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code or, subject to entry of the Final Order, section 506(c) of the Bankruptcy Code or the "equities of the case" exception of section 552 of the Bankruptcy Code, (B) shall not be subordinate to, or *pari passu* with, (x) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise or (y) any liens or claims of any Debtor or any direct or indirect subsidiary thereof against any Debtor or any of such Debtor's property, and (C) shall be valid, binding, perfected and enforceable against any trustee or any other estate representative elected or appointed in the Chapter 11 Cases or any Successor Cases, and/or upon the dismissal of any of the Cases.  The Adequate Protection Liens shall be junior to the DIP Liens and the Pre-Petition Lender's liens arising under any Pre-Petition Credit Agreement Documents, senior to any other liens, including, without limitation, to any other adequate protection replacement liens, and subject to the Carve-Out.

(d)     Interest and Professional Fees.  Without limiting any rights of the Pre-Petition Lender under section 506(b) of the Bankruptcy Code, which rights are hereby preserved, and in consideration, and as a requirement, for obtaining the Pre-Petition Lender's consent to the entry of this Interim Order and the Debtors' consensual use of Cash Collateral as provided herein and as additional adequate protection, (i) the Pre-Petition Lender's reasonable fees, costs, expenses, and charges (including the reasonable fees, costs, and expenses of counsel and financial advisors for the Pre-Petition Lender) to the extent, and at the times, payable under the Pre-Petition Credit

19

Agreement Documents, including any unpaid fees, costs and expenses accrued prior to the Petition Date, and (ii) all of the interest accruing under the Pre-Petition Credit Agreement Documents at the default rate(s) set forth therein, in the case of each of sub-clauses (i) and (ii) above, whether or not budgeted in the Approved Budget, and without further notice, motion, or application to, order of, or hearing before, this Court, shall accrue during these Chapter 11 Cases and shall be deemed to be included in the Pre-Petition Indebtedness; provided, however, that any payment, accrual or accrual of post-petition interest or reimbursement of post-petition fees, costs and expenses under the Pre-Petition Credit Agreement Documents shall be reapplied to reduce the principal amount of the Pre-Petition Indebtedness to the extent this Court determines in a final, non-appealable order that the Pre-Petition Lender is not entitled to such payment, accrual or reimbursement pursuant to section 506(b) of the Bankruptcy Code.  The interest and fees that are the subject of this subsection (d) are to be paid only on the Termination Date; provided, however, that the Structuring Fee shall be paid on the Closing Date.

(e)     Right to Seek Additional Adequate Protection.  This Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Pre-Petition Lender to seek additional or alternative forms of adequate protection at any time; provided that any such additional or alternative adequate protection shall at all times be subordinate and junior to the claims and liens of the DIP Lender granted under this Interim Order and the DIP Loan Documents.

4.     **Small Mine Development LLC**.

(a)     Replacement Liens for Small Mine Development LLC.  Small Mine Development LLC ("Small Mine") purports to hold valid and perfected mechanic's liens against certain of the Pre-Petition Collateral and/or DIP Collateral.  Nothing contained in this Interim Order shall

constitute or be deemed to constitute a finding that any such mechanic's liens are valid and enforceable or as to the amount, nature, or priority, of such purported liens (all parties reserving their rights with respect thereto).  As adequate protection of the purported liens of Small Mine, whether or not Small Mine filed an objection to the entry of this Interim Order, Small Mine is hereby granted replacement liens, subject in all respects to the Carve-Out, in the same property in which it is found to have an interest pursuant to a final order of this Court (or any other court of competent jurisdiction) not subject to appeal and to the same extent that such mechanic's liens may be determined to exist and only to the extent necessary to protect Small Mine from the diminution in value of its purported interests.

(b)    <u>Relative Priority of Small Mine Adequate Protection</u>.  The adequate protection lien granted to Small Mine shall rank in the same relative priority to the Adequate Protection Liens granted to the Pre-Petition Lender as the mechanics' liens purportedly held by Small Mine rank in relation to the Pre-Petition Liens, as such priority is determined by a final order of this Court (or any other court of competent jurisdiction) not subject to appeal.

(c)    The failure to file an adversary proceeding by Small Mine within seventy-five (75) days of the Petition Date shall not bar Small Mine from later asserting by way of an adversary proceeding or otherwise that it is entitled to priority as a mechanic's lien claimant over the Pre-Petition Liens.

5.    **Automatic Post-Petition Lien Perfection.**  This Interim Order shall be sufficient and conclusive evidence of the validity, enforceability, perfection, and priority of the DIP Liens and the Adequate Protection Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document that may otherwise be required under the law of any jurisdiction (including, without limitation, the laws of the States of

Nevada (including, without limitation NRS Chapter 107), California (including, without limitation, chapter 6 of the California General Code) and Montana, ((including, without limitation, title 71 of the Montana Code)), or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable law) such liens, or to entitle the DIP Lender or the Pre-Petition Lender to the priorities granted herein.  Notwithstanding the foregoing, the DIP Lender may, in its sole discretion, enter into and file, as applicable, financing statements, mortgages, security agreements, notices of Liens, and other similar documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices, and other agreements or documents shall be deemed to have been entered into, filed or recorded as of the Petition Date.  The applicable Debtors shall execute and deliver to the DIP Lender all such financing statements, mortgages, notices, and other documents as such parties may reasonably request to evidence and confirm the contemplated validity, perfection and priority of the DIP Liens and the Adequate Protection Liens, as applicable, granted pursuant hereto.  Without limiting the foregoing, the DIP Lender may, in its discretion, file a photocopy of this Interim Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any Debtor has real or personal property, and in such event, the subject filing or recording officer shall be authorized and hereby is directed to file or record such copy of this Interim Order.  For the avoidance of doubt, the DIP Lender shall be entitled to enjoy the benefit of all financing statements, deeds of trust, mortgages, or other instruments or documents that may otherwise be required under the law of any jurisdiction to which the Pre-Petition Lender is a party without the need to enter into new financing statements, deeds of trust,

mortgages, or other instruments or documents that may otherwise be required under the law of any jurisdiction.

6.   **Automatic Stay**.   The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby vacated and/or modified pursuant to the terms of this Interim Order and the DIP Loan Documents as necessary to (i) permit the Debtors to grant the Adequate Protection Liens and the DIP Liens and to incur all liabilities and obligations to the DIP Lender, under the DIP Loan Documents, the DIP Facility, and this Interim Order, (ii) authorize the DIP Lender and the Pre-Petition Lender to retain and apply payments made in accordance with the DIP Loan Documents and the Pre-Petition Credit Agreement Documents, (iii) to permit each of the DIP Lender and the Pre-Petition Lender to perform any act authorized under this Interim Order and the DIP Loan Documents, and (iv) otherwise to the extent necessary to implement and effectuate the provisions of this Interim Order and the DIP Loan Documents.

7.   **Release of Claims**.   Subject only to the entry of the Final Order and the rights of parties in interest that are specifically set forth in Paragraph 8 below, the releases provided in Section 7.13 of the DIP Credit Agreement are expressly incorporated herein by reference and are effective as of the date of entry of this Interim Order.

8.   **Reservation of Certain Third Party Rights and Bar of Challenges and Claims**.   The Debtors' Stipulations shall be binding upon the Debtors and their estates in all circumstances upon entry of this Interim Order but subject in all respects to entry of the Final Order.   Nothing in this Interim Order or the DIP Loan Documents shall prejudice whatever rights any official committee(s) or any other party in interest (other than the Debtors) may have (a) to object to or challenge the findings herein, including, but not limited to, those in relation to (i) the validity, extent, perfection or priority of the mortgages, security interests and liens of the Pre-

23

Petition Lender in and to the Pre-Petition Collateral or (ii) the validity, allowability, priority, status or amount of the Pre-Petition Indebtedness, or (b) to bring suit against the Pre-Petition Lender in connection with or related to the Pre-Petition Indebtedness, or the actions or inactions of the Pre-Petition Lender arising out of or related to the Pre-Petition Indebtedness; provided, however, that, unless any official committee(s) or any other party in interest obtains the requisite standing to commence, and commences, a contested matter or adversary proceeding raising such objection or challenge, including without limitation any claim against the Pre-Petition Lender in the nature of a setoff, counterclaim or defense to the Pre-Petition Indebtedness (including but not limited to, those under sections 506, 544, 547, 548, 549, 550 and/or 552 of the Bankruptcy Code or by way of suit against the Pre-Petition Lender), by the later of (a) with respect to any Committee, sixty (60) calendar days following the appointment of any Committee, or (b) if no Committee is appointed, with respect to other parties in interest with requisite standing other than the Debtors or any Committee, seventy-five (75) calendar days following entry of the Interim Order (collectively, (a) and (b) shall be referred to as the "Challenge Period," and the date that is the next calendar day after the termination of the Challenge Period, in the event that no objection or challenge is raised during the Challenge Period, shall be referred to as the "Challenge Period Termination Date"),[7] upon the Challenge Period Termination Date, any and all such challenges and objections by any party (including, without limitation, any official creditors' committee(s), any chapter 11 or chapter 7 trustee appointed herein or in any Successor Case, and any other party in interest) shall be deemed to be forever waived and barred, and all of the obligations under the Pre-Petition Credit Agreement Documents shall be allowed secured claims within the meaning of section 506 of the Bankruptcy Code for all purposes in connection

---

[7] If a chapter 7 trustee or a chapter 11 trustee is appointed or elected during the Challenge Period, then the Challenge Period Termination Date with respect to such trustee only shall be the later of (i) the last day of the Challenge Period and (ii) the date that is twenty (20) days after the date on which such trustee is appointed or elected.

with the Chapter 11 Cases and the Debtors' Stipulations shall be binding on all creditors, interest holders and parties in interest. To the extent any such objection or complaint is filed, the findings herein shall nonetheless remain binding and preclusive on the Committee, any other official committee and on any other person or entity, except to the extent that such assertions were expressly challenged in such objection or complaint. In the event of a timely and successful challenge, this Court shall fashion the appropriate remedy with respect to the Pre-Petition Lender after hearing from all parties.

9. **Carve-Out**. Subject to the terms and conditions contained in this paragraph, each of the DIP Liens, the DIP Superpriority Claims, the Pre-Petition Liens, the Adequate Protection Liens, the Adequate Protection Priority Claims and all other DIP Obligations shall be subject to payment of the Carve-Out in accordance with the terms of this Interim Order:

(a) <u>Carve-Out</u>. For purposes of this Interim Order, "<u>Carve-Out</u>" means the sum of (i) the aggregate amount of any reasonable and unpaid fees, costs and expenses that were accrued or incurred prior to the Carve-Out Date by the professionals retained by the Debtors or any professionals retained by the Committee (collectively, the "<u>Professionals</u>") to the extent allowed by an order of the Bankruptcy Court and in compliance with the Approved Budget, plus (ii) those reasonable fees, costs and expenses incurred by Professionals after the Carve-Out Date and subsequently allowed by order of the Bankruptcy Court and in compliance with the Approved Budget, plus (iii) fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee pursuant to 28 U.S.C. § 1930, plus (iv) fees and expenses of up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; <u>provided</u> that (x) from the date hereof through and including the date that is seventy-five (75) days after the Petition Date (the "<u>Initial Carve-Out Date</u>"), the amounts described in items (i) and (ii) of this paragraph shall

25

not exceed $700,000 in the aggregate (the "Initial Carve-Out Cap"), (y) after the Initial Carve-Out Date, the amounts described in items (i) and (ii) of this paragraph shall not exceed $400,000 in the aggregate (the "Final Carve-Out Cap", together with the Initial Carve-Out Cap, the "Carve-Out Caps") and (z) following the Carve-Out Date any amounts paid to Professionals by any means will reduce the respective Carve-Out Caps on a dollar-for-dollar basis; provided, further that in no event shall more than $50,000 of the Carve-Out be utilized to challenge or prevent the DIP Lender's exercise of any and all rights and remedies available to it under the DIP Credit Agreement or applicable law upon the occurrence of a Termination Event.

(b)    No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees.  Neither of the DIP Lender or the Pre-Petition Lender shall be responsible for the direct payment or reimbursement of any fees, costs, expenses or disbursements of any of the Professionals.  Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors, the Professionals, any other official or unofficial committee in these Chapter 11 Cases or any Successor Cases or shall affect the right of the DIP Lender or the Pre-Petition Lender to the allowance and payment of such fees.

10.    **Waiver of 506(c) Claims/Marshalling**.  Subject to the entry of the Final Order, no costs or expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral, the Pre-Petition Collateral or the Cash Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law without the prior written consent of the DIP Lender or the Pre-Petition Lender, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender or the Pre-Petition Lender.  In no event shall the DIP Lender or the Pre-

26

Petition Lender be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Pre-Petition Collateral, as applicable.

11.     **After-Acquired Property**.   Except as otherwise expressly provided in this Interim Order, pursuant to section 552(a) of the Bankruptcy Code, all property acquired by the Debtors on or after the Petition Date is not, and shall not be, subject to any lien of any person or entity resulting from any security agreement entered into by the Debtors prior to the Petition Date, except to the extent that such property constitutes proceeds of property of the Debtors that is subject to a valid, enforceable, perfected, and unavoidable lien as of the Petition Date (or a valid, enforceable and unavoidable lien that is perfected subsequent to the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code) that is not subject to subordination or avoidance under the Bankruptcy Code or other provisions or principles of applicable law.

12.     **Protection of DIP Lender's and the Pre-Petition Lender's Rights**.   Unless the DIP Lender and the Pre-Petition Lender shall have provided their prior written consent, or all DIP Obligations and obligations under the Pre-Petition Credit Agreement Documents have been paid in full, there shall not be entered in any of these Chapter 11 Cases or any Successor Cases any order (including any order confirming any plan of reorganization or liquidation) that authorizes any of the following: (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the DIP Collateral, the Pre-Petition Collateral and/or that is entitled to administrative priority status, in each case that is superior to or *pari passu* with the DIP Liens, the DIP Superpriority Claims, the Pre-Petition Liens, the Adequate Protection Liens, the Adequate Protection Priority Claims and/or the other DIP Protections; (ii) the use of Cash Collateral for any purpose other than to pay

amounts set forth in the Approved Budget or otherwise permitted under the DIP Loan

Documents, the DIP Obligations and the obligations under the Pre-Petition Credit Agreement

Documents, or as otherwise permitted in the DIP Loan Documents and this Interim Order, or (iii)

any modification of either of the DIP Lender's or the Pre-Petition Lender's rights under this

Interim Order, the DIP Loan Documents or the Pre-Petition Credit Agreement Documents.

13.    **Cash Collection and Borrower's Account**.  From and after the date of the entry

of this Interim Order, the proceeds of the DIP Facility, and all collections and proceeds of any

DIP Collateral, Pre-Petition Collateral, or services provided by any Debtor and all Cash

Collateral that shall at any time come into the possession, custody, or control of any Debtor, or to

which any Debtor is now or shall become entitled at any time, shall be promptly deposited in (i)

the Borrower's Account or (ii) in one of the accounts identified and authorized in the Cash

Management Order.  No funds shall be disbursed from the Borrower's Account or any such other

account other than in accordance with the DIP Credit Agreement and the Approved Budget.

Upon an Event of Default, no amounts (other than the Carve-Out) shall be disbursed from the

Borrower's Account or such other accounts.  All amounts in the Borrower's Account and such

other accounts shall remain as collateral for the DIP Facility, and shall not be subject to any

liens, including in connection with any Adequate Protection Liens.  Upon the direction of the

DIP Lender, at any time after the occurrence of a Termination Event, all proceeds in the

Borrower's Account or such other accounts shall be remitted to the DIP Lender for application to

the DIP Obligations until payment in full, and then to the Pre-Petition Lender for application to

the Pre-Petition Indebtedness (except to the extent such proceeds are not Pre-Petition Collateral

or proceeds of Pre-Petition Collateral) until payment in full, and the DIP Lender and the Pre-

Petition Lender shall be entitled to take all action that is necessary or appropriate to effectuate

ACTIVE 210952032v.8

the foregoing.  Unless otherwise agreed to in writing by the DIP Lender, the Debtors shall maintain no accounts except those identified in the Cash Management Order.  The Debtors and the financial institutions where the bank accounts authorized in the Cash Management Order are maintained are authorized and directed to remit funds in such accounts upon receipt of any direction to that effect from the DIP Lender or, following payment in full of the DIP Obligations, the Pre-Petition Lender.

14.     **Disposition of DIP Collateral; Credit Bid**.

(a)     Unless the DIP Obligations and the obligations under the Pre-Petition Indebtedness are paid in full upon the closing of a sale or other disposition of the DIP Collateral or the Pre-Petition Collateral, the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral or any portion of the Pre-Petition Collateral (or enter into any binding agreement to do so) without the prior written consent of the DIP Lender and the Pre-Petition Lender (and no such consent shall be implied from any other action, inaction, or acquiescence by either of the DIP Lender or the Pre-Petition Lender, or any order of this Court), except as permitted in the DIP Loan Documents and/or the Pre-Petition Credit Agreement Documents, as applicable, and this Interim Order.  Except to the extent otherwise expressly provided in the DIP Loan Documents, all proceeds from the sale, transfer, lease, encumbrance or other disposition of any DIP Collateral shall be remitted to the DIP Lender for application to repayment of the DIP Obligations, and then for application to repayment of any remaining Pre-Petition Indebtedness, in each case, in accordance with the terms of this Interim Order, the DIP Loan Documents and/ or the Pre-Petition Credit Agreement Documents, as the case may be.

(b)     The DIP Lender (or one or more of its designees, affiliates or assignees) shall have the unqualified right to credit bid any amount up to the full amount of any DIP Obligations

29

in any sale of any or all of the DIP Collateral under or pursuant to (i) section 363 of the Bankruptcy Code, (ii) any plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) section 725 of the Bankruptcy Code.  The Debtors, on behalf of themselves and their estates, stipulate and agree that any sale of all or part of the DIP Collateral that does not include an unqualified right to credit bid any amount up to the full amount of the DIP Obligations would mean that the DIP Lender will not receive the indubitable equivalent of its claims and interests.

(c)      Subject the applicable provisions of the Bankruptcy Code, Paragraphs 4(c) and 8 hereof and the right of any party with requisite standing to seek relief limiting the Pre-Petition Lender's right to credit bid thereunder, the Pre-Petition Lender (or one or more of its designees, affiliates or assignees) shall have the unqualified right to credit bid any amount up to the full amount of any unpaid Pre-Petition Indebtedness in any sale of any or all of the Pre-Petition Collateral (or any DIP Collateral subject to any Adequate Protection Liens) under or pursuant to (i) section 363 of the Bankruptcy Code, (ii) any plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) section 725 of the Bankruptcy Code.  The Debtors, on behalf of themselves and their estates, stipulate and agree that any sale of all or part of the Pre-Petition Collateral (or any DIP Collateral subject to any Adequate Protection Liens) that does not include an unqualified right to credit bid any amount up to the full amount of any unpaid Pre-Petition Indebtedness would mean that the Pre-Petition Lender will not receive the indubitable equivalent of its claims and interests.

(d)      In the event of the sale of any or all of the DIP Collateral, the DIP Lender shall be given the opportunity to submit a bid as "stalking horse bidder" with a credit bid of any or all (at the DIP Lender's discretion) unpaid amounts under the DIP Facility and any unpaid Pre-Petition

Indebtedness serving as the "stalking horse bid", subject to terms and conditions to be mutually agreed by the DIP Lender and Debtors, and, if the DIP Lender is accepted by the Debtors as the stalking horse bidder, the DIP Lender shall have a right of first refusal if such stalking horse bid is topped or the Debtors otherwise reach an agreement with another party to sell any such DIP Collateral.  The Debtors will consider in good faith any stalking horse bid proposed by the DIP Lender but the Debtors shall not have any commitment to accept such bid and may designate another party to serve as a stalking horse bidder for any and all assets provided such other party submits a bid that provides for the payment in full in cash of any unpaid amounts under the DIP Facility and any unpaid Pre-Petition Indebtedness and otherwise is higher and better than a bid submitted by the DIP Lender.  Any procedures for the sale of any or all of the Debtors' assets (i) shall be in a form as approved by the DIP Lender, which approval shall not be unreasonably withheld, prior to their filing and (ii) shall seek entry of an order of this Court providing that the DIP Lender may credit bid up to the entirety of the amounts due in connection with the DIP Facility and any unpaid Pre-Petition Indebtedness.

15. **Termination; Rights and Remedies Upon Termination Event**.

(a)     The DIP Facility shall terminate the earliest of (i) the Maturity Date; (ii) the acceleration of all or any portion of the DIP Obligations; (iii) fifty-five (55) days after the entry of this Interim Order, unless the Final Order shall have been entered and become effective prior thereto; (iv) the conversion of any of these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code unless otherwise consented to in writing by the DIP Lender; (v) the dismissal of any of these Chapter 11 Cases unless otherwise consented to in writing by the DIP Lender; (vi) the effective date of any Debtor's plan of reorganization confirmed in these Chapter 11 Cases that provides for the payment in full in cash of all the DIP Obligations; (vii) the closing of

31

a sale of substantially all the assets of the Debtors, (viii) the filing of a plan of reorganization in these Chapter 11 Cases by any party other than the Debtors without the consent of the DIP Lender; (ix) the closing of a sale of substantially all the DIP Collateral that is consented to by the DIP Lender or that provides for the payment in full in cash on the date of such closing of all the DIP Obligations; and (x) the Debtors seek or propose to sell all or substantially all the assets of the Debtors and such sale does not or cannot reasonably be expected to provide for payment in full of all the DIP Obligations without the consent of the DIP Lender (such date of termination, the "Termination Date").  Furthermore, the occurrence of an "Event of Default" under the DIP Credit Agreement (one event of which is the occurrence of the Termination Date), as set forth therein, or any other material breach, default or other violation by any of the Debtors of the terms and provisions of this Interim Order shall constitute a termination event under this Interim Order and the DIP Loan Documents (each, a "Termination Event") unless waived in writing by the DIP Lender.  Prior to the appointment of a Committee in these Chapter 11 Cases, upon the occurrence of a Termination Event, the DIP Lender shall be required to seek the Court's relief from the automatic stay imposed by section 362 of the Bankruptcy Code prior to exercising the DIP Lender's remedies available to it under the DIP Credit Agreement, this Interim DIP Order and applicable law; provided, however, that the DIP Lender shall have no obligation to honor Borrowing Notices until such time as a determination is made by the Court regarding the DIP Lender's request for automatic stay relief.  After the appointment of a Committee in these Chapter 11 Cases, upon the occurrence of a Termination Event, but subject to the Notice Period required by Section 11.2 of the DIP Credit Agreement, any automatic stay otherwise applicable to the DIP Lender is hereby modified, without requiring prior notice to or authorization of this

32

Court, to the extent necessary to permit the DIP Lender to exercise any and all rights and remedies available to it under the DIP Credit Agreement and applicable law.

(b)      Upon the effectiveness of any relief from the automatic stay with respect to the DIP Facility pursuant to Paragraph 15(a) hereof, the Pre-Petition Lender shall have relief from the automatic stay to the same extent as the DIP Lender, and without further notice, hearing, motion, order or other action of any kind, to foreclose on, or otherwise enforce and realize on its Pre-Petition Liens and the Adequate Protection Liens or otherwise exercise remedies against the DIP Collateral or Pre-Petition Collateral permitted by this Interim Order, the Pre-Petition Credit Agreement Documents and/or applicable non-bankruptcy law; provided, however, that any such foreclosure, enforcement or exercise of remedies by the Pre-Petition Lender shall not interfere with or otherwise be inconsistent with any foreclosure or other enforcement by the DIP Lender of any DIP Liens or other DIP Protections or any other exercise of remedies by the DIP Lender.

(c)      Subject to the provisions of Paragraph 8 hereof, all proceeds realized in connection with the exercise of the rights and remedies of the DIP Lender or the Pre-Petition Lender shall be turned over first to the DIP Lender for application to the DIP Obligations under, and in accordance with the provisions of, the DIP Loan Documents and this Interim Order until payment in full of all of the DIP Obligations and then to the Pre-Petition Lender for application to the obligations under the Pre-Petition Credit Agreement Documents.

16.      **Restriction on Use of Proceeds**.   Notwithstanding anything herein to the contrary, no loans and/or proceeds from the DIP Facility, DIP Collateral, Cash Collateral (including any retainer held by any professionals for the below-referenced parties), Pre-Petition Collateral, or any portion of the Carve-Out may be used by (a) any Debtor, Committee or trustee or other estate representative appointed in these Chapter 11 Cases or any Successor Cases, or any

ACTIVE 210952032v.8

other person, party, or entity (including any of the Professionals or the members of the Committee) to prosecute any challenge (including any litigation or other action) in connection with the value of the Pre-Petition Collateral or the DIP Collateral (or to pay any professional fees and disbursements incurred in connection therewith) at any time; or (b) any Debtor, any Committee, or any trustee or other estate representative appointed in these Chapter 11 Cases or any Successor Cases, or any other person, party, or entity (including any of the Professionals or the members of the Committee) to (or to pay any professional fees and disbursements incurred in connection therewith): (i) request authorization to obtain post-petition loans or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code, or otherwise, other than from the DIP Lender, or to seek any modification to this Interim Order not approved by the DIP Lender and, to the extent such modification would affect the rights of the Pre-Petition Lender, the Pre-Petition Lender; (ii) investigate (except as set forth below), assert, join, commence, support, or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the interests of, in any capacity, any or all of the DIP Lender, the Pre-Petition Lender, their respective affiliates, assigns or successors and the respective officers, directors, employees, agents, attorneys, representatives and other advisors of the foregoing, with respect to any transaction, occurrence, omission, action, or other matter (including formal or informal discovery proceedings in anticipation thereof), including (A) any challenges raised during the Challenge Period and any Avoidance Actions or other actions arising under chapter 5 of the Bankruptcy Code; (B) any action with respect to the validity, enforceability, priority, and extent of the DIP Obligations and/or the obligations under the Pre-Petition Credit Agreement Documents, or the validity, extent, and priority of the DIP Liens, the

Pre-Petition Liens or the Adequate Protection Liens; (C) any action seeking to invalidate, set aside, avoid, or subordinate, in whole or in part, the DIP Liens, the other DIP Protections, the Pre-Petition Liens, the Adequate Protection Liens, or the other Adequate Protection; (D) any action seeking, or having the effect of, preventing, hindering, or otherwise delaying any or all of the DIP Lender's or the Pre-Petition Lender's assertion, enforcement, or realization on the Cash Collateral, the DIP Collateral or the Pre-Petition Collateral in accordance with the DIP Loan Documents or the Pre-Petition Credit Agreement Documents, as applicable, or this Interim Order; and/or (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections, and benefits granted to any or all of the DIP Lender or the Pre-Petition Lender hereunder or under the DIP Loan Documents or the Pre-Petition Credit Agreement Documents, as applicable, or any payments made thereunder or in respect thereof; provided, however, up to $25,000 in the aggregate of the Carve-Out, any DIP Collateral, any Pre-Petition Collateral, any Cash Collateral and proceeds of the DIP Facility may be used by the Committee (to the extent such Committee is appointed) to investigate (but not to prosecute) the claims and/or liens of the Pre-Petition Lender under the Pre-Petition Credit Agreement Documents (but not the claims and/or Liens of the DIP Lender) so long as such investigation occurs within the Challenge Period; (iii) pay any fees or similar amounts to any person (other than the Pre-Petition Lender) who has proposed or may propose to purchase interests in any of the Debtors without the prior written consent of the DIP Lender and the Pre-Petition Lender; or (iv) use or seek to use Cash Collateral or sell or otherwise dispose of DIP Collateral or Pre-Petition Collateral, unless otherwise permitted hereby, without the prior written consent of the DIP Lender and the Pre-Petition Lender.

ACTIVE 210952032v.8

17.     **Proofs of Claim**.  Notwithstanding any order entered by this Court in relation to the establishment of a bar date in any of these Chapter 11 Cases or Successor Cases to the contrary, the DIP Lender and the Pre-Petition Lender will not be required (but are authorized) to file proofs of claim in any of the Cases or Successor Cases for any claim allowed herein.

18.     **Preservation of Rights Granted Under the Interim Order**.

(a)     <u>No Non-Consensual Modification or Extension of Interim Order</u>.  The Debtors irrevocably waive any right to seek any amendment, modification, or extension of this Interim Order (including through any chapter 11 plan of reorganization) without the prior written consent of the DIP Lender, and no such consent shall be implied by any other action, inaction, or acquiescence of the DIP Lender.  In the event any or all of the provisions of this Interim Order are hereafter modified, amended, or vacated by a subsequent order of this Court or any other court, such modification, amendment, or vacatur shall not affect the validity, perfection, priority, allowability, enforceability, or non-avoidability of any advances, payments, or use of cash authorized or made hereby or pursuant to the DIP Loan Documents, or lien, claim, priority or other DIP Protections authorized or created hereby or pursuant to the DIP Loan Documents. Based on the findings set forth in this Interim Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility, in the event any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated, or stayed by a subsequent order of this Court or any other court, the DIP Lender and the Pre-Petition Lender shall be entitled to the protections provided in section 364(e) of the Bankruptcy Code, and notwithstanding any such reversal, modification, vacatur, or stay, any use of Cash Collateral or any DIP Obligations or any DIP Protections (including the Adequate Protection) incurred or granted by the Debtors prior to the actual receipt of written notice by the DIP Lender of the

ACTIVE 210952032v.8

effective date of such reversal, modification, vacatur, or stay shall remain in full force and effect and be binding on all parties in interest and be governed in all respects by the original provisions of this Interim Order (and shall maintain their respective priorities as provided by this Interim Order), and the DIP Lender and the Pre-Petition Lender shall be entitled to all of the DIP Protections (including the Adequate Protection) and all other rights, remedies, Liens, priorities, privileges, protections, and benefits granted pursuant to section 364(e) of the Bankruptcy Code, this Interim Order, or the DIP Loan Documents.

(b)     Survival of Interim Order.  The provisions of this Interim Order and the DIP Loan Documents, any actions taken pursuant hereto or thereto, and all of the DIP Protections (including the Adequate Protection), and all other rights, remedies, liens, priorities, privileges, protections, and benefits granted to any or all of the DIP Lender or the Pre-Petition Lender, respectively, shall survive, and shall not be modified, impaired, or discharged by, the entry of any order confirming any plan of reorganization in any Chapter 11 Case or Successor Case, converting any Chapter 11 Case to a case under chapter 7, dismissing any of the Chapter 11 Cases, withdrawing of the reference of any of the Chapter 11 Cases or any Successor Cases or providing for abstention from handling or retaining of jurisdiction of any of the Chapter 11 Cases or any Successor Case in this Court, or terminating the joint administration of these Chapter 11 Cases or any Successor Case or by any other act or omission.  The terms and provisions of this Interim Order, including all of the DIP Protections (including the Adequate Protection) and all other rights, remedies, Liens, priorities, privileges, protections, and benefits granted to any or all of the DIP Lender or the Pre-Petition Lender, respectively, shall continue in full force and effect and be binding on all parties in interest notwithstanding the entry of any such order, and such DIP Protections (including the Adequate Protection), and such other rights, remedies, Liens

37

priorities, privileges, protections and benefits, shall continue in full force and effect in these Chapter 11 Cases and in any Successor Cases and after dismissal of any thereof, and shall maintain their respective priorities as provided by this Interim Order.  The DIP Obligations shall not be discharged by the entry of an order confirming any chapter 11 plan of reorganization, the Debtors having waived such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code.

19.    **Insurance Policies**.  Upon entry of this Interim Order, the DIP Lender and the Pre-Petition Lender shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees, as applicable, on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral, and the Debtors shall take such actions as are reasonably requested by the DIP Lender or the Pre-Petition Lender from time to time to evidence or effectuate the foregoing.

20.    **Other Rights and Obligations**.

(a)    Expenses.  As provided in the DIP Loan Documents (and without limiting the Debtors' respective obligations thereunder), the applicable Debtors will pay all reasonable expenses incurred by the DIP Lender (including the reasonable fees and disbursements of Lender Professionals) in connection with the preparation, execution, delivery, and administration of the DIP Loan Documents, this Interim Order, the Final Order, and any other agreements, instruments, pleadings, or other documents prepared or reviewed in connection with any of the foregoing, whether or not any or all of the transactions contemplated hereby or by the DIP Loan Documents are consummated.

(b)    Notice of Professional Fees.  Professionals for the DIP Lender (including professionals engaged by counsel to the DIP Lender) (collectively, the "Lender Professionals")

shall not be required to comply with the U.S. Trustee fee guidelines or submit invoices to this Court, U.S. Trustee, any Committee or any other party in interest.

(c)     Binding Effect.   The provisions of this Interim Order, including all findings herein, subject to the rights set forth in paragraph 8 hereof, and the DIP Loan Documents shall be binding upon all parties in interest in these Chapter 11 Cases, in any Successor Cases, or upon dismissal of any such Chapter 11 Case or Successor Case, including the DIP Lender, the Pre-Petition Lender, any Committee, and the Debtors and their respective estates, successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary or responsible person appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors); provided, however, that the DIP Lender and the Pre-Petition Lender shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 or chapter 11 trustee or other responsible person appointed for the estates of the Debtors in any Chapter 11 Case or Successor Case.

(d)     No Waiver.   The failure of the DIP Lender or the Pre-Petition Lender to seek relief or otherwise exercise their rights and remedies under this Interim Order, the Pre-Petition Credit Agreement Documents, the DIP Loan Documents or otherwise (or any delay in seeking or exercising same) shall not constitute a waiver of any of such parties' rights hereunder, thereunder, or otherwise.   Except as prohibited by this Interim Order, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair, any right or ability of the DIP Lender and the Pre-Petition Lender under the Bankruptcy Code or under non-bankruptcy law to (i) request conversion of these Chapter 11

Cases or any Successor Cases to cases under chapter 7, dismissal of these Chapter 11 Cases or any Successor Cases, or the appointment of a trustee or examiner in these Chapter 11 Cases or any Successor Cases, or to oppose the use of Cash Collateral in any Successor Case, (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, any chapter 11 plan or plans with respect to any of the Debtors or seek early termination of the Debtors' exclusive rights to propose a plan under the Bankruptcy Code, or (iii) except as expressly provided herein, exercise any of the rights, claims, or privileges (whether legal, equitable, or otherwise) of the DIP Lender or the Pre-Petition Lender.

(e)    <u>No Third Party Rights</u>.  Except as explicitly provided for herein or in any DIP Loan Document, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or  direct, indirect, or incidental beneficiary.

(f)    <u>Amendments</u>.  The Debtors and the DIP Lender are authorized and empowered, without further notice and hearing or approval of this Court, to make any non-material modifications to the DIP Loan Documents, in accordance with Section 12.1 of the DIP Credit Agreement.

(g)    <u>Inconsistency</u>.  In the event of any inconsistency between the terms and conditions of the DIP Loan Documents and of this Interim Order, the provisions of this Interim Order shall govern and control.  In the event of any inconsistency between the terms or conditions of this Interim Order and the terms or conditions of any other order entered by this Court in the nature of a "first day order", the provisions of this Interim Order shall govern and control.

(h)    <u>Enforceability</u>.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully

enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry, and there shall be no stay of execution or effectiveness of this Interim Order.

(i)     <u>Reservation of Rights</u>.   Nothing in this Interim Order shall be deemed to constitute the consent of the DIP Lender or the Pre-Petition Lender, and each of the foregoing expressly reserve the right to object, to entry of any order of the Bankruptcy Court that provides for the sale or other disposition of all or substantially all of the assets of the Debtors (or any other sale or other disposition of assets of any of the Debtors outside the ordinary course of business) to any party unless, in connection and concurrently with any such event, the proceeds of such sale are or will be sufficient to pay in full the DIP Obligations, the Pre-Petition Indebtedness and the Adequate Protection Priority Claims and all of the foregoing are paid in full on the closing date of such sale.

(j)     <u>Headings</u>.   Paragraph headings used herein are for convenience only and are not to affect the construction of, or to be taken into consideration in, interpreting this Interim Order.

21.   **<u>Final Hearing</u>**

(a) The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled **Thursday, January 14, 2016** at **9:30 a.m.**(Mountain Time) in **Courtroom D**, U.S. Bankruptcy Court, U.S. Custom House, 721 19th Street, Denver, Colorado 80202-2508.   The proposed Final Order shall be substantially the same as the Interim Order except that (i) those provisions in the Interim Order that are subject to the entry of the Final Order shall be included in the Final Order without such qualification, and (ii) where appropriate, references to this Interim Order shall be changed to

41

references to the Final Order.  If no objections to the relief sought in the Final Hearing are filed and served in accordance with this Interim Order, no Final Hearing may be held, and a separate Final Order may be presented by the Debtors and entered by this Court.

(b)     <u>Final Hearing Notice</u>.  On or before November 25, 2015, the Debtors shall serve, by United States mail, first-class postage prepaid (such service constituting adequate notice of the Final Hearing), (i) notice of the entry of this Interim Order and of the Final Hearing (the "<u>Final Hearing Notice</u>") and (ii) a copy of this Interim Order on the parties having been given notice of the Interim Hearing and to any other party that has filed a request for notices with this Court and to any Committee after the same has been appointed, or Committee counsel, if the same shall have been appointed.  The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Bankruptcy Court **by no later than January 7, 2016**, which objections shall be served so that the same are **actually received on or before such date** by: (a) the Debtors, (b) counsel to the DIP Lender, (c) counsel to the Pre-Petition Lender, and (d) the U.S. Trustee.[8]


22.     **Retention of Jurisdiction**.  This Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

Dated:  November 23, 2015

_____
HONORABLE SIDNEY B. BROOKS
UNITED STATES BANKRUPTCY JUDGE

---

[8] The Final Hearing Notice shall include the following instructions for appearances of counsel/parties located outside the Denver metro area by telephone: Dial 720-904-7499, a few minutes prior to commencement of the hearing. It is a computerized system and you will be prompted to input an access code/ meeting ID, followed by the pound key (#). The access code/meeting ID is: 997 040 944. You may then be prompted to input an attendee ID number, followed by the pound key (#). If you do not know this attendee ID number, press the pound key (#) to continue. You will then be connected into the conference. Failure to connect to the conference in a timely manner may preclude your participation in the hearing. If you are  unable to connect after following the instructions provided, please call the Judge's chambers and leave a name and the telephone number where you can be reached and the Court will return the call.

## Exhibit A

Approved Budget

**Atna Resources Ltd DIP Budget**
Week ending 11/13/2015
*($ 000's except ounces production)*

| Week ending | 20-Nov | 27-Nov | 4-Dec | 11-Dec | 18-Dec | 25-Dec | 1-Jan | 8-Jan | 15-Jan | 22-Jan | 29-Jan |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total weekly estimated production (oz.) | 623 | 977 | 812 | 881 | 698 | 192 | 192 | 216 | 216 | 216 | 216 |
| Gold Price - unhedged ($US) | $ 1,084 | $ 1,084 | $ 1,084 | $ 1,084 | $ 1,084 | $ 1,084 | $ 1,084 | $ 1,084 | $ 1,084 | $ 1,084 | $ 1,084 |
| *Cumulative gold production (oz.)* | *623* | *1,601* | *2,413* | *3,294* | *3,993* | *4,185* | *4,377* | *4,593* | *4,809* | *5,025* | *5,241* |
| **Receipts** | | | | | | | | | | | |
| Briggs | $ - | $ 273 | $ 208 | $ 208 | $ 208 | $ 208 | $ 208 | $ 234 | $ 234 | $ 234 | 234 |
| Pinson | 19 | 406 | 482 | 420 | 537 | 329 | - | - | 189 | - | - |
| Other | - | 32 | - | 5 | - | - | - | - | - | - | - |
| **Total receipts** | **19** | **711** | **690** | **633** | **745** | **537** | **208** | **234** | **423** | **234** | **234** |
| **Operating Disbursements** | | | | | | | | | | | |
| *Briggs related* | | | | | | | | | | | |
| Payroll | - | (71) | - | (85) | - | (57) | - | (57) | - | (54) | - |
| Cyanide, Diesel and other | (88) | (88) | (88) | (88) | (80) | (80) | (80) | (73) | (73) | (73) | (73) |
| **Briggs related disbursements** | **(88)** | **(159)** | **(88)** | **(173)** | **(80)** | **(137)** | **(80)** | **(130)** | **(73)** | **(127)** | **(73)** |
| *Pinson related related* | | | | | | | | | | | |
| Payroll | - | (63) | - | (123) | - | (38) | - | (10) | - | (10) | - |
| Pinson mining contractor | - | (300) | (300) | (300) | (300) | - | - | - | - | - | - |
| Electricity, transportation and other | (47) | (53) | (42) | (58) | (89) | (8) | (8) | (8) | (20) | (8) | (8) |
| **Pinson related disbursements** | **(47)** | **(416)** | **(342)** | **(482)** | **(389)** | **(46)** | **(8)** | **(18)** | **(20)** | **(18)** | **(8)** |
| Contractors and Temp. Labor | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) |
| Other payroll | - | (8) | - | (13) | - | (8) | - | (8) | - | (8) | - |
| Other operating | (4) | (4) | (4) | (4) | (4) | (4) | (4) | (4) | (4) | (4) | (4) |
| **Total operating** | **(149)** | **(597)** | **(445)** | **(682)** | **(484)** | **(206)** | **(103)** | **(171)** | **(108)** | **(168)** | **(96)** |
| **Corporate disbursements** | | | | | | | | | | | |
| Payroll | (5) | (43) | - | (92) | (53) | - | (43) | - | (43) | - | (43) |
| Employee benefits | 0 | (58) | 0 | (0) | (0) | (38) | 0 | 0 | (0) | 0 | (38) |
| Insurance & Surety Premiums | 0 | 0 | (121) | 0 | 0 | 0 | (103) | 0 | 0 | 0 | 0 |
| Taxes | 0 | (163) | 0 | 0 | (133) | (38) | 0 | 0 | 0 | 0 | (2) |
| Other corporate expenses | (38) | (64) | (7) | (7) | (7) | (36) | (38) | (9) | (7) | (7) | (9) |
| **Total corporate disbursements** | **(43)** | **(328)** | **(128)** | **(98)** | **(193)** | **(111)** | **(183)** | **(9)** | **(50)** | **(7)** | **(91)** |
| **Process related disbursements** | | | | | | | | | | | |
| Utility deposit / critical vendor payments | (19) | - | - | - | - | - | - | - | - | - | - |
| Pre-petition wage obligations | (147) | - | - | - | - | - | - | - | - | - | - |
| Debtor bankruptcy advisors | (65) | - | - | - | (298) | - | - | - | - | (288) | - |
| Secured lender's structuring fee for DIP financing | (120) | - | - | - | - | - | - | - | - | - | - |
| Secured lender bankruptcy advisors | - | - | - | - | (68) | - | - | - | - | (68) | - |
| Unsecured creditor committee fees | - | - | - | - | (30) | - | - | - | - | (30) | - |
| US trustee / court fees | - | - | - | - | (30) | - | - | - | - | (30) | - |
| Investment banking fees | (35) | - | - | - | (35) | - | - | - | - | (35) | - |
| **Total process related disbursments** | **(386)** | **-** | **-** | **-** | **(461)** | **-** | **-** | **-** | **-** | **(451)** | **-** |
| **Net cash flow** | $ (559) | $ (214) | $ 118 | $ (147) | $ (393) | $ 220 | $ (78) | $ 54 | $ 266 | $ (391) | $ 47 |
| *Note: Excludes DIP interest and related fees* | | | | | | | | | | | |
| Beginning cash | $ 430 | $ 500 | $ 500 | $ 618 | $ 500 | $ 500 | $ 720 | $ 642 | $ 696 | $ 962 | $ 1,000 |
| Net cash flow before DIP | (559) | (214) | 118 | (147) | (393) | 220 | (78) | 54 | 266 | (391) | 47 |
| DIP borrowing | 629 | 214 | 0 | 29 | 393 | 0 | 0 | 0 | 0 | 429 | 0 |
| Ending cash | $ 500 | $ 500 | $ 618 | $ 500 | $ 500 | $ 720 | $ 642 | $ 696 | $ 962 | $ 1,000 | $ 1,047 |
| Cumulative DIP borrowing | $ 629 | $ 843 | $ 843 | $ 872 | $ 1,265 | $ 1,265 | $ 1,265 | $ 1,265 | $ 1,265 | $ 1,694 | $ 1,694 |

**Atna Resources Ltd DIP Budget**
Week ending 11/13/2015
*($ 000's except ounces production)*

| Week ending | | 5-Feb | 12-Feb | 19-Feb | 26-Feb | 4-Mar | 11-Mar | 18-Mar | 25-Mar | 1-Apr | 8-Apr |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total weekly estimated production (oz.) | | 206 | 206 | 206 | 206 | 157 | 157 | 157 | 157 | 157 | 188 |
| Gold Price - unhedged ($US) | $ | 1,084 $ | 1,084 $ | 1,084 $ | 1,084 $ | 1,084 $ | 1,084 $ | 1,084 $ | 1,084 $ | 1,084 $ | 1,084 |
| *Cumulative gold production (oz.)* | | *5,447* | *5,653* | *5,860* | *6,066* | *6,224* | *6,381* | *6,538* | *6,696* | *6,853* | *7,042* |
| **Receipts** | | | | | | | | | | | |
| Briggs | $ | 224 $ | 224 $ | 224 $ | 224 $ | 171 $ | 171 $ | 171 $ | 171 $ | 171 $ | 204 |
| Pinson | | - | - | - | - | - | - | - | - | - | - |
| Other | | - | - | - | - | - | - | - | - | - | - |
| **Total receipts** | | **224** | **224** | **224** | **224** | **171** | **171** | **171** | **171** | **171** | **204** |
| **Operating Disbursements** | | | | | | | | | | | |
| *Briggs  related* | | | | | | | | | | | |
| Payroll | | (54) | - | (54) | - | (54) | - | (54) | - | (54) | - |
| Cyanide, Diesel and other | | (73) | (73) | (73) | (73) | (73) | (73) | (73) | (73) | (73) | (73) |
| **Briggs related disbursements** | | **(127)** | **(73)** | **(127)** | **(73)** | **(127)** | **(73)** | **(127)** | **(73)** | **(127)** | **(73)** |
| *Pinson related related* | | | | | | | | | | | |
| Payroll | | (10) | - | (10) | - | (10) | - | (10) | - | (10) | - |
| Pinson mining contractor | | - | - | - | - | - | - | - | - | - | - |
| Electricity, transportation and other | | (8) | (8) | (145) | (8) | (8) | (8) | (18) | (8) | (8) | (8) |
| **Pinson related disbursements** | | **(18)** | **(8)** | **(156)** | **(8)** | **(18)** | **(8)** | **(28)** | **(8)** | **(18)** | **(8)** |
| Contractors and Temp. Labor | | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) |
| Other payroll | | (8) | - | (8) | - | (8) | - | (8) | - | (8) | - |
| Other operating | | (4) | (4) | (4) | (4) | (4) | (4) | (4) | (4) | (4) | (4) |
| **Total operating** | | **(168)** | **(96)** | **(305)** | **(96)** | **(168)** | **(96)** | **(178)** | **(96)** | **(168)** | **(96)** |
| **Corporate disbursements** | | | | | | | | | | | |
| Payroll | | - | (43) | - | (43) | - | (43) | - | - | (43) | - |
| Employee benefits | | 0 | 0 | (0) | (33) | 0 | (5) | 0 | (0) | (33) | (5) |
| Insurance & Surety Premiums | | (103) | 0 | 0 | 0 | (192) | 0 | 0 | 0 | (50) | 0 |
| Taxes | | 0 | 0 | 0 | (2) | 0 | 0 | 0 | (2) | 0 | 0 |
| Other corporate expenses | | (13) | (7) | (7) | (7) | (7) | (7) | (7) | (7) | (38) | (19) |
| **Total corporate disbursements** | | **(116)** | **(49)** | **(7)** | **(84)** | **(204)** | **(49)** | **(7)** | **(9)** | **(164)** | **(24)** |
| **Process related disbursements** | | | | | | | | | | | |
| Utility deposit / critical vendor payments | | - | - | - | - | - | - | - | - | - | - |
| Pre-petition wage obligations | | - | - | - | - | - | - | - | - | - | - |
| Debtor bankruptcy advisors | | - | - | (258) | - | - | - | (203) | - | - | - |
| Secured lender's  structuring fee for DIP financing | | - | - | - | - | - | - | - | - | - | - |
| Secured lender bankruptcy advisors | | - | - | (68) | - | - | - | (68) | - | - | - |
| Unsecured creditor committee fees | | - | - | (30) | - | - | - | (30) | - | - | - |
| US trustee / court fees | | - | - | (30) | - | - | - | (30) | - | - | - |
| Investment banking fees | | - | - | (35) | - | - | - | (35) | - | - | - |
| **Total process related disbursments** | | **-** | **-** | **(421)** | **-** | **-** | **-** | **(366)** | **-** | **-** | **-** |
| **Net cash flow** | $ | **(60)** $ | **79** $ | **(509)** $ | **44** $ | **(201)** $ | **26** $ | **(379)** $ | **66** $ | **(161)** $ | **85** |
| *Note: Excludes DIP interest and related fees* | | | | | | | | | | | |
| **Beginning cash** | $ | 1,047 $ | 1,000 $ | 1,079 $ | 1,000 $ | 1,044 $ | 1,000 $ | 1,026 $ | 1,000 $ | 1,066 $ | 1,000 |
| Net cash flow before DIP | | (60) | 79 | (509) | 44 | (201) | 26 | (379) | 66 | (161) | 85 |
| DIP borrowing | | 12 | 0 | 430 | 0 | 157 | 0 | 354 | 0 | 96 | 0 |
| **Ending cash** | $ | **1,000** $ | **1,079** $ | **1,000** $ | **1,044** $ | **1,000** $ | **1,026** $ | **1,000** $ | **1,066** $ | **1,000** $ | **1,085** |
| Cumulative DIP borrowing | $ | 1,707 $ | 1,707 $ | 2,137 $ | 2,137 $ | 2,294 $ | 2,294 $ | 2,647 $ | 2,647 $ | 2,743 $ | 2,743 |

**Atna Resources Ltd DIP Budget**
Week ending 11/13/2015
*($ 000's except ounces production)*

| Week ending | | 15-Apr | 22-Apr | 29-Apr | 6-May | 13-May | 20-May | | Total |
|---|---|---|---|---|---|---|---|---|---|
| Total weekly estimated production (oz.) | | 188 | 188 | 188 | 144 | 144 | 144 | | 8,039 |
| Gold Price - unhedged ($US) | $ | 1,084 | $ 1,084 | $ 1,084 | $ 1,084 | $ 1,084 | $ 1,084 | | 29,268 |
| *Cumulative gold production (oz.)* | | *7,230* | *7,419* | *7,607* | *7,751* | *7,895* | *8,039* | | |
| | | | | | | | | | |
| **Receipts** | | | | | | | | | |
| Briggs | $ | 204 | $ 204 | $ 204 | $ 156 | $ 156 | $ 156 | $ | 5,284 |
| Pinson | | - | - | - | - | - | - | | 2,381 |
| Other | | - | - | - | - | - | - | | 37 |
| **Total receipts** | | **204** | **204** | **204** | **156** | **156** | **156** | | **7,702** |
| | | | | | | | | | |
| **Operating Disbursements** | | | | | | | | | |
| *Briggs related* | | | | | | | | | |
| Payroll | | (54) | - | (54) | - | (54) | (54) | | (810) |
| Cyanide, Diesel and other | | (73) | (73) | (73) | (68) | (68) | (68) | | (2,038) |
| **Briggs related disbursements** | | **(127)** | **(73)** | **(127)** | **(68)** | **(123)** | **(123)** | | **(2,849)** |
| | | | | | | | | | - |
| *Pinson related related* | | | | | | | | | - |
| Payroll | | (10) | - | (10) | - | (10) | (10) | | (338) |
| Pinson mining contractor | | - | - | - | - | - | - | | (1,200) |
| Electricity, transportation and other | | (18) | (8) | (8) | (8) | (8) | (18) | | (647) |
| **Pinson related disbursements** | | **(28)** | **(8)** | **(18)** | **(8)** | **(18)** | **(28)** | | **(2,186)** |
| | | | | | | | | | |
| Contractors and Temp. Labor | | (10) | (10) | (10) | (10) | (10) | (10) | | (270) |
| Other payroll | | (8) | - | (8) | - | (8) | (8) | | (117) |
| Other operating | | (4) | (4) | (4) | (4) | (4) | (4) | | (121) |
| **Total operating** | | **(178)** | **(96)** | **(168)** | **(91)** | **(163)** | **(173)** | | **(5,542)** |
| | | | | | | | | | |
| **Corporate disbursements** | | | | | | | | | |
| Payroll | | (43) | - | (43) | - | (43) | (43) | | (664) |
| Employee benefits | | 0 | (0) | (33) | (5) | 0 | (0) | | (250) |
| Insurance & Surety Premiums | | 0 | 0 | 0 | 0 | 0 | 0 | | (569) |
| Taxes | | 0 | 0 | (2) | 0 | 0 | (113) | | (455) |
| Other corporate expenses | | (7) | (7) | (7) | (7) | (7) | (38) | | (411) |
| **Total corporate disbursements** | | **(49)** | **(7)** | **(84)** | **(11)** | **(49)** | **(194)** | | **(2,349)** |
| | | | | | | | | | |
| **Process related disbursements** | | | | | | | | | |
| Utility deposit / critical vendor payments | | - | - | - | - | - | - | | (19) |
| Pre-petition wage obligations | | - | - | - | - | - | - | | (147) |
| Debtor bankruptcy advisors | | - | (203) | - | - | - | (203) | | (1,518) |
| Secured lender's  structuring fee for DIP financing | | - | - | - | - | - | - | | (120) |
| Secured lender bankruptcy advisors | | - | (68) | - | - | - | (68) | | (406) |
| Unsecured creditor committee fees | | - | (30) | - | - | - | (30) | | (180) |
| US trustee / court fees | | - | (30) | - | - | - | (30) | | (180) |
| Investment banking fees | | - | (35) | - | - | - | (290) | | (500) |
| **Total process related disbursments** | | **-** | **(366)** | **-** | **-** | **-** | **(621)** | | **(3,070)** |
| | | | | | | | | | |
| **Net cash flow** | $ | **(23)** | $ **(264)** | $ **(48)** | $ **54** | $ **(57)** | $ **(832)** | $ | **(3,258)** |
| *Note: Excludes DIP interest and related fees* | | | | | | | | | |
| | | | | | | | | | |
| **Beginning cash** | $ | **1,085** | $ **1,062** | $ **1,000** | $ **1,000** | $ **1,054** | $ **1,000** | $ | **430** |
| Net cash flow before DIP | | (23) | (264) | (48) | 54 | (57) | (832) | | (3,258) |
| DIP borrowing | | 0 | 202 | 48 | 0 | 3 | 832 | | 3,828 |
| **Ending cash** | $ | **1,062** | $ **1,000** | $ **1,000** | $ **1,054** | $ **1,000** | $ **1,000** | $ | **1,000** |
| | | | | | | | | | |
| Cumulative DIP borrowing | $ | 2,743 | $ 2,945 | $ 2,993 | $ 2,993 | $ 2,996 | $ 3,828 | $ | 3,828 |

## Exhibit B

DIP Agreement

EXECUTION COPY

**CANYON RESOURCES CORPORATION**

as Borrower

**THE GUARANTORS
FROM TIME TO TIME PARTY HERETO**

as Guarantors

and

**WATERTON PRECIOUS METALS FUND II CAYMAN, LP**

as Lender

**DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

November 23, 2015

# TABLE OF CONTENTS

Page

ARTICLE 1 INTERPRETATION ...................................................................................... 2

**1.1**   Defined Terms ................................................................................ 2
**1.2**   Other Usages ................................................................................. 22
**1.3**   Gender and Number ....................................................................... 22
**1.4**   Headings, Etc. ............................................................................... 22
**1.5**   Currency ........................................................................................ 23
**1.6**   Meaning of certain terms any reference in this Agreement to: ..... 23
**1.7**   Certain Phrases, Etc. ..................................................................... 23
**1.8**   Accounting Terms .......................................................................... 23
**1.9**   Incorporation of Schedules ........................................................... 23
**1.10**  Conflict .......................................................................................... 23
**1.11**  Certificates .................................................................................... 23
**1.12**  Permitted Liens ............................................................................. 23
**1.13**  UCC Terms .................................................................................... 24

ARTICLE 2 LOAN ............................................................................................................ 24

**2.1**   Structuring Fee .............................................................................. 24
**2.2**   Loan ............................................................................................... 24
**2.3**   Borrowing Procedures ................................................................... 24
**2.4**   Use of Proceeds; Borrower Account ............................................. 24
**2.5**   Lender's Loan Records .................................................................. 25
**2.6**   Termination or Reduction of Commitments .................................. 25

ARTICLE 3 PROCEDURE AND PAYMENTS ................................................................ 25

**3.1**   Repayment of Loans ...................................................................... 25
**3.2**   Interest .......................................................................................... 25

ARTICLE 4 PREPAYMENTS ......................................................................................... 25

**4.1**   Mandatory Prepayments ................................................................ 26
**4.2**   Change of Control ...............................................**Error! Bookmark not defined.**
**4.3**   Voluntary Prepayment of the Loan ............................................... 26
**4.4**   Application of Prepayments ........................................................... 26

ARTICLE 5 PAYMENTS UNDER THIS AGREEMENT ................................................ 26

**5.1**   Payments; Computation of Interest and Fees ............................... 26
**5.2**   Taxes .............................................................................................. 26

ARTICLE 6 GUARANTEE ............................................................................................... 29

**6.1**   Guarantee ....................................................................................... 29
**6.2**   Contribution .................................................................................. 29
**6.3**   Authorization; Other Agreements ................................................. 29
**6.4**   Guarantee Absolute and Unconditional ........................................ 30
**6.5**   Waivers .......................................................................................... 30

## TABLE OF CONTENTS
(Continued)

Page

| | | |
|---|---|---|
| **6.6** | Reliance | 31 |
| | | |
| **ARTICLE 7 SECURITY INTERESTS** | | 31 |
| **7.1** | Security Interest | 31 |
| **7.2** | Perfection of Security Interests | 33 |
| **7.3** | Lender's Rights; Limitations on Lender's Obligations | 34 |
| **7.4** | Covenants with Respect to Collateral | 35 |
| **7.5** | Bank Accounts; Collection of Accounts and Payments | 37 |
| **7.6** | Grant of License to Use Property; Intellectual Property | 37 |
| **7.7** | Limitation on Lender's Duty in Respect of Collateral | 38 |
| **7.8** | Authorized Terminations | 39 |
| **7.9** | Super-Priority Nature of Obligations | 39 |
| **7.10** | Payment of Obligations | 40 |
| **7.11** | Liens | 40 |
| **7.12** | No Discharge; Survival of Claims | 40 |
| **7.13** | Release | 40 |
| **7.14** | Waiver of Priming Rights | 41 |
| **7.15** | Priority of Claim | 41 |
| | | |
| **ARTICLE 8 CONDITIONS OF LENDING** | | 41 |
| **8.1** | Conditions Precedent to each drawing under the Loan | 41 |
| **8.2** | Conditions Precedent to First Draw under the Loan | 43 |
| **8.3** | Waiver | 44 |
| | | |
| **ARTICLE 9 REPRESENTATIONS AND WARRANTIES** | | 44 |
| **9.1** | Representations and Warranties | 44 |
| **9.2** | Survival of Representations and Warranties | 57 |
| | | |
| **ARTICLE 10 COVENANTS OF THE BORROWER** | | 57 |
| **10.1** | Affirmative Covenants | 57 |
| **10.2** | Negative Covenants | 66 |
| | | |
| **ARTICLE 11 EVENTS OF DEFAULT** | | 68 |
| **11.1** | Events of Default | 68 |
| **11.2** | Action Upon Event of Default | 73 |
| **11.3** | Remedies | 73 |
| **11.4** | Minimum Notice Period | 75 |
| **11.5** | Sale of Collateral | 75 |
| **11.6** | Actions Taken by Lender | 76 |
| **11.7** | Private Sales | 76 |
| **11.8** | Access to Land | 76 |
| **11.9** | Compliance With Limitations and Restrictions | 77 |
| **11.10** | No Impairment of Remedies | 77 |
| **11.11** | Attorney-In-Fact | 77 |

**TABLE OF CONTENTS**
(Continued)

Page

**11.12**   Application of Proceeds ...................................................................................... 77

ARTICLE 12 MISCELLANEOUS ............................................................................................. 78

**12.1**    Amendments, Etc. ................................................................................................. 78
**12.2**    Waiver .................................................................................................................. 78
**12.3**    Evidence of Debt and Borrowing Notices ............................................................ 78
**12.4**    Notices, Etc. ........................................................................................................ 78
**12.5**    Costs, Expenses General Indemnity and Environmental Indemnity ..................... 79
**12.6**    Release ................................................................................................................. 81
**12.7**    Successors and Assigns ........................................................................................ 82
**12.8**    Right of Set-off ..................................................................................................... 83
**12.9**    [Judgment Currency .............................................................................................. 83
**12.10**   Applicable Law; Jurisdiction; Etc. ....................................................................... 83
**12.11**   Counterparts ......................................................................................................... 84
**12.12**   Severability .......................................................................................................... 84
**12.13**   Entire Agreement; Schedules and Exhibits ........................................................... 84
**12.14**   Credit Party Joint and Several Liability ................................................................ 84
**12.15**   Further Assurances ............................................................................................... 85
**12.16**   Acknowledgements ............................................................................................... 85
**12.17**   Section 552(b) ...................................................................................................... 85
**12.18**   Consultant ............................................................................................................ 85
**12.19**   USA Patriot Act .................................................................................................... 85

–iii–

**TABLE OF CONTENTS**

(Continued)

| | |
|---|---|
| EXHIBIT A | FORM OF BORROWING NOTICE |
| EXHIBIT B | FORM OF COMPLIANCE CERTIFICATE |
| EXHIBIT C | FORM OF INTERIM ORDER |
| EXHIBIT D | APPROVED BUDGET |
| SCHEDULE 1.1(A) | DESCRIPTION OF THE CORE ASSETS |
| SCHEDULE 1.1(B) | LEASES |
| SCHEDULE 1.1(C) | MATERIAL CONTRACTS |
| SCHEDULE 1.1(D) | MINING PROPERTIES |
| SCHEDULE 9.1(I) | COMPLIANCE WITH CONTRACTS |
| SCHEDULE 9.1(J) | OWNERSHIP AND USE OF PROPERTY |
| SCHEDULE 9.1(K) | OWNERSHIP OF SUBJECT PROPERTIES |
| SCHEDULE 9.1(M) | OUTSTANDING CLAIMS |
| SCHEDULE 9.1(Y) | SHAREHOLDERS' AGREEMENT, ETC. |
| SCHEDULE 9.1(KK) | PROJECT PERMITS |
| SCHEDULE 10.1(P) | MAINTENANCE OF INSURANCE |
| [SCHEDULE 10.2(E) | TRANSACTIONS WITH RELATED PARTIES] |
| SCHEDULE 10.2(N) | BURDENS ON PRODUCTION |

ACTIVE 210918977v.12

## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This **DEBTOR-IN-POSSESSION CREDIT AGREEMENT** is dated November 23, 2015 (the "**Effective Date**") and entered into by and among Canyon Resources Corporation, a corporation incorporated pursuant to the laws of the State of Delaware and a debtor-in-possession under Chapter 11 of the Bankruptcy Code (as defined below), as the borrower (together with its successors and permitted assigns, the "**Borrower**"), Atna Resources Ltd., a corporation incorporated pursuant to the laws of the Province of British Columbia and a debtor-in-possession under Chapter 11 of the Bankruptcy Code (together with its successors and permitted assigns, the "**Parent**"), Atna Resources Inc., a corporation incorporated pursuant to the laws of the State of Nevada and a debtor-in-possession under Chapter 11 of the Bankruptcy Code ("**Atna**"), CR Montana Corporation, a corporation incorporated pursuant to the laws of the State of Colorado and a debtor-in-possession under Chapter 11 of the Bankruptcy Code ("**CR Montana**"), CR Briggs Corporation, a corporation incorporated pursuant to the laws of the State of Colorado and a debtor-in-possession under Chapter 11 of the Bankruptcy Code ("**CR Briggs**"), Horizon Wyoming Uranium, Inc., a corporation incorporated pursuant to the laws of the State of Wyoming and a debtor-in-possession under Chapter 11 of the Bankruptcy Code ("**Horizon Wyoming Uranium**") and each other Person that enters into a Guarantee from time to time, as Guarantors, and Waterton Precious Metals Fund II Cayman, LP, as the lender (together with its permitted successors and assigns in such capacity, the "**Lender**").

## RECITALS

**WHEREAS**, on November 18, 2015 (the "**Petition Date**"), the Borrower, Parent, Atna, CR Montana, CR Briggs, and Horizon Wyoming Uranium (each, a "**Debtor**" and collectively, the "**Debtors**") commenced Chapter 11 Cases Nos. 15-22848 through 15-22854 (each a "**Chapter 11 Case**" or a "**Case**" and collectively, the "**Chapter 11 Cases**" or the "**Cases**") by filing voluntary petitions for reorganization under the Bankruptcy Code with the United States Bankruptcy Court for the District of Colorado (the "**Bankruptcy Court**"). The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS**, prior to the Petition Date, the Pre-Petition Lender (as defined below) provided financing to the Borrower pursuant to the Senior Secured Credit Agreement, dated as of January 31, 2014, among the Borrower, as borrower, certain of the other Debtors and CR Reward Corporation, a corporation incorporated pursuant to the laws of the state of Nevada, as guarantors and the Pre-Petition Lender (as amended, modified or supplemented through the Petition Date, the "**Pre-Petition Credit Agreement**");

**WHEREAS**, the Borrower has requested that the Lender provide a senior secured, superpriority credit facility to the Borrower to fund certain requirements of the Borrower and the other Debtors and for other purposes permitted under this Agreement during the pendency of the Chapter 11 Cases;

**WHEREAS**, the Lender is willing to make certain Post-Petition (as defined below) loans to the Borrower upon the terms and conditions set forth herein;

**WHEREAS**, each Debtor other than the Borrower has agreed to guarantee all the Obligations (as defined below) and each Debtor has agreed to secure the Obligations by granting to the Lender a security interest in and Lien upon substantially all its existing and after-acquired personal and real property; and

**WHEREAS**, each Debtor acknowledges that it will receive substantial direct and indirect benefits by reason of the making of loans and other financial accommodations to the Borrower as provided in this Agreement;

**NOW THEREFORE THIS DEBTOR-IN-POSSESSION CREDIT AGREEMENT WITNESSES** that for good and valuable consideration, the receipt and sufficiency of which are acknowledged by each of the parties hereto, each of the parties agrees as follows:

## ARTICLE 1
## INTERPRETATION

**1.1     Defined Terms**.  As used in this Agreement, the following terms have the following meanings:

"**Account Debtor**" means an "account debtor" (as defined in the UCC), and includes Persons obligated to pay negotiable instruments and other Receivables.

"**Additional Guarantor**" means any Person which becomes a Guarantor in accordance with Section 10.1(x).

"**Adequate Protection Liens**" has the meaning ascribed thereto in the Interim Order or the Final Order, as applicable.

"**Affairs**" means the business, operations, undertaking, property, assets, liabilities, condition (financial or otherwise), performance and results of operations of a specified Person.

"**Affiliate**" means an affiliated body corporate and, for the purposes of this Agreement, (i) one body corporate is affiliated with another body corporate if one such body corporate is the subsidiary of the other or both are subsidiaries of the same body corporate or each of them is Controlled by the same Person and (ii) if two bodies corporate are affiliated with the same body corporate at the same time, they are deemed to be affiliated with each other.

"**Agreed Priority**" means the Liens made in favor of the Lender with the priorities set forth in Section 7.9, subject only to Permitted Liens.

"**Agreement**" means this Debtor-in-Possession Credit Agreement and all schedules and instruments in amendment or confirmation of it; and the expressions.

"**Anti-Terrorism Laws**" means any laws relating to terrorism or money laundering, including Executive Order No. 13224, the USA Patriot Act, the Applicable Laws comprising or implementing the Bank Secrecy Act, and the Applicable Laws administered by the United States Treasury Department's Office of Foreign Asset Control (as any of the foregoing Applicable Laws may from time to time be amended, renewed, extended, or replaced).

"**Applicable Law**" means any international treaty, any domestic or foreign constitution or any supranational, national, regional, federal, provincial, territorial, state, municipal, tribal or local statute, law, ordinance, code, rule, regulation, order (including any consent decree or administrative order), applicable to, or any directive, guideline, policy or Authorization of any Governmental Entity having jurisdiction with respect to any specified Person, property, transaction or event or any of such Person's Affairs, and any order, judgment, award or decree of any Governmental Entity, or arbitrator in any proceeding or action to which the Person in question is a party or by which such Person or any of its Affairs is bound.

"**Approved Budget**" has the meaning assigned to such term in Section 8.2(a)(i)(O).

"**Approved Budget Variance Report**" has the meaning assigned to such term in Section 10.1(b)(iii).

"**Assigned Insurance Policies**" has the meaning assigned to such term in Section 7.1(w).

"**Atna**" has the meaning specified in the Preamble.

"**Authorization**" means any authorization, approval, consent, certificate, exemption, license, permit, franchise, certification, registration or no-action letter from any Governmental Entity having jurisdiction with respect to any specified Person, property, transaction or event, or any of such Person's Affairs or from any Person in connection with any easements or contractual rights.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy" or any successor statute, and all rules promulgated thereunder.

"**Bankruptcy Court**" has the meaning specified in the Recitals.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure and local rules of the Bankruptcy Court, each as amended, and applicable to the Cases.

"**Borrower's Account**" means a bank account in the name of the Borrower with the following wire transfer instructions:

> ABA Number:  121000248
> Bank Name:  Wells Fargo Bank, N.A.
> Bank Address:  420 Montgomery Street, San Francisco, CA  94104
> Beneficiary Account Number (BNF):  300-2278583 (Canyon Resources Corporation)
> Swift Code:  WFBIUS6S

"**Borrowing Notice**" means a written request by the Borrower (acknowledged by the Parent) for a drawing under the Loan substantially in the form of Exhibit A hereto.

"**Briggs Gold Property**" means the Briggs gold project as further described in Schedule 1.1(A) hereto and, for greater certainty, includes all Mining Properties comprised in or related to such project and all personal property used in or located at such project.

"**Buildings and Fixtures**" means all plant, buildings, structures, erections, improvements, appurtenances and fixtures (including fixed machinery and fixed equipment) situated on any of the Subject Properties.

"**Business**" means the business of the Credit Parties as conducted as at the date hereof.

"**Business Day**" means any day of the year, other than a Saturday, Sunday or any day on which major banks are closed for business in Toronto, Ontario or New York, New York.

"**Capital Lease**" means, with respect to a Person, a lease or other arrangement in respect of real or personal property that is required to be classified and accounted for as a capital lease, finance lease or debt obligation on a balance sheet of the Person in accordance with IFRS.

"**Capital Lease Obligation**" means, with respect to a Person, the obligation of the Person to pay rent or other amounts under a Capital Lease and for the purposes of this definition, the amount of

3

such obligation at any date shall be the capitalized amount of such obligation at such date as determined in accordance with IFRS.

"**Capitalized Interest**" has the meaning assigned to such term in Section 3.2(a).

"**Canadian Bankruptcy Case**" means any bankruptcy, insolvency or similar proceeding in Canada commenced by or against a Credit Party.

"**Carve-Out**" means the sum of (x) (i) the aggregate amount of any reasonable and unpaid fees, costs and expenses that were accrued or incurred prior to the Carve-Out Date by the professionals retained by the Debtors or any professionals retained by the Committee (collectively, the "**Professionals**") to the extent allowed by an order of the Bankruptcy Court and in compliance with the Approved Budget, plus (ii) those reasonable fees, costs and expenses incurred by Professionals after the Carve-Out Date and subsequently allowed by order of the Bankruptcy Court and in compliance with the Approved Budget, provided that (1) from the Petition Date through and including the date that is seventy-five (75) days after the Petition Date (the "**Initial Carve-Out Date**"), the amounts described in items (i) and (ii) of this clause (x) shall not exceed $700,000 in the aggregate, and (2) after the Initial Carve-Out Date, the amounts described in items (i) and (ii) of this clause (x) shall not exceed $400,000 in the aggregate, plus (y) (i) fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee pursuant to 28 U.S.C. § 1930 and (ii) fees and expenses of up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code.

"**Carve-Out Date**" means the earlier of (i) the date on which any Event of Default occurs and (ii) the Maturity Date.

"**Carve-Out Reserve**" means an amount equal to up to $250,000 which may be designated by the Lender to the Borrower in writing at any time on or prior to the final drawing under the Loan.

"**Case**" has the meaning specified in the Recitals.

"**Cash Management Order**" means that certain Order (A) Authorizing, but not Directing, the Debtors to Maintain Their Existing Bank Accounts, Cash Management System and Business Forms; (B) Waiving Investment and Deposit Requirements; and (C) Granting Related Relief granted by the Bankruptcy Court on [_____].

"**Change of Control**" means the occurrence of any of the following events:

(a)     any Person or group of Persons (within the meaning of the Securities Exchange Act of 1934) (i) "**acting in concert**" shall have acquired legal or beneficial ownership of, or the power to exercise control or direction over, any Voting Shares of the Parent (or securities convertible into such Voting Shares), that together with such person's existing securities would constitute Voting Shares of the Parent representing more than 30% of the total voting power attached to all Voting Shares of the Parent then outstanding or (ii) shall have obtained the power to elect a majority of the members of the board of directors of the Parent;

(b)     any Person other than the Parent (in the case of the Borrower) or the Parent and the Borrower (in the case of the other Guarantors) shall have acquired legal or beneficial ownership of, any shares of any Credit Party (other than the Parent); or

4

(c)     there is consummated any amalgamation, consolidation, statutory arrangement, merger or similar transaction of the Parent (1) in which the Parent is not the continuing or surviving corporation or (2) pursuant to which any Voting Shares of the Parent would be reclassified, changed or converted into or exchanged for cash, securities or other property, other than (in each case) an amalgamation, consolidation, statutory arrangement, merger or similar transaction of the Parent in which the holders of the Voting Shares of the Parent representing more than 80% of the total voting power attached to all such Voting Shares immediately prior to the amalgamation, consolidation, statutory arrangement, merger or similar transaction have, directly or indirectly, more than 80% of the Voting Shares of the continuing or surviving corporation immediately after such transaction.

"**Chapter 11 Case**" has the meaning specified in the Recitals.

"**Closing Date**" means the date on which each of the conditions set forth in Sections 9.1 and 9.2 are satisfied or waived and the initial drawing under the Loan is made.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time.

"**Collateral**" has the meaning specified in Section 7.1.

"**Commitment**" means the commitment of the Lender to make the Loan under this Agreement in an aggregate amount not to exceed $4,000,000.

"**Committee**" means any statutory committee appointed in the Chapter 11 Cases.

"**Columbia Property**" means the Columbia property as further described in Schedule 1.1(A) hereto and, for greater certainty, includes all Mining Properties comprised in or related to such property and all personal property used in or located at such property.

"**Common Shares**" means common shares in the capital of the Parent.

"**Compliance Certificate**" means a certificate of the Parent and the Borrower substantially in the form of Exhibit B, in each case, signed on behalf of each such Credit Party by its an officer acceptable to the Lender.

"**Consultant**" has the meaning specified in Section 12.18.

"**Contaminant**" means any solid, liquid, gas, odor, heat, sound, vibration, radiation or combination of any of them that may (i) injure or damage property or plant or animal life, (ii) harm or cause a nuisance to any Person, (iii) adversely affect the health of any individual, (iv) impair the safety, of any individual, (v) render any property or plant or animal life unfit for use by humans, (vi) cause loss of enjoyment of normal use of property, or (vii) interfere with the normal course of business, and includes any "**Contaminant**" within the meaning assigned to such term (or any similar term) in any Environmental Law applicable to the Mining Properties or any of the Credit Parties.

"**Contingent Liability**" means, with respect to a Person, any agreement, undertaking or arrangement by which the Person guarantees, endorses or otherwise becomes or is contingently liable upon (by direct or indirect agreement, contingent or otherwise, to provide funds for

5

payment, to supply funds to, or otherwise to invest in a debtor, or otherwise to assure a creditor against loss) the obligation, debt or other liability of any other Person or guarantees the payment of dividends or other distributions upon the shares of any Person.  The amount of any contingent liability will, subject to any limitation contained therein, be deemed to be the reasonably probable outstanding principal amount of the obligation, debt or other liability to which the contingent liability is related.

"**Contract**" means any contract (written or oral), agreement, undertaking, indenture, mortgage, certificate, document and any other writing (whether formal agreement, letter or otherwise) under which any obligation, duty, covenant, agreement, affirmation, undertaking or liability is evidenced, assumed or undertaken, or any right or Lien (or right or interest therein) is granted, authenticated, notarized, authorized or perfected, and any notice, registration, recordation or filing associated with or required by any of the foregoing.

"**Contractual Obligation**" means, as to any Person, any provision of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Control**" of any Person means:

    (a)    the power (whether by way of ownership of shares, proxy, contract, agency or otherwise) to:

        (i)    cast, or control the casting of, more than 50% of the maximum number of votes that might be cast at a general meeting of such Person; or

        (ii)    appoint or remove all, or the majority, of the directors or other equivalent officers of such Person; or

        (iii)    give directions with respect to the operating and financial policies of such Person with which the directors or other equivalent officers of such Person are obliged to comply; and/or

    (b)    the holding beneficially of more than 50% of the issued share capital of such Person.

"**Control Agreement**" means (x) a control agreement, in form and substance satisfactory to the Lender, executed and delivered by a Credit Party or one of its Subsidiaries, the Lender, and the applicable Securities Intermediary or bank and (y) any Pre-Petition Control Agreement.

"**Controlled Account**" means a bank account that is subject to a Control Agreement.

"**Core Assets**" means, collectively, the Briggs Gold Property, the Columbia Property and the Pinson Mine.

"**Copyrights**" means original works of authorship in any medium of expression, whether or not published, and all rights, title and interests arising under any Applicable Law in or relating to copyrights and all mask work, database and design rights, whether or not registered or published, all registrations and recordations thereof and all applications in connection therewith, including copyrights for computer programs, and all issuances, extensions and renewals of such registrations and applications and all tangible and intangible property embodying the foregoing.

6

"**Credit Documents**" means this Agreement, the Perfection Certificates, the Security Agreements, and each other Contract executed by the Borrower or other Credit Party in connection with this Agreement and each other Contract executed by the Borrower or other Credit Party after the date hereof in accordance with the terms hereof and designated as a Credit Document by the Lender, as any of the foregoing may be amended, modified, supplemented, extended or restated from time to time in accordance with their respective terms.

"**Credit Parties**" means, collectively, the Borrower, the Parent and each other Guarantor, and "**Credit Party**" means any of them, together with its permitted successors and assigns.

"**Credit Party Accounts**" has the meaning specified in Section 9.1(dd)(vi).

"**CR Briggs**" has the meaning specified in the Preamble.

"**CR Kendall**" means CR Kendall Corporation, a corporation incorporated pursuant to the laws of the State of Colorado and a debtor-in-possession under Chapter 11 of the Bankruptcy Code.

 "**CR Montana**" has the meaning specified in the Preamble.

"**Debt**" of any Person means:

> (a)      all obligations of such Person for borrowed money, including debentures, notes or similar Instruments and other financial Instruments and obligations with respect to bankers' acceptances and contingent reimbursement obligations relating to letters of credit;

> (b)      all Financial Instrument Obligations of such Person;

> (c)      all Capital Lease Obligations and Purchase Money Debt of such Person;

> (d)      all obligations to pay the deferred and unpaid purchase price of property or services, which purchase price is due and payable more than 90 days after the date of placing such property or service or taking delivery at the completion of such services;

> (e)      all indebtedness of such Person secured by a Lien on any assets of such Person;

> (f)      all obligations to repurchase, redeem or repay any shares of such Person; and

> (g)      all Contingent Liabilities of the Person with respect to obligations of another Person if such obligations are of the type referred to in paragraphs (a) to (f).

"**Debtors**" has the meaning specified in the Recitals.

"**Default**" means an Event of Default or any event which, with the giving of notice or passage of time, or the making of any determination or any combination of the foregoing, would constitute an Event of Default.

"**Default Rate**" has the meaning specified in Section [3.2(c)].

"**DIP Administrative Claim**" means an allowed superpriority administrative expense claim under Section 364(c)(1) of the Bankruptcy Code, having priority over all administrative expense

claims, adequate protection and other diminution claims, priority claims and unsecured claims, including administrative expenses and other claims of the kind specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113, 1114 or any other provisions of the Bankruptcy Code.

"**DIP Facility**" means the credit facility provided to the Debtors pursuant to the Credit Documents.

"**DIP Liens**" has the meaning specified in Section 7.9.

"**Disposal**" means a sale, lease, release, abandonment, license, exchange, transfer, loan, grant, option or other disposal by a Person of any asset, undertaking or business (whether by a voluntary or involuntary single transaction or series of transactions) and "**Dispose**" and "**Disposition**" shall have a corresponding meaning.

"**Disposal Proceeds**" means the consideration received or receivable by a Credit Party for any Disposal made by such Credit Party, net of any costs actually paid in connection with the Disposal, including brokerage and transaction fees and applicable taxes.

"**Distribution**" has the meaning specified in Section 10.2(g).

"**Dollars**" and "**$**" means lawful money of the United States of America.

"**Effect of Bankruptcy**" means, with respect to any contractual obligation, contract, lease or agreement to which a Debtor is a party, any default or other legal consequences arising on account of the commencement, the filing or the pendency of the Chapter 11 Cases, as applicable (including the implementation of any stay), or the rejection of any such contractual obligation, contract or agreement with the approval of the Bankruptcy Court if required under Applicable Law, or any action approved by, or motion made before, the Bankruptcy Court.

"**Effective Date**" has the meaning specified in the Preamble.

"**Environment**" means soil, land surface or subsurface strata, surface waters (including navigable waters, ocean waters, streams, ponds, drainage basins and wetlands), groundwater, drinking water supply, stream sediments, ambient air (including indoor air), plant and animal life and any other environmental medium or natural resource.

"**Environmental Claim**" means, all liabilities, (including costs of remedial actions, natural resource damages and costs and expenses of investigation and feasibility studies, including the cost of environmental consultants and cost of legal fees) that may be imposed on, incurred by, or asserted against a Credit Party as a result of, or related to, any claim, suit, action, investigation, proceeding or demand by any Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law or otherwise, arising under any Environmental Law or related to any Release or threatened Release of Hazardous Materials, or to any environmental, health or safety condition arising prior to or after the date hereof.

"**Environmental Indemnified Liabilities**" shall have the meaning ascribed thereto in Section 12.5(b).

"**Environmental Laws**" means any Applicable Law relating to pollution or protection of the environment, ecology, threatened and endangered species or public or occupational health or

ACTIVE 210918977v.12

safety or environmental, health or safety issues on or pertaining to the Mining Properties, including, Applicable Laws relating to emissions, discharges, Releases or threatened Releases of Hazardous Materials into the Environment, the exposure of any Person to Hazardous Materials, reclamation or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 of the United States (CERCLA), as amended by the Superfund Amendments and Reauthorization Act and as further amended from time to time, and any successor statute and including all regulations promulgated thereunder and any state or local counterpart.

"**Equity Interests**" means, with respect to any Person, shares of capital stock of (or other ownership or profit interests in) such Person, warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including, without limitation, partnership, member or trust interests therein), whether voting or non-voting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"**ERISA**" means the *Employee Retirement Income Security Act* of 1974 of the United States of America, as amended from time to time, and any successor statute.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) under common control with the Credit Parties within the meaning of Section 414(b) or (c) of the Code.

"**Event of Default**" has the meaning specified in Section 11.1.

"**Excluded Accounts**" means those Credit Party Accounts not required to be subject to a Control Agreement as set forth in the Perfection Certificate.

"**Excluded Property**" has the meaning assigned to such term in Section 7.1.

"**Excluded Shares**" means any voting stock in excess of 65% of the outstanding voting stock of any Foreign Subsidiary.  For the purposes of this definition, "voting stock" means, with respect to any issuer, the issued and outstanding shares of each class of shares of such issuer entitled to vote (within the meaning of Treasury Regulations § 1.956-2(c)(2)).

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to the Lender or required to be withheld or deducted from a payment to the Lender: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of the Lender being organized under the laws of, or having an office located in the jurisdiction imposing such Tax (or any political subdivision thereof), or (ii) that are Other Connection Taxes; (b) Taxes attributable to the Lender's failure to comply with Section 5.2(e); and (c) any U.S. federal withholding Taxes imposed under FATCA.

"**Expropriation Event**" means the appropriation, confiscation, expropriation, cancellation, seizure or nationalization (by Applicable Law, intervention, court order, condemnation, exercise of eminent domain or other action or form of taking) of ownership or control of a Credit Party or any of its Subsidiaries or of a Mining Property, or any substantial portion thereof, or any substantial portion of the rights related thereto, or any substantial portion of the economic value

9

thereof, or which prevents or interferes with the ability of a Person to own or operate the property subject to such action, including by the imposition of any Tax, fee, charge or royalty.

"**Extraordinary Receipt**" means any cash received by or paid to or for the account of any Person not in the ordinary course of business, including tax refunds, pension plan reversions, proceeds of insurance (other than proceeds of business interruption insurance to the extent such proceeds constitute compensation for lost earnings), condemnation awards (and payments in lieu thereof), payments in connection with any Expropriation Event, indemnity payments and any purchase price adjustments, net of any costs actually paid in connection with the receipt, including brokerage and transaction fees and applicable taxes.

"**FATCA**" means Sections 1471 through 1474 of the Code, any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b) of the Code and any applicable intergovernmental agreement with respect thereto and applicable official implementing guidance thereunder.

"**Final Order**" means the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, which order shall be substantially in the form of the Interim Order or otherwise satisfactory in form and substance to the Lender, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal has been stayed, dismissed or denied unless the Lender waives such requirement, together with all extensions, modifications and amendments thereto, each in form and substance satisfactory to the Lender.  The Final Order (a) shall authorize and approve the transactions contemplated by the Credit Documents, (b) shall find that the Lender is extending credit to the Borrower in good faith within the meaning of Bankruptcy Code section 364(e) and (c) shall set forth provisions (i) approving in all respects the Credit Documents, and authorizing and directing the Debtors to execute and become bound by the Credit Documents; (ii) modifying the automatic stay to the extent necessary to permit or effectuate the terms of the Final Order and the Credit Documents, including to permit the creation and perfection of the Lender's Liens on the Collateral; (iii) providing for the automatic relief of such stay to permit the enforcement of the Lender's remedies under the DIP Facility, subject to the right of the Debtors and/or the Committee to seek to re-impose or continue the automatic stay; and (iv) providing that the Debtors acknowledge (x) the validity and enforceability of the Pre-Petition Obligations, without defense, offset or counterclaim of any kind, (y) the validity, perfection and priority of the Liens securing the Pre-Petition Obligations, and that the Debtors waive any right to challenge or contest such claims and liens and (z) that the Debtors have no valid claims or causes of action, whether based in contract, tort or otherwise against the Pre-Petition Lender with respect to the Pre-Petition Credit Agreement or the related documents or transactions.

"**Financial Advisor**" means Ernst & Young LLP or any other a financial advisory firm with experience in United States chapter 11 cases that is reasonably acceptable to the DIP Lender.

"**Financial Assistance**" has the meaning specified in Section 10.2(h).

"**Financial Instrument Obligations**" means, with respect to any Person, obligations arising under:

  (a)     any interest rate swap agreement, forward rate agreement, floor, cap or collar agreement, future or option, insurance or other similar agreement or arrangement, or any combination thereof, entered into or guaranteed by the Person where the

subject matter thereof is interest rates or the price, value or amount payable thereunder is dependent or based upon interest rates or fluctuations in interest rates in effect from time to time (but excluding non-speculative conventional floating rate indebtedness);

(b)   any currency swap agreement, cross-currency agreement, forward agreement, floor, cap or collar agreement, future or option, insurance or other similar agreement or arrangement, or any combination thereof, entered into or guaranteed by the Person where the subject matter thereof is currency exchange rates or the price, value or amount payable thereunder is dependent or based upon currency exchange rates or fluctuations in currency exchange rates in effect from time to time; or

(c)   any agreement for the making or taking of any commodity, swap agreement, floor, cap or collar agreement or commodity future or option or other similar agreement or arrangement, or any combination thereof, entered into or guaranteed by the Person where the subject matter thereof is any commodity or the price, value or amount payable thereunder is dependent or based upon the price or fluctuations in the price of any commodity; or any other similar transaction, including any option to enter into any of the foregoing, or any combination of the foregoing, in each case to the extent of the net amount due or accruing due by the Person under the obligations determined by marking the obligations to market in accordance with their terms.

"**Financial Quarter**" means a period of three consecutive months in each Financial Year ending on March 31, June 30, September 30 and December 31, as the case may be, of such year.

"**Financial Year**" means, in relation to the Parent, its financial year commencing on January 1 of each calendar year and ending on December 31 of such year.

"**Foreign Lender**" means the Lender or any successor or assignee that is organized under the laws of a jurisdiction other than the United States, each State thereof and the District of Columbia.

"**Foreign Subsidiary**" means any Subsidiary that is organized under the laws of a jurisdiction other than the United States of America, any State thereof or the District of Columbia (including, for the avoidance of doubt, any Subsidiary organized under the laws of Puerto Rico or any other territory).

"**Funding Letter**" means the letter agreement among the Credit Parties and the Lender, dated as of even date herewith, setting forth the terms and conditions pursuant to which the first draw under the Loan will be made.

"**Governmental Entity**" means (i) any multinational, national, federal, provincial, state, territorial, county, municipal, local, tribal, native or other government, governmental or public department, central bank, court, commission, board, bureau, agency, instrumentality or regulatory authority, domestic or foreign, (ii) any subdivision or authority of any of the foregoing, or (iii) any quasi-governmental or private body exercising any regulatory, judicial, expropriation or taxing authority under or for the account of any of the above.

"**Guaranteed Obligations**" has the meaning assigned to such term in Section 6.1.

"**Guarantees**" means the guarantee of the Obligations by the Guarantors pursuant to Article VI of this Agreement.

"**Guarantors**" means each of Parent, Atna, CR Briggs, CR Montana, Horizon Wyoming Uranium and each Additional Guarantor, and "**Guarantor**" means any one of them.

"**Hazardous Material**" means any substance or mixture of substances, or any pollutant or Contaminant, toxic, radioactive or dangerous waste or material, as defined or listed in, or otherwise classified pursuant to, or that may give rise to liability under, any Environmental Law, including any "**hazardous substance**" "**hazardous material**" "**hazardous waste**" "**toxic substance**" "**contaminant**" "**pollutant**" or any other similar formulation intended to define, list or classify substances by reason of deleterious properties such as ignitability, corrosiveness, reactivity, carcinogenicity, toxicity or dangerousness.

"**Hedging Agreement**" means (i) any currency exchange or interest rate swap agreement, currency exchange or interest rate cap agreement or currency exchange or interest rate collar agreements between any Credit Party and any other Person and (ii) all net forward sale, put/call options, spot deferred sale or other similar arrangement or agreement relating to the sale or purchase of any commodity.

"**Horizon Wyoming Uranium**" has the meaning specified in the Preamble.

"**IFRS**" means the International Financial Reporting Standards, which are the accounting standards and interpretations adopted by the International Accounting Standards Board, consistently applied.

"**Inactive Subsidiaries**" means CR Kendall and Horizon Wyoming Uranium.

"**Indemnified Person**" has the meaning specified in Section 12.5(a).

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Credit Party under any Credit Document and (b) to the extent not otherwise described in (a), Other Taxes.

"**Interest Payment Amount**" means, in relation to any Interest Payment Date, the aggregate amount of interest due and payable on the outstanding amount of the Loans with respect to the period ending on such Interest Payment Date at a rate of interest per annum equal to the Interest Rate.

"**Interest Payment Date**" means each of the following (i) each Monthly Payment Date, (ii) the Maturity Date, and (iii) any date on which the Borrower makes a voluntary or mandatory prepayment of all or any portion of the Loan.

"**Interest Rate**" means, 8.00% per annum.

"**Interim Order**" means the order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing, substantially in the form attached hereto as Exhibit C or such other form satisfactory to the Lender and together with all extensions, modifications, and amendments thereto that are each satisfactory to the Lender.  The Interim Order (a) shall authorize and approve the transactions contemplated by the Credit Documents, (b) shall find that the Lender is extending credit to the Borrower in good faith within the meaning of Bankruptcy Code section 364(e) and

12

(c) shall set forth provisions (i) approving in all respects the Credit Documents, and authorizing and directing the Debtors to execute and become bound by the Credit Documents; (ii) modifying the automatic stay to the extent necessary to permit or effectuate the terms of the Interim Order and the Credit Documents, including to permit the creation and perfection of the Lender's Liens on the Collateral; (iii) providing for the automatic relief of such stay to permit the enforcement of the Lender's remedies under the DIP Facility, subject to the right of the Debtors and/or the Committee to seek to re-impose or continue the automatic stay; and (iv) providing that the Debtors acknowledge (x) the validity and enforceability of the Pre-Petition Obligations, without defense, offset or counterclaim of any kind, (y) the validity, perfection and priority of the Liens securing the Pre-Petition Obligations, and that the Debtors waive any right to challenge or contest such claims and liens and (y) that the Debtors have no valid claims or causes of action, whether based in contract, tort or otherwise against the Pre-Petition Lender with respect to the Pre-Petition Credit Agreement or the related documents or transactions.

"**Internet Domain Name**" means all right, title and interest arising under any Applicable Law in or relating to internet domain names, whether or not trademarks, registered in any generic top level domain by any authorized private registrar or Governmental Entity.

"**Investment Banker**" means Maxit Capital LP or, in the event that Maxit Capital LP resigns, any other investment banking firm with experience in United States chapter 11 cases that is reasonably acceptable to the DIP Lender.

"**IRS**" means the United States Internal Revenue Service.

"**Land**" has the meaning assigned to such term in the definition of "Real Estate".

"**Leased Properties**" means, collectively, the real properties forming the subject matter of the Leases.

"**Leases**" means the leases, subleases, rights to occupy and licenses of real property or Buildings and Fixtures, to which any Credit Party is a party (i) at the date of this Agreement, as listed and described in Schedule 1.1(B), or (ii) after the date of this Agreement.

"**Lender**" has the meaning specified in the Preamble.

"**Lender Representatives**" has the meaning specified in Section 10.1(o).

"**Lien**" means any mortgage, deed of trust, lien, pledge, charge, security interest, hypothecation, indenture, preferential right, assignment, option, claim, royalty, production payment, burden on production or other lien, encumbrance or collateral security instrument in, on or to, or any right or interest, or the title of any vendor, lessor, lender or other secured party to, or interest or title of any Person under any conditional sale or other title retention agreement or Capital Lease with respect to, any property or asset owned or held by such Person, any mortgage, deed of trust, pledge, charge, security agreement, hypothecation, indenture, assignment or similar Instrument, or the filing of a financing statement or other similar instrument, which names such Person as debtor, or any security agreement or other similar instrument authorizing any other party as the secured party thereunder to file any financing statement or other similar instrument or any other arrangement, encumbrance or condition that in substance secures payment or performance of an obligation.

"**Loan**" has the meaning specified in Section 2.2.

13

"**Mandatory Prepayment Amount**" has the meaning specified in Section 4.1.

"**Material Adverse Effect**" means, when used with reference to any event or circumstance, any event or circumstance which has had, or could reasonably be expected to have, a material adverse effect (or a series of adverse effects, none of which is material in and of itself but which cumulatively could result in a material adverse effect) on (i) any Core Asset, (ii) the business, operations, results of operations, prospects, assets, performance, liabilities or the condition (financial or otherwise) of any Credit Party, (iii) any of the rights or remedies of the Lender under any of the Credit Documents, or (iv) the ability of any Credit Party to perform its obligations under any of the Credit Documents; provided, however that clause (ii) shall not be a Material Adverse Effect with respect to any Debtor if such event or circumstance is an Effect of Bankruptcy.

"**Material Contracts**" means, collectively, the agreements set out in Schedule 1.1(C) and any other agreement to which any Credit Party is a party and which is deemed material by the Lender, acting reasonably, to the Business or the operation of the Mining Properties.

"**Maturity Date**" means May 18, 2016.

"**Mining Properties**" and each individually, a "**Mining Property**", includes each of the Core Assets and all surface, subsurface and mineral rights, water rights, and all surface, subsurface and mineral leases, concessions, licenses, claims, rights, titles or interests owned, leased, held or controlled by a Credit Party in connection with the Core Assets, and all related, associated or appurtenant rights, in each case howsoever characterized or designated, that are owned, leased, held, or controlled, directly or indirectly, by a Credit Party, with such rights, titles and interests described in Schedule 1.1(D).

"**Monthly Payment Date**" the last Business Day of each calendar month for the period commencing on the Effective Date and ending on the Maturity Date.

"**New Atna Deed of Trust**" means the Deed Of Trust, Security Agreement, Assignment of Production, Rents and Leasehold Interests, Fixture Filing, and Financing Statement from CR Briggs, as Trustor to First American Title Insurance Company, as Trustee and Lender, as Beneficiary.

"**New Mortgages**" means the New Atna Deed of Trust, the New Borrower Deed of Trust, the New CR Briggs Deed of Trust and the New CR Montana Deed of Trust, to be entered into prior to the second draw of the Loan.

"**New Borrower Deed of Trust**" means the Deed of Trust, Security Agreement, Assignment of Production, Rents and Leasehold Interests, Fixture Filing, and Financing Statement from the Borrower, as Trustor to First American Title Insurance Company, as Trustee and Lender, as Beneficiary.

"**New CR Briggs Deed of Trust**" means the Deed of Trust, Security Agreement, Assignment of Production, Rents and Leasehold Interests, Fixture Filing, and Financing Statement from CR Briggs, as Trustor to First American Title Insurance Company, as Trustee and Lender, as Beneficiary.

"**New CR Montana Deed of Trust**" means the Deed of Trust, Security Agreement, Assignment of Production, Rents and Leasehold Interests, Fixture Filing, and Financing Statement from

CR Montana, as Trustor to First American Title Insurance Company, as Trustee and Lender, as Beneficiary.

"**Multiemployer Plan**" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which any Credit Party or any ERISA Affiliate is making or accruing an obligation to make contributions or has made or accrued an obligation to make contributions.

"**Non-Core Assets**" means real property interests of the Credit Parties not comprised in or relevant to any of the Core Assets and, for greater certainty, excluding (i) all personal property and (ii) the Core Assets.

"**Obligations**" means all duties, covenants, agreements, liabilities, indebtedness and obligations of each of the Credit Parties with respect to the repayment, payment or performance of all indebtedness, liabilities and obligations (monetary or otherwise) of each of the Credit Parties, including the Loan, whenever arising, whether primary, secondary, direct, contingent, fixed or otherwise and whether joint, several, or joint and several, established by or arising under or in connection with this Agreement and each other Credit Document, including, in each case, the payment of principal, interest, fees, expenses, reimbursements and indemnification obligations.

"**Orders**" means, collectively, the Final Order and the Interim Order.

"**Organizational Documents**" means (i) with respect to a corporation, its articles of incorporation, amalgamation or continuance or other similar documents and its by-laws, and (ii) with respect to any other Person that is not a natural person, the organization and governance documents of such Person in each case as amended and supplemented from time to time.

"**Other Connection Taxes**" means, with respect to the Lender, Taxes imposed as a result of a present or former connection between the Lender and the jurisdiction imposing such Tax (other than connections arising from the Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Credit Document, or sold or assigned an interest in any Loan or Credit Document).

"**Other Taxes**" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Credit Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"**Owned Properties**" means, collectively, (i) the Mining Properties to the extent they are owned by any Credit Party, and (ii) after the date of this Agreement, the additional lands and premises which are owned by any of the Credit Parties.

"**Parent Annual Report**" has the meaning specified in Section 9.1(z).

"**Parent Quarterly Report**" has the meaning specified in Section 9.1(z).

"**Participant Register**" has the meaning specified in Section 12.7(f).

"**Pension Plan**" means any plan or arrangement, whether funded or unfunded, registered or not registered, that provides defined benefit pensions or term-certain annuities in respect of any

ACTIVE 210918977v.12

employees, former employees or retirees of any Credit Party, including a plan within the meaning of Section 3(2) of ERISA maintained or contributed to by the Credit Parties or any ERISA Affiliate, including any Multiemployer Plan within the meaning of Section 4001(a)(3) of ERISA.

"**Perfection Certificate**" means, in respect of each Credit Party, a certificate of a senior officer of such Credit Party, addressed to the Lender, in form and substance reasonably satisfactory to the Lender and pursuant to which certain factual matters relating to such Credit Party and the Collateral of such Credit Party are certified true and correct, together with all schedules and exhibits attached thereto or referred to therein, as the same may be updated from time to time pursuant to Section 9.1(dd).

"**Permitted Debt**" means, in respect of any Person, the following:

      (a)     the Obligations;

      (b)     Debt of the Credit Parties in the principal amount outstanding as of the Petition Date arising under Capital Leases and Purchase Money Debt and incurred without violation of the Pre-Petition Credit Agreement;

      (c)     Debt in respect of bonds, letters of credit or bank guarantees in favor of a public utility or any other Governmental Entity when required by such utility or other Governmental Entity in connection with the operations of any Credit Party (including for the reclamation or remediation of mining properties), all in the ordinary course of business;

      (d)     Debt owing by any Credit Party to another Credit Party;

      (e)     the Pre-Petition Obligations;

      (f)     obligations owing by any Credit Party pursuant to insurance premium financing arrangements with AFCO Insurance Premium Finance ("**IPFA Obligations**"); and

      (g)     any guarantee by any Credit Party of any Debt permitted under paragraphs (b), (c), (d), (e) or (f).

"**Permitted Dewatering Cessation Event**" has the meaning specified in Section 10.2(s).

"**Permitted JV**" means a joint venture in which a Credit Party is a partner or otherwise makes an investment for the development of an asset provided that at the time of such investment by the Credit Party the following conditions are satisfied:

      (a)     no Default or Event of Default has occurred and is continuing or would exist after the creation of the joint venture;

      (b)     the joint venture agreement or investment shall be (i) in a form and substance mutually acceptable to the Lender and applicable Credit Party and (ii) consented to in writing by the Lender; and

      (c)     no Lien on any Collateral is granted in connection with or results from such joint venture.

16

"**Permitted Existing Liens**" means Liens in existence on the Petition Date, solely to the extent that such Liens have been incurred in accordance with the terms of the Pre-Petition Credit Documents and are valid, perfected, enforceable and non-avoidable as of the Petition Date, other than the Pre-Petition Liens.

"**Permitted Liens**" means any one or more of the following with respect to the property and assets of the Companies:

    (a)    Permitted Existing Liens;

    (b)    Liens for taxes, assessments or governmental charges or levies not at the time due or delinquent or the validity or amount of which are being contested in good faith by appropriate proceedings and as to which reserves are being maintained in accordance with IFRS so long as forfeiture of any part of such property or assets will not result from the failure to pay such taxes, assessments or governmental charges or levies during the period of such contest;

    (c)    restrictions, easements, rights of way, servitudes or other similar rights in land granted to or reserved by other Persons which in the aggregate do not materially impair the usefulness, in the operation of the business of any Credit Party, of the property subject to such restrictions, easements, rights of way, servitudes or other similar rights in land granted to or reserved by other Persons;

    (d)    Liens resulting from the deposit of cash or Cash Equivalents to secure workers' compensation, surety or appeal bonds, costs of litigation when required by law and public and statutory obligations;

    (e)    Liens (including Liens resulting from the deposit of cash or Cash Equivalents) given to a public utility or any other Governmental Entity when required by such utility or other Governmental Entity in connection with the operations of any Credit Party, all in the ordinary course of business and in accordance with the Approved Budget;

    (f)    the reservations, limitations, provisos and conditions, if any, expressed in any original grants from the United States of America or any other Governmental Entity, and, in respect of unpatented mining claims, the permanent title of the United States;

    (g)    title defects or irregularities which are of a minor nature and in the aggregate will not materially impair the use of the property for the purpose for which it is held;

    (h)    the Security;

    (i)    the Pre-Petition Liens;

    (j)    Adequate Protection Liens;

    (k)    Liens on the Pinson Mine as security for additional indebtedness subject to the terms of an inter-creditor agreement among the Lender, each applicable Credit Party and a third party creditor, in form and substance satisfactory to the Lender;

(l)     any security interests registered in the Personal Property Registry (British Columbia) under base registration # 5481868 in relation to the net smelter return affecting mineral claims located in the Ecstall River Area, Skeena Mining Division, Province of British Columbia, which net smelter return was granted by the Parent under the purchase and sale agreement dated December 16, 1993 between Falconbridge Limited and the Parent, provided the amount secured thereby shall not be increased beyond the original amount thereof;

(m)    Liens or claims incidental to construction and mechanics', warehouseman's, carriers' and other similar liens securing obligations pursuant to contracts existing as of the Petition Date; and

(n)    Liens securing IPFA Obligations.

"**Person**" means a natural person, partnership, limited liability company, corporation, joint stock company, trust, unincorporated association, joint venture or other entity or Governmental Entity, and pronouns have a similarly extended meaning.

"**Petition Date**" has the meaning specified in the Recitals.

"**Pinson Mine**" means the Pinson mine as further described in Schedule 1.1(A) hereto and, for greater certainty, includes all Mining Properties comprised in or related to such mine and all personal property used in or located at such mine.

"**Pledge Amendment**" has the meaning specified in Section 7.4(a)(iv).

"**Post-Petition**" means the time period beginning immediately upon the filing of the Chapter 11 Cases.

"**Pre-Petition**" means the time period ending immediately prior to the filing of the Chapter 11 Cases.

"**Pre-Petition Collateral**" has the meaning assigned to the term "Collateral" in the Pre-Petition Credit Agreement.

"**Pre-Petition Control Agreements**" means each account control agreement granting control of a Credit Party Account in favor of the Pre-Petition Lender and entered into pursuant to the Pre-Petition Credit Documents.

"**Pre-Petition Credit Agreement**" has the meaning specified in the Recitals.

"**Pre-Petition Credit Documents**" has the meaning assigned to the term "Credit Documents" in the Pre-Petition Credit Agreement.

"**Pre-Petition Lender**" has the meaning assigned to the term "Lender" in the Pre-Petition Credit Agreement.

"**Pre-Petition Liens**" means Liens securing the Pre-Petition Obligations.

"**Pre-Petition Obligations**" means the all "Obligations" under and as defined in the Pre-Petition Credit Agreement, including, interest from and after the Petition Date at the applicable rate

18

provided in accordance with Section 10.12 of the Pre-Petition Credit Agreement and all fees and expenses payable to the Pre-Petition Lender pursuant to the Pre-Petition Credit Agreement.

"**Priming Liens**" has the meaning specified in Section 7.9(b).

"**Prepayment Notice**" has the meaning specified in Section 4.2(a).

"**Project Permits**" means those Authorizations for the development and operation of the Mining Properties, as defined in Section 9.1(kk).

"**Prudent Mining Industry Practices**" means those practices, standards, methods, techniques and specifications, as they may evolve, change and modify from time to time that (a) are commonly used and generally accepted in the mining industry as good, safe and prudent operational, administrative, environmental and engineering practices in connection with the design, construction, operation, maintenance, repair or use of mining projects, mining facilities, mining infrastructure, mining equipment or other components of a mining operation, (b) conform in all material respects to Applicable Laws, (c) conform in all material respects to operational and maintenance guidelines and requirements suggested by applicable manufacturers, suppliers and insurance providers (taking into account the size, age, service and type of asset), and (d) are commercially reasonable based on the nature of the Mining Properties.

"**Purchase Money Debt**" means Debt assumed by a Credit Party as part of, or issued or incurred by Credit Party to pay or provide funds to pay, all or a part of the purchase price of any equipment hereafter or previously acquired by a Credit Party.

"**Real Estate**" means all (i) Leases, (ii) with respect to any Credit Party, all of those plots, pieces or parcels of land now owned, leased or hereafter acquired or leased by such Credit Party (the "**Land**"), together with the right, title and interest of such Credit Party, if any, in and to the streets, the land lying in the bed of any streets, roads or avenues, opened or proposed, in front of, the air space and development rights pertaining to the Land and the right to use such air space and development rights, all rights of way, privileges, liberties, tenements, hereditaments and appurtenances belonging or in any way appertaining thereto, all fixtures, all easements now or hereafter benefiting the Land and all royalties and rights appertaining to the use and enjoyment of the Land, including all alley, vault, drainage, mineral, water, oil and gas rights, patented mining claims, unpatented mining claims (lode and placer), unpatented millsites, tunnel sites and rights, royalties and other real property interests, all gold, silver and other ores, minerals, metals, mineral elements and compounds, dore, concentrate, veins, lodes and mineral deposits that are on, in, under, extending from or into, produced or to be produced from, stored, stacked, handled, processed, refined, beneficiated, transported or marketed on or from all or any part of the Land, together with all of the buildings and other improvements now or hereafter erected on the Land, and any fixtures appurtenant thereto and (iii) any Mining Property.

"**Receivables**" means all Accounts, all Payment Intangibles, all Instruments, all Chattel Paper, all Electronic Chattel Paper (as each such term is defined in Section 1.13), and all obligations supporting or otherwise relating to any of the foregoing.

"**Register**" has the meaning specified in Section 12.7(e).

"**Related Party**" means in respect of any Credit Party (a) a Person that alone or in combination with others holds an Equity Interest or has contractual rights sufficient to affect the Control of such Credit Party, (b) a Person who beneficially owns, directly or indirectly, voting securities of

such Credit Party or who exercises Control or direction over voting securities of such Credit Party or a combination of both carrying more than 10% of the voting rights attached to all voting securities of such Credit Party, (c) a director or senior officer of a Credit Party or a Person who is a Related Party by virtue of clauses (a) or (b) of this definition of any Credit Party, or (d) an Affiliate of any of the foregoing.

"**Release**" means any material release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, leaching or migration of any element or compound in or into the Environment (including the abandonment or disposal of any barrels, tanks, containers or receptacles containing any Hazardous Materials), or in, into or out of any vessel or facility, including the movement of any Hazardous Materials through the air, soil, subsoil, surface, water, groundwater, rock formation or otherwise.

"**Released Parties**" has the meaning assigned to such term in Section 7.13.

"**Relevant Jurisdiction**" means, from time to time, any jurisdiction in which a Credit Party has personal property or in which it carries on business as well as each of the jurisdictions in which real property comprising a Core Asset is located and any other jurisdiction as the Lender and Lender's Counsel may determine is relevant.

"**Secured Party Expenses**" means the amounts payable pursuant to Section 12.5(a).

"**Security**" means, at any time, the Liens in favor of the Lender in the Collateral securing the Obligations.

"**Security Agreements**" means this Agreement, each of the Orders (when entered by the Bankruptcy Court and in the case of the Interim Order, until the entry of the Final Order), the New Mortgages, the Control Agreements and any other security agreement, pledge agreement, control agreement or other Contract by which the Lender obtains a Lien in or on any property or assets of a Credit Party (including all shares held by such Credit Party) to secure the Obligations, together with all amendments, modifications, supplements, extensions and restatements thereof in accordance with its terms.

"**Security Documents**" means each of the Security Agreements and any other Contract evidencing, granting, perfecting or effecting the security granted to the Lender by any Credit Party, as security for the payment and performance of the Obligations, in each case, with all modifications, supplements, amendments, extensions or restatements thereto or thereof in accordance with their respective terms, all schedules and exhibits attached thereto and all financing statements and other Contracts or instruments required to be filed or recorded or notices required to be given in order to authenticate and perfect the Liens created by the foregoing.

"**Section 506(a) Determination**" means a determination under Section 506(a) of the Bankruptcy Code.

"**Structuring Fee**" has the meaning specified in Section 2.1.

"**Subject Properties**" means, collectively, the Mining Properties and all other Owned Properties and Leased Properties, and each individually a "**Subject Property**".

"**Subsidiaries**" means each subsidiary of a Credit Party.

"**subsidiary**" means with respect to any Person (the "**parent**") at any date, (i) any corporation, limited liability company, association or other business entity of which securities or other ownership interests representing more than 50% of the voting power of all Equity Interests entitled to vote in the election of the directors thereof are, as of such date, held by the parent and/or one or more subsidiaries of the parent, (ii) any partnership, (x) the sole general partner or the managing general partner of which is the parent and/or one or more subsidiaries of the parent or (y) the only general partners of which are the parent and/or one or more subsidiaries of the parent and (iii) any other Person that is otherwise Controlled by the parent and/or one or more subsidiaries of the parent, but, in the case of the Credit Parties, shall exclude Sand Creek Joint Venture Uranium One, Partner.

"**Subsidiary Properties**" has the meaning specified in Section 9.1(s).

"**Sureties**" means all sureties, present and future, as modified, renewed or increased, that are required to comply with applicable Authorizations and as required by a Governmental Entity.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholdings), assessments, fees or other charges imposed by any Governmental Entity, including any interest, additions to tax, penalties or similar liabilities applicable thereto.

"**Termination Date**" means the earliest of (i) the Maturity Date; (ii) the acceleration of all or any portion of the Obligations; (iii) 50 days after the entry by the Bankruptcy Court of the Interim Order, unless the Final Order shall have been entered and become effective prior thereto; (iv) the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code unless otherwise consented to in writing by the Lender; (v) the dismissal of any of the Chapter 11 Cases unless otherwise consented to in writing by the Lender; (vi) the effective date of any Debtor's plan of reorganization confirmed in the Chapter 11 Cases that provides for the payment in full in cash of all the Obligations; (vii) the closing of a sale of substantially all the assets of the Debtors, (viii) the filing of a plan of reorganization in the Cases by any party other than the Debtors without the consent of the Lender; (ix) the closing of a sale of substantially all the Collateral that is consented to by the Lender or that provides for the payment in full in cash on the date of such closing of all the Obligations; (x) the Debtors seek or propose to sell all or substantially all the assets of the Debtors and such sale does not or cannot reasonably be expected to provide for payment in full of all the Obligations without the consent of the Lender and (xi) the occurrence and continuance of an Event of Default and the determination by the Lender to terminate the DIP Facility.

"**Trade Secrets**" means all right, title and interest arising under any Applicable Law in or relating to trade secrets.

"**TSX**" means the Toronto Stock Exchange and each successor thereto.

"**UCC**" or "**Uniform Commercial Code**" means the Uniform Commercial Code as in effect from time to time in the State of New York; *provided*, *however*, that if a term is defined in Article 9 of the Uniform Commercial Code differently than in another Article thereof, the term shall have the meaning specified in Article 9; *provided*, *further* that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or nonperfection, of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such

21

perfection or effect of perfection or nonperfection or availability of such remedy, as the case may be.

"**Updated Budget**" has the meaning specified in Section 10.1(b)(ii).

"**USA Patriot Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"**U.S. Person**" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"**U.S. Tax Compliance Certificate**" has the meaning assigned to such term in paragraph (e)(ii)(C) of Section 5.2.

"**Variance Covenant Testing Period**" the meaning assigned to such term in Section 10.1(b)(iii).

"**Variance Testing Disbursements**" means, with respect to any Variance Covenant Testing Period, the aggregate cash disbursements of the Credit Parties during such period (other than (i) disbursements on account of professional fees and expenses and (ii) disbursements made with the consent of the Lender pursuant to orders of the Bankruptcy Court.

"**Variance Testing Revenue**" means, with respect to any Variance Covenant Testing Period, an amount equal to the aggregate cash receipts of the Credit Parties during such period (excluding proceeds of Loans).

"**Voting Shares**" means shares of capital stock of any class of any corporation carrying voting rights under all circumstances, provided that, for the purposes of such definition, shares which only carry the right to vote conditionally on the happening of any event shall not be considered Voting Shares, whether or not such event shall have occurred, nor shall any shares be deemed to cease to be Voting Shares solely by reason of a right to vote accruing to shares of another class or classes by reason of the happening of such event.

"**Waste**" means ashes, garbage and refuse and includes domestic waste, industrial waste, municipal refuse or such other wastes as are designated as such under any Environmental Law.

"**Weekly Actuals Report**" has the meaning specified in Section 10.1(b)(i).

**1.2     Other Usages**.  References to "**this Agreement**", "**the agreement**", "**hereof**", "**herein**", "**hereto**" and like references refer to this Agreement and not to any particular Article, Section, Subsection, paragraph or other subdivision of this Agreement.  Any references herein to any agreements or documents shall mean such agreements or documents as amended, supplemented, restated or otherwise modified from time to time in accordance with the terms hereof and thereof.

**1.3     Gender and Number**.  Any reference in the Credit Documents to gender includes all genders and words importing the singular number only include the plural and vice versa.

**1.4     Headings, Etc.**  The provision of a Table of Contents, the division of this Agreement into Articles and Sections and the insertion of headings are for convenient reference only and are not to affect the interpretation of this Agreement.

22

**1.5**     **Currency**.   All references in the Credit Documents to Dollars, unless otherwise specifically indicated, are expressed in the currency of the United States of America.

**1.6**     **Meaning of certain terms any reference in this Agreement to:**a Default being "**continuing**" means that such Default has not been waived or remedied and an Event of Default being "**continuing**" means that such Event of Default has not been waived;

(b)     unless otherwise indicated, a "**Credit Document**" or any other agreement or instrument is a reference to that Credit Document or other agreement or instrument as amended, modified, novated, supplemented, extended or restated;

(c)     "**Article**", "**Section**", "**Subsection**" and "**paragraph**" followed by a number or letter mean and refer to the specified Article, Section, Subsection or paragraph of this Agreement;

(d)     "**knowledge**" of any Person shall be deemed to mean such knowledge of any of the senior officers of a Credit Party after due and diligent inquiry.  Each party hereto acknowledges that no personal liability shall attach to any Person as a result of a breach of any representation or warranty in this Agreement; and

(e)     "**repay**" (or any derivative form thereof) shall, subject to any contrary indication, be construed to include "**prepay**" (and, as the case may be, the corresponding derivative form thereof).

**1.7**     **Certain Phrases, Etc.**   In any Credit Document (i) (x) the words "**including**" and "**includes**" mean "**including (or includes) without limitation**", and does not create or denote a limitation, (y) the phrase "**the aggregate of**", "**the total of**", "**the sum of**", or a phrase of similar meaning means "**the aggregate (or total or sum), without duplication, of**", and (z) the word "**asset**" includes present and future properties, revenues and rights of every description, (ii) in the computation of periods of time from a specified date to a later specified date, unless otherwise expressly stated, the word "**from**" means "**from and including**" and the words "**to**" and "**until**" each mean "**to but excluding**" and (iii) references to any law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such law.

**1.8**     **Accounting Terms**.   All accounting terms not specifically defined in this Agreement shall be interpreted in accordance with IFRS.

**1.9**     **Incorporation of Schedules**.   The schedules and exhibits attached to this Agreement shall, for all purposes of this Agreement, form an integral part of it.

**1.10**     **Conflict**.   The provisions of this Agreement prevail in the event of any conflict or inconsistency between its provisions and the provisions of any of the other Credit Documents.

**1.11**     **Certificates**.   Whenever the delivery of a certificate is a condition precedent to the taking of any action by the Lender or the occurrence of any event hereunder, the truth and accuracy of the facts and the diligent and good faith determination of the opinions stated in such certificate shall in each case be conditions precedent to have such action taken, and any certificate executed by any Credit Party shall be deemed to represent and warrant that the facts stated in such certificate are true and accurate in all respects.

**1.12**     **Permitted Liens**.   Any reference in this Agreement or any of the other Credit Documents to a Permitted Lien or a Lien permitted by this Agreement is not intended to subordinate or postpone, and

ACTIVE 210918977v.12

shall not be interpreted as subordinating or postponing, or as any agreement to subordinate or postpone, any Lien created by any of the Credit Documents to any Permitted Lien or any Lien permitted hereunder.

**1.13    UCC Terms**. Unless otherwise defined herein or the context otherwise requires, the following terms have the respective meanings provided in the UCC: (i) Accounts; (ii) Certificated Security; (iii) Chattel Paper; (iv) Commercial Tort Claims; (v) Documents; (vi) Deposit Accounts; (vii) Electronic Chattel Paper; (viii) Equipment; (ix) Financial Assets; (x) General Intangible; (xi) Goods; (xii) Instruments; (xiii) Inventory; (xix) Investment Property; (xv) Payment Intangibles; (xvi) Proceeds; (xvii) Securities Account; (xviii) Securities Intermediary; (xix) Uncertificated Security; (xx) Fixtures; (xxi) Letter-of-Credit Rights; (xxii) Supporting Obligations and (xxiii) Accessions.

## ARTICLE 2
## LOAN

**2.1    Structuring Fee**. On the date of the Closing Date, the Borrower shall pay to the Lender a one-time cash structuring fee in an amount equal to $120,000 (the "**Structuring Fee**"). The Structuring Fee shall be paid on the Closing Date in immediately available funds and is deemed earned as of the Effective Date and once paid, shall not be refundable under any circumstances.

**2.2    Loan**. On the terms and subject to the conditions contained in this Agreement, the Lender agrees to make a Loan (the "**Loan**") in Dollars to the Borrower from time to time from and after the Effective Date in an aggregate principal amount not to exceed the Commitment. The Loan shall be drawn in installments, consisting of (x) a first installment in an aggregate principal amount not to exceed $[1,265,000] plus the Structuring Fee, to be drawn on a date no earlier than the day of the entry of the Interim Order by the Bankruptcy Court, and no later than 20 days, after entry of the Interim Order by the Bankruptcy Court, and (y) additional installments drawn from time to time but not to exceed more than one installment every two weeks, in an aggregate principal amount not to exceed the excess of the Commitment over the sum of (i) the principal amount of the all prior installments drawn under the Loan, and (ii) the Carve-Out Reserve, to be funded on a date on or after the date of entry of the Final Order by the Bankruptcy Court but no later than one month prior to the Maturity Date. Amounts of the Loan repaid or prepaid may not be reborrowed. Each installment (other than the last installment drawn under the Loan, which may be in an amount equal to the undrawn portion of the Commitment) shall be in an amount not less than $750,000.

**2.3    Borrowing Procedures**. The Borrower shall request a draw under the Loan by delivering to Lender a written Borrowing Notice signed by the Borrower, which shall be delivered to the Lender on or prior to the date of the first draw of the Loan and no later than 2 Business Days (or such shorter period as may be agreed to by Lender) prior to the date of each subsequent requested draw under the Loan. Each Borrowing Notice shall be irrevocable and shall specify (i) that a draw under the Loan is requested by the Borrower, (ii) the date of the requested draw (which shall be a Business Day), (iii) the aggregate principal amount of such draw to be borrowed and (iv) such other information and certifications as set forth in the form of Borrowing Notice and as the Lender shall otherwise have reasonably requested. No draw under the Loan shall be made if a Default has occurred and is continuing or could result from such draw (unless the Lender has waived the relevant Default for the purpose of making such draw).

**2.4    Use of Proceeds; Borrower Account**.

(a)    Proceeds of each draw under the Loan shall be deposited by way of wire transfer or other electronic funds transfer of the applicable funds into the Borrower Account. No such proceeds shall be disbursed from the Borrower Account other than in accordance with this Section 2.4.

(b)      [RESERVED].

(c)      [RESERVED].

(d)      The Borrower shall fund each disbursement from the Borrower Account by way of check or wire transfer or other electronic funds transfer of the applicable funds to the intended recipients.

**2.5      Lender's Loan Records**.  The Lender shall maintain accounts and records evidencing the Loan and all payments received hereunder, which accounts and records shall constitute, in the absence of manifest error, *prima facie* evidence thereof.

**2.6      Termination or Reduction of Commitments**.   Any unused Commitment shall be terminated upon the earliest of (x) the final draw under the Loan, (y) the occurrence of an Event of Default if and to the extent required pursuant to Section 11.2 in accordance with the terms thereof and (z) the occurrence of the Termination Date.

### ARTICLE 3
### PROCEDURE AND PAYMENTS

**3.1      Repayment of Loans**.  The Borrower shall pay in full to Lender all the outstanding Obligations on the Maturity Date.

**3.2      Interest**.

(a)      The Interest Payment Amount on each Loan shall accrue from the date of the drawing thereof and shall be payable in arrears on each Interest Payment Date; provided, that on each Monthly Payment Date (but not, for the avoidance of doubt, on any other Interest Payment Date), the Interest Payment Amount (w) shall not be paid in cash and shall instead automatically be deemed added to the outstanding principal amount of the Loan, (x) shall be referred to in the aggregate as "Capitalized Interest", (y) shall be treated as an additional principal amount of the Loan due under, and evidenced by, this Agreement and (z) shall bear interest, from such Interest Payment Date until paid in full, at the rate per annum otherwise applicable to the Loan.

(b)      Interest (other than Capitalized Interest) accrued on the Loan or other monetary Obligations after the date such amount is due and payable (whether on the Termination Date, any Interest Payment Date, upon acceleration or otherwise) shall be payable upon demand.

(c)      Upon the occurrence and during the continuance of any Event of Default, the Borrower shall pay interest (after as well as before judgment) on the Loans and the other  Obligations, from the date on which such amount is due until such amount is paid in full, payable on demand, at a rate per annum equal at all times to the Interest Rate plus 2% (the "**Default Rate**").

(d)      Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; provided, that any Loan that is repaid on the same day on which it is made shall bear interest for one (1) day.

(e)      Each determination by the Lender of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

### ARTICLE 4
### PREPAYMENTS

25

**4.1    Mandatory Prepayments**.  The Borrower shall prepay the Loans, together with accrued and unpaid Interest Payment Amounts thereon, with the following amounts (each, a "**Mandatory Prepayment Amount**") and at the following times:

(a)    the amount of all Disposal Proceeds, simultaneously upon receipt; and

(b)    the amount of all Extraordinary Receipts received by or on behalf of any Credit Party, concurrently with receipt.

**4.2    Voluntary Prepayment of the Loan**.

(a)    The Borrower may prepay the Loan (in whole but not in part) at any time on five (5) Business Days prior written notice to the Lender (each, a "**Prepayment Notice**").

(b)    The Borrower shall make such prepayment in cash no later than five (5) Business Days following delivery of the Prepayment Notice, together with all other Obligations then outstanding.

(c)    The Prepayment Notice shall be irrevocable and shall state that the prepayment contemplated therein is for the full amount outstanding hereunder.

**4.3    Application of Prepayments**.  All amounts pre-paid to Lender by any Credit Party pursuant to this Article 4 on any date shall be applied first, to the payment of all costs, fees, expenses and indemnities then due and payable to the Lender and including all fees and expenses of attorneys and Consultants reimbursable hereunder; second, to the payment of all accrued and unpaid interest then due and payable on the Loans (other than any Capitalized Interest); and third, to the payment of principal of the Loan (including all Capitalized Interest thereon).

## ARTICLE 5
## PAYMENTS UNDER THIS AGREEMENT.

**5.1    Payments; Computation of Interest and Fees**.

(a)    The Borrower shall make any payment required to be made by it to the Lender without set-off, deduction, withholding, or counterclaim or cross-claim, by depositing the amount of cash then due (including with respect to each Interest Payment Amount) in Dollars by wire transfer to Lender in immediately available funds, in each case by not later than 12:00 p.m. (New York time) on the date the payment is due, to an account designated by the Lender.

(b)    Unless otherwise expressly provided in this Agreement, the Lender shall make the Loan and other payments to the Borrower under this Agreement by crediting the Borrower Account with the amount of the payment not later than 3:00 p.m. (New York time) on the date the payment is to be made.

(c)    Whenever any payment or delivery to be made hereunder shall be stated to be due on a day that is not a Business Day, the payment shall be made on the next succeeding Business Day.

(d)    All computations of interest and fees shall be made by the Lender on the basis of a year of 360 days taking into account the actual number of days (including the first day and the last day) occurring in the period for which the fees are payable.

**5.2    Taxes**.

(a)      **Payments Free of Taxes**.  Any and all payments by or on account of any obligation of any Credit Party hereunder or under any other Credit Document shall be made free and clear of and without reduction or withholding for any Taxes, except as required by Applicable Law. If any Applicable Law (as determined in the good faith discretion of an applicable Credit Party) requires the deduction or withholding of any Tax from any such payment by a Credit Party, then the applicable Credit Party shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Entity in accordance with Applicable Law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Credit Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the Lender receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)      **Payment of Other Taxes by the Credit Parties**.  Without limiting the provisions of subsection (a) above, the applicable Credit Party shall timely pay any Other Taxes to the relevant Governmental Entity in accordance with Applicable Law or at the option of the Lender timely reimburse it for the payment of any Other Taxes.

(c)      **Indemnification by the Credit Parties**.  The Credit Parties shall indemnify the Lender, within 10 days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by the Lender or required to be withheld or deducted from a payment to the Lender, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Entity. A certificate as to the amount of such payment or liability delivered to the Borrower by the Lender shall be conclusive absent manifest error.

(d)      **Evidence of Payments**.  Upon request of the Lender, as soon as practicable after any payment of any Taxes by any Credit Party to a Governmental Entity, such Credit Party shall deliver to the Lender the original or a certified copy of a receipt issued by such Governmental Entity evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Lender.

(e)      **Status of Lender**.

(i)      If the Lender is entitled to an exemption from or reduction of withholding Tax with respect to payments hereunder or under any other Credit Document, the Lender shall deliver to the Borrower, at the time or times reasonably requested by the Borrower, such properly completed and executed documentation reasonably requested by the Borrower as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, the Lender, if requested by the Borrower, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by the Borrower as will enable the Borrower to determine whether or not the Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in clauses (ii) – (iv) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject the Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of the Lender.

(ii)      Without limiting the generality of the foregoing, or any successor or assignee of the Lender that is a U.S. Person shall deliver to the Borrower on or prior to the date on which such successor or assignee becomes a party under this Agreement (and from time to time

thereafter upon the reasonable request of the Borrower), executed originals of IRS Form W-9 certifying that successor or assignee is exempt from U.S. federal backup withholding tax. Any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a party under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

      (A)     duly completed and executed originals of IRS Form W-8BEN (or applicable successor form, including W-8BENE) claiming eligibility for benefits of an income tax treaty to which the United States is a party,

      (B)     duly completed and executed originals of IRS Form W- 8ECI,

      (C)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrower within the meaning of section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code ("**U.S. Tax Compliance Certificate**") and (y) duly completed and executed originals of Internal Revenue Service Form W-8BEN (or applicable successor form, including W-8BENE),

      (D)     to the extent a Foreign Lender is not the beneficial owner, duly completed and executed originals of IRS Form W-8IMY, accompanied by any applicable "withholding statement" required by Applicable Law to be associated with the IRS Form W-8IMY, and IRS Form W-8ECI, IRS Form W-8BEN (or applicable successor form, including W-8BEN-E), the certifications described in clause (ii)(C) above, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; *provided* that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide the certifications described in clause (ii)(C) on behalf of each such direct and indirect partner, or

      (E)     any other form prescribed by Applicable Law as a basis for claiming exemption from or a reduction in United States Federal withholding tax duly completed together with such supplementary documentation as may be prescribed by Applicable Law to permit the Borrower to determine the withholding or deduction required to be made.

      (f)     **Treatment of Certain Refunds**.  If the Lender determines, in its sole discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section, it shall pay to the Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of the Lender, as the case may be, and without interest (other than any interest paid by the relevant Governmental Entity with respect to such refund), *provided* that the Borrower, upon the request of the Lender, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Entity) to the Lender in the event the Lender is required to repay such refund to such Governmental Entity. Notwithstanding anything to the contrary in this paragraph (f), in no event will the

ACTIVE 210918977v.12

Lender be required to pay any amount to the Borrower pursuant to this paragraph (f) the payment of which would place the Lender in a less favorable net after-Tax position than the Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This subsection shall not be construed to require the Lender to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrower or any other Person.

(g)      The Credit Parties' obligations under this Section 5.2 shall survive without limitation the termination of the DIP Facility and this Agreement and all other Credit Documents and the permanent repayment of the outstanding credit and all other amounts payable hereunder.

## ARTICLE 6
## GUARANTEE

**6.1      Guarantee**.

To induce the Lender to make the Loans, each Guarantor hereby, jointly and severally, absolutely, unconditionally and irrevocably guarantees, as primary obligor and not merely as surety, the full and punctual payment and performance when due, whether at stated maturity or earlier, by reason of acceleration, mandatory prepayment or otherwise in accordance with any Credit Document, of all the Obligations of the Borrower whether existing on the Effective Date or thereinafter incurred or created (the "**Guaranteed Obligations**"). This Guarantee by each Guarantor hereunder constitutes a guarantee of payment and not of collection. This Guarantee is a continuing guarantee of payment and shall apply to all Guaranteed Obligations.

**6.2      Contribution**.

To the extent that any Guarantor shall be required hereunder to pay any portion of any Guaranteed Obligation exceeding the greater of (a) the amount of the economic benefit actually received by such Guarantor from the Loans and other Obligations and (b) the amount such Guarantor would otherwise have paid if such Guarantor had paid the aggregate amount of the Guaranteed Obligations (excluding the amount thereof repaid by the Borrower) in the same proportion as such Guarantor's net worth on the date enforcement is sought hereunder bears to the aggregate net worth of all the Guarantors on such date, then such Guarantor shall be reimbursed by such other Guarantors for the amount of such excess, pro rata, based on the respective net worth of such other Guarantors on such date.

**6.3      Authorization; Other Agreements**.

Subject to the Interim Order or the Final Order, as applicable, the Lender is hereby authorized, without notice to or demand upon any Guarantor and without discharging or otherwise affecting the obligations of any Guarantor hereunder and without incurring any liability hereunder, from time to time, to do each of the following:

(a)      (i) modify, amend, supplement or otherwise change, (ii) accelerate or otherwise change the time of payment or (iii) waive or otherwise consent to noncompliance with, any Guaranteed Obligation or any Credit Document;

(b)      apply to the Guaranteed Obligations any sums by whomever paid or however realized to any Guaranteed Obligation in such order as provided in the Credit Documents;

(c)      refund at any time any payment received by the Lender in respect of any Guaranteed Obligation;

(d)      (i) Dispose of, exchange, enforce, waive, substitute, liquidate, terminate, release, abandon, fail to perfect, subordinate, accept, substitute, surrender, exchange, affect, impair or otherwise alter or release any Collateral for any Guaranteed Obligation or any other guarantee therefor in any manner, (ii) receive, take and hold additional Collateral to secure any Guaranteed Obligation, (iii) add, release or substitute all or any Guarantors, makers or endorsers of any Guaranteed Obligation or any part thereof and (iv) otherwise deal in any manner with the Borrower and any other Guarantor, maker or endorser of any Guaranteed Obligation or any part thereof; and

(e)      settle, release, compromise, collect or otherwise liquidate the Guaranteed Obligations.

**6.4      Guarantee Absolute and Unconditional**.

Each Guarantor hereby waives and agrees not to assert any defense, whether arising in connection with or in respect of any of the following or otherwise, and hereby agrees that its obligations under this Guarantee are irrevocable, absolute and unconditional and shall not be discharged as a result of or otherwise affected by any of the following (which may not be pleaded and evidence of which may not be introduced in any proceeding with respect to this Guarantee, in each case except as otherwise agreed in writing by the Lender):

(a)      the invalidity or unenforceability of any obligation of the Borrower or any other Guarantor under any Credit Document or any other agreement or instrument relating thereto (including any amendment, consent or waiver thereto), or any security for, or other guarantee of, any Guaranteed Obligation or any part thereof, or the lack of perfection or continuing perfection or failure of priority of any security for the Guaranteed Obligations or any part thereof;

(b)      the absence of (i) any attempt to collect any Guaranteed Obligation or any part thereof from the Borrower or any Guarantor or other action to enforce the same or (ii) any action to enforce any Credit Document or any Lien thereunder;

(c)      the failure by any Person to take any steps to perfect and maintain any Lien on, or to preserve any rights with respect to, any Collateral;

(d)      any workout, insolvency, bankruptcy proceeding, reorganization, arrangement, liquidation or dissolution by or against the Borrower, any Guarantor or any of the Borrower's other Subsidiaries (including, without limitation, the Chapter 11 Cases) or any procedure, agreement, order, stipulation, election, action or omission thereunder, including any discharge or disallowance of, or bar or stay against collecting, any Guaranteed Obligation (or any interest thereon) in or as a result of any such proceeding;

(e)      any foreclosure, whether or not through judicial sale, and any other Disposition of any Collateral or any election following the occurrence of an Event of Default by the Lender to proceed separately against any Collateral in accordance with the Lender's rights under any Applicable Law; or

(f)      any other defense, setoff, counterclaim or any other circumstance that might otherwise constitute a legal or equitable discharge of the Borrower, any other Guarantor or any of the Borrower's other Subsidiaries, in each case other than the payment in full of the Guaranteed Obligations.

**6.5      Waivers**.

ACTIVE 210918977v.12

Each Guarantor hereby unconditionally and irrevocably waives and agrees not to assert any claim, defense, setoff or counterclaim based on diligence, promptness, presentment, requirements for any demand or notice hereunder including any of the following: (a) any demand for payment or performance and protest and notice of protest, (b) any notice of acceptance, (c) any presentment, demand, protest or further notice or other requirements of any kind with respect to any Guaranteed Obligation (including any accrued but unpaid interest thereon) becoming immediately due and payable and (d) any other notice in respect of any Guaranteed Obligation or any part thereof, and any defense arising by reason of any disability or other defense of the Borrower or any Guarantor. Each Guarantor further unconditionally and irrevocably agrees not to (x) enforce or otherwise exercise any right of subrogation or any right of reimbursement or contribution or similar right against the Borrower or any other Guarantor by reason of any Credit Document or any payment made thereunder until all Obligations are satisfied or (y) assert any claim, defense, setoff or counterclaim it may have against any other Credit Party or set off any of its obligations to such other Credit Party against obligations of such Credit Party to such Guarantor. In addition, any Debt of the Borrower or any other Credit Party now or hereafter held by any Guarantor is hereby subordinated in right of payment to the prior indefeasible payment-in-full of the Obligations. No obligation of any Guarantor hereunder shall be discharged other than by complete performance.

**6.6    Reliance**.

Each Guarantor hereby assumes responsibility for keeping itself informed of the financial condition of the Borrower, each other Guarantor and any other guarantor, maker or endorser of any Guaranteed Obligation or any part thereof, and of all other circumstances bearing upon the risk of nonpayment of any Guaranteed Obligation or any part thereof that diligent inquiry would reveal, and each Guarantor hereby agrees that Lender shall not have any duty to advise any Guarantor of information known to it regarding such condition or any such circumstances. In the event the Lender, in its sole discretion, undertakes at any time or from time to time to provide any such information to any Guarantor, the Lender shall be under no obligation to (a) undertake any investigation not a part of its regular business routine, (b) disclose any information that such the Lender, pursuant to accepted or reasonable commercial finance or banking practices, wishes to maintain confidential or (c) make any future disclosures of such information or any other information to any Guarantor.

**ARTICLE 7**
**SECURITY INTERESTS**

**7.1    Security Interest**.

To induce the Lender to enter into this Agreement and the other Credit Documents and to secure the due and punctual payment of all Obligations, howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing or due or to become due, in accordance with the terms thereof and to secure the performance of all of its Obligations and the Obligations of all other Credit Parties hereunder and under the other Credit Documents, each Credit Party hereby grants to the Lender a security interest in, and each Credit Party hereby pledges and collaterally assigns to the Lender, a Lien upon and a continuing first-priority Lien security interest (subject only to (i) the Carve-Out, (ii) Pre-Petition Liens and (iii) Permitted Existing Liens but in any event as provided in Section 7.9) in accordance with sections 364(c)(2) and (3) of the Bankruptcy Code, in all of its right, title and interest in, to and under all property and assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of such Credit Party, whether owned or consigned by or to, or leased from or to, such Credit Party, and regardless of where located (all of which being hereinafter collectively referred to as the "**Collateral**"), including all:

(a)    Pre-Petition Collateral;

31

(b)      Receivables;

(c)      Chattel Paper;

(d)      Commercial Tort Claims;

(e)      Deposit Accounts;

(f)      Documents;

(g)      Equipment;

(h)      Fixtures;

(i)      General Intangibles (including Payment Intangibles);

(j)      Goods;

(k)      Instruments;

(l)      intellectual property;

(m)      Inventory;

(n)      Investment Property;

(o)      Letter-of-Credit Rights;

(p)      Real Estate;

(q)      software;

(r)      Supporting Obligations;

(s)      money, policies and certificates of insurance, deposits, cash or other property;

(t)      books, records and information relating to any of the foregoing and/or to the operation of any Credit Party's business, and all rights of access to such books, records, and information, and all property in which such books records and information are stored, recorded and maintained;

(u)      without duplication, each Mining Property and all of each Credit Party's rights in patented and unpatented mining claims, licenses and permits required for the extraction of minerals or metals from any Mining Property;

(v)      insurance proceeds, refunds and premium rebates, including, without limitation, proceeds of fire and credit insurance, whether any of such proceeds, refunds and premium rebates arise out of any of the foregoing ((i) through (u)) and otherwise;

(w)      any and all of such Credit Party's interest under all policies of insurance relating to any of the Collateral or any part of the Real Estate (the "**Assigned Insurance Policies**"), including, without limitation, (A) all rights of such Credit Party to receive monies due and to become due under or pursuant to the Assigned Insurance Policies, including, without limitation, all insurance proceeds paid or payable

upon the occurrence of any loss, destruction damage, condemnation or other taking of the applicable Collateral, (B) all claims of such Credit Party for damages arising out of or for breach of or default under the Assigned Insurance Policies and (C) all other rights, remedies, benefits and privileges of such Credit Party under the Assigned Insurance Policies, including, without limitation, all rights to terminate, amend, supplement, modify or waive performance under the Assigned Insurance Policies and to compel performance and otherwise to exercise all rights and remedies thereunder;

(x)    liens, guaranties, rights, remedies, and privileges pertaining to any of the foregoing ((a) through (w)), including the right of stoppage in transit; and

(y)    any of the foregoing whether now owned or now due, or in which any Credit Party has an interest, or hereafter acquired, arising, or to become due, or in which any Credit Party obtains an interest, and all products, Proceeds, substitutions, and Accessions of or to any of the foregoing;

*provided*, *however*, that the Collateral shall not include the following property (collectively, the "**Excluded Property**"): (i) any (a) permit, lease, license, contract, instrument or other agreement held by a Credit Party that prohibits or requires the consent of any Person as a condition to the creation by such Credit Party of a security interest or Lien thereon or that would be breached or give the other party the right to terminate it as a result thereof, or any permit, lease, license contract or other agreement held by a Credit Party to the extent that any law applicable thereto prohibits the creation of a security interest or Lien thereon or that would be breached or give the other party the right to terminate it as a result thereof, but only, in each case to the extent, and for so long as, such prohibition is not terminated or rendered unenforceable or otherwise deemed ineffective by the UCC (including Sections 9-406(a), 9-407(a), 9-408(a) and 9-409 of the UCC) or any other law, and (b) Equipment owned by a Credit Party that is subject to a purchase money Lien or a capital lease which is permitted under this Agreement if the contract or other agreement in which such Lien is granted (or in the documentation providing for such capital lease) prohibits or requires the consent of any Person as a condition to the creation of any other Lien on such equipment or that would be breached or give the other party the right to terminate it as a result thereof; (ii) any Excluded Shares; (iii) any intent-to-use trademark applications to the extent that, and solely during the period in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to- use trademark applications under applicable federal law, *provided* that upon submission and acceptance by the United States Patent and Trademark Office of an amendment to allege use pursuant to 15 U.S.C. Section 1060(a) (or any successor provision), such intent-to-use trademark application shall be considered Collateral; and (iv) any avoidance actions under Chapter 5 of the Bankruptcy Code; *provided*, *however*, (A) "Excluded Property" shall not include any Proceeds, substitutions or replacements of Excluded Property (unless such Proceeds, substitutions or replacements would constitute replacements of Excluded Property); (B) if and when any property shall cease to be Excluded Property, such property shall be deemed at all times from and after the date hereof to constitute Collateral and (C) from and after the entry by the Bankruptcy Court of the Final Order, Collateral shall include all proceeds of avoidance actions under Chapter 5 of the Bankruptcy Code and any property received thereby whether by judgment, settlement or otherwise.

**7.2    Perfection of Security Interests**.

(a)    Each Credit Party hereby irrevocably authorizes the Lender and its Affiliates, counsel and other representatives, at any time and from time to time, to file in the name of such Credit Party or otherwise and without separate authorization or authentication of such Credit Party appearing thereon, such UCC financing statements or continuation statements as the Lender may reasonably deem necessary or reasonably appropriate to further perfect or maintain the perfection of the Lien of the Lender under this Agreement, and such financing statements and amendments may describe the Collateral covered thereby as "all of the debtor's personal property and assets" or words to similar effect, whether now owned or

hereafter acquired, notwithstanding that such description may be broader in scope than the Collateral described in this Agreement.  Each Credit Party hereby also authorizes the Lender and its Affiliates, counsel and other representatives, at any time and from time to time, to execute and file any and all agreements, instruments, documents and papers as the Lender may reasonably request to evidence the Lien of the Lender in any intellectual property and the goodwill or accounts and general intangibles of such Credit Party relating thereto or represented thereby.  Such Credit Party agrees that, except to the extent that any filing office requires otherwise, a carbon, photographic, photostatic or other reproduction of this Agreement or of a financing statement is sufficient as a financing statement.  The Credit Parties shall pay the costs of, or incidental to, any recording or filing of any financing or continuation statements or other assignment documents concerning the Collateral.

(b)     The DIP Liens are granted as security only and shall not subject the Lender to, or in any way alter or modify, any obligation or liability of any Credit Party with respect to or arising out of the Collateral.

(c)     Each Credit Party will promptly deliver or cause to be delivered each Instrument and each Certificated Security to the Lender, accompanied by duly executed stock powers or other instruments of transfer or assignment in blank, all in form and substance reasonably satisfactory to the Lender and all promissory notes shall be endorsed by the applicable Credit Party or accompanied by a duly executed instrument of transfer or assignment in blank.

(d)     Notwithstanding subsections (a), (b) and (c) of this Section 7.2, or any failure on the part of any Credit Party or the Lender to take any of the actions set forth in such subsections, the Liens and security interests granted herein shall be deemed valid, enforceable and perfected by entry of the Interim Order and the Final Order, as applicable. No financing statement, notice of lien, mortgage, deed of trust or similar instrument in any jurisdiction or filing office need be filed or any other action taken in order to validate and perfect the Liens and security interests granted by or pursuant to this Agreement, the Interim Order or the Final Order.

**7.3     Lender's Rights; Limitations on Lender's Obligations**.

(a)     Subject to each Debtor's rights and duties under the Bankruptcy Code (including section 365 of the Bankruptcy Code), it is expressly agreed by each Debtor that, anything herein or in any other Credit Document to the contrary notwithstanding, each Debtor shall remain liable under each of its respective Contractual Obligations incurred after the Petition Date or assumed with the consent of the Lender and Bankruptcy Court approval to observe and perform all the conditions and obligations to be observed and performed by it thereunder.  The Lender shall have no obligation or liability under any Contractual Obligation by reason of or arising out of this Agreement or any other Credit Document or the granting herein of a Lien thereon or the receipt by the Lender of any payment relating to any Contractual Obligation pursuant hereto.  The Lender shall not be required or obligated in any manner to perform or fulfill any of the obligations of any Credit Party under or pursuant to any Contractual Obligation, or to make any payment, or to make any inquiry as to the nature or the sufficiency of any payment received by it or the sufficiency of any performance by any party under any Contractual Obligation, or to present or file any claims, or to take any action to collect or enforce any performance or the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

(b)     Subject to the Interim Order or the Final Order, as applicable, at any time after an Event of Default has occurred and is continuing, after giving notice to the relevant Credit Party of its intent to do so, the Lender may notify each of such Credit Party's Account Debtors and all other Persons obligated on any of the Collateral that the Lender has a security interest therein, and that payments shall be made directly to the Lender (by instructing that such payments be remitted by direct wire transfer to the Lender

34

or to a post office box which shall be in the name and under the control of the Lender).  Once any such notice has been given to any Account Debtor or other Person obligated on the Collateral, none of the Credit Parties shall give any contrary instructions to such Account Debtor or other Person without the Lender's prior written consent.

(c)     Subject to the Interim Order or the Final Order, as applicable, at any time after an Event of Default has occurred and is continuing, the Lender may in the Lender's own name, in the name of a nominee of the Lender or in the name of any Credit Party communicate with (and such Credit Party hereby authorizes the Lender to so notify) each Account Debtor to verify with such Persons, to the Lender's reasonable satisfaction, the existence, amount, terms of, and any other matter relating to, Accounts, Instruments, Chattel Paper and/or Payment Intangibles, and that such Collateral has been assigned to the Lender, and that any payments due or to become due in respect of such Collateral are to be made directly to the Lender or any other designee on its behalf.

(d)     It is understood and agreed that the security interests in cash and Investment Property created hereunder shall not prevent the Debtors from using such assets in the ordinary course of their respective businesses, subject to the provisions of the Interim Order, the Final Order (as applicable), the Approved Budget and the Credit Documents.

**7.4     Covenants with Respect to Collateral**.

Without limiting any Credit Party's covenants and agreements contained in this Agreement and the other Credit Documents, each Credit Party covenants and agrees with the Lender that from and after the date of this Agreement and until the Termination Date:

(a)     Further Assurances; Pledge of Instruments; Chattel Paper.

(i)     At any time and from time to time, upon the reasonable written request of the Lender and at the sole expense of such Credit Party, such Credit Party shall promptly and duly execute and deliver any and all such further instruments and documents and take such further actions (including the filing and recording of financing statements and other documents) as the Lender may reasonably deem necessary to obtain the full benefits of this Agreement and of the rights and powers herein granted with respect to the Collateral, including (A) using its commercially reasonable efforts to enforce the security interests granted hereunder; and (B) filing any financing or continuation statements under the UCC in effect in any jurisdiction with respect to the Liens granted hereunder or under any other Credit Document.

(ii)     (A) Without the prior written consent of the Lender, such Credit Party will not (x) sell, assign, transfer or pledge the pledged Collateral (except pursuant to a transaction permitted by this Agreement) or (y) otherwise encumber any of its rights in or to the Collateral (except for Permitted Liens), or any unpaid dividends, interest or other distributions or payments with respect to the pledged Collateral or grant a Lien in the pledged Collateral, unless otherwise expressly permitted by this Agreement; (B) upon the written request of the Lender, each Credit Party will, at its expense, promptly execute and deliver all such further instruments and take all such further actions as the Lender from time to time may reasonably request in order to ensure to the Lender the security interests to the pledged Collateral granted hereby are perfected to the extent not expressly prohibited under the Interim Order or the Final Order, as applicable; and (C) subject to the Interim Order or the Final Order, as applicable, in the case of each Credit Party which is an issuer of Equity Interests pledged hereunder, such Credit Party agrees that after an Event of Default it will comply with instructions of the Lender with respect to the Equity Interests

35

of such issuer without further consent by the applicable Credit Party, *provided* that the Lender shall not issue any such instructions unless an Event of Default has occurred and is continuing.

(iii)     Unless such Collateral either (x) has been delivered to, and is held by, the Pre-Petition Lender pursuant to the Pre-Petition Credit Agreement or (y) has been delivered to the Lender subject to the Interim Order or the Final Order, as applicable, such Credit Party will promptly deliver or cause to be delivered to the Lender all Collateral consisting of the following negotiable Documents, Certificated Securities, Chattel Paper and Instruments (in each case, accompanied by stock powers, alonges or other instruments of transfer executed in blank) promptly (and in any event within ten (10) Business Days) after such Credit Party receives the same:  (A) any negotiable Document or Instrument having a value in excess of $[25,000], (B) any Certificated Securities (other than certificated pledged Equity Interests of Subsidiaries of such Credit Party delivered to the Lender pursuant to Section 7.2(c)) or (C) any Chattel Paper (other than Chattel Paper (I) the value of which, in the aggregate for all such Chattel Paper, does not exceed $[100,000] or (II) which evidences leases of Inventory for a period of time that is less than one month), and such Credit Party will provide prompt written notice of receipt thereof to the Lender.

(iv)     Unless delivered to, and held by, the Pre-Petition Lender pursuant to the Pre-Petition Credit Agreement, each Credit Party will, upon obtaining ownership of any additional Equity Interests or promissory notes or Instruments or any Equity Interests or promissory notes or Instruments required to be pledged to the Lender pursuant to clause (ii) above, which Equity Interests, notes or Instruments are not listed in the Perfection Certificate on the date hereof, promptly deliver to the Lender a pledge amendment in form and substance reasonably satisfactory to the Lender (a "**Pledge Amendment**") in respect of any such additional Equity Interests, promissory notes or Instruments.  Each Credit Party hereby authorizes the Lender to attach each Pledge Amendment to this Agreement and agrees that all Equity Interests, promissory amounts or instruments listed on any Pledge Amendment delivered to the Lender shall for all purposes hereunder be considered Collateral.

(v)     Such Credit Party shall obtain authenticated Control Agreements from (x) each Securities Intermediary issuing or holding any Financial Assets to or for such Credit Party and (y) each commodities intermediary holding commodities for such Credit Party; and such Credit Party shall within twenty (20) Business Days after acquiring any Uncertificated Securities that are not credited to a Securities Account obtain from each issuer of such Uncertificated Securities an acknowledgment of the pledge of such Uncertificated Securities to the Lender granting "control" (within the meaning of Section 8-106 of the UCC) over such Uncertificated Securities to the Lender and in a form that is reasonably satisfactory to the Lender.

(vi)     At any time (x) upon the Lender's reasonable written request or (y) if an Event of Default has occurred and is continuing, unless the Lender has otherwise consented in writing (which consent may be revoked) or control has been granted to the Pre-Petition Lender, such Credit Party shall take all steps necessary to grant the Lender control of all Electronic Chattel Paper in accordance with the UCC and all "transferable records" as defined in each of the Uniform Electronic Transactions Act and the Electronic Signatures in Global and National Commerce Act.

(vii)     Such Credit Party shall promptly, and in any event within twenty (20) Business Days after the same is acquired by it, notify the Lender of Commercial Tort Claims in excess of $[25,000], individually or in the aggregate, acquired by it.

36

(b)      **Notices**.  Such Credit Party will advise the Lender promptly, in reasonable detail, of any Lien (other than Permitted Liens) on or claim made or asserted against a material portion of the Collateral of which it has knowledge, which could reasonably be expected to have a Material Adverse Effect on the Collateral or the ability of the Lender to exercise any of its remedies hereunder.

(c)      **Organizational/Collateral Location Changes; No Reincorporation**.   Except as otherwise contemplated by this Agreement or a plan of reorganization of the Debtors approved by the Lender in accordance with section 1126 of the Bankruptcy Code, such Credit Party will give the Lender at least thirty (30) calendar days prior written notice of any change to the information set forth in the Perfection Certificate to the extent needed to make the Perfection Certificate up to date and accurate. Such Credit Party shall not affect any such change unless it has taken all steps necessary or reasonably required by the Lender to maintain continued perfection of the Lender's security interest in the Collateral with the same priority as prior to such change. Without limiting the prohibitions on mergers involving any Credit Party as contained in this Agreement, none of the Credit Parties shall reincorporate or reorganize itself under the laws of any jurisdiction other than the jurisdiction in which it is incorporated or organized as of the date hereof without the prior written consent of the Lender.

(d)      **Maintenance of Security Interest**.  Such Credit Party shall promptly notify the Lender in writing of its acquisition of any interest hereafter in property that is of a type where a security interest or Lien must be registered, recorded or filed under, or notice thereof given under, any federal statute or regulation. Such Credit Party shall maintain the security interest created by this Agreement as a perfected security interest having at least the priority described in this Agreement and shall support the Lender in the defense of such security interest and such priority against the claims and demands of all Persons.

(e)      **Use of Collateral**.  Such Credit Party will do nothing to impair the rights of the Lender in any of the Collateral. Such Credit Party will not use or permit any Collateral to be used unlawfully or in violation of any provision of applicable law, or any insurance policy covering any of the Collateral. Without limiting the foregoing, such Credit Party will not permit the production of Inventory in violation of any provision of the Fair Labor Standards Act and such Credit Party will not adjust, settle or compromise the amount or payment of any Account, or release wholly or partly any Account Debtor thereof or allow any credit or discount thereon (other than credits and discounts in the ordinary course of business).

**7.5**      **Bank Accounts; Collection of Accounts and Payments**.

Each Credit Party, and any of its Affiliates, employees, agents and other Persons acting for or in concert with any Credit Party shall, acting as trustee for the Lender, receive, as the sole and exclusive property of the Lender, any moneys, checks, notes, drafts or other payments relating to and/or constituting proceeds of Accounts or other Collateral which come into the possession or under the control of such Credit Party or any Affiliates, employees, agent, or other Persons acting for or in concert with any Credit Party, and immediately upon receipt thereof, such Credit Party or such Persons shall deposit the same or cause the same to be deposited in kind, in deposit accounts in accordance with the Cash Management Order.

**7.6**      **Grant of License to Use Property; Intellectual Property**.

Subject to the Interim Order and Final Order, as applicable,

(a)      for the purpose of enabling the Lender to exercise rights and remedies hereunder (including in order to take possession of, collect, receive, assemble, process, appropriate, remove, realize upon, sell, lease, license, assign, give an option or options to purchase or otherwise dispose of Collateral)

37

at such time as the Lender shall be lawfully entitled to exercise such rights and remedies and upon the occurrence and during the continuance of an Event of Default (subject to the Interim Order or the Final Order, as applicable), each Credit Party hereby grants to the Lender, subject to the provisions of any applicable License, an irrevocable, nonexclusive license (exercisable without payment of royalty or other compensation to such Credit Party) to use, license or sublicense any intellectual property now owned or hereafter acquired by such Credit Party, and wherever the same may be located, and including in such license access to all media in which any of the licensed items may be recorded or stored and to all software and programs used for the compilation or printout thereof and an irrevocable license (exercisable without payment of rent or other compensation to such Credit Party) to use and occupy all real estate owned or leased by such Credit Party.

(b)      after the occurrence of an Event of Default and in connection with exercising its rights under Section 7.6(a), the Lender, subject to the Interim Order or the Final Order, as applicable, may:

(i)      subject to the express terms of any valid and enforceable restriction in favor of a Person who is not a Credit Party that prohibits, or requires any consent or establishes any other conditions for, an assignment thereof, license, or sublicense, whether general, special or otherwise, and whether on an exclusive or non-exclusive basis, any intellectual property throughout the world for such term or terms, on such conditions and in such manner as the Lender shall in its sole discretion determine;

(ii)      without assuming any obligations or liability thereunder, at any time and from time to time, enforce (and shall have the exclusive right to enforce) against any licensee or sublicensee all rights and remedies of any Credit Party in, to and under any License and take or refrain from taking any action under any provision thereof, and each Credit Party hereby releases the Lender from, and agrees to hold the Lender free and harmless from and against any claims arising out of, any lawful action so taken or omitted to be taken with respect thereto;

(iii)      request that each Credit Party use its commercially reasonable efforts to obtain all requisite consents or approvals by the licensor or sublicensor of each License to effect the assignment of all of such Credit Party's right, title and interest thereunder to the Lender or its designee and will execute and deliver to the Lender a power of attorney, in form and substance reasonably satisfactory to the Lender, for the implementation of any lease, assignment, License, sublicense, grant of option, sale or other disposition of intellectual property; and

(iv)      direct any Credit Party to refrain, in which event such Credit Party shall refrain, from using or practicing any intellectual property in any manner whatsoever, directly or indirectly, and shall, if requested by the Lender, change such Credit Party's name to eliminate therefrom any use of any Trademark and will execute such other and further documents as the Lender may request to further confirm this change and transfer ownership of the intellectual property and registrations and any pending applications therefor to the Lender.

(c)      in the event of any disposition following the occurrence and during the continuance of any Event of Default, each Credit Party shall supply its know-how and expertise relating to the manufacture and sale of any products, services or works made or rendered in connection with or under intellectual property, and its customer lists and other records relating to such intellectual property and to the distribution of said products, services or works, to the Lender.

**7.7      Limitation on Lender's Duty in Respect of Collateral**.

The Lender's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under Section 9-207 of the UCC or otherwise, shall be to deal with it in the same manner as the Lender deals with similar collateral in its possession; provided that Lender complies in all material respects with all Applicable Laws in its management and operation of the Collateral. The Lender shall use reasonable care with respect to the Collateral in its possession or under its control. The Lender shall have no other duty as to any Collateral in its possession or control or in the possession or control of any agent or nominee of the Lender, or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto. The Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which it accords similar collateral in its possession. The Lender shall not be liable or responsible for any loss or damage to any of the Collateral, or for any diminution in the value thereof, by reason of the act or omission of any warehousemen, carrier, forwarding agency, consignee or other agent or bailee selected by the Lender in good faith. The powers conferred on the Lender hereunder are solely to protect the Lender's interest in the Collateral and shall not impose any duty upon the Lender to exercise any such powers. The Lender shall be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither it nor any of its officers, directors, employees or agents shall be responsible to any Credit Party for any act or failure to act hereunder, except for its own gross negligence or willful misconduct.

**7.8     Authorized Terminations**.

(a)     Upon any sale or other transfer by any Credit Party (other than any sale or transfer to another Credit Party) of any Collateral that is permitted under this Agreement or upon the effectiveness of any written consent to the release of the security interest granted hereby in any Collateral, the security interest in such Collateral shall be automatically released and such Collateral shall be sold free and clear of the Lien and security interests created hereby.

(b)     Following the Termination Date or the release pursuant to clause (a) above, the Lender shall promptly, at the expense of the relevant Credit Party, execute and deliver to such Credit Party all documents that such Credit Party shall reasonably request to evidence such termination or release, including authorization to file termination statements and releases in accordance with Section 9-513(c) of the UCC. Any execution and delivery of documents pursuant to this Section 7.8 shall be without recourse to or warranty by the Lender.

**7.9     Super-Priority Nature of Obligations**.

(a)     All Obligations shall constitute administrative expenses of the Debtors in the Chapter 11 Cases, with administrative priority and senior secured status under Sections 364(c) and 364(d) of the Bankruptcy Code.  Subject to the Carve-Out, such administrative claim shall have priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, 1114 or any other provision of the Bankruptcy Code or otherwise, and shall at all times be senior to the rights of the Debtors, the estates of the Debtors, and any successor trustee or estate representative in the Chapter 11 Cases or any subsequent proceeding or case under the Bankruptcy Code.

(b)     All Obligations shall at all times, subject to the Carve-Out, (i) subject to Section 364(d)(1) of the Bankruptcy Code, be secured by fully perfected first priority, valid, binding, enforceable, non-avoidable and automatically perfected priming security interest in and Liens upon (the "**Priming Liens**") the Pre-Petition Collateral and (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by fully perfected first priority, valid, binding, enforceable, non-avoidable and automatically perfected security interest in and liens upon the Collateral (other than Collateral referenced

in clause (i)) whether created, existing or acquired prior or subsequent to the commencement of the Cases (the "**First Liens**" and, together with the Priming Liens, the "**DIP Liens**").  The DIP Liens, and the priorities accorded to the Obligations, shall have the priority and senior secured status afforded by Sections 364(c) and 364(d)(l) of the Bankruptcy Code, all as more fully set forth in the Interim Order and Final Order.

(c)       The DIP Liens under Sections 364(c)(2),(c)(3) and (d) of the Bankruptcy Code, and the administrative claims under Section 364(c)(1) of the Bankruptcy Code, in each case afforded the Obligations, shall also have priority over any claims arising under Section 506(c) of the Bankruptcy Code subject and subordinate only to the Carve-Out.

**7.10      Payment of Obligations**.

On the Termination Date, the Lender shall be entitled to immediate payment of all outstanding Obligations without further application to or order of the Bankruptcy Court.

**7.11      Liens**.

(a)       The Credit Parties covenant and agree that the DIP Facility and all Obligations will at all times be secured by the DIP Liens as set forth in the Interim Order and the Final Order, as applicable.

(b)       The DIP Liens on Collateral of the Credit Parties will not be subject to challenge and will attach and become valid and perfected upon entry of the Interim Order without any requirement of any further action by the Lender.  Other than the DIP Liens, the Collateral will be free and clear of all Liens, claims and encumbrances other than Permitted Liens.

(c)       The Liens, lien priority, administrative priorities and other rights and remedies granted to the Lender pursuant to this Agreement, the Interim Order and/or the Final Order (specifically, including, but not limited to, the existence, perfection and priority of the Liens provided herein and therein and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of indebtedness by any Credit Party (pursuant to section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of any of the Chapter 11 Cases, or by any other act or omission whatsoever.

**7.12      No Discharge; Survival of Claims**.

The Credit Parties agree that (i) the Obligations hereunder shall not be discharged by the entry of an order confirming a plan of reorganization in any Chapter 11 Case (and the Debtors, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waive any such discharge) unless such order provides for the payment in full of the Obligations or the Lender otherwise consents and (ii) the super-priority administrative claim granted pursuant to the Interim Order and Final Order and described in Section 7.9 and the Liens granted to the Lender pursuant to the Interim Order and Final Order and described in Section 7.9 shall not be affected in any manner by the entry of an order confirming a plan of reorganization in any Chapter 11 Case.

**7.13      Release of Liability**.

The Credit Parties hereby acknowledge, effective upon entry of the Interim Order and subject to the terms thereof, that the Credit Parties have no defense, counterclaim, offset, recoupment, cross complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all or any part of the Credit Parties' liability to repay Lender as provided in this Agreement or any other

Credit Document or to seek affirmative relief or damages of any kind or nature from Lender. Subject to the Orders, the Credit Parties, each in their own right on behalf of their bankruptcy estates, and on behalf of all their successors, assigns, and any Affiliates and any Person acting for and on behalf of, or claiming through them, hereby fully, finally and forever release and discharge Lender, its Affiliates, and their respective past and present officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them (collectively, the "**Released Parties**") of and from any and all past and present actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages, including, without limitation, those payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement, any other Credit Document, the Interim Order, the Final Order or the transactions contemplated hereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing.

### 7.14   Waiver of Priming Rights.

Upon the Effective Date, and on behalf of themselves and their estates, and for so long as any Obligations shall be outstanding, the Credit Parties hereby irrevocably waive any right, pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Liens securing the Obligations, or to approve a claim of equal or greater priority than the Obligations, other than with respect to adequate protection Liens approved by order of the Bankruptcy Court in the Interim Order or the Final Order.

### 7.15   Priority of Claim.

The Credit Parties covenant and agree that the Obligations at all times will constitute DIP Administrative Claims, subject only to the Carve-Out.

## ARTICLE 8
## CONDITIONS OF LENDING

### 8.1   Conditions Precedent to each drawing under the Loan.

(a)   The obligation of the Lender to fund each drawing under the Loan hereunder is subject to the following conditions precedent being satisfied, fulfilled, waived or otherwise met to the satisfaction of the Lender at the time such draw under the Loan is requested and funded:

(i)   the representations and warranties made by the Credit Parties in the Credit Documents or which are contained in any certificate furnished at any time under or in connection herewith, or therewith, shall be true and correct as of the date the draw is made as if made on and as of such date, except for representations and warranties expressly stated to relate to a specific earlier date;

41

(ii)      no Default or Event of Default shall have occurred or be continuing on such date or after giving effect to such draw and the Lender shall have received a certificate of a senior financial officer of the Parent and of the Borrower so certifying to the Lender;

(iii)     immediately after giving effect to the making of any such draw (and the application of the proceeds thereof), the aggregate sum of all drawings under the Loan (excluding for such purposes any Capitalized Interest) shall not exceed the Commitment;

(iv)     other than the Cases, there shall not exist any litigation, investigation, bankruptcy or insolvency, injunction, order or claim affecting or relating to any Credit Party or any of its Subsidiaries, or any Mining Property, which has, had, or could reasonably be expected to have, a Material Adverse Effect, or which could reasonably be expected to affect the legality, validity or enforceability of this Agreement or any other Credit Document, in each case that has not been settled, dismissed, vacated, discharged or terminated;

(v)      no Material Adverse Effect shall have occurred and the Lender has not become aware of any facts which, in the Lender's opinion, could reasonably be expected to have a Material Adverse Effect;

(vi)     each of the Credit Documents is in full force and effect enforceable against the Credit Parties, as applicable, in accordance with its respective terms;

(vii)    execution and delivery by the Borrower of a duly completed Borrowing Notice with respect to such drawing, including all information reasonably requested from the Credit Parties;

(viii)   the Borrower shall have paid the Structuring Fee (which may, for the avoidance of doubt, be paid via withholding from the proceeds of the first drawing under the Loan);

(ix)     delivery of a certificate of an officer of the Borrower certifying that all necessary and relevant Authorizations relating to the development, mining and operation of each of the Mining Properties, have been obtained and none have been rescinded, cancelled or otherwise terminated in any respect;

(x)      evidence satisfactory to the Lender confirming the validity of the Security Documents and their application to the Loans and the Obligations as well as the validity and perfection of the DIP Liens granted by such Security Documents and the Orders with the Agreed Priority;

(xi)     all conditions set forth in Section 2.3, Section 2.4 and this Section 8.1 shall have been, and shall remain, satisfied to the satisfaction of the Lender in its sole discretion and the Borrower's delivery of a Borrowing Notice shall constitute the Borrower's representation and warranty that all such conditions precedent have been, and remain, satisfied;

(xii)    evidence satisfactory to the Lender that the proceeds of such drawing under the Loan shall be applied in accordance with the Approved Budget and that the proceeds of all prior drawings under the Loan have been applied in accordance with the Approved Budget;

(xiii)   other than in the case of the first drawing under the Loan, the Borrower shall have performed each of its obligations under the Funding Letter by the date on which such obligations are required to be performed pursuant to the Funding Letter; and

(xiv)    other than in the case of the first drawing under the Loan, the Final Order shall be entered and in full force and effect and shall not have been appealed, stayed, reversed, vacated or otherwise modified without the consent of the Lender.

**8.2    Conditions Precedent to First Draw under the Loan**.

(a)    In addition to the satisfaction of the conditions set out in Section 8.1, the obligation of the Lender to fund the first draw under the Loan is subject to and conditional upon the following conditions precedent being satisfied, fulfilled or otherwise met to the satisfaction of the Lender at the time such draw is requested and funded:

(i)    receipt by the Lender of the following documents, each in full force and effect, and in form and substance satisfactory to the Lender:

(A)    all data, reports, maps, surveys, financial statements, any Contract and any other information requested by the Lender for its diligence, including searches of all Lien filings, registrations and records deemed necessary by the Lender, and copies of any documents, filings and Instruments on file in such jurisdictions, shall have been provided, and the Lender shall have completed its technical, legal, financial, permitting, environmental, reclamation financial assurance and other diligence investigation of the Credit Parties and the Mining Properties in scope, and with results, satisfactory to the Lender;

(B)    executed copies of the Credit Documents, including this Agreement and the Security Documents (other than the New Mortgages), together with any filings or other instruments for filing or registration or notarization thereof, notices with respect thereto or other instruments determined by the Lender to be necessary or desirable to establish and perfect the DIP Liens established pursuant to the Security Documents and the Interim Order;

(C)    certificates of status or other similar type of evidence for the Credit Parties from all Relevant Jurisdictions;

(D)    certified copies of the Organizational Documents of each Credit Party;

(E)    officer certified copies of all Material Contracts;

(F)    a certified copy of the directors' resolutions of each Credit Party with respect to the authorization, execution and delivery of the Credit Documents, to which each is a party, being delivered in connection herewith;

(G)    a certificate of an officer of each Credit Party certifying the names and the true signatures of the officers authorized to sign the Credit Documents;

(H)    delivery of evidence that (i) the Lender is first loss payee and additional insured under the insurance policies and (ii) such insurance policies are in compliance with Section 10.1(p);

(I)    satisfactory searches of all mineral rights and other interests of each Credit Party in respect of the Mining Properties;

(J)      certificates representing the Equity Interests and Instruments pledged pursuant to the Security Documents together with duly executed stock transfer powers, unless such Collateral has been delivered to, and is held by, the Pre-Petition Lender pursuant to the Pre-Petition Credit Agreement;

(K)      a Perfection Certificate for each Credit Party signed by a senior officer of each such Credit Party;

(L)      accurate and complete copies of the most recent consolidated financial statements of the Parent;

(M)      all regulatory approvals for the transactions contemplated by each of the Credit Documents;

(N)      the Interim Order shall be entered and in full force and effect and shall not have been appealed, stayed, reversed, vacated or otherwise modified without the consent of the Lender;

(O)      a document setting forth a cash management system for the Credit Parties consistent with the existing cash management system of the Credit Parties;

(P)      the Lender shall have received a cash forecast for the period from the Petition Date through the Maturity Date setting forth projected cash flows and disbursements, to be in form, scope and substance acceptable to the Lender and in the form attached hereto as Exhibit D (the "**Approved Budget**"); and

(Q)      such other documents, certificates, opinions and agreements which the Lender may reasonably request;

(ii)      evidence that all DIP Liens created pursuant to the Security Documents or the Interim Order have been duly perfected and registered in all Relevant Jurisdictions and any other relevant jurisdiction as required by the Lender; and

(iii)      evidence of the entry by the Bankruptcy Court of all "first day orders" entered at or about the time of the commencements of the Chapter 11 Cases each in form and substance reasonably satisfactory to the Lender.

**8.3      Waiver**.  The conditions in Sections 8.1 and 8.2 are inserted for the sole benefit of the Lender and may be waived by the Lender, in whole or in part, with or without conditions, as the Lender may determine in its sole discretion.

## ARTICLE 9
## REPRESENTATIONS AND WARRANTIES

**9.1      Representations and Warranties**.  Each of the Credit Parties (other than Horizon Wyoming Uranium, unless expressly stated below), for itself and on behalf of each of its Subsidiaries (other than the Inactive Subsidiaries, unless expressly stated below), hereby represents and warrants to the Lender, acknowledging and confirming that the Lender is relying on such representations and warranties without independent inquiry in entering into this Agreement and making each Loan that:

ACTIVE 210918977v.12

(a)     **Incorporation and Qualification**.   Each of the Credit Parties (including Horizon Wyoming Uranium), and each of their respective Subsidiaries (including the Inactive Subsidiaries) is a corporation duly incorporated or organized and validly existing under the Applicable Laws of its jurisdiction of incorporation as set forth in its Perfection Certificate.  Each of the Credit Parties (including Horizon Wyoming Uranium) and each of their respective Subsidiaries (including the Inactive Subsidiaries) is qualified, licensed or registered to carry on business under the Applicable Laws in all jurisdictions in which such qualification, licensing or registration is necessary.

(b)     **Corporate Power**.   Each of the Credit Parties (including Horizon Wyoming Uranium) and each of their respective Subsidiaries (including the Inactive Subsidiaries) has, subject to the entry of the Orders, all requisite corporate power and authority to (i) own, lease and operate its properties and assets (including the Mining Properties) and to carry on its business as now being conducted by it, and (ii) enter into and perform its Obligations under the Credit Documents to which it is a party.

(c)     **Conflict with Other Instruments**.   The execution and delivery by each of the Credit Parties (including Horizon Wyoming Uranium) and the performance of its obligations under, and compliance with the terms, conditions and provisions of, the Credit Documents to which it is a party, will not (i) conflict with or result in a breach of any of the terms or conditions of (w) their Organizational Documents, (x) any Applicable Law, (y) any Contract or contractual restriction binding on or affecting them or their properties, or (z) any judgment, injunction, determination or award which is binding on them, or (ii) result in, require or permit (x) the imposition of any Lien in, on or with respect to any of their assets or properties (except in favor of the Lender), (y) the acceleration or the maturity of any Debt binding on or affecting any Credit Party or (z) any third party to terminate or acquire rights under any Material Contract.

(d)     **Corporate Action, Governmental Approvals, Etc**.   Subject to the entry of the Orders, the execution and delivery of each of the Credit Documents by each Credit Party (including Horizon Wyoming Uranium) that is a party thereto and the performance by such Credit Party of its Obligations under the Credit Documents, have been duly authorized by all necessary corporate action including, without limitation, the obtaining of any necessary equityholder consents.   Subject to the entry of the Orders, no authorization, consent, approval, registration, qualification, designation, declaration or filing with any Governmental Entity or other Person is or was necessary in connection with the execution, delivery and performance of the Obligations under the Credit Documents, except as are in full force and effect, unamended, at the date of this Agreement.

(e)     **Execution and Binding Obligation**.   This Agreement and the other Credit Documents have been duly executed and delivered by each Credit Party (including Horizon Wyoming Uranium) that is a party thereto and, subject to the entry of the Orders, constitute legal, valid and binding Obligations of such Credit Party enforceable against it in accordance with their respective terms, subject only to any limitation under Applicable Laws relating to (i) bankruptcy, insolvency, arrangement or creditors' rights generally and (ii) the discretion that a court may exercise in the granting of equitable remedies.

(f)     **No Default or Event of Default**.   No Default or Event of Default has occurred and is continuing or could result from any drawing of the Loan.

(g)     **All Authorizations Obtained and Registrations Made**.   The Security Documents and the Orders are effective to create in favor of the Lender, valid Liens with the Agreed Priority in the Collateral and the proceeds thereof enforceable against third parties and any trustee in bankruptcy and/or any other similar official.   Subject to the entry of the Orders, all Authorizations and registrations necessary to permit each Credit Party (including Horizon Wyoming Uranium)  to (i) execute, deliver and perform each Credit Document to which it is a party, (ii) create valid Liens enforceable against third

45

parties and any trustee in bankruptcy and/or any other similar official in the Collateral and the proceeds thereof with the Agreed Priority, (iii) consummate the transactions contemplated by the Credit Documents, (iv) own its property and assets and (v) carry on its business (including Authorizations and registrations necessary to permit the Credit Parties (including Horizon Wyoming Uranium) to carry on the Business), have been obtained or effected and are in full force and effect. Each Credit Party (including Horizon Wyoming Uranium) and its respective Subsidiaries (including the Inactive Subsidiaries) is in compliance with the requirements of all such Authorizations and registrations and there are no investigations or proceedings existing, pending or, to the knowledge of any of the Credit Parties (including Horizon Wyoming Uranium), threatened which could result in the revocation, cancellation, suspension or any adverse modification of any of such Authorizations or registrations.  The Security Documents and the Orders constitute a fully perfected security interest or fixed charge on all right, title and interest of each Credit Party (including Horizon Wyoming Uranium) in the assets and/or property described therein as security for the obligations specified therein in each case prior and superior in right to any other Person, with the Agreed Priority.  The Collateral includes all Equity Interests owned by and all the tangible and intangible assets of each of the Credit Parties (except as otherwise provided in this Agreement).  The security interest granted to the Lender pursuant hereto will be perfected upon entry of the Interim Order without any requirement of any further action by the Lender.

(h)     **Compliance with Contracts**.  Except as set out in Schedule 9.1(i), the Credit Parties (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) are in compliance with, and have at all times complied with, each of the contractual obligations (including those under each Material Contract) owing by each of them to its customers, suppliers and other Persons.  No Contract to which a Credit Party (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) is a party is in default (other than a default resulting from the Cases with respect to which enforcement of remedies is not stayed by means of the Cases) nor has any counterparty thereto claimed or asserted a default or breach thereof.  To the knowledge of the Credit Parties, each Contract to which a Credit Party (including Horizon Wyoming Uranium) is party is in full force and effect and no material default on the part of any party thereto has occurred thereunder.

(i)      **Material Contracts**.  Each Material Contract has been duly executed and delivered by each Credit Party (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) and each other Person party thereto and constitutes a legal, valid and binding obligation of such Credit Party and the counterparty thereto enforceable against it in accordance with its respective terms, subject only to any limitation under Applicable Law relating to (i) bankruptcy, insolvency, arrangement or creditors' rights generally and (ii) the discretion that a court may exercise in the granting of equitable remedies.  Each Material Contract is in full force and effect and except as set out in Schedule 9.1(i), no default on the part of any party thereto has occurred thereunder.  All Authorizations necessary to permit each party to perform its obligations under each Material Contract and consummate the transactions contemplated thereby are and will continue to be in full force and effect and there are no investigations or proceedings existing, pending or threatened which could result in the revocation, cancellation, suspension or adverse modification of any such Authorization.

(j)      **Ownership and Use of Property**.

(i)      Schedule 9.1(j) accurately and completely sets forth and describes all real property owned, leased, held or controlled by the Credit Parties (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium), including all fee interests, licenses and other tenements, leases, mining leases, mineral rights, water rights and other real property interests held by any of the Credit Parties (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium).

(ii)     With respect to the real property interests listed in Schedule 9.1(j):  (A) the Credit Party (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) indicated as such on such Schedule owns, has exclusive rights to, or is in possession thereof, as applicable, free and clear of all Liens, claims, encumbrances or other burdens on production, other than Permitted Liens and any burdens on production permitted under Section 10.2(n), and (B) except as set out in Schedule 9.1(m), there are no actions or administrative or other proceedings pending or, to any Credit Party's knowledge, threatened in writing against those interests.

(iii)     Each Credit Party (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) and each Subsidiary thereof (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium), has good and marketable title to its owned real property and has valid and effective rights to its leased property, free and clear of all Liens, except for Permitted Liens.

(iv)     All Taxes, charges, rates, levies and assessments that, if unpaid, would create a Lien or charge on any Mining Property or any portion thereof, have been paid in full and will be paid in full.

(v)     Except as set out in Schedule 9.1(i), all contractors, subcontractors, agents and other Persons providing services, materials or labor on or for the benefit of any Mining Property have been paid in a timely manner for all work performed or services, goods or labor provided on or with respect thereto, except where such payments are subject to a bona fide dispute, which is being diligently pursued by a Credit Party (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) pursuant to appropriate procedures.

(vi)     Except as set forth in Schedule 9.1(j), each of the Credit Parties (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) has good and marketable title to an undivided one hundred percent (100%) of the beneficial and legal interest to all fee lands, patented mining claims, and unpatented mining claims set forth on Schedule 9.1(j), in each case, which title is free and clear of all Liens, subject to Permitted Liens, and is superior and paramount to any adverse claim or right of title which may be asserted.

(vii)     Except as set forth in Schedule 9.1(j), with respect to the unpatented mining claims listed on the attached Schedule 9.1(j):  (A) the Credit Parties (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) are in exclusive possession thereof, free and clear of all Liens other than Permitted Liens; (B) all such claims were located, staked, filed and recorded on available public domain land in compliance with all Applicable Laws; (C) assessment work, intended in good faith to satisfy the requirements of Applicable Laws and generally regarded in the mining industry as sufficient, for all assessment years was timely and properly performed on or for the benefit of the claims, and affidavits evidencing such work were timely recorded; (D) claim rental and maintenance fees required to be paid under Applicable Law in lieu of the performance of assessment work, in order to maintain the claims have been timely and properly paid, and affidavits or other notices evidencing such payments and required under Applicable Laws have been timely and properly filed and recorded; and (E) there are no actions or administrative or other proceedings pending or, to the best of the knowledge of the Credit Parties, threatened against or affecting any of the claims.

(viii)     Except as set forth in Schedule 9.1(j), as to the patented mining claims listed on Schedule 9.1(j):  (A) the Credit Parties (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) own an undivided one hundred percent (100%) of the beneficial and legal

ACTIVE 210918977v.12

interest in those claims in each case, free and clear of all Liens except for Permitted Liens; (B) the Credit Parties (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) are in exclusive possession of those claims; and (C) there are no actions or administrative or other proceedings pending or, to the knowledge of any Credit Party, threatened against those claims.

(k)      **Ownership of Subject Properties**.  None of the Borrower or any of the other Credit Parties (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) (i) owns any real property other than the Owned Properties, (ii) is bound by any agreement to own or lease any real property other than the Leases or (iii) has leased any of its Owned Properties except as set out in Schedule 9.1(k).

(l)      **Leased Properties**.  Each Lease is in good standing and all amounts owing under each Lease have been paid by each Credit Party (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium), as applicable.

(m)      **Work Orders**.  Except as set out in Schedule 9.1(m), there are no outstanding work orders, enforcement orders, compliance orders or other similar notices or requirements by or from a Governmental Entity relating to any of the Subject Properties, nor do any of the Credit Parties (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) have notice of any possible impending or future work order, enforcement order, compliance order or other similar notice or requirement.

(n)      **Expropriation**.  No part of any of the Subject Properties or the Buildings and Fixtures located on the Subject Properties has been subject to an Expropriation Event, no written notice or proceeding in respect of an Expropriation Event has been given or commenced, nor is any Credit Party (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) aware of any intent or proposal to give any such notice or commence any proceedings.

(o)      **Encroachments**.  The Buildings and Fixtures located at each of the Subject Properties are located entirely within such Subject Property and are in conformity with all Applicable Laws, including zoning, building, and set-back codes and coverage requirements.  There are no encroachments upon any of the Subject Properties.

(p)      **Compliance with Laws**.  Each Credit Party (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) and its respective Subsidiaries (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) is in compliance in all material respects with all Applicable Laws.  Each of the Subject Properties has been used, explored and operated by the Credit Parties (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) in compliance in all respects with all Applicable Laws.  These include, but are not limited to, license fee payments, annual reporting requirements (exploration, safety and environmental), annual plan filing requirements (exploration and environmental), the establishment and maintenance of an environmental reclamation fund, and meeting minimum expenditure requirements.

(q)      **No Default**.  None of the Credit Parties (including Horizon Wyoming Uranium) or its respective Subsidiaries (including the Inactive Subsidiaries) is in violation of any of its Organizational Documents or any shareholders', partnership, joint venture or similar agreement applicable to it.

(r)      **No Material Adverse Agreements**.  None of the Credit Parties (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) or its respective Subsidiaries (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) is a party to any Contract or subject to any restriction (including any restriction set forth in its Organizational Documents or any shareholders',

48

partnership, joint venture or similar agreement applicable to it) which has, had or to the best of its knowledge in the future may have, a Material Adverse Effect.

(s)     **Environmental Compliance**.

(i)     Except as set out in Schedule 9.1(m), the Subject Properties (including the Mining Properties) and all other real property owned or leased by any Subsidiary (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) of a Credit Party (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) (collectively, the "**Subsidiary Properties**"), and all equipment and facilities on any of the foregoing, are and have been owned, developed, operated, leased, reclaimed (as and if required) and utilized in compliance in all material respects with applicable Environmental Laws, and each Credit Party (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) and each Subsidiary thereof (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) holds, and is in material compliance with all Authorizations required by Environmental Laws for the ownership, operation and/or reclamation of the Subject Properties (in the case of the Credit Parties) and the Subsidiary Properties (in the case of such Subsidiaries), and each Credit Party (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) and each of its Subsidiaries (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) is in compliance with all financial assurance requirements applicable to the Mining Properties and the Subsidiary Properties, as applicable, under applicable Environmental Laws.

(ii)     Except as set out in Schedule 9.1(m), there are no pending Environmental Claims, or pending consent decrees, clean-up orders, mitigation orders, compliance orders, remediation orders or other orders, decrees, judgments or other administrative or judicial requirements outstanding relating to any Credit Party's (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) or its Subsidiaries' (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) compliance with any Environmental Law or to a Release of Hazardous Materials with respect to any Subject Property or Subsidiary Property, as applicable.

(iii)     Except as set out in Schedule 9.1(m), no Credit Party (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) nor any Subsidiary (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) thereof has received any written or actual notice of any Environmental Claim relating to any Subject Property nor any Subsidiary Property, nor does any Credit Party (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) or any Subsidiary (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) thereof have knowledge or reason to believe that any such notice will be received or is being threatened.

(iv)     Except as set out in Schedule 9.1(m), there have been no Releases of any Hazardous Materials, at, on, under or from any Subject Property or any Subsidiary Property, or any property previously owned, operated, used or leased by any Credit Party (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) or any Subsidiary (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) thereof or at any third party property to which any Credit Party (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) or any Subsidiary (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) thereof has sent or arranged for the sending of Hazardous Materials for disposal or treatment that has resulted, or could reasonably be expected to result in a material liability under Environmental Laws.

(v)     Except as set out in Schedule 9.1(m), no conditions exist at, on or under any property now or previously owned, operated, used or leased by any Credit Party (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) or any Subsidiary (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) thereof which, with the passage of time, or the giving of notice or both, would give rise to liability under any Environmental Law; which liability could reasonably be expected to have a Material Adverse Effect.

(t)     **Pension Plans**.  None of the Credit Parties (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) or any of their respective Subsidiaries (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) maintains any Pension Plan or has any liability or threatened liability under or pursuant to a Pension Plan.

(u)     **Labor Matters**.   There are no existing or threatened strikes, lock-outs or other disputes relating to any collective bargaining agreement to which any Credit Party (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) is a party.  No Credit Party (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) is subject to, or party to, a collective bargaining agreement with respect to any employees.

(v)     **Books and Records**.  All books and records of the Credit Parties (including Horizon Wyoming Uranium) have been fully, properly and accurately kept and completed and there are no material inaccuracies or discrepancies of any kind contained or reflected therein.  Each of the Credit Parties' (including Horizon Wyoming Uranium) books and records and other data and information are available to it in the ordinary course of its business.

(w)     **Tax Liability**.  Each of the Credit Parties (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) has filed all tax and information returns which are required to be filed.  Each of the Credit Parties (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) has paid all current Taxes due, interest and penalties, if any, which have become due pursuant to such returns or pursuant to any assessment received by it other than those in respect of which liability based on such returns is being contested in good faith and by appropriate proceedings where adequate reserves, satisfactory to the Lender, have been established in accordance with IFRS.  Adequate provision for payment has been made for Taxes not yet due.  There are no tax disputes existing or pending involving any of the Credit Parties (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) or the Business.  Parent has not filed any tax return in the United States, paid any Tax to any U.S. federal, state or local tax authority nor has Parent been assessed for any Taxes by any U.S. federal, state or local tax authority.

(x)     **Corporate Structure**.  At the date of this Agreement:

(i)     Its Perfection Certificate sets forth, for each Credit Party (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium), its name, its type of organization, its organizational identification number, if any, its authorized and issued Equity Interests, and (other than in relation to the Parent) the holders of its Equity Interests, and all agreements binding on such holders with respect to their Equity Interests.  The Perfection Certificate contains a diagram of the organizational structure of the Credit Parties and their Subsidiaries.

(ii)     Except as set forth in its Perfection Certificate, none of the Credit Parties (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) owns any Equity Interests.

50

(iii)     Except as set forth in its Perfection Certificate, in the five years preceding the Effective Date, none of the Credit Parties (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) has acquired any substantial assets from any other Person or been party to any merger, amalgamation, reorganization, combination or similar transaction.

(iv)     Each Credit Party (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) has good title to all Equity Interests in each Subsidiary (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) of such Credit Party, and all such Equity Interests are duly issued, fully paid and non-assessable.

(v)     There are no outstanding warrants, options or other agreements which require or may require the issuance of any Equity Interests of any of the Credit Parties (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) (other than the Parent) or the issuance of any Debt or securities convertible into Equity Interests of any of the Credit Parties (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) (other than the Parent) and there are no outstanding debt or securities convertible into Equity Interests of any of the Credit Parties (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) (other than the Parent).

(vi)     Except as set forth in its Perfection Certificate, none of the Credit Parties (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) is, directly or indirectly, a member of, or a partner or participant in, any partnership, joint venture or syndicate.

(y)     **Shareholders' Agreement, Etc**.   Each of the Credit Parties (including Horizon Wyoming Uranium) is a corporation.  Except as disclosed on Schedule 9.1(y), none of the shareholders of the Credit Parties (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) is party to any shareholders', voting or other agreement relating to shares of any of the Credit Parties (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) owned by such shareholder.

(z)     **Financial Statements**.   Each of (x) the quarterly consolidated financial statements of the Parent for the period ending on June 30, 2015 and filed with the British Columbia Securities Commission on August 4, 2015 (including the related notes and schedules thereto) (the "**Parent Quarterly Report**") and (y) the annual audited consolidated financial statements of the Parent for the period ending on December 31, 2014 and filed with the British Columbia Securities Commission on March 17, 2015 (including the related notes and schedules thereto) (the "**Parent Annual Report**"), fairly present the consolidated financial position of the Parent and its Subsidiaries at such date and the consolidated results of the operations and changes in financial position of the Parent and its Subsidiaries for such period, all in accordance with IFRS.

(aa)     **Debt**.   No Credit Party (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) has any Debt except Permitted Debt.  There exists no default (howsoever described) under the provisions of any Contract evidencing such Debt or of any agreement relating thereto (other than a default resulting from the Cases with respect to which enforcement of remedies is stayed by means of the Cases).

(bb)     **Insurance**.   The Credit Parties (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) maintain insurance policies with financially sound and reputable insurers of types and in amounts which are customarily maintained by other companies applying Prudent Mining Industry Practices, and the Credit Parties (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) otherwise have and maintain insurance for each of its respective businesses and the Mining Properties in compliance with Section 10.1(p). There has been no default or failure by the party or

51

parties that were insured under the provisions of such policies of insurance maintained which would prevent the recovery by the relevant Credit Party (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) that was insured thereunder of the full amount of any material insured loss. No claims have been made under such insurance policies which are unresolved.

(cc)     **No Litigation**.   Except as set out in Schedule 9.1(m), there are no actions, suits or proceedings pending, taken and not stayed pursuant to the Bankruptcy Code or, to the knowledge of any of the Credit Parties (including Horizon Wyoming Uranium), threatened before or by any Governmental Entity or by or against any elected or appointed public official or Person in any jurisdiction which (i) challenges, or threatens, the validity or propriety of the transactions contemplated under the Credit Documents or the documents, Instruments and agreements executed or delivered in connection therewith or related thereto, (ii) alleges the violation of any Applicable Law, (iii) involves any Material Contract, (iv) challenges or threatens the validity of all or any portion of any of the Subject Properties or any Credit Party's (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) legal interest or claim thereto, or (v) could reasonably be expected to result, either in any case or in the aggregate, in a Material Adverse Effect.

(dd)     **Perfection Certificates.** The Perfection Certificate for each Credit Party (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) sets forth:

(i)     a list of all jurisdictions (or registration districts within such jurisdictions) in which such Credit Party (i) has its chief executive office, head office, registered office and chief place of business, (ii) carries on business, (iii) has any account debtors, or (iv) stores any tangible personal property (except for goods in transit in the ordinary course of business);

(ii)     a list of all Authorizations which are material or necessary to such Credit Party, the Business or the ownership, management and operation of any of the Mining Properties;

(iii)     a list of all intellectual property (and the registration particulars thereof) that is material or necessary to such Credit Party or the Business;

(iv)     a list of all Contracts to which such Credit Party is a party or to which any of its properties or assets could be subject, for which breach, non-performance, cancellation or failure to renew could have a Material Adverse Effect;

(v)     a list of all labor agreements to which such Credit Party is a part;.

(vi)     the details of all bank accounts of such Credit Party (each, a "**Credit Party Account**") and any Control Agreement to which each such bank account is, or is required to be, subject (it being understood that no supplement to or modification of the Perfection Certificate shall modify the information described in this clause (vi)); and

(vii)     a list of all consulting agreements to which a Credit Party is party.

(ee)     **No Liabilities**.   Except as reflected or reserved against in the Parent Quarterly Report or, if applicable, the most recent financial statements delivered pursuant to Section 10.1(a), none of the Credit Parties (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) or any of their respective Subsidiaries (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) has liabilities or obligations of any nature (whether absolute, accrued, contingent or otherwise) except for current liabilities incurred in the ordinary course and reflected in the Approved Budget.

(ff) **Broker's Fees**. Except as set out in Schedule 9.1(ff), no broker's or finder's fee or commissions will be payable by reason of any action of any of the Credit Parties (including Horizon Wyoming Uranium)with respect to any of the transactions contemplated by the Credit Documents.

(gg) **Foreign Assets Control Regulations; Questionable Payments**.

(i) Neither the execution and delivery of this Agreement nor the Borrower's use of the proceeds of the Loans will violate the Trading with the Enemy Act, as amended, or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) or any other enabling legislation or executive order relating thereto or. Each Credit Party (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) and its Subsidiaries (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) are in compliance, in all material respects, with (x) the USA Patriot Act and (y) the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act* (Canada)*, the Corruption of Foreign Public Officials Act* (Canada)*, the Criminal Code* (Canada) or the *United Nations Act* (Canada).

(ii) None of the Credit Parties (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium), nor, to the knowledge of the Credit Parties, any director, officer, agent, employee or other person associated with or acting on behalf of the Credit Parties, or any subsidiary or any Credit Party has (i) used any corporate or entity funds for any unlawful contribution, gift, entertainment, or other unlawful expense relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate or entity funds; (iii) violated or is in violation of any provision of the Foreign Corrupt Practices Act of 1977, as amended, or any similar law in the United States of America or any other country having jurisdiction; or (iv) made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment, and no part of the Loan proceeds will be used for any purpose described in the foregoing clauses (i) through (iv).

(iii) No Credit Party (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) or any Affiliate thereof, or their respective agents acting or benefiting in any capacity in connection with the Loan or other transactions hereunder:

(A) is or will become any of the following (each a "**Blocked Person**"):

(a) a Person that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224;

(b) a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224;

(c) a Person or entity with which Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(d) a Person or entity that commits, threatens or conspires to commit or supports "terrorism" as defined in Executive Order No. 13224;

(e) a Person or entity that is named as a "specially designated national" on the most current list published by the U.S. Treasury Department Office of Foreign Asset

Control at its official website or any replacement website or other replacement official publication of such list; or

(f)     a person or entity who is affiliated or associated with a person or entity listed above;

(B)     conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person, or deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224; or

(C)     are a "Special Designated National" or "Blocked Person" as those terms are defined in the Office of Foreign Asset Control Regulations (31 C.F.R. § 500 et. seq.).

(hh)     **[RESERVED].**

(ii)     **Affiliate Transactions**.  The Credit Parties (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) are not conducting, permitting or suffering to be conducted, any transaction with any Affiliate.

(jj)     **Feasability Studies**.  The Credit Parties (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) have heretofore made available to the Lender all feasibility studies and geological, reserve, resource, metallurgical, engineering and financial data and evaluations of each Mining Property prepared by, or for the benefit of, any Credit Party (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) or otherwise in the possession of any Credit Party (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium).  The Credit Parties (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) are not aware of any inaccuracy or omission in such information which has not been disclosed to the Lender in writing.

(kk)     **Project Permits**.  Except as set forth in Schedule 9.1(kk) and except for Authorizations which are to be obtained by a Credit Party (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) from time to time in the ordinary course of business and the absence or delay of which will not interfere with or delay development and operation of a Mining Property, and subject to the entry of the Orders, the Credit Parties (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) possess all material Authorizations (including all water rights and related permits) of Governmental Entities which are necessary to develop, mine and operate the Mining Properties as and to the extent that they are currently being operated by the Credit Parties (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium), and to undertake and conduct the business of the Credit Parties (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) or any Subsidiary (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) thereof as it is currently being conducted.  Each Authorization held by any of the Credit Parties (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) as at the date hereof is identified in Schedule 9.1(kk) hereto (collectively, the "**Project Permits**") and each Credit Party (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) owns and holds each Project Permit set out opposite its name in Schedule 9.1(kk).  The Credit Parties (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) have obtained and hold all Project Permits necessary to conduct mining operations as and to the extent that they are currently being operated by the Credit Parties (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) at each of the Mining Properties and, except as disclosed the Lender, all such Project Permits are in full force and effect in accordance with their terms,

54

free of default, all appeal periods with respect to the granting thereof have lapsed and no written notice alleging a breach or default under any Project Permit or challenging or questioning the validity of any Project Permit has been delivered, except to the extent disclosed to the Lender in Schedule 9.1(kk). The Credit Parties (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) have sufficient, legally-enforceable rights of access, entry and egress to and from the Mining Properties, including rights sufficient to develop and operate the Mining Properties. The Pinson Mine is serviced with utilities, including water, gas and electricity as may be required to develop and operate the Pinson Mine in accordance with Prudent Mining Industry Practices.

(ll)   **Sufficiency of Mining Properties**.

(i)   The Credit Parties (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) hold Mining Properties recognized in the jurisdiction in which such particular property is located, in respect of the ore bodies, minerals and metals located in each of the Core Assets under valid, subsisting and enforceable title documents or other recognized and enforceable Contracts, sufficient to permit such Credit Party (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) to explore, mine, extract and process the minerals, ore and metals relating thereto as contemplated by the feasibility studies referred to in Section 9.1(jj).

(ii)   All of the Mining Properties are listed on Schedule D, and all such Mining Properties are in good standing on the date hereof.

(iii)   The Credit Parties (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) have no reason or reasonable ground for believing that they will not be able to obtain or maintain any Mining Property, the Project Permits or any other right necessary for exploration, development or extraction on the properties to which the Mining Properties apply and for maintaining the operation of the Core Assets, either pursuant to the applications made as of the date hereof to the appropriate Governmental Entities or pursuant to any other future application or agreement required for exploration, development or extraction on the properties to which the Mining Properties apply and for maintaining the operation of the Core Assets.

(iv)   All mining claim rental and maintenance fees required to be paid under Applicable Law in order to maintain the claims have been timely and properly paid, and affidavits or other notices evidencing such payments and required under Applicable Laws have been timely and properly filed and recorded.

(v)   The Mining Properties that are operational have been operating in accordance with Prudent Mining Industry Practices. The Mining Properties that are in care and maintenance have been placed in care and maintenance in accordance with Prudent Mining Industry Practices.

(mm)   **Federal Regulations**. No part of the proceeds of the Loan will be used for "purchasing" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U as now and from time to time hereafter in effect or for any purpose that violates the provisions of Regulation U. If requested by the Lender, the Borrower will furnish to the Lender a statement to the foregoing effect in conformity with the requirements of FR Form G-3 or FR Form U-1 referred to in Regulation U.

(nn)   **Investment Company Act; Other Regulations**. No Credit Party (including Horizon Wyoming Uranium) is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended. No Credit Party

55

(including Horizon Wyoming Uranium) is subject to regulation under any Applicable Law (other than Regulation X of the Board) that limits its ability to incur Debt.

(oo)     **Inactive Subsidiaries**.  No Inactive Subsidiary has assets (including any contractual rights or permits) that are material to the Business.

(pp)     **Disclosure**.  All forecasts, projections and other information supplied to the Lender were prepared in good faith and adequately disclose all relevant assumptions, are true and accurate in all respects, and were based on fair assumptions.  There is no fact known to any Credit Party (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) which could have a Material Adverse Effect and which has not been fully disclosed to the Lender or filed with the United States Securities and Exchange Commission or the British Columbia Securities Commission.  None of the representations or warranties made by the Credit Parties (including Horizon Wyoming Uranium) in the Credit Documents as of the date such representations and warranties are made or deemed made, and none of the statements contained in any written exhibit, report, statement or certificate furnished by or on behalf of the Credit Parties (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) in connection with the Credit Documents or filed with the United States Securities and Exchange Commission or the British Columbia Securities Commission, contains any untrue statement of a material fact or omits any material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances under which they are made, not misleading as of the time when made or delivered.

(qq)     **Reorganization Matters**.

(i)     The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof and the proper notice was given for (i) the motion seeking approval of the Credit Documents and the Interim Order and Final Order, (ii) the hearing for the approval of the Interim Order, and (iii) the hearing for the approval of the Final Order.

(ii)     After the entry of the Interim Order, and pursuant to and solely to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against the Debtors now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code, subject, as to priority only, to the Carve-Out.

(iii)     After the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order, the Obligations will be secured by a valid and perfected Lien having the priority described in the Orders.

(iv)     The Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect and has not been modified or amended without the consent of the Lender, or reversed or stayed.

(v)     The Approved Budget has been prepared in good faith by the Borrower, based on assumptions believed by the Borrower to be reasonable at the time such forecasts were prepared.

(rr)    **Certain Debt**.  No Credit Party (including, to the knowledge of each Credit Party, Horizon Wyoming Uranium) has any Debt under any Hedging Agreement outstanding as of the Petition Date, including any close-out amounts thereunder.

**9.2    Survival of Representations and Warranties**.  The representations and warranties in this Agreement and in any certificates or documents delivered to the Lender in connection therewith shall not merge in or be prejudiced by, and shall survive, the making of each Loan and shall continue in full force and effect so long as any amount is owing by the Borrower to the Lender under this Agreement.

**ARTICLE 10**
**COVENANTS OF THE BORROWER**

**10.1    Affirmative Covenants**.  Until the full and final payment and performance of the Obligations and the termination of this Agreement, each of the Parent and the Borrower shall, and (as the case may be) each of the other Credit Parties shall, perform all covenants in this Section 10.1:

(a)    **Financial Statements, Reports and Other Information**.  Deliver to the Lender, or cause to be delivered to the Lender, all financial and other information delivered to the TSX and each of the following:

(i)    as soon as practicable and in any event within 45 days after the end of each Financial Quarter of each Financial Year, the Parent's consolidated and consolidating unaudited quarterly financial statements for the Financial Year to such Financial Quarter, prepared in accordance with IFRS;

(ii)    as soon as practicable and in any event within 90 days after the end of each Financial Year, the annual consolidated and consolidating financial statements of the Parent and the other Credit Parties prepared in accordance with IFRS for such Financial Year;

(iii)    together with the delivery of each of the financial reports required to be delivered pursuant to the foregoing clauses (i) and (ii) a duly completed and executed Compliance Certificate;

(iv)    as soon as practicable, such other information in the possession of any Credit Party with respect to its financial condition, business and/or operations including copies of all financial statements, proxy statements, material reports and other material disclosure information which any Credit Party shall send or make available to any of its shareholders or which it is required or elects to file with any Governmental Entity;

(v)    as soon as practicable but no later than 30 days after the end of each calendar month, a report setting forth, in each case in a form and in sufficient detail satisfactory to Lender, consolidated and consolidating (x) balance sheets of each Credit Party as of the end of such month, (y) statements of income and cash flows of each Credit Party for such month, and for the period commencing at the end of the previous Financial Year and ending with the end of such month and (z) profit and loss statements of each Credit Party for such month and for the period commencing at the end of the previous Financial Year and ending with the end of such month, in each case, prepared in accordance with IFRS (subject to the absence of footnote disclosures and to normal year-end adjustments);

(vi)    as soon as practicable but no later than 30 days after the end of each calendar month, the Credit Parties shall submit to the Lender a written report concerning its business and

57

activities, each of the Mining Properties and all activities and occurrences with respect thereto during the preceding calendar month and shall include a summary description of actions taken with respect to each of the Mining Properties, a description of actual expenditures (as compared to the budgeted expenditures), together with an operating statement in form and substance acceptable to Lender and containing (i) line items corresponding to the Approved Budget showing in reasonable detail all actual expenses related to the operation and maintenance of each Mining Property compared to the budgeted expenses for such period, (ii) to the extent available, information showing the amount of gold and silver produced by each Mining Property during such period and (iii) to the extent available, information showing (A) the amount, if any, of other sales of gold and silver sold by the Credit Parties from each Mining Property, together with an explanation of any such sale and identification of the purchaser, and (B) the amount, if any, of other products sold by the Credit Parties from the Mining Properties, together with an explanation of any such sale and identification of the purchaser;

(vii)     promptly upon receipt, copies of any detailed audit reports, management letters or recommendations submitted to any Credit Party (or the audit or finance committee of any Credit Party) by the Auditors in connection with the accounts or books of any Credit Party, or any audit of any Credit Party;

(viii)     promptly upon any change that would affect the accuracy of the information with respect to any Credit Party set forth in any Perfection Certificate, an update of such Perfection Certificate signed by a senior officer of such Credit Party;

(ix)     promptly after receiving a request from the Lender, such other certificates, reports, status updates, data and information respecting the condition or operations, financial or otherwise, of any Credit Party and any of the Core Assets as the Lender may from time to time request, with the same to be delivered in form and substance reasonably acceptable to the Lender. All such other certificates, reports, status updates, data and information delivered to the Lender shall be true, complete and accurate in all respects; and

(x)     promptly upon making or committing to make expenditures that would, in accordance with IFRS, be considered capital expenditures, the amount of and all information reasonably requested by the Lender regarding such capital expenditures.

All reports, descriptions, data and other information provided by the Credit Parties pursuant to Section 10.1(a) or (b) (i) shall be true, complete and accurate in all respects and (ii) shall not contain any material misstatement of fact or omit to state a material fact, and all projections contained in any such reports, certificates, status updates and otherwise shall be based on information which, when delivered, is deemed to be true, correct and complete in all material respects and shall fairly present such Credit Party's then current estimate of its future business, operations and affairs.

(b)     **Approved Budget; Cash Flow Reporting**.

(i)     Commencing with the first Wednesday after the Petition Date, the Borrower will furnish to the Lender on each Wednesday (or, if such day is not a Business Day, the next succeeding Business Day) of each week, a report (the "**Weekly Actuals Report**"), in form and detail acceptable to the Lender, setting forth (x) actual cash receipts and disbursements for the one week period ended on the previous Saturday and (y) a calculation of each of Variance Testing Revenue and Variance Testing Disbursements for the period from the Sunday prior to the Petition Date through the previous Saturday.

58

(ii)     Within three Business Days of delivery of (x) the Weekly Actuals Report for the calendar week ended November 28, 2015 and (y) each fourth Weekly Actuals Report thereafter, the Borrower will furnish to the Lender an updated cash forecast (each, an "**Updated Budget**") for the period from the previous Sunday through the end of the term of the Approved Budget, setting forth projected cash receipts and disbursements, in form and scope similar to the Approved Budget;

(iii)     Together with (x) the Weekly Actuals Report for the calendar week ended November 28, 2015 and (y) each fourth Weekly Actuals Report thereafter, the Borrower will furnish to the Lender (A) a variance report (each, an "**Approved Budget Variance Report**") showing the difference between actual cash receipts and disbursements for the period from the date of the previous Approved Budget Variance Report through the previous Saturday (each such period, a "**Variance Covenant Testing Period**") and projected cash receipts and disbursements for such period set forth in the Approved Budget and (B) a variance report showing the difference between actual cash receipts and disbursements for the period from the date of the previous Approved Budget Variance Report through the previous Saturday and projected cash receipts and disbursements for such period set forth in the Updated Budget.

(c)     **Notice of Litigation**.  Give notice to the Lender as soon as it becomes aware of the commencement of any material action, litigation, proceeding, arbitration, investigation, grievance or dispute affecting any Credit Party, any Mining Property, any Material Contract or any Affairs of a Credit Party, together with copies of the court filings or other documents associated therewith.

(d)     **Notice of Default**.  Give notice to the Lender as soon as it becomes aware of any Default or Event of Default or any event or circumstance which could have a Material Adverse Effect, together with, in the case of a Default or Event of Default, a statement of an officer of the Borrower setting forth details of such Default or Event of Default and the action that the Borrower has taken and propose to take with respect thereto.

(e)     **Notice of Environmental Matters**.  Promptly after the filing or receipt thereof, copies of (i) all new Project Permits, together with a description thereof, (ii) any revised reclamation estimates or material changes to reclamation-related financial assurance and (iii) all notices with or from any Governmental Entity or any other Person alleging noncompliance with or violation of any Environmental Law or Project Permit and any correspondence in response thereto.

(f)     **Corporate Existence**.  Preserve and maintain its corporate existence.

(g)     **Compliance with Laws, Etc**.  Comply, and shall cause each of their Subsidiaries, agents and third party contractors to comply with, all Applicable Laws.

(h)     **Comply with Environmental Laws**.  Own, operate and manage its business and the Mining Properties in compliance with all Applicable Laws, including Environmental Laws, and each Credit Party shall, and shall cause its agents and third party contractors to, (i) manage and operate the Mining Properties and the Business in compliance in all material respects with all Environmental Laws, (ii) obtain and maintain all Authorizations and make all registrations required under all Environmental Laws in relation to the Mining Properties and the Business and remain in compliance therewith and (iii) store, treat, transport, generate, otherwise handle and dispose of all Hazardous Materials and Waste owned, managed or controlled by any of the Credit Parties in compliance with all Environmental Laws.

(i)     **Conduct of Operations and Maintenance of Properties**.

59

(i)     Engage solely in the business of developing, mining and operating the Mining Properties, and other prospective mining projects, and in activities incidental thereto, in accordance with Prudent Mining Industry Practices and the Approved Budget.

(ii)     The Credit Parties shall diligently and continuously explore, investigate, develop, mine, operate, maintain and use each Mining Property (and in the case of any Mining Property in "care and maintenance", care for and maintain) in accordance with Prudent Mining Industry Practices, including, subject to Section 10.2(s), the continuation of underground dewatering activities (including operating and maintaining necessary ventilation fans, pumps, rapid infiltration basins and related equipment required to perform dewatering activities required for the removal and drainage of underground water) at the Pinson Mine (and any of the other Core Assets in need of dewatering) to prevent flooding and any other underground water related damage and to maintain the Pinson Mine (and any of the other Core Assets in need of dewatering) open for operations in accordance with such Prudent Mining Industry Practices.

(iii)     Should Small Mine Development, LLC and any of its applicable Affiliates (each, a "**Small Mine Contractor**") cease operations at the Pinson Mine, each applicable Credit Party shall require that prior to ceasing operations, each applicable Small Mine Contractor or another contractor reasonably acceptable to the Lender where necessary shall bolt any unbolted headings and faces prior to each Small Mine Contractor demobilizing from the Pinson Mine.

(iv)     Should a Credit Party intend to place the Pinson Mine under a care and maintenance plan, such Credit Party shall provide the Lender with a copy of such plan not less than 15 days prior to the implementation of such plan and shall implement such plan in accordance with Prudent Mining Industry Practices.

(v)     The Credit Parties shall, from time to time, make and cause to be made all reasonably necessary repairs, renewals, replacements, additions and improvements to the Mining Properties, the Project Permits and their properties and assets, such that the Borrower and the other Credit Parties may properly and advantageously conduct the Business at all times in accordance with Prudent Mining Industry Practices. The Credit Parties shall maintain and shall keep secure all drill hole databases, available and identifiable core samples and pulp and shall maintain and keep secure all laboratory, administrative, workshop and other serviced facilities in accordance with Prudent Mining Industry Practices.

(vi)     No Credit Party shall acquire or lease any real property interests, or terminate or release any right, title or interest it may have to any mining claims, without the prior written consent of the Lender.

(j)     **Payment of Fees**.  If under any Applicable Law mining claim fees (including federal annual mining claim maintenance fees) or any other fee of any kind applicable to the Core Assets or the maintenance of a Project Permit becomes due prior to the Maturity Date, the Borrower shall cause the relevant Credit Party to timely and properly pay such fee.

(k)     **Ownership of Core Assets**.  The Borrower shall at all times own all the issued and outstanding shares of the Guarantors (except for the Parent). The Parent shall at all times own all the issued and outstanding shares of the Borrower.

(l)     **Payment of Taxes and Claims**.  Pay, or cause to be paid when due, (i) all Taxes, assessments and governmental charges or levies imposed upon it or upon its income, sales, capital or profit or any other property belonging to any of the Credit Parties, and (ii) all claims which, if unpaid,

60

might by Applicable Law become a Lien upon any of the Credit Parties' property or assets (A) except any such tax, assessment, charge, levy or claim which is being contested in good faith and by proper proceedings and in respect of which the Borrower or any of the Credit Parties have established adequate reserves, satisfactory to the Lender, in accordance with IFRS or (B) which are Permitted Liens and which could not, individually or collectively, in the Lender's opinion, have a Material Adverse Effect.

(m)    **Keeping of Books**.  Keep proper books of record and account, in which full and correct entries shall be made in respect of its business and shall promptly notify the Lender of any change in accounting practices or procedures implemented by a Credit Party relative to such practices and procedures as of the execution of this Agreement.

(n)    **Updated Banking Information**.  Promptly notify the Lender of any change in bank location or accounts (other than Excluded Accounts), and shall at all times ensure that each of its respective bank accounts (other than Excluded Accounts) located in the United States remains subject to a Control Agreement as provided in the Perfection Certificate.

(o)    **Rights of Inspection**.  If no Event of Default has occurred and is continuing, not more than on two occasions prior to the Maturity Date, and otherwise at any time, upon reasonable and timely notice, the Credit Parties shall permit Lender or any of its employees, officers, agents, engineers, Consultants or other representatives (collectively the "**Lender Representatives**"), during normal business hours at the expense of the Borrower, to make copies of any abstracts from the records and books of account of any Credit Party and to discuss any of its Affairs with any of its directors, officers, employees, agents, representatives or auditors.  If no Event of Default has occurred and is continuing, not more than on two occasions prior to the Maturity Date, and otherwise at any time, upon reasonable and timely notice, the Credit Parties shall permit the Lender or any Lender Representative, to inspect the Mining Properties and the Business and discuss any of the Affairs of any Credit Party with any of its personnel and third party contractors.  The Borrower shall pay or reimburse the Lender for all reasonable costs and expenses of the Lender in connection with each site visit by the Lender or any Lender Representatives. The Lender will ensure that each Lender Representative complies with the reasonable health and safety requirements of the Borrower including applicable Mine Safety and Health Administration ("**MSHA**") safety regulations and requirements and must have a MSHA safety training certificate.  The Lender shall indemnify each Credit Party and its respective directors, officers, employees, agents, shareholders and representatives from any liability arising out of the negligence or willful misconduct of the Lender Representatives related to such inspections. Lender and Lender Representatives shall not unreasonably interfere with normal business operations in its exercise of rights of inspection hereunder.

(p)    **Maintenance of Insurance**.  Maintain with financially sound and reputable insurance companies (i) insurance on all its property and assets insuring against at least such risks as are usually insured against in the same or a similar business and as required by Applicable Laws and (ii) liability insurance covering at least such risks as are usually insured against in the same or a similar business and as required by Applicable Laws; and furnish to the Lender, upon request, full information as to the insurance carried.  The present insurance coverage of the Credit Parties as of the Effective Date is outlined as to carrier, policy number, expiration date, type and amount on Schedule 10.1(p).  Upon the request of the Lender from time to time, each Credit Party shall deliver to the Lender evidence of the insurance then in effect, including a detailed list of such insurance containing the information set forth on Schedule 10.1(p).  The insurance policies with respect to the Mining Properties shall name the Lender as first loss payee and additional insured and shall contain an endorsement providing that such insurance cannot be terminated or amended without at least thirty days' prior notice to the Lender; provided, however, that such insurance may be amended with prior written notice to the Lender to remove from coverage property sold by any Credit Party in compliance with this Agreement.

(q)     **Authorizations**.  Obtain and maintain in full force all Authorizations necessary for the exploration, development, mining and operation of the Mining Properties and the performance of the Credit Parties' obligations and perform and observe all covenants, conditions and restrictions contained in, or imposed on it by, any Authorization and/or Material Contract.

(r)     **Deliver Additional Material Contracts**.  Notify the Lender within five (5) Business Days upon the entering into of any new Material Contract and if requested by the Lender deliver (i) a certified copy of each such Material Contract to the Lender within five (5) Business Days of such request, (ii) a customary consent to the collateral assignment to Lender  of such Material Contract (including step-in and cure rights) executed by each of the parties to such Material Contract within ten (10) days of such request and (iii) promptly take all actions reasonably requested by the Lender to cause each Material Contract entered into after the date hereof to become subject to the DIP Liens.

(s)     **Perfection and Protection of Security**.   Perform, execute and deliver all acts, agreements and other documents as may be requested by the Lender at any time to register, file, signify, publish, perfect, maintain, protect, and enforce the Security or grant a security interest on any assets (other than Non-Core Assets) of the Credit Parties with the Agreed Priority including, (i) executing, recording and filing of the Security Documents and financing, change or continuation statements in connection therewith, in form and substance satisfactory to the Lender, (ii) delivering to the Lender the originals of all Instruments, documents and chattel paper and all other Collateral of which the Lender determines it should have physical possession in order to perfect and protect the Security, duly endorsed or assigned to the Lender, (iii) delivering to the Lender warehouse receipts covering any portion of the Collateral located in warehouses and for which warehouse receipts are listed, (iv) placing notations on its books of account to disclose the Security, (v) delivering to the Lender all letters of credit on which the Credit Party is named beneficiary and (vi) taking such other steps as are deemed necessary by the Lender to maintain the Security with the Agreed Priority.

(t)     **Accounts**.  Each Credit Party shall maintain the deposit accounts and securities accounts, in the location and with the bank, financial institution or brokerage described in the Perfection Certificate, and shall not open or suffer to exist any other accounts or change such accounts without Lender's prior written consent.

(u)     **Control Agreements**.  Each Credit Party Account shall at all times be (i) held as Collateral to secure the repayment and/or performance of the Obligations, (ii) held at the financial institution at which such Credit Party Account was maintained on the Petition Date under the terms of the Pre-Petition Credit Documents or otherwise at a financial institution acceptable to the Lender and in each case, subject to a Control Agreement and (iii) subject to a perfected Priming Lien in favor of the Lender, with all rights and remedies in respect thereto as set forth in the Orders and the other Credit Documents.

(v)     **Further Assurances**.  Upon request of the Lender, (i) at the cost and expense of the Borrower, execute and deliver, or cause to be executed and delivered, to the Lender such further Instruments and do and cause to be done such further acts as may be necessary or proper in the opinion of the Lender, acting reasonably, to carry out more effectively the provisions and purposes of the Credit Documents, and (ii) at the cost and expense of the Lender, execute and deliver, or cause to be executed and delivered, to the Lender such further Instruments and do and cause to be done such further acts as may be necessary or proper in the opinion of the Lender, acting reasonably, to put in place a standard form mortgagee policy of title insurance with respect to the insurable portions of the Mining Properties.

(w)     **Use of Proceeds**.

(i)        All proceeds of the Loans shall be used solely to fund, in each case only to the extent specified in the Approved Budget (subject to the permitted variance), (a) operating expenses and other amounts for general and ordinary course purposes of the Credit Parties, (b) current interest and fees payable pursuant to the Credit Documents, (c) make adequate protection payments required under the Interim Order and the Final Order and (d) such other administrative payments, including the budgeted professional fees, as may be authorized and approved by the Lender under the Interim Order, the Final Order or any subsequent order of the Bankruptcy Court.

(ii)       No portion of the proceeds of the Loans, the Collateral or the Carve-Out shall be used to (a) challenge the validity, perfection, priority, extent or enforceability of the DIP Facility, the Pre-Petition Obligations, or the Liens on the assets of the Debtors securing the DIP Facility or the Pre-Petition Obligations or (b) assert any claim against the Lender or the Pre-Petition Lender; *provided*, *however*, that (x) the proceeds of the Loans may be used to seek a Section 506(a) Determination, (y) up to $50,000 of the Carve-Out may be utilized to challenge or prevent the DIP Lender's exercise of any and all rights and remedies available to it under the Credit Agreement or applicable law upon the occurrence of an Event of Default and (z) up to $25,000 of the proceeds of the Loans may be used by the Committee to investigate potential claims arising out of, or in connection with, the Pre-Petition Credit Agreement or the security interests and liens securing the Pre-Petition Obligations during the period for such investigation specified in the Orders.  The Carve-Out shall be reduced by an amount equal to all proceeds of the Loans used pursuant to the foregoing proviso.

(iii)      Subject to entry of an appropriate order of the Bankruptcy Court (in form and substance acceptable to the Lender), proceeds of the Loans may be used to pay professional fees and expenses of the Debtors and of the Committee allowed and payable under sections 330 and 331 of the Bankruptcy Code in accordance with the Approved Budget and the Carve-Out.

(iv)      Any amounts paid to professionals of the Debtors and of the Committee by any means will reduce the Carve-Out on a dollar-for-dollar basis and the Carve-Out will be limited to the maximum amount of $700,000 as reduced in accordance with the Orders; *provided*, that nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement, or compensation sought by the professionals retained by the Debtors or any Committee in the Chapter 11 Cases.

(x)     **Additional Guarantors**.  The Parent, the Borrower and each other Credit Party shall ensure that on or prior to any Person becoming a Subsidiary of any Credit Party:

(i)        such Person shall execute and deliver in favor of the Lender a joinder to this Agreement, pursuant to which such Person becomes a Guarantor hereunder;

(ii)       such Person shall grant any and all Security as the Lender may require;

(iii)      to the extent not previously delivered, all shares in the capital of such Person are pledged to the Lender (and all original share certificates are delivered to the Lender, duly endorsed in blank or accompanied by a duly executed stock power transfer form) and, if requested by the Lender, all directors of such Person have delivered to the Lender resignations duly executed but undated;

(iv)      the Lender shall receive evidence of registration or other perfection of such Security and/or pledge in such jurisdictions as the Lender may require to ensure that such

Security and/or pledge creates valid and enforceable security interests in the assets or shares to which such Security or pledge relates with the Agreed Priority, enforceable against third parties, trustees in bankruptcy and all similar officials;

(v)     the Lender shall receive opinions of the counsel to such Person relating to, among other things, its subsistence, the due authorization, execution, delivery and enforceability of the Credit Documents to which such Person is a party and the creation and perfection of the Liens against such Person under the Security Documents;

(vi)     the Lender shall receive all discharges, subordination agreements, waivers and confirmations as the Lender may require to ensure that all Obligations under the Credit Documents are secured by Liens on the property and assets of such Person with the Agreed Priority; and

(vii)     the Lender shall receive a Perfection Certificate signed by a senior officer of such Person, together with such other evidence, certificates and documentation as the Lender may request;

in each case, in form and substance satisfactory to the Lender.  For greater certainty, any acquisition of the Equity Interests of another Person is subject to Section 10.2(i).

(y)     **Defense of Title and Rights.**  Each Credit Party shall preserve and defend its ownership of and all right, title and interest in its assets, properties and rights, including each Mining Property, as such title is represented and warranted in Section 9.1(j), except as may be permitted pursuant to Section 10.2(d).  Each Credit Party shall defend the Liens in favor of the Lender, and the Credit Parties shall maintain and preserve such Liens as perfected Liens with the Agreed Priority.  Each Credit Party shall ensure that the Security Documents shall at all times cover and extend to all assets, properties, rights and interests of each Credit Party.

(z)     **[RESERVED].**

(aa)     **Leases**.  Each Credit Party shall provide the Lender with immediate written notice of any material default under any Lease and shall provide the Lender with the right to cure such default to the extent there is a cure right in respect of such default in such Lease.

(bb)     **Permitted Dewatering Cessation Event**.  Upon the occurrence of a Permitted Dewatering Cessation Event, the Credit Parties shall (i) immediately notify the Lender in writing of such occurrence, the specific nature and details thereof, and the steps the Credit Parties intends to take in order to remedy the Permitted Dewatering Cessation Event (if capable of being remedied), and (ii) take all reasonable steps necessary to remedy such Permitted Dewatering Cessation Event, if capable of being remedied, and once remedied, resume necessary dewatering activities as described in Section 10.1(i).

(cc)     **Reorganization Matters**.  The Debtors shall give, on a timely basis as specified in the Interim Order or the Final Order all notices required to be given to all parties specified in the Interim Order or Final Order.  The Debtors shall provide the Lender with drafts of all pleadings, motions and applications to be filed by or on behalf of any Debtor at least two (2) Business Days in advance of such filing; provided that if such advance delivery is not practicable under the circumstances, the applicable Debtor or Debtors shall immediately advise the Lender of the substance of any relief that will be sought and shall, in any event, provide copies of such material prior to filing with the Bankruptcy Court.

64

(dd)     **Financial Advisor**.  The Debtors have retained Ernst & Young LLP to act as financial advisor.  In the event Ernst & Young LLP resigns or the Bankruptcy Court fails to approve its retention the Debtors will select an alternative Financial Advisor on terms reasonably acceptable to the Lender, to advise the Debtors in connection with the Cases, within twenty (20) days after any such engagement is terminated.

(ee)     **Professional Fees**.  Promptly following receipt thereof, the Debtors shall deliver to the Lender all monthly fee statements detailing the fees of all its professionals (including counsel and financial advisors) for such month delivered in accordance with the interim compensation procedures approved by the Bankruptcy Court**.**

(ff)     **Monthly Meetings**.  At least once per calendar month, upon request of the Lender, at mutually acceptable times (and with telephonic conferences being acceptable), the Debtors shall, and shall procure that representatives of the Debtors' professionals (including counsel and financial advisors) as may be requested by the Lender, meet together with the Lender to update the Lender on the status of the Cases and to discuss any other issues in connection therewith as may be requested by the Lender.

(gg)     **Secured Party Expenses**. The Borrower shall pay all Secured Party Expenses on the Termination Date.

(hh)     **Investment Banker**. The Debtors have retained Maxit Capital LP to act as investment banker. In the event that Maxit Capital LP resigns or the Bankruptcy Court fails to approve its retention the Debtors will select an alternative Investment Banker with mining industry experience on terms reasonably acceptable to the Lender, to advise the Debtors in connection with the Cases, within twenty (20) days after any such engagement is terminated.

(ii)     **Separate Existence**. Each Credit Party shall maintain certain policies and procedures relating to its existence as a separate company as follows, and shall do all things necessary to maintain its corporate existence separate and distinct from any other Person.  Each Credit Party shall:

(i)     observe all formalities necessary to remain a legal entity separate and distinct from any other Person;

(ii)     maintain its assets and liabilities separate and distinct from those of any other Person in such a manner that it is not difficult to segregate, identify or ascertain such assets;

(iii)     maintain records, books, bank accounts and accounting records separate from those of any other Person;

(iv)     pay its obligations in the ordinary course of business as a legal entity separate from any other Person;

(v)     subject to the Cash Management Order, keep its funds separate and distinct from any funds of any other Person, and receive, deposit, withdraw and disburse such funds separately from any funds of any other Person;

(vi)     not agree to pay, assume, guarantee or become liable for any debt of, or otherwise pledge its assets for the benefit of, any other Person (except as set forth in the Credit Documents and the Pre-Petition Credit Documents);

(vii)     in all dealings with third parties and the public, identify itself by its own name and as a separate and distinct entity and not hold out that it is a division of any other Person or that any other Person is a division of it;

(viii)    not induce any third party to rely on the creditworthiness of any other Person in order that such third party will contract with it;

(ix)     allocate and charge fairly and reasonably any common overhead shared with any other Person;

(x)      hold itself out as a separate entity, and correct any known misunderstanding regarding its separate identity; and

(xi)     conduct business in its own name, ensure that all communications are made solely in its name, and use separate invoices, stationery and checks.

**10.2     Negative Covenants**.  Except with the prior written consent of the Lender (acting in its sole and absolute discretion), until the irrevocable, full and final payment and performance of the Obligations and the termination of this Agreement, none of the Parent, the Borrower or any of the other Credit Parties shall:

(a)     **Debt**.  Create, incur, assume or suffer to exist any Debt, other than Permitted Debt.

(b)     **Liens**.   Create, incur, assume or suffer to exist, any Lien on any of their respective properties or assets, now owned or hereafter acquired, or assign or otherwise convey any right to receive the production, proceeds or income therefrom, other than Permitted Liens [and any burdens on production permitted under Section 10.2(n)].

(c)     **Mergers, Etc**.  Enter into any reorganization, consolidation, amalgamation, arrangement, winding-up, merger or other similar transaction or convey, lease or Dispose of all or substantially all of its assets or convey, lease or Dispose of all or any part of any Mining Property, in each case other than the Cases or pursuant to an order of the Bankruptcy Court.

(d)     **Disposal of Assets Generally**.  Dispose of any property or asset (including, without limitation, any securities) other than (i) bona fide sales of inventory, in the ordinary course of business for the purpose of carrying on the Business and at fair market value, and (ii) the sale or other disposition of any asset (other than securities) in the ordinary course of business which, has no material economic value to the Business, is obsolete, redundant, or is being disposed of in connection with a rebuild, renewal or replacement of the asset, provided that the aggregate fair market value of property or assets Disposed of in reliance on this clause (ii) shall not exceed $250,000.  For the avoidance of doubt, no Credit Party shall Dispose of any Core Asset or any property relating to and necessary for the continued operation of a Core Asset.

(e)     **Transactions with Related Parties**.   Directly or indirectly enter into, on non-arm's length terms, any agreement with, make any financial accommodation for, or otherwise enter into any transaction with, a Related Party other than the creation of and investment in a Permitted JV as permitted by this Agreement.

(f)     **Change in Business**.  Make any change in the nature of the Business.

66

(g)      **Distributions**.   Other than to the Borrower, any other Credit Party, declare, make or pay any Distribution other than management fees required under applicable Canadian tax laws or directors' fees.   For purposes of this Section 10.2(g), "**Distribution**" includes with respect to any Person (i) any dividend or other distribution on issued shares or any other Equity Interest of the Person or any of its Subsidiaries, (ii) any purchase, redemption or retirement of any issued share, warrant or other Equity Interest or any other option or right to acquire any share or other Equity Interest of the Person or any of its Subsidiaries or (iii) any payment whether as consulting fees, management fees or otherwise to any Related Party of the Person or any of its Subsidiaries.

(h)      **Financial Assistance**.   Except for customary and usual intercompany transactions that do not prejudice or adversely affect the Lender's rights and interests in, or the value of, the Collateral, including pursuant to the Credit Parties' cash management system as in effect on the date hereof, provide any Financial Assistance to any Person.   For the purposes of this Section 10.2(h), "**Financial Assistance**" includes any advances, loans or other extensions of credit, guarantees, indemnities, financial accommodations or other Contingent Liabilities in the nature of a guarantee or indemnity or capital contributions.

(i)      **Acquisitions**.   Without the prior written consent of the Lender, purchase any shares, stocks, bonds, notes, debentures, securities or other Equity Interests of any Person, or acquire all or substantially all the assets of, any other Person.

(j)      **Capital Expenditures**.   No Credit Party shall make or commit to make, or suffer or permit the making of, expenditures that would, in accordance with IFRS, be considered capital expenditures in an aggregate amount greater than $250,000.

(k)      **Hedging**.   Enter into any Hedging Agreement.

(l)      **Business**.   Carry on the Business otherwise than through the Borrower or any Credit Party.

(m)      **Charter Documents**.   Amend or modify any of its Organizational Documents (or equivalent charter documents) without the prior written consent of the Lender, not to be unreasonably withheld.

(n)      **Burdens on Production**.   Grant, sell, suffer to exist, transfer, assign or convey, directly or indirectly, to any Person any offtake, royalty (of any kind or nature whatsoever, howsoever designated), production payment or other interest in any Mining Property other than to the Lender, other than any royalty or production payment set out in Schedule 10.2(n) or in respect of which the Lender has provided its prior written consent.

(o)      **Limitation on the Issuance of Shares**.   Other than Equity Interests in the capital of the Parent (provided no Event of Default would result therefrom), sell, transfer or issue, and the Credit Parties shall cause each Subsidiary to not sell, transfer or issue, any Equity Interest.

(p)      **Pension Plans**.   None of the Credit Parties or any of their respective Subsidiaries shall assume, create or maintain any Pension Plan or liability under or pursuant to a Pension Plan.

(q)      **Prepayment of Debt**.   Directly or indirectly, voluntarily or involuntarily, purchase, redeem, defease or repay or prepay any principal, interest or any other amount in relation to any Debt, except with the prior written consent of the Lender or pursuant to an order of the Bankruptcy Court.

(r)     **Compliance with USA Patriot Act**.  Conduct any business or engage in any transaction or dealing with any Blocked Person, including the making or receiving of any contribution of funds, goods or services to or for the benefit of any Blocked Person; deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224; or engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in Executive Order No. 13224, the USA Patriot Act or any other Anti-Terrorism Law.

(s)     **Pinson Mine Dewatering**.  The Credit Parties shall not terminate or materially reduce necessary dewatering activities (as required by Section 10.1(i)) at the Pinson Mine other than as required by safety regulations, a roof fall or an act of God (each a "**Permitted Dewatering Cessation Event**").

(t)     **Chapter 11 Claims**.  Except for the Carve-Out, no Debtor shall incur, create, assume, suffer to exist or permit any super-priority administrative claim against such Debtor which is *pari passu* with or senior to the claims of the Lender against the Debtors, except as set forth in Section 7.9.

(u)     **Approved Budgets**.  The Borrower shall not make any change in the Approved Budget without the prior written consent of the Lender.

(v)     **Financial Covenants**.

(i)     The Credit Parties shall not pay professional fees (other than the fees and expenses of the advisors and consultants working on behalf of the Lender) from the proceeds of the DIP Facility in excess of the amounts set forth in the line items entitled "Unsecured creditor committee fees", "Investment banking fees", and "Debtor bankruptcy advisors" in the Approved Budget.

(ii)     The Credit Parties will not permit actual Variance Testing Disbursements for any Variance Covenant Testing Period to exceed 120% of the projected Variance Testing Disbursements for such period set forth in the Approved Budget.

(w)     **Accounting Changes**.  No Credit Party shall make any change in (i) its accounting policies or reporting practices, except as required by IFRS as notified to the Lender (*provided* that the Credit Parties shall provide a historical reconciliation for the prior audited period addressing any such change in accounting practices), or (ii) its Financial Year without the prior written consent of the Lender.

(x)     **Inactive Subsidiaries**.  No Inactive Subsidiary shall acquire any assets (including entering into or acquiring any contractual rights or permits) that are material to the Business.

## ARTICLE 11
## EVENTS OF DEFAULT

**11.1     Events of Default**.  Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without notice, application or motion to, hearing before, or order of the Bankruptcy Court or any notice to any Credit Party, the occurrence of any of the following events shall constitute an "**Event of Default**" under this Agreement:

(a)     **Non-Payment**.  A Credit Party fails to make payment of any Obligation (whether for principal, interest, costs, fees, expenses or any other amount due hereunder or under any other Credit Document) when due and payable pursuant to any of the terms of a Credit Document (whether on a payment date, by prepayment, on demand or otherwise).

ACTIVE 210918977v.12

(b)      **Misrepresentation**.  Any representation or warranty or certification made or deemed to be made by a Credit Party or any of its respective directors or officers in any Credit Document shall prove to have been incorrect, incomplete or misleading in any material respect when made or deemed to be made.

(c)      **Breach of Covenants**.  A Credit Party fails to perform, observe or comply with:

(i)      any of the covenants or any other provision or obligation contained in Section 10.2 (other than Section 10.2(s)), Section 10.1(f), Section 10.1(i), Section 10.1(p), Section 10.1(w), Section 10.1(x), Section 10.1(y) and Section 10.1(z); or

(ii)      Section 10.2(s) and such failure is not capable of being remedied or, if capable of being remedied, continues for a period of 5 Business Days, provided in such case the Credit Party is proceeding diligently to remedy such failure and the Lender is not prejudiced thereby; or

(iii)      any other covenant or any other provision or obligation contained in Section 10.1(j) and such failure is not capable of being remedied or, if capable of being remedied, continues for a period of 15 Business Days, provided in such case the Credit Party is proceeding diligently to remedy such failure and the Lender is not prejudiced thereby; or

(iv)      any other covenant or any other provision or obligation contained in any Credit Document to which it is a party and such failure is not capable of being remedied or, if capable of being remedied, continues for a period of 15 Business Days, provided in such case the Credit Party is proceeding diligently to remedy such failure and the Lender is not prejudiced thereby.

(d)      **Cross-Default**.  A Credit Party (or any Subsidiary of any Credit Party) fails to pay the principal of, premium, if any, interest on, or any other amount relating to, any of its Debt, Post-Petition, the principal of which Debt exceeds $100,000 (or the equivalent amount in any other currency) when such amount becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise); or any other event occurs or condition exists if its effect is to accelerate, or permit the acceleration of such Debt; or any such Debt shall be (or may be) declared to be due and payable prior to its stated maturity.

(e)      **Material Contracts**.  A Credit Party fails to perform or observe any material term, covenant or agreement contained in any Material Contract on its part to be performed or observed (other than as a result of the Cases); or any Material Contract is amended without the prior written consent of the Lender and such amendment could have a Material Adverse Effect; or any Material Contract is terminated or revoked or permitted to lapse (other than in accordance with its terms and not as a result of default); or any party to any Material Contract delivers a notice of termination or revocation in respect of such Material Contract and such Material Contract is subsequently terminated or revoked, in each case without the written consent of Lender.

(f)      **Judgments**.  Any judgment or order for the payment of money in excess of $100,000 (or the equivalent amount in any other currency) is rendered against a Credit Party (or any Subsidiary of any Credit Party).

(g)      **Unenforceability of Pre-Petition Documentation**.  Except as a result of an Effect of Bankruptcy:

(i)      any material provision of any Pre-Petition Credit Document shall cease to be in full force and effect;

(ii)      any Pre-Petition Credit Document is revoked or terminated, becomes unlawful or is declared null and void by a Governmental Entity of competent jurisdiction; or

(iii)      any Pre-Petition Credit Document becomes unenforceable, is repudiated or the enforceability thereof is contested or disaffirmed by or on behalf of any party thereto other than the Pre-Petition Lender.

(h)      **Dissolution**.  Any application is made for, or order, judgment or decree is entered against any Credit Party decreeing, the winding-up or dissolution or any similar process of such Credit Party and, in the case of an application, such application remains undischarged or unstayed for any period of 15 days after the application is first made or a resolution is passed for the winding-up, dissolution or liquidation of any of the Credit Parties (or any Subsidiary of any Credit Party).

(i)      **Security Imperiled**.   Any Credit Document is declared by a court or tribunal of competent jurisdiction to be void, invalid, illegal or unenforceable or the validity, legality or enforceability thereof is contested by any Credit Party or any other Person party thereto (other than the Lender), or any Credit Party or any other Person party thereto denies that it has any or further obligations thereunder.

(j)      **Agreed Priority of Collateral**.  If any one or more of the Credit Documents ceases to be in full force and effect or any DIP Lien is no longer effective to create in favor of the Lender, a valid Lien in any Collateral with the Agreed Priority.

(k)      **Change of Control**.  A Change of Control occurs.

(l)      **Material Adverse Effect**.  Any event, circumstance or condition which could reasonably be expected to have a Material Adverse Effect has occurred.

(m)      **Expropriation/Condemnation**.  An Expropriation Event occurs.

(n)      **Regulatory Action**.  Other than an order of the Bankruptcy Court pursuant to the Cases consented to by the Lender in writing, any Governmental Entity shall take or attempt to take any action, except for any action with respect to the claim(s) set out in Schedule 9.1(m), with respect to a Credit Party, or with respect to any Mining Property or any Collateral subject to the Security Documents, which has, had or could reasonably be expected to have a Material Adverse Effect unless such action is set aside, dismissed or withdrawn within 90 days of its institution or such action is either being contested in good faith, its effect is stayed during such contest, or the respective Credit Party is pursuing a remedy or resolution to such action in good faith, the Credit Parties are allowed to continue the development, mining and operation of each Mining Property during such period, and the same could not be expected to have a Material Adverse Effect.

(o)      **Cessation of Core Asset Operations**.  Without the prior written consent of the Lender, and except for the planned placement of the Pinson Mine under a care and maintenance plan, any Core Asset, or any portion thereof, shall be abandoned or terminated, development or operation of any Core Asset shall be terminated or reduced materially from existing levels of operation and development (other than as contemplated by the Approved Budget), provided nothing in the foregoing shall prevent a Credit Party from modifying its operations in a manner required to comply with Prudent Mining Industry Practices, provided such modification (i) does not result in the closure of the Briggs Mine or place Briggs Mine under a care and maintenance plan, or (ii) result in the cessation of dewatering activities at the Pinson Mine (unless otherwise expressly permitted in this Agreement).

70

(p)      **Financial Statements**.  The audited financial statements, if any, of any Credit Party (or any Subsidiary of any Credit Party) are qualified in any respect by such Credit Party's or such Subsidiary's independent auditors, other than as a result of the Cases.  For certainty, a qualification from an independent auditor that the Credit Party may not be able to remain a going concern due to a working capital deficit or the existence of the Cases, shall not constitute an Event of Default.

(q)      **Reorganization Matters**.  Any of the following occurs in any Chapter 11 Case or, to the extent set forth below, the Canadian Bankruptcy Case:

(i)      the bringing of a motion or taking of any action by a Debtor:  (A) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (B) to grant any Lien other than Permitted Liens upon or affecting any Collateral in the Chapter 11 Case or the Canadian Bankruptcy Case; (C) except as provided in the Interim Order, Final Order or Approved Budget, as the case may be, to use cash collateral under Section 363(c) of the Bankruptcy Code without the prior written consent of the Lender;

(ii)      the entry of an order in any of the Chapter 11 Cases or the Canadian Bankruptcy Case confirming a plan or plans of reorganization that does not contain a provision for termination of the DIP Facility and repayment in full in cash of all the Obligations on or before the effective date of such plan or plans;

(iii)      the entry of an order in the Chapter 11 Case or the Canadian Bankruptcy Case amending, supplementing, staying, vacating or otherwise modifying the Credit Documents or the Interim Order or the Final Order without the written consent of the Lender or the filing by a Debtor of a motion for reconsideration with respect to the Interim Order or the Final Order;

(iv)      the Interim Order is not entered on or before the date that is seven days after the Petition Date;

(v)      the Final Order is not entered on or before the date that is 50 days after the date of entry of the Interim Order;

(vi)      the payment of any Pre-Petition claim unless (A) reflected in the Approved Budget or (B) authorized pursuant to an order approved by the Bankruptcy Court and made with the written consent of the Lender which consent will not be unreasonably withheld;

(vii)      the allowance of any claim or claims under Sections 506(c) or 552(b) of the Bankruptcy Code or otherwise against the Collateral in any Chapter 11 Case or the Canadian Bankruptcy Case;

(viii)      the appointment of an interim or permanent trustee in any Chapter 11 Case or the appointment of a receiver or an examiner in any Chapter 11 Case with expanded powers to operate or manage the financial affairs, the business or reorganization of a Debtor;

(ix)      the sale, without the written consent of the Lender, of all or substantially all of a Debtor's assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Cases, or otherwise that does not provide for payment in full in cash of the Obligations;

(x)      the dismissal of any Chapter 11 Case, or the conversion of any Chapter 11 Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or a Debtor shall file

71

a motion or other pleading seeking the dismissal of any Chapter 11 Case under Section 1112 of the Bankruptcy Code or otherwise;

(xi)      the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code to allow any creditor other than the Lender to proceed against any assets of a Debtor with an aggregate value in excess of $20,000;

(xii)      the entry of an order in any Chapter 11 Case or the Canadian Bankruptcy Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations;

(xiii)      the failure of a Debtor to perform any of its obligations under the Interim Order or the Final Order;

(xiv)      the entry of an order in any of the Chapter 11 Cases or the Canadian Bankruptcy Case granting any other super-priority claim or Lien equal or superior to the DIP Lien of the Lender;

(xv)      a Debtor engages in or supports any challenge to the validity, perfection, priority, extent or enforceability of the DIP Facility or the Pre-Petition Obligations or the Liens on or security interests in the assets of such Debtor securing the DIP Facility or the Pre-Petition Obligations in any Chapter 11 Case or the Canadian Bankruptcy Case, including seeking to equitably subordinate or avoid the liens securing the Pre-Petition Obligations;

(xvi)      a Debtor engages in or assists any investigation or asserts any claim or cause of action (or supports the assertion of the same) against the Lender or the Pre-Petition Lender in any Chapter 11 Case or the Canadian Bankruptcy Case;

(xvii)      any Person shall seek a Section 506(a) Determination with respect to the Pre-Petition Obligations that is unacceptable to the Pre-Petition Lender in any Chapter 11 Case or the Canadian Bankruptcy Case;

(xviii)      [RESERVED];

(xix)      (x) the Debtors shall file with the Bankruptcy Court a motion including procedures for the sale of all or substantially all the assets of the Debtors or (y) the Bankruptcy Court shall have entered a final order approving bid procedures for the sale of all or substantially all the assets of the Debtors, in the case of each of the foregoing clauses (x) and (y), in form and substance that has not been approved by the Lender in writing (such approval not to be unreasonably withheld) prior to its filing with the Bankruptcy Court;

(xx)      a Debtor supports any plan or plans of reorganization not acceptable to the Lender in any Chapter 11 Case or the Canadian Bankruptcy Case;

(xxi)      a Debtor takes any action in the Chapter 11 Case or the Canadian Bankruptcy Case that is materially adverse to the Lender;

(xxii)      the entry of an order in any Chapter 11 Case or the Canadian Bankruptcy Case that precludes that Lender from credit bidding all or any portion of the Obligations or the Pre-Petition Obligations; or

72

(xxiii)   the occurrence of the Termination Date.

**11.2    Action Upon Event of Default**.

(a)      If any Event of Default has occurred and is continuing and subject to the Notice Period, the Lender shall, notwithstanding the provisions of Section 362 of the Bankruptcy Code (the automatic stay of Section 362 of the Bankruptcy Code shall be deemed modified and vacated to permit the Lender to exercise its remedies under this Agreement and the Credit Documents), without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court: (i) terminate the DIP Facility; (ii) reduce the Commitment from time to time; (iii) declare all or any portion of the Obligations due and payable; (iv) increase the rate of interest applicable to the Obligations to the Default Rate; (v) direct any or all of the Credit Parties to sell or otherwise dispose of any or all of the Collateral on terms and conditions acceptable to the Lender pursuant to Sections 363, 365 and other applicable provisions of the Bankruptcy Code (and, without limiting the foregoing, direct any Credit Party to assume and assign any lease or executory contract included in the Collateral to the Lender's designees in accordance with and subject to Section 365 of the Bankruptcy Code); (vi) enter onto the premises of any Credit Party in connection with an orderly liquidation of the Collateral; and (vii) exercise any rights and remedies provided to the Lender the Credit Documents or at law or equity, including all remedies provided under the UCC and pursuant to the Interim Order and the Final Order.

(b)      Notwithstanding anything to the contrary contained herein, the Lender shall not be permitted to exercise any remedy (other than those described in clauses (i), (ii), (iii) and (iv) of Section 11.2(a))  unless the Lender shall have given five Business Days prior written notice (the "**Notice Period**") to the Debtors, counsel to any Committee and the Office of the U.S. Trustee during which Notice Period the Debtors and any Committee may seek relief from the Bankruptcy Court to re-impose or continue the automatic stay with respect to any remedy other than those described in clauses (i), (ii), (iii) and (iv) of Section 11.2(a); *provided*, that in any hearing after the giving of the aforementioned notice, the only issue that may be raised by the Debtors and the Committee being whether, in fact, an Event of Default has occurred and is continuing.

**11.3    Remedies**.

Upon the occurrence and during the continuation of an Event of Default, the Lender shall have the right, but not the obligation, subject to the Orders, to do any of the following, and all disbursements and expenses made by the Lender in connection therewith shall be added to and be made a part of the Obligations and, whether or not said sum, including such disbursements and expenses, exceeds the indebtedness originally intended to be secured hereby, the entire amount of said sum, including such disbursements and expenses, shall be secured by the DIP Liens and shall be due and payable upon demand therefor and thereafter shall bear interest at the Default Rate or the maximum rate permitted by Applicable Law, whichever is less:

(a)      vote or exercise any and all of any Credit Party's rights or powers incident to its ownership of Equity Interests in any other Credit Party, including any rights or powers to manage or control such Credit Party;

(b)      demand, sue for, collect or receive any money or property at any time payable to or receivable by any Credit Party on account of or in exchange for all or part of the Equity Interests pledged by it pursuant to the Orders;

(c)      amend, terminate, supplement or modify all or any of the Organizational Documents of any Credit Party the Equity Interests of which constitute Collateral;

(d)        proceed to protect and enforce the rights vested in it hereunder and under the UCC;

(e)        cause all revenues and all other moneys and other property forming part of the Collateral to be paid and/or delivered directly to it, and demand, sue for, collect and receive any such moneys and property;

(f)        cause any action at law or in equity or other proceeding to be instituted and prosecuted to collect or enforce any of the Obligations, or rights hereunder or included in the Collateral, or for specific enforcement of any covenant or agreement contained herein or in any Material Contract or other agreements forming part of the Collateral, or in aid of the exercise of any power herein or therein granted, or for any foreclosure hereunder and sale under a judgment or decree in any judicial proceeding, or to enforce any other legal or equitable right vested in it by this Agreement or by Applicable Law;

(g)        foreclose or enforce any other agreement or other instrument by or under or pursuant to which the Obligations are issued or secured;

(h)        incur expenses, including attorneys' fees, consultants' fees, and other costs in connection with the exercise of any right or power under this Agreement or any other Credit Document;

(i)        perform any obligation of any Credit Party hereunder or under any other Credit Document or any Material Contract or other agreement forming part of the Collateral, submit renewal notices or exercise any purchase options under leases, and make payments, purchase, contest or compromise any encumbrance, charge or lien, and pay taxes and expenses and insure, process and preserve the Collateral without, however, any obligation to do so;

(j)        take possession of the Collateral and of any and all books of account and records of the Debtors relating to any of the Collateral and render it usable and repair and renovate the same without, however, any obligation to do so, and enter upon, or authorize its designated agent to enter upon, any location where the same may be located for that purpose (including the right of the Lender to exclude the Debtors and all Persons claiming access through any of the Debtors from any access to the Collateral or to any part thereof) and the Lender and its representatives are hereby granted an irrevocable license to enter upon such premises for such purpose, control, manage, operate, rent and lease the Collateral, collect all rents and income from the Collateral and apply the same to reimburse the Lender for any reasonable cost or expenses incurred hereunder or under any of the Credit Documents and to the payment or performance of any of the Obligations, and apply the balance to the Obligations as provided herein and any remaining excess balance to whomsoever is legally entitled thereto;

(k)        make any reasonable compromise or settlement deemed desirable with respect to any of the Collateral and extend the time of payment, arrange for payment installments or otherwise modify the terms of, any Collateral;

(l)        secure the appointment of a receiver of the Collateral or any part thereof, whether incidental to a proposed sale of the Collateral or otherwise, and all disbursements made by such receiver and the expenses of such receivership shall be added to and be made a part of the Obligations and, whether or not said principal sum, including such disbursements and expenses, exceeds the indebtedness originally intended to be secured hereby, the entire amount of said sum, including such disbursements and expenses, shall be secured by the DIP Liens and shall be due and payable upon demand therefor and thereafter shall bear interest at the Default Rate or the maximum rate permitted by Applicable Law, whichever is less;

74

(m)      enter into any extension, reorganization, deposit, merger, consolidation or other agreement pertaining to, or deposit, surrender, accept, hold or apply other property in exchange for, the Collateral or any part thereof;

(n)      transfer the Collateral or any part thereof to the name of the Lender or to the name of Lender's nominee;

(o)      take possession of and endorse in the name of any Credit Party or in the name of the Lender, for the account of any Credit Party, any bills of exchange, checks, drafts, money orders, notes or any other chattel paper, documents or instruments constituting all or any part of the Collateral or received as interest, rent or other payment on or on account of the Collateral or any part thereof or on account of its sale or lease;

(p)      appoint another Person (who may be an employee, officer or other representative of the Lender) to do any of the foregoing, or take any other action permitted hereunder, on behalf of the Lender;

(q)      execute (in the name, place and stead of any Credit Party) endorsements, assignments and other instruments of conveyance or transfer with respect to all or any of the Collateral;

(r)       take any other action which the Lender deems necessary or desirable to protect or realize upon its security interest in the Collateral or any part thereof;

(s)      require each Credit Party to assemble the Collateral or any part thereof and to make the same (to the extent the same is reasonably moveable) available to the Lender at a place to be designated by the Lender which is reasonably convenient to the Credit Parties and the Lender;

(t)      make formal application for the transfer of all or any Governmental Approvals of any Credit Party to the Lender or to any assignee of the Lender or to any purchaser of any of the Collateral to the extent the same are assignable in accordance with their terms and Applicable Laws;

(u)      bring an action or proceeding to foreclose or proceed to sell any real property pursuant to a power of sale; and/or

(v)      exercise any other or additional rights or remedies granted to the Lender under any other provision of this Agreement or any other Credit Document, or exercisable by a secured party under the UCC or under any other Applicable Law and without limiting the generality of the foregoing and without notice except as specified in Section 11.4, sell the Collateral or any part thereof in one or more parcels at public or private sale, at any exchange or broker's board or elsewhere, at such price or prices and on such other commercially reasonable terms in accordance with the UCC.

### 11.4      Minimum Notice Period.

If, pursuant to Applicable Laws, prior notice of any action described in Section 11.3 is required to be given to any Credit Party, each Credit Party hereby acknowledges that the minimum time required by such Applicable Laws, or (if no minimum time is specified) 10 days, shall be deemed a reasonable notice period.

### 11.5      Sale of Collateral.

In addition to exercising the foregoing rights, the Lender may, to the extent permitted by Applicable Laws and subject to the Orders, arrange for and conduct the sale of the Collateral at a public

ACTIVE 210918977v.12

or private sale (as the Lender may elect) which sale may be conducted by an employee or representative of the Lender, and any such sale shall be conducted in a commercially reasonable manner. The Lender may release, temporarily or otherwise, to the applicable Credit Party any item of Collateral of which the Lender has taken possession pursuant to any right granted to the Lender by this Agreement without waiving any rights granted to the Lender under this Agreement, the other Credit Documents or any other agreement related hereto or thereto. Each Credit Party, in dealing with or disposing of the Collateral or any part thereof, hereby waives all rights, legal and equitable, it may now or hereafter have to require marshaling of assets or to require, upon foreclosure, sales of assets in a particular order. Each successor of any Credit Party under the Credit Documents agrees that it shall be bound by the above waiver, to the same extent as if such successor gave the waiver itself. Each Credit Party also hereby waives, to the fullest extent it may lawfully do so, the benefit of all laws providing for rights of appraisal, valuation, stay, extension or redemption after foreclosure now or hereafter in force. If the Lender sells any of the Collateral upon credit, the Credit Party in respect of such Collateral will be credited only with payments actually made by the purchaser and received by the Lender. In the event the purchaser fails to pay for the Collateral, the Lender may resell the Collateral and the relevant Credit Party shall be credited with the proceeds of the sale in excess of the amounts required to pay the Obligations in full. In the event the Lender bids at any foreclosure or trustee's sale or at any private sale permitted by Applicable Law and this Agreement or any other Credit Document, the Lender may bid all or less than the amount of the Obligations. The Lender shall not be obligated to make any sale of Collateral regardless of whether or not notice of sale has been given. The Lender may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. Each Credit Party further acknowledges and agrees that any offer to sell any part of the Collateral that has been (i) publicly advertised on a bona fide basis in a newspaper or other publication of general circulation or (ii) made privately in the manner described herein to not fewer than 10 bona fide offerees shall be deemed to involve a "public disposition" for the purposes of Section 9-610(c) of the UCC.

**11.6    Actions Taken by Lender**.

Any action or proceeding to enforce this Agreement or other agreement forming part of the Collateral may be taken by the Lender either in the name of the applicable Credit Party or in the Lender's name, as the Lender may deem necessary.

**11.7    Private Sales**.

The Lender shall incur no liability as a result of the sale of the Collateral, or any part thereof, at any private sale made in good faith by Lender pursuant to Section 11.3 or Section 11.5 conducted in a commercially reasonable manner and in accordance with the requirements of Applicable Laws. Each Credit Party hereby waives any claims against the Lender and arising by reason of the fact that the price at which the Collateral may have been sold at such a private sale was less than the price that might have been obtained at a public sale or was less than the aggregate amount of the Obligations, even if the Lender accepts the first offer received and does not offer the Collateral to more than one offeree, *provided* that such private sale is conducted in a commercially reasonable manner and in accordance with applicable Laws.

**11.8    Access to Land**.

In exercising its right to take possession of the Collateral upon the occurrence and during the continuation of an Event of Default hereunder, the Lender, personally or by its Consultants, agents or attorneys, and subject to the rights of any tenant under any lease or sublease of the Collateral and subject to the Orders, to the fullest extent permitted by Applicable Law, may enter upon any Real Estate owned

ACTIVE 210918977v.12

or leased by any Credit Party without being guilty of trespass or any wrongdoing, and without liability to such Credit Party for damages thereby occasioned.

**11.9     Compliance With Limitations and Restrictions**.

Each Credit Party hereby agrees that in respect of any sale of any of the Collateral pursuant to the terms hereof, the Lender is hereby authorized to comply with any limitation or restriction in connection with such sale as it may be advised by counsel is necessary in order to avoid any violation of Applicable Laws, or in order to obtain any required approval of the sale or of the purchaser by any Governmental Entity or official, and each Credit Party further agrees that such compliance shall not result in such sale being considered or deemed not to have been made in a commercially reasonable manner, nor shall the Lender be liable or accountable to such Credit Party for any discount allowed by reason of the fact that such Collateral is sold in compliance with any such limitation or restriction.

**11.10     No Impairment of Remedies**.

If, in the exercise of any of its rights and remedies hereunder, the Lender forfeits any of its rights or remedies, including any right to enter a deficiency judgment against any Credit Party or any other Person, whether because of any applicable Law pertaining to "election of remedies" or otherwise, each Credit Party hereby consents to such action by the Lender and, to the extent permitted by Applicable Law, waives any claim based upon such action, even if such action by the Lender would result in a full or partial loss of any rights of subrogation, indemnification or reimbursement which such Credit Party might otherwise have had but for such action by the Lender or the terms herein.  Any election of remedies which results in the denial or impairment of the right of the Lender to seek a deficiency judgment against any of the parties to any of the Credit Documents shall not, to the extent permitted by applicable Laws, impair any Credit Party's obligations hereunder.

**11.11     Attorney-In-Fact**.

(a)     Each Credit Party hereby constitutes and appoints the Lender and each successor or permitted assign of the Lender, the true and lawful attorney-in-fact of such Credit Party, with full power and authority in the place and stead of such Credit Party and in the name of such Credit Party, Lender or otherwise to enforce all rights, interests and remedies of such Credit Party with respect to the Collateral or enforce all rights, interests and remedies of the Lender under this Agreement (including the rights set forth in this Article XI).  This power of attorney is a power coupled with an interest and shall be irrevocable; *provided*, that nothing in this Agreement shall prevent any Credit Party from, prior to the exercise by Lender of any of the aforementioned rights, undertaking such Credit Party's operations in the ordinary course of business in accordance with the Collateral and the Credit Documents.

(b)     If any Credit Party fails to perform any agreement or obligation contained herein, and such failure continues for 10 days following delivery of written notice by the Lender to such Credit Party, and subject to the Orders, the Lender itself may perform, or cause performance of, such agreement or obligation, and the reasonable expenses of the Lender incurred in connection therewith shall be payable by such Credit Party and shall be secured by the Collateral.

**11.12     Application of Proceeds**.

Any moneys received by the Lender after the occurrence and during the continuance of an Event of Default may be held by the Lender on account of the Obligations without prejudice to any claim by the Lender for any deficiency after such moneys are received by the Lender, and each Credit Party shall remain liable for any such deficiency.  All such moneys may be applied to such part of the Obligations as

77

the Lender may direct.  The Lender may at any time change any such appropriation of any such moneys received by it and may reapply the same to any other part of the Obligations it may from time to time see fit, notwithstanding any previous application.

**ARTICLE 12**
**MISCELLANEOUS**

**12.1    Amendments, Etc.**  No amendment to any provision of the Credit Documents shall be effective unless it is in writing and has been signed by the Lender and each of the Credit Parties who are a party thereto and no waiver of any provision of any of the Credit Documents, nor consent to any departure by any Credit Party or any other Person from such provisions, is effective unless in writing and approved by the Lender.  Any amendment, waiver or consent is effective only in the specific instance and for the specific purpose for which it was given.

**12.2    Waiver**.

(a)    No failure on the part of the Lender to exercise, and no delay in exercising, any right under any of the Credit Documents shall operate as a waiver of such right; nor shall any single or partial exercise of any right under any of the Credit Documents preclude any other or further exercise of such right or the exercise of any other right.

(b)    Except as otherwise expressly provided in this Agreement, the covenants, representations and warranties shall not merge on and shall survive each drawing of the Loan and, notwithstanding the any such drawing or any investigation made by or on behalf of any party, shall continue in full force and effect.

**12.3    Evidence of Debt and Borrowing Notices**.  The indebtedness of the Borrower resulting from the Loan shall be evidenced by the records of the Lender, which shall constitute prima facie evidence of such indebtedness.

**12.4    Notices, Etc.**  Any notice, direction or other communication to be given under this Agreement shall, except as otherwise permitted, be in writing and given by delivering it or sending it by facsimile or other similar form of recorded communication addressed:

(a)    to any Credit Party at:

Atna Resources Ltd.
250 – 14142 Denver West Parkway
Golden, CO  80401-3119
Attention:        Chief Executive Officer and Chief Financial Officer
Facsimile:       (303) 279-3772
Email:            jhesketh@atna.com and rgloss@atna.com]

With a copy to:

Bull, Housser & Tupper LLP
Suite 900 – 900 Howe Street
Vancouver, BC V6Z 2M4
Attention:        David Hunter
Facsimile:       (604) 646-2634
Email:            dmh@bht.com

78

and

Squire Patton Boggs LLP
221 E. Fourth Street
Suite 2900
Cincinnati, OH 45202
Attention:        Stephen Lerner
Facsimile:        (513) 361-1201
Email:   stephen.lerner@squirepb.com]

(b)        to the Lender at:

Waterton Precious Metals Fund II Cayman, LP
c/o Waterton Global Resource Management, Inc.
Suite 5050, 199 Bay Street
Toronto, Ontario M5L 1E2
Attention:        Richard J. Wells
Facsimile:        (416) 504-3507

With a copy (which shall not constitute notice) to:

Sidley Austin LLP
One South Dearborn
Chicago, Illinois 60603
Attention: Jessica Boelter
Facsimile: (312) 853-7036
Email:   jboelter@sidley.com

Any such communication shall be deemed to have been validly and effectively given if (i) personally delivered, on the date of such delivery if such date is a Business Day and such delivery was made prior to 4:00 p.m. (New York time), otherwise on the next Business Day, or (ii) transmitted by facsimile, electronic mail or similar means of recorded communication on the Business Day following the date of transmission.  Any party may change its address for service from time to time by notice given in accordance with the foregoing and any subsequent notice shall be sent to the party at its changed address.

**12.5    Costs, Expenses General Indemnity and Environmental Indemnity**.

(a)        Each Credit Party shall, whether or not the transactions contemplated in this Agreement are completed, indemnify and defend and hold the Lender, the Lender's Affiliates, Consultants and their respective directors, partners, managers, members, owners, principals, shareholders, officers, employees, agents, consultants and representatives (each an "**Indemnified Person**") harmless from, and shall pay to such Indemnified Person on the Termination Date all amounts required to compensate the Indemnified Person for, any cost, expense, liability, obligation, loss, damage, penalty, action, judgment, fine, suit, charge, claim, taxes, payments or disbursements of any kind or nature whatsoever, including the reasonable fees and expenses of any financial advisor and reasonable attorney's fees and expenses imposed on, incurred by, suffered by or asserted against, the Indemnified Person as a result of, connected with or arising out of (i) the preparation, execution and delivery of, preservation of rights under, enforcement of, or refinancing, renegotiation or restructuring of, any present or future Credit Document, the Interim Order and the Final Order and any related amendment, waiver or consent, as well as the consummation of the transactions contemplated hereby and thereby, (ii) any advice of counsel as to the rights and duties of the Lender with respect to the administration of the Credit Documents, the Interim

79

Order and the Final Order or any transaction contemplated under the Credit Documents, the Interim Order and the Final Order, (iii) any default (whether or not constituting a Default or Event of Default) by a Credit Party, (iv) any proceedings brought by or against the Indemnified Person, or in which the Indemnified Person otherwise participates, due to its entering into or being a party to any of the Credit Documents, or by reason of its exercising or performing, or causing the exercise or performance of, any right, power or obligation under any of the Credit Documents or otherwise in connection with its interest in any Security, whether or not such proceedings are related to the enforcement of any Credit Document,; (v) the ownership, management, administration or operation of any Mining Property, except in each case to the extent caused by the gross negligence or willful misconduct of the Indemnified Person; (vi) obtaining the approval of the Credit Documents by the Bankruptcy Court; (vii) the preparation and review of pleadings, documents and reports related to any of the Chapter 11 Cases or the Canadian Bankruptcy Case or any subsequent case under Chapter 7 of the Bankruptcy Code, attendance at meetings, court hearings or conferences related to any of the Chapter 11 Cases or the Canadian Bankruptcy Case or any subsequent case under Chapter 7 of the Bankruptcy Code; and (viii) general monitoring of any of the Chapter 11 Cases or the Canadian Bankruptcy Case or any subsequent case under Chapter 7 of the Bankruptcy Code.

(b)     Each Credit Party shall indemnify and hold harmless and agrees to defend the Indemnified Persons against any cost, expense, liability, obligation, loss, damage, penalty, action, judgment, fine, suit, charge, claim, taxes, payments or disbursements of any kind or nature whatsoever (including strict liability and including costs and expenses of investigation, abatement and remediation and monitoring of spills or Releases or threatened Releases of Hazardous Materials or other Contaminants, and including liabilities of the Indemnified Persons to third parties (including Governmental Entities) in respect of bodily injuries, property damage, damage to or impairment of the environment or any other injury or damage and including liabilities of the Indemnified Persons to third parties for the third parties' foreseeable and unforeseeable consequential damages) (collectively, "**Environmental Indemnified Liabilities**") incurred as a result of or in connection with the entering into, the administration of or enforcement of this Agreement or any other Credit Document, including the exercise by the Lender of any rights hereunder or under any of the other Credit Documents, which result from or relate, directly or indirectly, to:

(i)     the presence, Release or threatened Release of any Hazardous Material or other Contaminants, by any means or for any reason, whether or not such presence, Release or threatened Release of Hazardous Materials or other Contaminants was under the control, care or management of a Credit Party or of a previous owner, operator, tenant or other Person;

(ii)     any Release, presence, use, creation, transportation, storage or disposal of any Hazardous Material or Contaminant on or with respect to the Subject Property or the business, operations or activities of any Credit Party;

(iii)     any claim or order for any clean-up, restoration, detoxification, reclamation, repair or other securing or remedial action which relates to any Subject Property or the business, operations or activities of any Credit Party;

(iv)     any Environmental Claim with respect to any Subject Property or any Credit Party; or

(v)     the breach or violation or alleged breach or violation of any Environmental Laws by a Credit Party.

For purposes of this Section, "**liability**" shall include (A) liability of an Indemnified Person for costs and expenses of abatement and remediation of spills and releases of Hazardous Materials where such abatement and remediation is prudent for the continued operation of the Business or required by Environmental Laws and to the extent required to maintain the value and use of the Collateral, (B) liability of an Indemnified Person to a third party to reimburse the third party for bodily injuries, property damages and other injuries or damages which the third party suffers, including (to the extent, if any, that the Indemnified Person is liable therefor) foreseeable and unforeseeable consequential damages suffered by the third party, (C) liability of the Indemnified Person for damage suffered by the third party, (D) liability of an Indemnified Person for damage to or impairment of the environment and (E) liability of an Indemnified Person for court costs, expenses of alternative dispute resolution proceedings, and fees and disbursements of expert consultants and legal counsel on a solicitor and own client basis.

(c)     If, with respect to the Lender, (i) any change in any law, rule, regulation, judgment or order or any change in the interpretation, application or administration of such law, rule, regulation, judgment or order, occurring or becoming effective after this date, or (ii) compliance by the Lender with any direction, request or requirement (whether or not having the force of law) of any Governmental Entity made or becoming effective after the date hereof, has the effect of causing any loss to the Lender or reducing the Lender's rate of return by (A) increasing the cost to the Lender of performing its obligations under any of the Credit Documents (including the costs of maintaining any capital, reserve or special deposit requirements), (B) requiring the Lender to maintain or allocate any capital or additional capital or affecting its allocation of capital in respect of its obligations under any of the Credit Documents, (C) reducing any amount payable to the Lender under any of the Credit Documents or (D) causing the Lender to make any payment or to forego any return on, or calculated by reference to, any amount received or receivable by the Lender under the Credit Documents, then the Lender may give notice to the Borrower specifying the nature of the event giving rise to the loss and the Borrower shall, on demand, pay such amounts as the Lender specifies are necessary to compensate it for any such loss.  A certificate as to the amount of any such loss submitted in good faith by the Lender to the Borrower shall be conclusive and binding for all purposes, absent manifest error.

(d)     Each Credit Party shall pay to the Lender on demand any amounts required to compensate the Lender for any loss suffered or incurred by it as a result of (i) any payment being made in respect of the Loan, (ii) the failure of a Credit Party to give any notice in the manner and at the times required by this Agreement, (iii) the failure of the Borrower to make a drawing under the Loan in the manner and at the time specified in any Borrowing Notice or (iv) the failure of the Borrower to make a payment or a mandatory repayment in the manner and at the time specified in this Agreement.  A certificate as to the amount of any loss submitted in good faith by the Lender to the Borrower shall be conclusive and binding for all purposes, absent manifest error.

(e)     The provisions of this Section 12.5 shall survive the termination of this Agreement, release or foreclosure of the Mortgages and the repayment of all Obligations.  Each Credit Party acknowledges that neither its obligation to indemnify nor any actual indemnification by it of the Lender or any other Indemnified Person in respect of such Person's losses for the legal fees and expenses shall in any way affect the confidentiality or privilege relating to any information communicated by such Person to its counsel.

**12.6     Release**.  Upon irrevocable and indefeasible repayment and performance in full of the Obligations, including all indebtedness, obligations and liabilities (direct or indirect, absolute or contingent, matured or not, solely or jointly) of each of the Credit Parties incurred under or in connection with this Agreement and/or any other Credit Documents and the irrevocable payment to the Lender of all reasonable costs, charges, expenses and legal fees and disbursements (on a solicitor and his own client basis) incurred by the Lender in connection with the Security, each of the Credit Parties shall be entitled

to a release and discharge of the Security constituted by the Security Documents, other than obligations and/or liabilities that have accrued prior to the date of such release or any other obligation which is expressly stated to survive the termination of the Security Documents, provided that the Lender no longer has any obligations (contingent or otherwise) under or in connection with this Agreement or any other Credit Document.

**12.7   Successors and Assigns**.

(a)     None of the Credit Parties shall have the right to assign or transfer any of its rights or obligations under this Agreement or any interest in this Agreement without the prior written consent of the Lender, which consent may be unreasonably withheld.

(b)     The Lender, at the Lender's expense, may assign or transfer any of its rights, interests or obligations (in whole or in part) under this Agreement and any other Credit Document without the consent of, or notice to, any Credit Party.  If any consent is requested and no response is received by the Lender within five Business Days of such request, the Borrower shall be deemed to have given its consent.  In the case of any such assignment or transfer authorized under this Section 12.7, the assignee or transferee (as the case may be) shall have, to the extent of such assignment or transfer, the same rights, benefits and obligations as it would if it were the Lender hereunder and the Lender shall be relieved of its obligations hereunder with respect to the commitments and/or obligations assigned and/or transferred; provided that an assignee or transferee (as the case may be) shall not be entitled to receive any greater payment under any provision of any Credit Document than the Lender would have been entitled to receive.  Each of the Credit Parties hereby acknowledges and agrees that any assignment or transfer will give rise to a direct obligation of the Credit Parties to such assignee or transferee (as the case may be) and that such assignee or transferee (as the case may be) shall be considered to be a "**Lender**" hereunder.  The Lender may furnish any information concerning the Credit Parties in its possession from time to time to assignees and transferees provided that any such assignee or transferee agrees to maintain the confidentiality of such information.

(c)     The Credit Parties shall provide such certificates, acknowledgments and further assurances in respect of this Agreement and the Credit Documents as the Lender may reasonably require in connection with any assignment pursuant to this Section 12.7.

(d)     Any assignment pursuant to this Section 12.7 will not constitute a repayment by the Borrower to the Lender of the Loan or a new drawing under the DIP Facility to the Borrower by the Lender or by the assignee, as the case may be, and the parties acknowledge that each Credit Party's obligations with respect to the Loan will continue and will not constitute new obligations.

(e)     The Lender shall maintain at its offices a register for the recordation of the names and addresses of the Lender and each successor and assignee, and the principal amounts (and stated interest) of each Loan owing to, the Lender and or such successor or assignee pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Lender and each successor and assignee shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as the holder of each Loan specified therein as held by the Lender or such successor or assignee for all purposes of this Agreement.

(f)     If the Lender or any successor or assignee sells a participation interest in a Loan, such Lender or successor or assignee shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Loans or other obligations under the Credit Documents (the "**Participant Register**"); provided that neither the Lender nor any successor nor any assignee shall

82

have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Credit Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and the Lender or the applicable successor or assignee shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

**12.8    Right of Set-off**.  Upon the occurrence and during the continuance of any Default, the Lender is authorized at any time and from time to time, to the fullest extent permitted by law (including general principles of common-law), to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by it to or for the credit or the account of any Credit Party against any and all of the obligations of any Credit Party under any of the Credit Documents, irrespective of whether or not the Lender has made demand under any of the Credit Documents and although such obligations may be unmatured or contingent.  If an obligation is unascertained, the Lender may, in good faith, estimate the obligation and exercise its right of set-off in respect of the estimate, subject to providing the applicable Credit Party with an accounting when the obligation is finally determined.  The Lender shall promptly notify the applicable Credit Party after any set off and application is made by it, provided that the failure to give notice shall not affect the validity of the set off and application.  The rights of the Lender under this Section 12.8 are in addition to any other rights and remedies (including all other rights of set-off) which the Lender may have.

**12.9    [RESERVED]**

**12.10    Applicable Law; Jurisdiction; Etc.**

(a)    **GOVERNING LAW**.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, UNITED STATES OF AMERICA, WITHOUT REFERENCE TO CONFLICTS OF LAWS (OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

(b)    All judicial proceedings brought against any Credit Party arising out of or relating to this Agreement or any other Credit Document, or any Obligations hereunder or thereunder, must be brought in the Bankruptcy Court and, if the Bankruptcy Court does not have (or abstains from) jurisdiction, such proceeding may be brought in the courts of the State of New York, the courts of the United States of America for the Southern District of New York and appellate court of any thereof.

(c)    **SUBMISSION TO JURISDICTION**.  EACH CREDIT PARTY IRREVOCABLY AND UNCONDITIONALLY CONSENTS AND AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN EACH CREDIT PARTY, ON THE ONE HAND, AND THE LENDER, ON THE OTHER HAND, PERTAINING TO THIS AGREEMENT OR ANY OF THE OTHER CREDIT DOCUMENTS OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER CREDIT DOCUMENTS; *PROVIDED*, THAT EACH CREDIT PARTY ACKNOWLEDGES THAT ANY APPEALS FROM THE BANKRUPTCY COURT MAY HAVE TO BE HEARD BY AN APPELLATE COURT OTHER THAN THE BANKRUPTCY COURT; *PROVIDED*, *FURTHER*, THAT, SUBJECT TO RECEIVING PRIOR APPROVAL FROM THE BANKRUPTCY COURT AUTHORIZING SUCH ACTION, NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE THE LENDER BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL

83

OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER.

(d)   **WAIVER OF VENUE**.   EACH CREDIT PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT IN ANY COURT REFERRED TO IN SECTION 12.10(b).  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(e)   **WAIVER OF JURY TRIAL**.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).   EACH PARTY HERETO (i) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (ii) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 12.10.

**12.11   Counterparts**.  This Agreement and any amendments, waivers, consents, or supplements may be executed in any number of counterparts in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all of which counterparts together shall constitute one and the same Instrument.  This Agreement shall become effective upon the execution of a counterpart hereof by each of the parties.  This Agreement may be validly executed and delivered by facsimile, portable document format (.pdf) or other electronic transmission, and delivery of an executed counterpart of a signature page to this Agreement, any amendment, waiver, consent or supplement, or to any other Credit Document, by facsimile, portable document format (.pdf) or other electronic delivery (including e-mail) shall be as effective and binding as delivery of a manually executed counterpart thereof.

**12.12   Severability**.  If any provision hereof is determined to be ineffective, invalid, illegal or unenforceable for any reason, the remaining provisions hereof shall remain in full force and effect, binding on and enforceable against the parties.

**12.13   Entire Agreement; Schedules and Exhibits**.  The Schedules to this Agreement and the Exhibits to this Agreement form an integral part of this Agreement and are incorporated herein by reference and expressly made a part hereof.  This Agreement constitutes the entire agreement among the parties with respect to the subject matter hereof, superseding all prior statements, representations, discussions, agreements and understandings, oral or written, relating to such subject matter.

**12.14   Credit Party Joint and Several Liability**.  Each of the Credit Parties shall be jointly and severally liable for all the Obligations.  The Borrower and the other Credit Parties are engaged in related businesses and are integrated to such an extent that the financial strength and flexibility of each Credit Party has a direct, tangible and immediate impact on the success of the other Credit Parties.  Each Credit Party will derive substantial direct and indirect benefit from the extensions of the Loan to the Borrower

84

hereunder. Each Credit Party waives any right to revoke, terminate or suspend its guarantee and acknowledges that it entered into such Guarantee in contemplation of the benefits that it would receive by this Agreement.

**12.15    Further Assurances**.  Each Credit Party shall execute, acknowledge and deliver to the Lender such other and further documents and Contracts and do or cause to be done such other acts as the Lender reasonably determines to be necessary or desirable to effect the intent of the parties to this Agreement or otherwise to protect and preserve the interests of the Lender hereunder, promptly upon request of the Lender, including the execution and delivery of any and all documents and Contracts which are necessary or advisable to create, protect or maintain in favor of the Lender, Liens (with the Agreed Priority) on all Collateral of the Credit Parties as may be required by this Agreement or any Security Documents that are duly perfected in accordance with all Applicable Laws.

**12.16    Acknowledgements**.  Each of the parties hereto hereby acknowledges that:

(a)    it has been advised by its own legal counsel in the negotiation, preparation, execution and delivery of this Agreement and each other Credit Document;

(b)    this Agreement and the other Credit Documents shall not be construed against any party or more favorably to any party based upon which party drafted the same, it being agreed and acknowledged that all parties contributed substantially to the negotiation and preparation of this Agreement and the other Credit Documents;

(c)    the Lender has no fiduciary relationship with or duty to the Borrower or any other Credit Party arising out of or in connection with this Agreement, or any other agreement, arrangement or Instrument, and the relationship between the Lender, on one hand, and the Borrower and the other Credit Parties, on the other hand, in connection herewith is solely that of creditor and debtor; and

(d)    neither this Agreement nor any other Credit Document or other Instrument between any Credit Party and the Lender creates a joint venture or partnership among the parties hereto, and no joint venture or partnership exists, or shall be deemed to exist, among the Lender and the Borrower or among the Lender and the other Credit Parties.

**12.17    Section 552(b)**.

The Lender shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Lender with respect to proceeds, products, offspring or profits of any of the Collateral.

**12.18    Consultant**.

The Credit Parties hereby acknowledge and agree that the Lender shall have the unfettered right to appoint an engineer, technical consultant, auditor, agent and/or advisor retained by the Lender from time to time (each a "**Consultant**") (at usual and customary hourly rates) to analyze the operational status of any Mining Property and the other operations of the Credit Parties. The Credit Parties shall be responsible for all reasonable and documented costs and expenses of any Consultant.

**12.19    USA Patriot Act**.

Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies the Credit Parties which information

includes the name and address of each Credit Party and other information that will allow the Lender to identify such Credit Party in accordance with the Act.

[*Signatures on following page.*]

ACTIVE 210918977v.12

**IN WITNESS WHEREOF** the parties have executed this Debtor-in-Possession Credit Agreement.

**Borrower:**
**CANYON RESOURCES CORPORATION**

By: _____
Authorized Signing Officer

**Parent:**
**ATNA RESOURCES LTD.**

By: _____
Authorized Signing Officer

**Other Guarantors:**

**ATNA RESOURCES INC.**

By: _____
Authorized Signing Officer

**CR MONTANA CORPORATION**

By: _____
Authorized Signing Officer

**CR BRIGGS CORPORATION**

By: _____
Authorized Signing Officer

**HORIZON WYOMING URANIUM, INC.**

By: _____
Authorized Signing Officer

*Debtor-in-Possession Credit Agreement*

**LENDER:**

**WATERTON PRECIOUS METALS FUND II CAYMAN, LP, by its general partner, WATERTON GLOBAL RESOURCE MANAGEMENT, LP, by WATERTON GLOBAL RESOURCE MANAGEMENT CAYMAN CORP.**

By: _____
Authorized Signing Officer

*Debtor-in-Possession Credit Agreement*

ACTIVE 210918977v.12

**EXHIBIT "A"**
**FORM OF BORROWING NOTICE**

**TO:**    **Waterton Precious Metals Fund II Cayman, LP (the** "**Lender**")

**DATE:** _____, 2015

      This notice of borrowing (this "**Borrowing Notice**") is delivered pursuant to that certain **DEBTOR-IN-POSSESSION CREDIT AGREEMENT** dated _____, 2015 by and among Canyon Resources Corporation, a corporation incorporated pursuant to the laws of the State of Delaware and a debtor-in-possession under Chapter 11 of the Bankruptcy Code (as defined below), as the borrower (together with its successors and permitted assigns, the "**Borrower**"), Atna Resources Ltd., a corporation incorporated pursuant to the laws of the Province of British Columbia and a debtor-in-possession under Chapter 11 of the Bankruptcy Code (together with its successors and permitted assigns, the "**Parent**") and each other Guarantor party thereto, and Waterton Precious Metals Fund II Cayman, LP, as the lender (together with its successors and assigns, the "**Lender**").  Capitalized terms used herein without definition shall have the meaning ascribed to such term in the Credit Agreement.

      This Borrowing Notice is irrevocable and represents the Borrower's request for a drawing under the Loan, and the following information is provided pursuant to Section 2.3 of the Credit Agreement.

      1.     <u>Date of Requested Borrowing</u>:  _____, 201[5]

      2.     <u>Amount of Requested Loan</u>:    $_____

      3.     [<u>Structuring Fee Withheld Amount</u>:]    $_____

      4.     [<u>Additional Withheld Amount</u>:] $_____

      5.     <u>Proposed Use of Borrowing</u>:    *[Borrower to describe the proposed use of funds]*

      The drawing requested hereby may be made for the credit of the Borrower to the Borrower's Account by wire transfer of the funds to:

Name of Bank:

Address of Bank:

Account Name:

Account Number:

Transit Number:

ABA Number:

SWIFT Code:

      The Borrower hereby authorizes the Lender to withhold and retain from this drawing of the Loan [(a) $[_____] as payment to the Lender of the Structuring Fee pursuant to Section 2.1 of the Credit Agreement, and (b)] $_____ as repayment for certain costs, expenses and fees incurred by the Lender in connection with the Credit Agreement.

The Borrower hereby certifies:

(a)    the representations and warranties made by the Credit Parties in the Credit Agreement, in the Security Documents or in any certificate furnished at any time under or in connection with the Credit Agreement are true and correct on and as of the date set forth above as if made on and as of such date, except for representations and warranties expressly stated to relate to a specific earlier date;

(b)    no Default or Event of Default has occurred and is continuing on the date set forth above or will occur after giving effect to the drawing under the Loan contemplated hereby;

(c)    except as disclosed to the Lender in the Credit Agreement, there does not exist any litigation, investigation, bankruptcy or insolvency, injunction, order or claim affecting or relating to any Credit Party or any of its Subsidiaries, or any Mining Property, which has had, or could reasonably be expected to have, a Material Adverse Effect, or which could reasonably be expected to affect the legality, validity or enforceability of the Credit Agreement or any other Credit Document, that has not been settled, dismissed, vacated, discharged or terminated;

(d)    no Borrower, Credit Party or any Mining Property has incurred or suffered a Material Adverse Effect;

(e)    the proceeds of the Loan will be applied in accordance with the Approved Budget; and

(f)    all conditions set forth in Section 2.3, Section 2.4 and Article 8.1 [and 8.2][1] of the Credit Agreement have been, and shall remain, satisfied; each of the Parent and the Borrower hereby certifies the satisfaction of all such conditions precedent (that have not been waived by the Lender in its sole discretion) by its delivery of this Borrowing Notice.

[*Signature Page Follows*]

---

[1] Include for initial drawing.

IN WITNESS WHEREOF, this Borrowing Notice has been duly executed and delivered by a duly authorized officer of the undersigned as of the date first above written.

**CANYON RESOURCES CORPORATION**

By: _____

Name:

Title:

**ATNA RESOURCES LTD.**

By: _____

Name:

Title:

**EXHIBIT "B"**

**FORM OF COMPLIANCE CERTIFICATE**

**TO:**     **Waterton Precious Metals Fund II Cayman, LP**

Each of the undersigned refers to that certain DEBTOR-IN-POSSESSION CREDIT AGREEMENT dated _____, 2015 by and among Canyon Resources Corporation, a corporation incorporated pursuant to the laws of the State of Delaware and a debtor-in-possession under Chapter 11 of the Bankruptcy Code (as defined below), as the borrower (together with its successors and permitted assigns, the "**Borrower**"), Atna Resources Ltd., a corporation incorporated pursuant to the laws of the Province of British Columbia and a debtor-in-possession under Chapter 11 of the Bankruptcy Code (together with its successors and permitted assigns, the "**Parent**") and each other Guarantor party thereto, and Waterton Precious Metals Fund II Cayman, LP, as the lender (together with its successors and assigns, the "**Lender**").  Capitalized terms used herein without definition are so used as defined in the Credit Agreement.

Each of the undersigned, _____ being the _____ of the Parent and _____ being the _____ of the Borrower, certify, without personal liability, to the Lender, that on this _____ day of _____, 201[__] (the "**Determination Date**"):

1.      I have read the provisions of the Credit Agreement which are relevant to this certificate and have made such examinations or investigations as are necessary to enable me to express an informed opinion on the matters contained in this certificate.

2.      Except as disclosed on Schedule 1 to this Compliance Certificate, as at this date:

  (a)     there have been no changes to the corporate structure as set out in the Perfection Certificate delivered pursuant to Section 9.1(x) of the Credit Agreement;

  (b)     the Borrower and each of the Credit Parties have, as applicable, duly performed all the covenants in Article 10.1 of the Credit Agreement;

  (c)     No default or Event of Default has occurred which is continuing and the Credit Parties are not in breach of any terms or conditions of the Credit Agreement;

  (d)     the attached financial information is true and correct in all material respects;

  (e)     the financial statements most recently delivered pursuant to Section 10.1(a)(i) or 10.1(a)(ii), as applicable, have been prepared in accordance with IFRS in effect on the date of such financial statements and the information contained therein is true and correct in all respects, subject only to year-end audit adjustments, and present fairly and consistently the results of operations and changes in the financial position of the Credit Parties, on a consolidated and consolidating basis, as of and to this date;

  (f)     all reports, descriptions, data and other information provided by the Credit Parties pursuant to Section 10.1(a) or (b) of the Credit Agreement (i) were true, complete and accurate in all respects and (ii) did not contain any material misstatement of fact or omit to state a material fact, and all projections contained in any such reports, certificates, status updates and otherwise were based on information which, when delivered, was true, correct and complete in all material

Exh. B-1

respects and fairly presents such Credit Party's then current estimate of its future business, operations and affairs; and

(f)      except as disclosed on the schedule attached hereto, the representations and warranties referred to in Section 9.1(a), (b), (f), (j), (k), (l), (n), (p), (s), (aa), (cc), (kk) and (ii) are true and correct as though made on this date.

3.      The proceeds of each drawing of the Loan have been applied in accordance with Section 10.1(w).

4.      The Credit Parties are in full compliance with each financial covenant set forth in Section 10.2(v).[2]

5.      I acknowledge and agree on behalf of the Parent and the Borrower, respectively, that this certificate constitutes a "**Credit Document**" for the purposes of the Credit Agreement.

[*Signature Page Follows*]

---

[2]      Or if any of such certification cannot be given, stating in reasonable detail the necessary qualifications to such certification.

DATED this _____ day of _____, 201[__].

**ATNA RESOURCES LTD.**

By: _____
      Name:
      Title:

**CANYON RESOURCES CORPORATION**

By: _____
      Name:
      Title: