THIS IS NOT A SOLICITATION OF VOTES ON THE PLAN. VOTES MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED A DISCLOSURE STATEMENT. THE DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF COLORADO

---

| | | |
|---|---|---|
| ------------------------------------------------------- x | | |
| In re: | : | Case No. 15-22848 JGR |
| | : | |
| Atna Resources Inc., *et al.*[1] | : | Chapter 11 |
| | : | |
| | : | Jointly Administered Under |
| Debtors. | : | Case No.  15-22848 |
| | : | |
| ------------------------------------------------------- x | | |

---

### [PROPOSED] DISCLOSURE STATEMENT FOR JOINT PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

---

**SQUIRE PATTON BOGGS (US) LLP**

Stephen D. Lerner
221 E. Fourth Street, Suite 2900
Cincinnati, Ohio 45202
Telephone: (513) 361-1200
Facsimile: (513) 361-1201

-and-

Nava Hazan
30 Rockefeller Plaza, 23rd Floor
New York, New York 10112
Telephone: (212) 872-9800
Facsimile: (212) 872-9815

**SQUIRE PATTON BOGGS (US) LLP**

Aaron A. Boschee (Colorado # 38675)
1801 California Street, Suite 4900
Denver, Colorado 80202
Telephone: (303) 830-1776
Facsimile: (302)  896-9239

*Counsel for the Debtors and Debtors in Possession*

Dated:   September  [__], 2016

THIS IS NOT A SOLICITATION OF VOTES ON THE PLAN. VOTES MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED A DISCLOSURE STATEMENT. THE DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.

---

[1] The debtors and debtors in possession and their respective case numbers are: Atna Resources Inc. (15-22848); Canyon Resources Corporation (15-22849); CR Briggs Corporation (15-22850); CR Montana Corporation (15-22851); CR Kendall Corporation (15-22852); Atna Resources Ltd. (15-22853); Horizon Wyoming Uranium, Inc. (15-22854).

THIS IS NOT A SOLICITATION OF VOTES ON THE PLAN. VOTES MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT
HAS APPROVED A DISCLOSURE STATEMENT. THE DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT
HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M. ON [___], 2016 (PREVAILING MOUNTAIN TIME), UNLESS THE DEBTORS EXTEND THE VOTING DEADLINE. TO BE COUNTED, THE BALLOTING AGENT MUST <u>ACTUALLY</u> <u>RECEIVE</u> YOUR BALLOT ON OR BEFORE THE VOTING DEADLINE.**

**THE DEBTORS PROVIDE NO ASSURANCE THAT THE DISCLOSURE STATEMENT (AND THE EXHIBITS HERETO) THAT IS ULTIMATELY APPROVED IN THE CHAPTER 11 CASES (A) WILL CONTAIN ANY OF THE TERMS IN THIS CURRENT DOCUMENT OR (B) WILL NOT CONTAIN DIFFERENT, ADDITIONAL OR MATERIAL TERMS THAT DO NOT APPEAR IN THIS CURRENT DOCUMENT.**

**THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN AND ANY EXHIBITS ATTACHED HERETO IS <u>HIGHLY</u> <u>SPECULATIVE</u>, AND PERSONS SHOULD NOT RELY ON SUCH DOCUMENTS IN MAKING INVESTMENT DECISIONS WITH RESPECT TO (A) THE DEBTORS OR (B) ANY OTHER ENTITIES THAT MAY BE AFFECTED BY THE CHAPTER 11 CASES.**

THIS IS NOT A SOLICITATION OF VOTES ON THE PLAN. VOTES MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED A DISCLOSURE STATEMENT. THE DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR THE JOINT PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN. YOU SHOULD NOT RELY UPON OR USE THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY, AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS. THE LIQUIDATION ANALYSIS, DISTRIBUTION PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. THEREFORE, ANY ANALYSES, ESTIMATES OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF DISCLOSURE CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN.

IT IS THE DEBTORS' POSITION THAT THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER. RATHER, HOLDERS OF CLAIMS AND EQUITY INTERESTS AND OTHER ENTITIES SHOULD CONSTRUE THIS DISCLOSURE STATEMENT AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR PROJECTED OBJECTION TO A PARTICULAR CLAIM IS, OR IS NOT, IDENTIFIED IN THE DISCLOSURE STATEMENT. THE LIQUIDATING TRUSTEE MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THE DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS. THE PLAN RESERVES FOR THE LIQUIDATING TRUSTEE THE RIGHT TO BRING CAUSES OF ACTION (AS DEFINED IN THE PLAN) AGAINST ANY ENTITY OR PARTY IN INTEREST EXCEPT THOSE SPECIFICALLY RELEASED.

THIS IS NOT A SOLICITATION OF VOTES ON THE PLAN. VOTES MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED A DISCLOSURE STATEMENT. THE DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE DEBTORS' MANAGEMENT HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THE DEBTORS HAVE USED THEIR REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, NO ENTITY HAS AUDITED THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO. HOLDERS OF CLAIMS AND EQUITY INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DEBTORS FILED THIS DISCLOSURE STATEMENT. HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSIS OF THE TERMS OF THE PLAN, INCLUDING, WITHOUT LIMITATION, ANY RISK FACTORS CITED HEREIN, IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL HEREIN.

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ..................................................................................................................... 1

       A.     Definitions and Exhibits............................................................................................ 1

              1.     Definitions ..................................................................................................... 1

              2.     Exhibits .......................................................................................................... 1

       B.     Notice to Creditors.................................................................................................... 1

              1.     Purpose of Disclosure Statement ................................................................... 1

       C.     Disclosure Statement Enclosures.............................................................................. 2

              1.     Disclosure Statement Approval Order ........................................................... 2

              2.     Notice of Confirmation Hearing .................................................................... 2

              3.     Ballots............................................................................................................ 2

       D.     Inquiries .................................................................................................................... 2

II.    OVERVIEW OF DEBTORS' OPERATIONS AND CHAPTER 11 CASES .......................... 2

       A.     Debtors' Prepetition Business Operations................................................................. 2

              1.     Business ......................................................................................................... 2

       B.     Prepetition Funded Indebtedness .............................................................................. 3

              1.     The Waterton Facility .................................................................................... 3

              2.     Equipment and Capital Leases ....................................................................... 3

              3.     Mechanic's Liens ........................................................................................... 4

              4.     Other Secured Debt........................................................................................ 4

       C.     Unsecured Debt......................................................................................................... 4

              1.     Trade Debt ...................................................................................................... 4

       D.     Equity Interests ......................................................................................................... 4

       E.     Events Leading to the Debtors' Chapter 11 Filing.................................................... 4

       F.     The Chapter 11 Cases ............................................................................................... 6

              1.     Commencement of Chapter 11 Cases ............................................................ 6

              2.     Events During the Pendency of the Chapter 11 Cases ................................... 6

III.   OVERVIEW OF THE PLAN ................................................................................................. 10

       A.     General..................................................................................................................... 10

       B.     Assets for Distribution Under the Plan ................................................................... 11

       C.     Summary Table of Classification and Treatment of Claims and Equity Interests under the
              Plan.......................................................................................................................... 11

       D.     Provisions Governing Distributions Under the Plan ............................................... 14

              1.     Initial Distribution Date ............................................................................... 14

              2.     Establishment of Disputed Reserves............................................................ 14

              3.     Maintenance of Disputed Reserves.............................................................. 15

**TABLE OF CONTENTS**
(continued)

Page

4.      Quarterly Distributions ................................................................................. 15

5.      Record Date for Distributions ...................................................................... 15

6.      Delivery of Distributions .............................................................................. 15

7.      Transactions on Business Days ..................................................................... 16

8.      Manner of Cash Payments Under the Plan or the Liquidating Trust Agreement ........... 16

9.      Time Bar to Cash Payments by Check ......................................................... 16

10.     Compliance with Tax Requirements ............................................................. 16

11.     No Payments of Fractional Dollars .............................................................. 17

12.     Interest on Claims ......................................................................................... 17

13.     Setoff and Recoupment ................................................................................. 17

E.      Means for Implementation and Execution of the Plan ............................................ 17

1.      Appointment of the Liquidating Trustee and the Liquidating Trust Committee ............ 17

2.      Formation of the Liquidating Trust ............................................................... 17

3.      Funding of the Liquidating Trust .................................................................. 17

4.      Rights and Powers of the Liquidating Trustee .............................................. 18

5.      Fees and Expenses of the Liquidating Trust ................................................. 18

6.      Semi-Annual Reports to Be Filed by the Liquidating Trust ......................... 18

7.      Directors/Officers/Equity/Assets of the Debtors on the Effective Date ....... 18

8.      Liquidation of the Debtors ............................................................................ 19

9.      Operations of the Debtors Between the Confirmation Date and the Effective Date ........ 19

10.     Establishment of the Administrative Bar Date ............................................. 19

11.     Term of Injunctions or Stays ........................................................................ 20

12.     Cancellation of Equity Interests ................................................................... 20

F.      Procedures for Resolving and Treating Disputed Claims ...................................... 20

1.      No Distribution Pending Allowance .............................................................. 20

2.      Resolution of Disputed Claims ..................................................................... 20

3.      Objection Deadline ........................................................................................ 20

4.      Estimation of Claims ..................................................................................... 20

5.      Disallowance of Claims ................................................................................. 21

6.      Adjustment to Claims Without Objection ..................................................... 21

G.      Treatment of Executory Contracts and Unexpired Leases .................................... 21

1.      Rejection of Executory Contracts and Unexpired Leases ............................. 21

2.      Claims Based on Rejection of Executory Contracts or Unexpired Leases .... 21

3.      Executory Contracts and Unexpired Leases to Be Assumed ........................ 22

-ii-

**TABLE OF CONTENTS**
(continued)

Page

|  |  | 4. | Payments Related to the Assumption of Executory Contracts and Unexpired Leases | 22 |
|---|---|---|---|---|
|  | H. |  | Conditions Precedent to Effective Date of the Plan | 22 |
|  |  | 1. | Conditions Precedent to the Effective Date | 22 |
|  | I. |  | Release, Injunction and Related Provisions | 23 |
|  |  | 1. | Compromise and Settlement | 23 |
|  |  | 2. | Releases | 23 |
|  |  | 3. | Exculpation | 23 |
|  |  | 4. | Release by Holders of Claims and Interests | 24 |
|  |  | 5. | Injunction | 24 |
|  |  | 6. | Releases of Liens | 25 |
|  |  | 7. | No Substantive Consolidation | 25 |
|  |  | 8. | Preservation of Rights of Action | 25 |
|  | J. |  | Retention of Jurisdiction | 26 |
|  | K. |  | Miscellaneous Provisions | 27 |
|  |  | 1. | Final Fee Applications | 27 |
|  |  | 2. | Payment of Statutory Fees | 27 |
|  |  | 3. | Modification of Plan | 27 |
|  |  | 4. | Revocation of Plan | 28 |
|  |  | 5. | Successors and Assigns | 28 |
|  |  | 6. | Governing Law | 28 |
|  |  | 7. | Reservation of Rights | 28 |
|  |  | 8. | Article 1146 Exemption | 28 |
|  |  | 9. | Section 1125(e) Good Faith Compliance | 28 |
|  |  | 10. | Further Assurances | 28 |
|  |  | 11. | Service of Documents | 29 |
|  |  | 12. | Filing of Additional Documents | 29 |
|  |  | 13. | No Stay of Confirmation Order | 29 |
|  |  | 14. | Aid and Recognition | 29 |
| IV. |  |  | ALTERNATIVES TO THE PLAN | 29 |
|  | A. |  | Liquidation Under Chapter 7 of the Bankruptcy Code | 30 |
|  | B. |  | Alternative Chapter 11 Plan | 30 |
| V. |  |  | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 30 |
|  | A. |  | Federal Income Tax Consequences to Holders of General Unsecured Claims | 31 |
|  | B. |  | Federal Income Tax of the Liquidating Trust | 31 |

# TABLE OF CONTENTS
(continued)

**Page**

|  |  |  |  |  |
|---|---|---|---|---|
|  | 1. | Transfer of Assets to the Liquidating Trust | 31 |
|  | 2. | Classification as a Liquidating Trust | 31 |
|  | 3. | Tax Reporting | 32 |
| C. | Withholding and Reporting | | 32 |
| VI. | SOLICITATION AND VOTING PROCEDURES | | 33 |
| A. | Solicitation Package | | 33 |
|  | 1. | Contents of Solicitation Package | 33 |
|  | 2. | Distribution of Solicitation Package | 33 |
| B. | Voting Instructions and General Tabulation Procedures | | 34 |
|  | 1. | Voting Record Dates | 34 |
|  | 2. | Voting Deadline | 34 |
|  | 3. | Tabulation Procedures | 35 |
| VII. | CONFIRMATION PROCEDURES | | 37 |
| A. | Confirmation Hearing | | 37 |
| B. | Statutory Requirements for Confirmation of the Plan | | 38 |
|  | 1. | Best Interests of Creditors Test | 39 |
|  | 2. | Feasibility | 39 |
|  | 3. | Acceptance by Impaired Classes | 40 |
|  | 4. | Confirmation Without Acceptance by All Impaired Classes | 40 |
|  | 5. | No Unfair Discrimination | 40 |
|  | 6. | Fair and Equitable Test | 41 |
| C. | Contact for More Information | | 41 |
| VIII. | PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN | | 42 |
| A. | Certain Bankruptcy Law Considerations | | 42 |
|  | 1. | Parties-in-Interest May Object to the Debtors' Classification of Claims and Equity Interests | 42 |
|  | 2. | Failure to Satisfy Vote Requirement | 42 |
|  | 3. | Debtors May Not Be Able to Secure Confirmation of the Plan | 42 |
|  | 4. | Nonconsensual Confirmation | 43 |
|  | 5. | Debtors May Object to the Amount or Classification of a Claim | 43 |
|  | 6. | Risk of Non-Occurrence of the Effective Date | 43 |
|  | 7. | Contingencies Not to Affect Votes of Impaired Classes to Accept or Reject the Plan | 43 |
| B. | Risk Factors That May Affect Distributions Under The Plan | | 43 |

**TABLE OF CONTENTS**
(continued)

Page

|   | | | |
|---|---|---|---|
| | 1. | Debtors Cannot State with any Degree of Certainty What Recovery Will Be Available to Holders of Allowed Claims in Voting Classes | 43 |
| | 2. | Actual Amounts of Allowed Claims May Differ from the Estimated Claims and Adversely Affect the Percentage Recovery on General Unsecured Claims | 43 |
| C. | | Disclosure Statement Disclaimer | 44 |
| | 1. | Information Contained Herein is for Soliciting Votes | 44 |
| | 2. | Disclosure Statement Was Not Approved by the Securities and Exchange Commission | 44 |
| | 3. | Disclosure Statement May Contain Forward Looking Statements | 44 |
| | 4. | No Legal or Tax Advice Is Provided to You by this Disclosure Statement | 44 |
| | 5. | No Admissions Made | 44 |
| | 6. | Failure to Identify Litigation Claims or Projected Objections | 44 |
| | 7. | No Waiver of Right to Object or Right to Recover Transfers and Assets | 45 |
| | 8. | Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors | 45 |
| | 9. | Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update | 45 |
| | 10. | No Representations Outside the Disclosure Statement Are Authorized | 45 |
| D. | | Liquidation Under Chapter 7 | 45 |
| IX. | | CONCLUSION | 45 |

## I.   INTRODUCTION

This is the disclosure statement (the "<u>Disclosure Statement</u>") of Atna Resources Inc., Canyon Resources Corporation, CR Briggs Corporation, CR Montana Corporation, CR Kendall Corporation, Atna Resources Ltd. and Horizon Wyoming Uranium, Inc., the debtors and debtors in possession (collectively, the "<u>Debtors</u>") in the above-captioned chapter 11 cases, pending before the United States Bankruptcy Court for the District of Colorado (the "<u>Bankruptcy Court</u>"), filed in connection with the Debtors' Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code, dated September [__], 2016 (the "<u>Plan</u>"), a copy of which is attached to this Disclosure Statement as <u>Exhibit A</u>.

### A.   Definitions and Exhibits

#### 1.   Definitions

Unless otherwise defined herein, capitalized terms used in this Disclosure Statement shall have the meanings ascribed to such terms in the Plan.

#### 2.   Exhibits

All exhibits to this Disclosure Statement are incorporated as if fully set forth herein and are a part of this Disclosure Statement.

### B.   Notice to Creditors

#### 1.   Purpose of Disclosure Statement

The purpose of this Disclosure Statement is to set forth information that (i) summarizes the Plan and alternatives to the Plan, (ii) advises holders of Claims and Equity Interests of their rights under the Plan, (iii) assists holders of Claims entitled to vote in making informed decisions as to whether they should vote to accept or reject the Plan, and (iv) assists the Bankruptcy Court in determining whether the Plan complies with the provisions of chapter 11 of the Bankruptcy Code and should be confirmed.

By order dated [__], 2016, the Bankruptcy Court approved this Disclosure Statement, finding that it contains "adequate information" as that term is used in Section 1125(a)(1) of the Bankruptcy Code. However, the Bankruptcy Court has not passed on the merits of the Plan. Creditors should carefully read the Disclosure Statement in its entirety before voting on the Plan.

**IT IS THE OPINION OF THE DEBTORS THAT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES AND CREDITORS. THEREFORE, THE DEBTORS RECOMMEND THAT CREDITORS VOTE TO APPROVE THE PLAN.**

**IT IS ALSO THE OPINION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS THAT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES AND CREDITORS. THEREFORE, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS RECOMMENDS THAT CREDITORS VOTE TO APPROVE THE PLAN.**

**PLEASE READ THE DISCLOSURE STATEMENT, INCLUDING THE PLAN, IN ITS ENTIRETY. A COPY OF THE PLAN IS ATTACHED AS <u>EXHIBIT A</u>. THE DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN FOR THE CONVENIENCE OF CREDITORS AND EQUITY INTEREST HOLDERS, BUT THE PLAN ITSELF QUALIFIES ALL SUCH SUMMARIES. ACCORDINGLY, IF THERE EXISTS ANY INCONSISTENCY BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL CONTROL.**

C.      **Disclosure Statement Enclosures**

Accompanying the Disclosure Statement are the following enclosures:

1.      **Disclosure Statement Approval Order**

A copy of the order of the Bankruptcy Court, dated [__], 2016, approving the Disclosure Statement and, among other things, establishing procedures for voting on the Plan and scheduling the hearing to consider, and the deadline for objecting to, confirmation of the Plan (the "Disclosure Statement Order").

2.      **Notice of Confirmation Hearing**

A copy of the notice of the deadline for submitting ballots to accept or reject the Plan and, among other things, the date, time and place of the Confirmation Hearing and the deadline for filing objections to confirmation of the Plan (the "Confirmation Hearing Notice").

3.      **Ballots**

One or more ballots (and return envelopes) for voting to accept or reject the Plan, unless you are not entitled to vote to accept or reject the Plan and are deemed to accept or reject the Plan, and therefore, are not entitled to vote. See Article III below for an explanation of which parties in interest are entitled to vote.

D.      **Inquiries**

If you have any questions about the packet of materials that you have received, please contact Squire Patton Boggs (US) LLP, 221 E. Fourth Street, Suite 2900, Cincinnati, Ohio 45202, (513) 361-1200, Attn: Elliot M. Smith, during normal business hours.

## II.      OVERVIEW OF DEBTORS' OPERATIONS AND CHAPTER 11 CASES

A.      **Debtors' Prepetition Business Operations**

1.      **Business**

Debtor Atna Resources Ltd. ("Atna Canada"), the indirect parent company of Atna Resources Inc., was incorporated on May 30, 1984 under the laws of the Province of British Columbia, Canada. Its principal business activity was the acquisition, exploration, development and operation of mineral properties located in the United States, specifically in the states of California, Nevada and Montana, and in Canada. Atna Canada was a publicly traded, U.S.-based gold producer, and its stock was trading on the OTCQB Marketplace in the United States under the symbol "ATNAF" and the Toronto Stock Exchange in Canada under the symbol "ATN." The Debtors' executive offices were located in Golden, Colorado and all of their senior management, including their Chief Executive Officer and Chief Financial Officer worked in the Golden headquarters.

The Debtors operated the Pinson underground gold mine located near Winnemucca, Nevada, and the Briggs gold mine located in Inyo County, California. The Debtors' development assets included the Mag open-pit project adjacent to the Pinson underground mine and the Columbia gold project located near Lincoln, Montana. The Debtors also held mineral rights and exploration-stage properties in Canada (specifically, the Wolf polymetallic prospect in Yukon and the Ecstall polymetallic prospect in British Columbia) and in the United States as well as the Kendall mine, located near Lewistown, Montana, which was in the final stage of reclamation and closure activities. The Debtors' Sand Creek property, a uranium exploration property located south and east of Douglas, Wyoming, was subject to a joint venture with Uranium One Exploration USA, Inc.

### B.    Prepetition Funded Indebtedness

#### 1.    The Waterton Facility

        The Debtors (other than CR Kendall Corporation and Horizon Wyoming Uranium, Inc.) and Waterton Precious Metals Fund II Cayman, L.P. ("Waterton") were parties to that certain Senior Secured Credit Agreement dated January 31, 2014 (the "Prepetition Credit Agreement"), pursuant to which the Debtors entered into a $22.0 million senior secured, non-revolving credit facility (the "Prepetition Facility").

        The majority of the proceeds of the Prepetition Facility were used to refinance other current obligations and an existing secured loan with Sprott Resource Lending Partnership in the approximate amount of CAN$18.1 million.  Such loan was initially undertaken in 2011 to refinance the initial development and acquisition of the remaining 70% interest in the Pinson mine property. The remainder of the proceeds was used for general working capital purposes, including a reduction in trade payables. As of September 30, 2015, the outstanding principal balance owing under the Prepetition Facility, inclusive of fees payable upon maturity, was $19,080,800, plus accrued interest owing under the Prepetition Facility.

        The Prepetition Facility bore interest at a coupon-rate of 10% per annum and matured on the earlier of (i) January 31, 2016 (or if the facility has been accelerated in the event of a default, the date on which Waterton demands repayment), and (ii) the date all amounts owing under the Prepetition Facility are voluntarily or mandatorily prepaid in full, without a repayment penalty. On the maturity date, the Debtors were also obligated to pay (i) a cash fee equal to 5% of the original Prepetition Facility, and (ii) an additional cash fee equal to 5% of the Prepetition Facility less any prepayments made during the first 12 months of the Prepetition Credit Agreement.

        As consideration for structuring the Prepetition Facility, the Debtors paid to Waterton a structuring fee of $440,000 and issued to Waterton 10 million common-share purchase-warrants. Each of the warrants entitled Waterton to acquire one common share of Atna Canada at an exercise price of CAN$0.25 per common share for a period of three years following the issue date. These warrants were cancelled in November of 2014.

        Substantially all of the material assets owned directly by the U.S.-based Debtors were pledged as security to secure the obligations owing under the Prepetition Facility, as more particularly described in the Prepetition Credit Documents (the "Prepetition Collateral"). The Prepetition Collateral did not include, however, (i) certain "Excluded Assets" defined in the prepetition Security Agreement dated as of January 31, 2014 as: "Any contract, agreement, permit or license (together with the equipment, fixtures or goods subject to any such contract, agreement, permit or license) to the extent the Debtors are validly prohibited from granting a security interest in such contract, agreement, permit or license (and the equipment, fixtures or goods subject thereto) pursuant to the terms thereof, but only to the extent that such prohibition is not invalidated under the UCC or otherwise waived"; and (ii) certain "Non-Core Assets" defined in the Prepetition Credit Agreement as: "Real property interests of the Credit Parties not comprised in or relevant to any of the Core Assets and, for greater certainty, excluding (i) all personal property and (ii) the Core Assets."

        Waterton had control agreements in place with Wells Fargo Bank, giving it access to the Debtors two principal bank accounts, including the account into which all other funds are routinely swept.  In the event of a default under the Prepetition Facility, Waterton had the right to sweep all cash in these two deposit accounts without providing notice to the Debtors.

        The Debtors were unable to comply with certain covenants under the Prepetition Facility and were in default as of approximately November 1, 2015.

#### 2.    Equipment and Capital Leases

        The Debtors had various equipment and capital leases for printers, copiers, heavy mining and crushing equipment and vehicles at various mining sites and locations, which equipment was, in some cases, idle. Some of these leases had buy-out options while others had the option for the Debtors to acquire the equipment or

vehicle for fair market value.  Many of the lessors filed financing statements in an effort to secure the Debtors' obligations under these agreements.

### 3.  Mechanic's Liens

Certain creditors that performed services at or with respect to a particular mining location may have asserted a mechanic's lien or similar statutory lien with respect to certain of the Debtors' property. The Debtors made no acknowledgment or stipulation with respect to any such purported liens that may exist or that may be filed pursuant to section 546(b) of the Bankruptcy Code during these cases.

### 4.  Other Secured Debt

In the ordinary course of business, the Debtors incurred other categories of secured debt from time to time, including reclamation and other obligations that are backed by surety bonds and/or tax obligations that might be subject to statutory liens in favor of a particular governmental entity. The Debtors made no acknowledgment or stipulation with respect to any such purported liens that may exist.

### C.  Unsecured Debt

### 1.  Trade Debt

As a company with operations in California, Colorado, Nevada and Montana, the Debtors purchased or leased mining equipment and processing supplies and used other services and goods from numerous vendors. As of the Petition Date, the Debtors estimated that they collectively owed approximately $9.0 million in trade debt.

### D.  Equity Interests

As of November 17, 2015, 211,028,526 shares of common stock of Atna Canada were issued and outstanding and such common stock traded on the OTCQB Marketplace and the Toronto Stock Exchange. Atna Canada's market capitalization was approximately $8.4 million as of the Petition Date. As of the Petition Date, there were 5,926,009 warrants to purchase shares of Atna Canada's common stock at CAD$0.18 and approximately 12,953,000 outstanding stock options with a weighted average exercise price of CAD$0.49 with respect to Atna Canada's common stock. Approximately 9,242,000 of the outstanding stock options were vested and exercisable.

### E.  Events Leading to the Debtors' Chapter 11 Filing

Around November 2014, the price of gold dropped to a low of $1,140 per ounce. Based on such decrease, the Debtors had to decide whether to commence pre-stripping on a new segment of the main pit at the Briggs mine. The ore reserve calculation for the pit had originally been made using a gold price of $1,300 per ounce. Given the lower gold price, the next increment was unlikely to be economical and also required a $2.5 million capital investment, which funds were not available to the Debtors. The Debtors thus decided to ramp-down the Briggs mine and recover capital by processing the residual gold inventory, selling parts inventories and equipment, while retaining critical equipment and permits to allow a restart of the mining operations, should gold prices increase.

In December 2014, the personnel at the Briggs mine were notified that, without a substantial increase in the gold price, both crushing and mining operations would cease by mid-year in 2015. A decision was made to mine only those ores that had been pre-stripped, an ore inventory sufficient for approximately six months of continued mining. Mining operations ceased in July 2015 and crushing ceased in August 2015.  Process operations were expected to continue at Briggs to recover approximately 12,742 ounces of gold inventory remaining in the plants and leach pad at the end of the third quarter of 2015.  Gold was anticipated to be recovered from inventory in sequentially declining amounts into early 2017. The workforce was reduced from approximately 140 employees to 20 as of the Petition Date at the Briggs mine.  The Briggs mine generated $2.0 million in operating cash flow in the third of quarter of 2015, exclusive of $1.4 million used to pay down trade payables.

4

In the first half of 2015, operations at the Pinson mine sequentially increased according to plan, producing approximately 5,667 ounces of payable gold.  Direct operating cash flow from the Pinson mine in the period was $1.7 million, which was re-invested in continuing development activities as required to meet mine plan requirements. However, ore production at the Pinson underground mine fell significantly short of planned production in the third quarter of 2015, principally as a result of delays in developing the Adams Peak and Range Front ore zones, where highly altered and fractured ground conditions were encountered.  Ore mined at Pinson in the third quarter of 2015 originated from the OG and Otto zones. To compensate for the lack of development in the Adams Peak and Range Front zones, work was done to advance deepening the primary spiral at the mine to access new production levels in the OG and Otto zones. However, an increase in production could only be achieved once the development of these lower levels was completed.

In addition, limited capital availability had constrained development activities at the Pinson mine to a just-in-time basis required to support near-term revenue needs. This operating strategy was upset by the inability to develop the Adams Peak and Range Front zones on a timely basis to make ores available in the third and fourth quarters of 2015.  This shortage of pre-developed mining faces adversely impacted both revenue and operating cost structures.

Despite the Debtors' prepetition efforts to increase revenue, decrease costs, reduce or delay capital expenditures and raise capital to address the Debtors' liquidity constraints, the Debtors' liquidity continued to deteriorate. The Debtors' cash and cash equivalents decreased from $2.2 million on December 31, 2014 to $0.6 million on September 30, 2015 and to approximately $0.2 million on November 17, 2015.

While the market prices for gold have declined substantially in the last few years, which has had a severe negative impact on the Debtors, the continuing loss of liquidity has been largely the result of:  (i) the continued indifference in the market for gold company equities, (ii) a lack of capital in the mining sector as a whole, (iii) a significant shortfall in the third quarter of 2015 gold production at the Pinson mine, and (iv) a depressed market for the sale of idled mining equipment. These issues severely limited the Debtors' ability to raise new capital, to refinance its debt, or even to sell itself.  While the Debtors believed their assets had significant value that could be realized over time, these events created a critical build-up in payables and a severe shortage of liquidity. The situation was also exacerbated by the pending maturity of the Prepetition Facility in January 2016.  Indeed, the Debtors' capital structure placed a significant burden on free cash flow and contributed to the depletion of existing cash balances.

The Debtors were also in default under the Prepetition Facility. The Debtors did not have sufficient funds to comply with the terms and conditions of the Prepetition Facility, which included the required payment of all accounts payable older than 90 days, and making scheduled principal and interest payments.

On July 31, 2015, the Debtors hired Maxit Capital L.P. ("Maxit") as their strategic advisors to develop, evaluate and assist the Debtors in implementing various potential strategies and transaction alternatives, including the issuance of debt and/or equity securities, a recapitalization and a sale of substantially all or a portion of the Debtors' assets.

With the assistance of Maxit, the Debtors contacted 65 parties, consisting of 41 strategic parties and 24 financial investors to determine whether such parties had an interest in engaging in a strategic transaction with the Debtors. The Debtors sought proposals for equity and debt financing and asset sale transactions. The Debtors provided non-disclosure agreements ("NDAs") to interested parties and received signed NDAs from 12 parties. The Debtors also provided the parties that signed NDAs access to the Debtors' data room. Thereafter, 2 parties conducted site visits. As of November 2015, however, no proposal to engage in a transaction was received by the Debtors and their advisors.

After extensive consultation with the Debtors' restructuring professionals and the Debtors' diligent evaluation of restructuring options, the Debtors determined that either a sale process for all or substantially all of the Debtors' assets or a reorganization process was in the Debtors' best interests. In the Debtors' view, the commencement of the Chapter 11 Cases and the implementation of a Bankruptcy Court supervised sale or reorganization process would permit the Debtors to either consummate a sale of all or substantially all of their assets

or confirm a plan of reorganization and to maximize the value of their estates for the benefit of the Debtors' creditors and all other parties in interest.

### F.   The Chapter 11 Cases

#### 1.   Commencement of Chapter 11 Cases

On November 18, 2015, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors retained the law firm of Squire Patton Boggs (US) LLP as their primary bankruptcy counsel. Additionally, the Debtors retained Ernst & Young LLP as their financial advisor and Maxit as their investment banker.

On October 20, 2015, the Bankruptcy Court entered an order authorizing Atna Resources Inc. to act as the Debtors' foreign representative in connection with ancillary Canadian Recognition Proceedings pending in the Canadian Court under the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended (the "CCAA"), Action No. S-159677, Vancouver Registry. On November 23, 2015, the Canadian Court entered an initial order recognizing the Chapter 11 Cases as a "foreign main proceeding" (as defined in subsection 45(1) of the CCAA) and otherwise providing for the governance of certain aspects of the Canadian Recognition Proceedings. The Debtors retained the law firm of Bull, Housser & Tupper LLP to serve as their Canadian bankruptcy counsel in connection with the Canadian Recognition Proceedings. The Canadian Court also appointed Alvarez & Marsal Canada Inc. to serve as Information Officer in the Canadian Recognition Proceedings.

#### 2.   Events During the Pendency of the Chapter 11 Cases

##### a.   First Day Motions

On the Petition Date, the Debtors filed several motions and other pleadings (the "First Day Motions") to ensure an orderly transition into chapter 11, including (i) a motion for the procedural joint administration of the Debtors' Chapter 11 Cases; (ii) a motion to pay certain pre-petition workforce obligations and other benefits to the Debtors' employees; (iii) a motion relating to the continued use of the Debtors' existing cash management system, bank accounts and business forms; (iv) a motion to retain and employ Upshot Services LLC ("Upshot") as the Debtors' claims and noticing agent; (v) a motion to establish procedures for determining adequate assurance for the provision of utility services; and (vi) a motion to obtain post-petition debtor-in-possession financing. The First Day Motions were granted with certain adjustments or modifications to accommodate the concerns of the Bankruptcy Court, the United States Trustee and other parties in interest.

##### b.   Appointment of the Creditors' Committee

On December 16, 2015, the Office of the United States Trustee for the District of Colorado appointed the Official Committee of Unsecured Creditors in these Chapter 11 Cases [Docket No. 173]. The Committee members are: Southern Counties Oil Co. LP d/b/a SC Fuels, Total Specialties USA, Inc., Cutting Edge Supply, Western Mining Services, LLC and Thiessen Team, USA Inc. The Committee retained the law firm of Onsager, Guyerson, Fletcher and Johnson to serve as its primary bankruptcy counsel.

The Debtors and their Professionals have consulted with the Committee and its Professionals on all significant matters throughout these Chapter 11 Cases. The Committee was supportive of the Sale and also supports the Plan.

##### c.   The DIP Financing Motion

In order for the Debtors to maintain their operations through these cases, it was necessary for the Debtors to obtain post-petition financing. After extensive and arms'-length negotiations with Waterton, the Debtors entered into the DIP Facility. The DIP Facility was approved by the Bankruptcy Court on an interim basis on November 23, 2015 pursuant to an interim order [Docket No. 92] and on a final basis on January 14, 2016, pursuant to the *Final Order (I) Authorizing Debtors to Obtain Post-Petition Financing, (II) Authorizing the Use of Cash*

*Collateral, (III) Granting Liens, Including Priming Liens, and Superpriority Claims, (IV) Granting Adequate Protection, and (V) Granting Related Relief* [Docket No. 271] (the "Final DIP Order").

The DIP Facility was a senior secured priming and superpriority post-petition financing of up to $4.00 million. The proceeds of the DIP Facility were used for working capital and general operating purposes subject to the terms and conditions of the Final DIP Order and to the extent set forth in the Debtors' 13 week cash flow projection, as the same was amended from time to time and the carve-out provided for in the Final DIP Order. The amounts outstanding under the DIP Facility were paid in full pursuant to the Sale and the Committee Settlement Agreement.

    d.    **The Assets Sales**

    (i)    *De Minimus Assets Sales*

On December 22, 2015, the Debtors filed a *Motion for an Order Approving Procedures to Sell or Transfer Certain De Minimis Assets, Free and Clear of Liens, Claims and Encumbrances, and to Pay Market Rate Commissions in Connection With Such Sales Without Further Court Approval*, which was approved by the Bankruptcy Court in January 2, 2016 [Docket No. 329], as supplemented by an order dated May 23, 2016 [Docket No. 516]. As per the order, the value of the *De Minimis* Assets sold could not exceed $1,000,000 in the aggregate. While a notice or a hearing was not required for the Debtors to consummate an individual sale or transfer for an amount of less than $100,000, the Debtors had to follow specific procedures for a sale or transfer of an asset valued at more than $100,000 but less than $250,000.

    (ii)    *Sale of Substantially All Assets*

On February 18, 2016, the Bankruptcy Court entered an order [Docket No. 366] granting the Debtors' *Motion for an Order (A) Establishing Procedures for the Conduct of a Restructuring Transaction Process and (B) Granting Related Relief* [Docket No. 314]. The Debtors and their advisors thereafter worked diligently to conduct a comprehensive process (the "Transaction Process") to identify all potential restructuring alternatives and options to maximize value in these cases. The Transaction Process was designed to help facilitate (i) the ongoing marketing process that began pre-petition, (ii) the selection and execution of specific transaction(s) resulting from the marketing process, and (iii) the consummation of a sale (or sales) of substantially all of the Debtors' assets, or a portion thereof, and/or the consummation of a plan of reorganization to resolve these cases.

On March 3, 2016, the deadline for initial letters of intent, the Debtors received preliminary indications of interest and specific proposals from at least four separate potential transaction parties for various asset sale transactions, none of which involves the purchase of the same set of assets. In light of these proposals and the absence of any proposal for a plan-based transaction, the Debtors, in consultation with the Committee, determined that the best way to maximize value in these cases was to pursue sales of substantially all of the Debtors' assets, or a portion thereof, pursuant to section 363 of the Bankruptcy Code.

On March 25, 2016, the Debtors filed a *Motion for Entry of: (I) an Order (A) Approving Bidding and Auction Procedures for the Sale of Substantially all of the Debtors' Assets, (B) Scheduling an Auction, Sale Hearing, and Other Dates and Deadlines, (C) Authorizing the Debtors to Designate a Stalking Horse Purchaser and Grant Stalking Horse Protections, (D) Approving the Assumption and Assignment of Contracts and Leases and Related Cure Procedures, and (E) Granting Related Relief, and (II) an Order Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, and Encumbrances* [Docket No. 398]. Pursuant to this motion, the Debtors sought authority to sell substantially all of the Debtors' assets or a portion thereof free and clear of liens, claims, and interests to the fullest extent permitted by section 363(f) of the Bankruptcy Code through a sale and auction process. On April 11, 2016, the Bankruptcy Court entered the *Revised Order (A) Approving Bidding and Auction Procedures for the Sale of Substantially all of the Debtors' Assets, (B) Scheduling an Auction, Sale Hearing, and Other Dates and Deadlines, (C) Authorizing the Debtors to Designate a Stalking Horse Purchaser and Grant Stalking Horse Protections, (D) Approving the Assumption and Assignment of Contracts and Leases and Related Cure Procedures, and (E) Granting Related Relief* entered [Docket No. 422].

The Debtors received five (5) bids by the bid deadline scheduled on April 28, 2016 for various sets of assets from the following parties: (i) Waterton, (ii) DV Natural Resources, LLC ("DV Natural Resources"), (iii) Solitario Exploration & Royalty Corp. ("Solitario"), (iv) Randol International Ltd., and (v) W.R.H. Nevada Properties, LLC ("WRH Nevada"). Each of these bids was designated a "Qualified Bid" and complied with all requirements established by the court-approved bid procedures.

The Debtors conducted an auction (the "Auction") on Monday May 2, 2016 at the offices of Squire Patton Boggs (US) LLP in Denver, Colorado, and the Auction was continued and concluded on May 4, 2016.

The successful bids for each of the individual auctions and the key terms of each transaction were the following:

a.    Waterton. Waterton was selected as the successful bidder for the following assets: (i) the Debtors' Pinson Project for a credit bid in the amount of $5 million, $500,000 of which was a credit bid of the DIP Obligations, as defined in the Final DIP Order (the "DIP Obligations") and the remainder of which was a credit bid of Pre-Petition Indebtedness, as defined in the Final DIP Order (the "Pre-Petition Indebtedness"); (ii) the Debtors' Columbia project for a credit bid in the amount of $1.6 million from the DIP Obligations and a grant of a one percent (1%) Net Profit Interest to Debtor CR Montana Corporation with a five year term valued by the Debtors at $1 million; (iii) certain royalty rights known as the "Copper Cliffs Royalty" for a credit bid in the amount of $250,000 from the DIP Obligations; and (iv) a royalty right held by Debtor Canyon Resources Corporation to receive 50% of a 3% royalty interest in Debtor CR Briggs Corporation for a credit bid in the amount of $250,000 from Pre-Petition Indebtedness.

b.    DV Natural Resources. DV Natural Resources was selected as the successful bidder and acquired the Debtors' Briggs project for consideration consisting of (i) the assumption of all of the Briggs project's reclamation and environmental obligations, (ii) the assumption of the surety bonds issued with respect to the Briggs project and the related cash collateral, and (iii) the agreement of Debtor CR Briggs Corporation to make an advance deposit of $180,000 for an engine repair necessary for the Briggs project.

c.    The Solitario Bid. Solitario was selected as the successful bidder and acquired a royalty right related to mineral rights owned by Debtor CR Montana Corporation for a $50,000 cash payment. It was originally understood that the royalty rights related to 18,000 acres of mineral rights. However, as the parties were finalizing the necessary transfer documentation and moving towards closing, the Debtors discovered that 3,000 acres of the original 18,000 acres had previously been conveyed to a third party, leaving only 15,000 acres of mineral rights to be sold. The Debtors addressed the issue with Solitario and the parties agreed to close the transaction on the reduced acreage in exchange for (i) a *pro rata* reduction to the purchase price from $50,000 to $40,000 and (ii) the conveyance of an additional asset – the Lolo Minerals 1.5% NSR royalty on one section of land in Missoula County owned by Debtor Canyon Resources Corp.

d.    The WRH Nevada Bid. WRH Nevada was selected as the successful bidder and acquired mineral rights owned by Debtor CR Montana Corporation for a $350,000 cash payment.

On May 5, 2016, the Bankruptcy Court conducted a hearing on the Sale and approved the sale of the respective assets to Waterton, DV Natural Resources, Solitario and WRH Nevada (collectively, the "Purchasers"). On May 11, 2016, the Bankruptcy Court entered the *Order (I) Approving the Sale of Certain Assets of the Debtors Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (II) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. 497], which approved the Sale, as supplemented by the *Supplemental Sale Order Approving Consensual Modification to Terms of Solitario Transaction* [Docket No. 523]. All the Sale transactions to the Purchasers closed shortly thereafter.

e.       **Schedules and Statements and Claims Bar Dates**

On November 19, 2015, the Debtors filed a motion for an extension of time to file their schedules of assets and liabilities and statements of financial affairs (the "Schedules and Statements"). On November 25, 2015, the Bankruptcy Court entered an amended order approving the extension through and including December 16, 2015 [Docket No. 105]. On December 16, 2015, each Debtor filed its respective Schedules and Statements pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007.

By motion dated December 2, 2015 (the "Bar Date Motion"), the Debtors sought the Bankruptcy Court's authorization to establish certain bar dates for filing proofs of claim against the Debtors' Estates. Pursuant to the Bar Date Order entered on December 14, 2015, the Bankruptcy Court granted the Bar Date Motion, establishing February 29, 2016 as the bar date for filing proofs of claim against the Debtors' Estates (the "General Bar Date") and May 16, 2016 as the governmental bar date (the "Governmental Bar Date," and together with the General Bar Date, the "Bar Dates") for filing proofs of claim against the Debtors' estates. On December 16, 2016, the Debtors served, among other things, notice of the Bar Dates in accordance with the Bar Date Order [Docket No. 175]. As of the Bar Dates, the Debtors had received or scheduled the following claims:

| Claim Priority | Total Number of Claims Filed/Scheduled | Total Face Amount of Claims Filed/Scheduled[2] |
|---|---|---|
| Secured Claims | 2 | $320,621.53 |
| Administrative Claims | 0 | $0.00 |
| Priority Claims | 16 | $296,319.53 |
| General Unsecured Claims | 240 | $19,650,671.42 |

The Debtors started the process of reviewing proofs of claim filed against their Estates and have started prosecuting claims objections in that regard. The Debtors have filed several omnibus claims objections and expect that several additional omnibus claims objections will be filed by the Liquidating Trustee. Consequently, the Debtors anticipate that the figures set forth above, which reflect the face amount of claims filed or scheduled and not yet objected to, will be reduced following the claims reconciliation process.

f.       **Status of Certain Litigation and Claims**.

1.       Settlement with the Committee, the Debtors and Waterton

Following good faith negotiations, the Debtors, Waterton and the Committee and Osgood Mining Company, LLC entered into the Settlement Agreement and Mutual Releases dated May 20, 2016 (the "Committee Settlement Agreement") pursuant to which, among other things, (i) a 2.5% net profits interest granted pursuant to a certain Net Profits Interest Agreement dated May 19, 2016 between Great Plains Mining, LLC, as grantor, and CR Montana Corporation, as grantee (the "Net Profits Interest") was granted to CR Montana Corporation to be held in trust for the benefit of the holders of General Unsecured Claims, (ii) Waterton agreed not to assert a lien on the Retained Sale Proceeds, which proceeds are to be held in trust by the Debtors for the benefit of the holders of General Unsecured Claims (other than Waterton), (iii) Waterton waived its right to recover or exercise any rights in its capacity as a holder of a General Unsecured Claim (including the Waterton Deficiency Claim), (iv) Waterton agreed to withdraw various claims filed against the Debtors' Estates, and (v) Waterton, the Committee and the Debtors provided mutual releases as set forth therein.

Among other things, the Committee Settlement Agreement resolved significant disputes, including, among other things, disputes with Waterton regarding the assertion of various claims and causes of action against Waterton on behalf of the Debtors' Estates with respect to the DIP Facility and the Final DIP Order and the

---

[2] The figures reflected herein reflect the amounts asserted in proofs of claim or as scheduled by the Debtors, and not objected to by the Debtors. There are claims asserted against, or scheduled by the Debtors that are contingent, unliquidated, or disputed, for which no monetary value has been assigned herein.

Prepetition Credit Agreement.  As such, the Committee Settlement Agreement provided significant value to the Debtors' Estates, favorably resolved and avoids potential significant litigation, and enabled the prompt and efficient wind-down of the Debtors' Estates. The Bankruptcy Court approved the Committee Settlement Agreement in the Sale Order.

2.    <u>The CR Kendall Settlement</u>

On July 14, 2016, the Debtors filed an *Emergency Motion for an Order Approving Consent Decree and Settlement Agreement Establishing a Custodial and Work Trust for CR Kendall Mine Closure Pursuant To Fed. R. Bankr. P. 9019* [Docket No. 564]. Following good faith negotiations, (i) the Montana Department of Environmental Quality for the State of Montana, (ii) Atna Resources Ltd., Atna Resources Inc. and CR Kendall Corporation, and (iii) Robert Fye, LLC, in his capacity as trustee of the CR Kendall Custodial and Work Trust entered into the CR Kendall Settlement Agreement dated August 15, 2016.  The trust established by the CR Kendall Settlement (i) shall receive the full amount of funds in the state-managed escrow account with the Montana Department of Environmental Quality for the State of Montana as of the date of transfer, which is in the amount of $2,346,829.42 as of June 10, 2016, (ii) shall use these funds to perform the work required by the Record of Decision for CR Kendall Mine, Amendment 007 to Operating Permit No. 00122, Fergus County, Montana for final mine closure, (iii) shall use these funds to pay the trustee costs, and to pay other administrative costs until closure is completed. According to the CR Kendall Settlement, the claims of the Montana Department of Environmental Quality for the State of Montana against the Debtors will be paid the cash in the escrow account as of the date of transfer, in the amount of $2,346,829.42 as of June 10, 2016.

The CR Kendall Settlement Agreement resolves significant disputes, including, among other things, disputes with respect to the closing of the CR Kendall Corporation mine. As such, the settlement provides significant value to the Debtors' Estates, favorably resolves and avoids potential significant litigation, and enables the prompt and efficient wind-down of the Debtors' Estates. The Bankruptcy Court approved the Kendall Settlement Agreement by order dated July 27, 2016 [Docket No. 577].

3.    <u>Horizon Wyoming Uranium, Inc. Assets</u>

Horizon Wyoming Uranium, Inc. does not have any creditors. All assets of Horizon Wyoming Uranium, Inc. will be deemed assets of Canyon Resources Corporation, Horizon Wyoming Uranium, Inc.'s direct parent, for purpose of the Plan and will be distributed accordingly.

## III.    OVERVIEW OF THE PLAN

### A.    General

This section of the Disclosure Statement summarizes the Plan, which is set forth in its entirety as <u>Exhibit A</u> hereto. This summary is qualified in its entirety by reference to the Plan. YOU SHOULD READ THE PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

In general, a chapter 11 plan (i) divides claims and equity interests into separate classes, (ii) specifies the property that each class is to receive under the plan, and (iii) contains other provisions necessary to implement the plan. Under the Bankruptcy Code, "claims" and "equity interests" are classified rather than "creditors" and "shareholders" because such entities may hold claims and equity interests in more than one class. Under Section 1124 of the Bankruptcy Code, a class of claims is "impaired" under a plan unless the plan (a) leaves unaltered the legal, equitable and contractual rights of each holder of a claim in such class or (b) provides, among other things, for the cure of existing defaults and reinstatement of the maturity of claims in such class. Class 4 (General Unsecured Claims Against Atna Resources Ltd.), Class 5 (General Unsecured Claims Against Canyon Resources Corporation), Class 6 (General Unsecured Claims Against CR Briggs Corporation), Class 7 (General Unsecured Claims Against CR Montana Corporation), Class 8 (General Unsecured Claims Against CR Kendall Corporation), Class 9 (General Unsecured Claims Against Atna Resources Inc.) and Class 10 (Equity Interests) are impaired under the Plan. Only holders of Classes 4, 5, 6, 7, 8 and 9 Claims are entitled to vote to accept or reject the Plan. Ballots are being furnished to all holders of Classes 4, 5, 6, 7, 8 and 9 Claims to submit their vote to accept or

10

reject the Plan. Holders of Class 10 Equity Interests are not entitled to vote to accept or reject the Plan and are conclusively deemed to have rejected the Plan.

A chapter 11 plan may also specify that certain classes of claims or equity interests are to have their claims or equity interests remain unaltered by the plan. Such classes are referred to as "not impaired," and because of the favorable treatment accorded to such classes, they are conclusively deemed to have accepted the plan and therefore need not be solicited to vote to accept or reject the plan. The holders of Class 1 (Priority Non-Tax Claims), Class 2 (Waterton Secured Claims) and Class 3 (Secured Claims) under the Plan are not impaired and are conclusively deemed to have accepted the Plan. Holders of such Claims are, therefore, not entitled to vote to accept or reject the Plan. Therefore, based on the foregoing, no ballots are enclosed for holders of such claims.

**B.      Assets for Distribution Under the Plan**

As soon as is reasonably practicable after the Effective Date (to the extent such amounts have not already been remitted), the Liquidating Trustee shall remit to holders of Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims an amount in Cash equal to the Allowed amount of such Claims, or such lesser amounts as agreed to by such holders. Additionally, the Plan provides that the Liquidating Trust shall make payment(s) to the holders of Allowed Claims in connection with accrued Professional Compensation as and when such Claims become due and payable by Final Order of the Bankruptcy Court authorizing and approving the payment of such Claims in accordance with Article II of the Plan.

**C.      Summary Table of Classification and Treatment of Claims and Equity Interests under the Plan**

Claims and Equity Interests are divided into ten (10) classes under the Plan, and the proposed treatment of Claims and Equity Interests in each Class is described in the Plan and in the chart set forth below. Such classification takes into account the different nature and priority of the Claims and Equity Interests. The Plan contains one class each for Priority Non-Tax Claims (Class 1), Waterton Secured Claims (Class 2), Secured Claims (Class 3), General Unsecured Claims Against Atna Resources Ltd. (Class 4), General Unsecured Claims Against Canyon Resources Corporation (Class 5), General Unsecured Claims Against CR Briggs Corporation (Class 6), General Unsecured Claims Against CR Montana Corporation (Class 7), General Unsecured Claims Against CR Kendall Corporation (Class 8), General Unsecured Claims Against Atna Resources Inc. (Class 9) and Equity Interests (Class 10). Classes 1, 2 and 3 are not impaired under the Plan and Classes 4, 5, 6, 7, 8, 9 and 10 are impaired under the Plan. The meaning of "impairment," and the consequences thereof in connection with voting on the Plan, are set forth in section III.A above.

The recoveries to holders of General Unsecured Claims, as described in the table below, are estimates that are subject to material changes. The estimated percentage recovery to holders of General Unsecured Claims is dependent on, among other things, the amount remaining after payment of all Allowed Administrative Claims, Claims in connection with Professional Compensation, Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims, the net recoveries of the Debtors and/or the Liquidating Trustee on account of the Retained Causes of Action and the total amount of General Unsecured Claims that become Allowed Claims. There can be no assurance that the estimated claims amounts are correct, and actual claim amounts may be significantly different from the estimates. The following table is qualified in its entirety by reference to the Plan, a copy of which is annexed hereto as Exhibit A. In no case will any creditor receive more than 100% of its Allowed Claim.

| Class Number | Description of Class | Estimated Amount of Allowed Claims in Class | Treatment Under the Plan/ Estimated % Recovery Under Plan |
|---|---|---|---|
| N/A | Administrative Claims | $0 | - Recovery: 100%<br><br>- Unimpaired<br><br>- Each holder of an Allowed Administrative Claim shall be paid the full unpaid amount of such Allowed Administrative Claim in Cash: (i) on the Effective Date or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (ii) if such Claim is Allowed after the Effective Date, on the date such Claim is Allowed or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due); (iii) at such time and upon such terms as may be agreed upon by such holder and the Debtors; or (iv) at such time and upon such terms as set forth in an order of the Bankruptcy Court. |
| N/A | Priority Tax Claims | $5,794.27 | - Recovery: 100%<br><br>- Unimpaired<br><br>- Except to the extent that a holder of an Allowed Priority Tax Claim against a Debtor agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall be paid the full unpaid amount of such Allowed Priority Tax Claim in Cash, on the latest of (i) the Effective Date, (ii) the date such Allowed Priority Tax Claim becomes Allowed and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law. |
| Class 1 | Priority Non-Tax Claims | $296,319.53 | - Recovery: 100%<br><br>- Unimpaired<br><br>- To the extent it has not already been paid prior to the Effective Date, Class 1 claimants shall receive those amounts that any such Claimant is entitled to receive on account of the Priority Non-Tax Claims. Such payments shall be made solely from the assets of the specific Debtor's estate against which the Allowed Priority Non-Tax Claim is filed. |
| Class 2 | Waterton Secured Claims | $0 | - Recovery: N/A<br><br>- Unimpaired<br><br>- Waterton shall neither receive nor retain any property or Distributions under the Plan. The Waterton Secured Claims were paid in full pursuant to the Sale and the Committee Settlement Agreement. |

| Class Number | Description of Class | Estimated Amount of Allowed Claims in Class | Treatment Under the Plan/ Estimated % Recovery Under Plan |
|---|---|---|---|
| Class 3 | Secured Claims | $320,621.44 | - Recovery: Unknown<br><br>- Unimpaired<br><br>- Except to the extent that a holder of an Allowed Secured Claim agrees to a less favorable treatment, each holder of an Allowed Class 3 Claim shall receive (i) receipt of the collateral securing any such Allowed Secured Claim on the Effective Date or as soon thereafter as reasonably practicable; or (ii) such other treatment that renders an Allowed Secured Claim Unimpaired on the later of the Effective Date and the date on which such Secured Claim becomes an Allowed Secured Claim. Any deficiency claim of a holder of an Allowed Class 3 Claim, if any, will be a General Unsecured Claim against the applicable Debtor's estate. |
| Class 4 | General Unsecured Claims Against Atna Resources Ltd. | $1,634,162.05 | - Recovery: 5%<br><br>- Impaired<br><br>- On or as soon as practicable after the Initial Distribution Date, the Liquidating Trust shall pay each holder of an Allowed General Unsecured Claim Against Atna Resources Ltd., in full and final satisfaction of such Allowed General Unsecured Claim, its Pro Rata share of the Liquidating Trust Fund assets attributable to such Debtor pursuant to one or more distributions. |
| Class 5 | General Unsecured Claims Against Canyon Resources Corporation | $141,329.95 | - Recovery: 36%<br><br>- Impaired<br><br>- On or as soon as practicable after the Initial Distribution Date, the Liquidating Trust shall pay each holder of an Allowed General Unsecured Claim Against Canyon Resources Corporation, in full and final satisfaction of such Allowed General Unsecured Claim, its Pro Rata share of the Liquidating Trust Fund pursuant to one or more distributions. |
| Class 6 | General Unsecured Claims Against CR Briggs Corporation | $3,589,424.04 | - Recovery: 1%<br><br>- Impaired<br><br>- On or as soon as practicable after the Initial Distribution Date, the Liquidating Trust shall pay each holder of an Allowed General Unsecured Claim Against CR Briggs Corporation, in full and final satisfaction of such Allowed General Unsecured Claim, its Pro Rata share of the Liquidating Trust Fund pursuant to one or more distributions. |

| Class Number | Description of Class | Estimated Amount of Allowed Claims in Class | Treatment Under the Plan/ Estimated % Recovery Under Plan |
|---|---|---|---|
| Class 7 | General Unsecured Claims Against CR Montana Corporation | $2,296.37 | - Recovery: 100%<br><br>- Impaired<br><br>- On or as soon as practicable after the Initial Distribution Date, the Liquidating Trust shall pay each holder of an Allowed General Unsecured Claim Against CR Montana Corporation, in full and final satisfaction of such Allowed General Unsecured Claim, its Pro Rata share of the Liquidating Trust Fund pursuant to one or more distributions. |
| Class 8 | General Unsecured Claims Against CR Kendall Corporation | $6,415,135.30 | - Recovery: 2%<br><br>- Impaired<br><br>- On or as soon as practicable after the Initial Distribution Date, the Liquidating Trust shall pay each holder of an Allowed General Unsecured Claim Against CR Kendall Corporation, in full and final satisfaction of such Allowed General Unsecured Claim, its Pro Rata share of the Liquidating Trust Fund pursuant to one or more distributions. |
| Class 9 | General Unsecured Claims Against Atna Resources Inc. | $7,868,323.71 | - Recovery: 8%<br><br>- Impaired<br><br>- On or as soon as practicable after the Initial Distribution Date, the Liquidating Trust shall pay each holder of an Allowed General Unsecured Claim Against Atna Resources Inc., in full and final satisfaction of such Allowed General Unsecured Claim, its Pro Rata share of the Liquidating Trust Fund pursuant to one or more distributions. |
| Class 10 | Equity Interests | N/A | - Recovery: None<br><br>- Impaired<br><br>- Holders of Equity Interests shall neither receive nor retain any property under the Plan. On the Effective Date, the Equity Interests shall be deemed cancelled. |

**D.     Provisions Governing Distributions Under the Plan**

**1.     Initial Distribution Date**

On the Initial Distribution Date or as soon thereafter as is reasonably practicable, the Liquidating Trust shall make, or shall make adequate reserves for, the Distributions required to be made under the Plan.

**2.     Establishment of Disputed Reserves**

On the Initial Distribution Date, and after making all Distributions required to be made on such date under the Plan, the Liquidating Trust shall establish a separate Disputed Reserve for Disputed Claims, each of which Disputed Reserves shall be administered by the Liquidating Trust. The Liquidating Trust shall reserve in Cash or other property, for Distribution on account of each Disputed Claim, the full asserted amount (or such lesser

amount as may be estimated by the Bankruptcy Court in accordance with Article VI.B of the Plan) with respect to each Disputed Claim.

### 3.     Maintenance of Disputed Reserves

The Liquidating Trust shall hold property in the Disputed Reserves in trust for the benefit of the holders of Claims ultimately determined to be Allowed. Each Disputed Reserve shall be closed and extinguished by the Liquidating Trust when all Distributions and other dispositions of Cash or other property required to be made hereunder will have been made in accordance with the terms of the Plan. Upon closure of a Disputed Reserve, all Cash (including any Cash Investment Yield) or other property held in that Disputed Reserve shall revest in and become the property of the Liquidating Trust. All funds or other property that vest or revest in the Liquidating Trust pursuant to Article V of the Plan shall be (a) used to pay the fees and expenses of the Liquidating Trust as and to the extent set forth in the Liquidating Trust Agreement, and (b) thereafter distributed on a Pro Rata basis to holders of Allowed Claims.

### 4.     Quarterly Distributions

Any Distribution that is not made on the Initial Distribution Date or on any other date specified herein because the Claim that would have been entitled to receive that Distribution is not an Allowed Claim on such date, shall be held by the Liquidating Trust in a Disputed Reserve pursuant to Article V.B of the Plan and Distributed (in full in the case of Administrative Claims, Priority Tax Claims or Priority Non-Tax Claims in Class 1) and up to its Ratable Proportion with respect to the General Unsecured Claims in Class 4, 5, 6, 7, 8, and 9) on the first Quarterly Distribution Date after such Claim is Allowed. No interest shall accrue or be paid on the unpaid amount of any Distribution paid on a Quarterly Distribution Date in accordance with Article V.C. of the Plan.

### 5.     Record Date for Distributions

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Record Date will be treated as the holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the Record Date. The Liquidating Trust shall have no obligation to recognize any transfer of any Claim occurring after the Record Date. In making any Distribution with respect to any Claim, the Liquidating Trust shall be entitled instead to recognize and deal with, for all purposes hereunder, only the Entity that is listed on the proof of Claim Filed with respect thereto or on the Schedules as the holder thereof as of the close of business on the Record Date and upon such other evidence or record of transfer or assignment that is known to the Liquidating Trust as of the Record Date.

### 6.     Delivery of Distributions

#### a.     General Provisions; Undeliverable Distributions

Subject to Bankruptcy Rule 9010 and except as otherwise provided herein, Distributions to the holders of Allowed Claims shall be made by the Liquidating Trust at (a) the address of each holder as set forth in the Schedules, unless superseded by the address set forth on proofs of Claim Filed by such holder or (b) the last known address of such holder if no proof of Claim is Filed or if the Debtors have been notified in writing of a change of address. If any Distribution is returned as undeliverable, the Liquidating Trust may, in its discretion, make such efforts to determine the current address of the holder of the Claim with respect to which the Distribution was made as the Liquidating Trust deems appropriate, but no Distribution to any such holder shall be made unless and until the Liquidating Trust has determined the then-current address of such holder, at which time the Distribution to such holder shall be made to the holder without interest. Amounts in respect of any undeliverable Distributions made by the Liquidating Trust shall be returned to, and held in trust by, the Liquidating Trust until the Distributions are claimed or are deemed to be unclaimed property under Section 347(b) of the Bankruptcy Code, as set forth in Article V.E.3 of the Plan. The Liquidating Trust shall have the discretion to determine how to make Distributions in the most efficient and cost-effective manner possible; *provided, however*, that its discretion may not be exercised in a manner inconsistent with any express requirements of the Plan or the Liquidating Trust Agreement.

b.      **Minimum Distributions**

Notwithstanding anything herein to the contrary, if a Distribution to be made to a holder of an Allowed Claim on the Initial Distribution Date or any subsequent date for Distributions would be $50 or less in the aggregate at the time of such Distribution, no such Distribution will be made to that holder unless a request therefor is made in writing to the Liquidating Trustee no later than twenty (20) days after the Effective Date.

c.      **Unclaimed Property**

Except with respect to property not Distributed because it is being held in a Disputed Reserve, Distributions that are not claimed by the expiration of the later of six (6) months from the Effective Date or ninety (90) days from such Distribution shall be deemed to be unclaimed property under Section 347(b) of the Bankruptcy Code and shall vest or revest in the Liquidating Trust, and the Claims with respect to which those Distributions are made shall be automatically cancelled. After the expiration of that applicable period, the claim of any Entity to those Distributions shall be discharged and forever barred. Nothing contained in the Plan shall require the Liquidating Trust to attempt to locate any holder of an Allowed Claim. All funds or other property that vests or revests in the Liquidating Trust pursuant to Article V of the Plan shall be distributed by the Liquidating Trustee to the other holders of Allowed Claims in accordance with the provisions of the Plan or the Liquidating Trust Agreement.

7.      **Transactions on Business Days**

If the Effective Date or any other date on which a transaction is to occur under the Plan shall occur on a day that is not a Business Day, the transactions contemplated by the Plan to occur on such day shall instead occur on the next succeeding Business Day.

8.      **Manner of Cash Payments Under the Plan or the Liquidating Trust Agreement**

Cash payments made pursuant to the Plan or the Liquidating Trust Agreement shall be in United States dollars by checks drawn on a domestic bank selected by the Liquidating Trust or by wire transfer from a domestic bank, at the option of the Liquidating Trust.

9.      **Time Bar to Cash Payments by Check**

Checks issued by the Liquidating Trust on account of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof. Requests for the reissuance of any check that becomes null and void pursuant to Article V.I of the Plan shall be made directly to the Liquidating Trustee by the holder of the Allowed Claim to whom the check was originally issued. Any Claim in respect of such voided check shall be made in writing on or before the later of six (6) months from the Effective Date or ninety (90) days after the date of issuance thereof. After that date, all Claims in respect of void checks shall be discharged and forever barred and the proceeds of those checks shall revest in and become the property of the Liquidating Trust as unclaimed property in accordance with Section 347(b) of the Bankruptcy Code and be distributed as provided in Article V.E.3 of the Plan.

10.     **Compliance with Tax Requirements**

In connection with making Distributions under the Plan, to the extent applicable, the Liquidating Trust shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. No Distribution shall be made to or on behalf of a holder of an Allowed Claim pursuant to the Plan unless and until such holder has provided the Liquidating Trust with any information that applicable law requires the Liquidating Trust to obtain in connection with making Distributions, including completed Internal Revenue Service Form W9. The Liquidating Trust may withhold the entire Distribution due to any holder of an Allowed Claim until such time as such holder provides the necessary information to comply with any withholding requirements of any governmental unit. Any property so withheld will then be paid by the Liquidating Trustee to the appropriate authority. If the holder of an Allowed Claim fails to provide the information necessary to comply with any withholding requirements of any governmental unit within six months from the date of first notification to the holder of the need for such information

or for the Cash necessary to comply with any applicable withholding requirements, then such holder's Distribution shall be treated as an undeliverable Distribution in accordance with Article V.E.1 of the Plan.

### 11.    No Payments of Fractional Dollars

Notwithstanding any other provision of the Plan to the contrary, no payment of fractional dollars shall be made pursuant to the Plan. Whenever any payment of a fraction of a dollar under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding down of such fraction to the nearest whole dollar.

### 12.    Interest on Claims

Except as specifically provided for in the Plan or the Confirmation Order, interest shall not accrue on Claims and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. Except as expressly provided herein or in a Final Order of the Bankruptcy Court, no prepetition Claim shall be Allowed to the extent that it is for postpetition interest or other similar charges.

### 13.    Setoff and Recoupment

The Liquidating Trust may, but shall not be required to, setoff against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any claims or defenses of any nature whatsoever that any of the Debtors, the Estates or the Liquidating Trust may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors, the Estates or the Liquidating Trust of any right of setoff or recoupment that any of them may have against the holder of any Claim.

### E.    Means for Implementation and Execution of the Plan

### 1.    Appointment of the Liquidating Trustee and the Liquidating Trust Committee

On or prior to the Confirmation Date, the Committee shall agree upon and appoint the Liquidating Trustee. Additionally, on or prior to the Confirmation Date, the Committee shall appoint a three (3) member Liquidating Trust Committee. The Liquidating Trustee shall serve at the direction of the Liquidating Trust Committee and in accordance with the Liquidating Trust Agreement and the Plan, *provided, however*, the Liquidating Trust Committee may not direct the Liquidating Trustee or the members of the Liquidating Trust Committee to act inconsistently with their duties under the Liquidating Trust Agreement and the Plan. The Liquidating Trust Committee may terminate the Liquidating Trustee at any time in accordance with the provisions of the Liquidating Trust Agreement.

### 2.    Formation of the Liquidating Trust

On the Effective Date, the Liquidating Trust shall be established pursuant to the Liquidating Trust Agreement for the purpose of, *inter alia*, (a) administering the Liquidating Trust Fund, (b) resolving all Disputed Claims, (c) pursuing the Retained Causes of Action, and (d) making all Distributions to the Beneficiaries provided for under the Plan. The Liquidating Trust is intended to qualify as a liquidating trust pursuant to United States Treasury Regulation Article 301.7701-4(d).

### 3.    Funding of the Liquidating Trust

On the Effective Date, the Liquidating Trust Fund shall vest automatically in the Liquidating Trust. The Plan shall be considered a motion pursuant to Sections 105, 363 and 365 of the Bankruptcy Code for such relief. The transfer of the Liquidating Trust Fund to the Liquidating Trust shall be made for the benefit and on behalf of the Beneficiaries. The assets comprising the Liquidating Trust Fund will be treated for tax purposes as being transferred by the Debtors to the Beneficiaries pursuant to the Plan in exchange for their Allowed Claims and then by the Beneficiaries to the Liquidating Trust in exchange for the beneficial interests in the Liquidating Trust. The Beneficiaries shall be treated as the grantors and owners of the Liquidating Trust. Upon the transfer of the

Liquidating Trust Fund, the Liquidating Trust shall succeed to all of the Debtors' rights, title and interest in the Liquidating Trust Fund, and the Debtors will have no further interest in or with respect to the Liquidating Trust Fund. Except to the extent definitive guidance from the IRS or a court of competent jurisdiction (including the issuance of applicable Treasury Regulations, the receipt by the Liquidating Trustee of a private letter ruling if the Liquidating Trustee so requests one) indicates that such valuation is not necessary to maintain the treatment of the Liquidation Trust as a liquidating trust for purposes of the Internal Revenue Code and applicable Treasury Regulations, as soon as possible after the Effective Date, but in no event later than sixty (60) days thereafter, (i) the Liquidating Trustee shall make a good faith valuation of the Liquidation Trust Assets, and (ii) the Liquidating Trustee shall establish appropriate means to apprise the Beneficiaries of such valuation. The valuation shall be used consistently by all parties (including, without limitation, the Debtors, the Liquidating Trust, the Beneficiaries and the Liquidating Trust Committee) for all federal income tax purposes. The Liquidating Trustee also shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Liquidating Trust that are required by any governmental unit.

### 4.      Rights and Powers of the Liquidating Trustee

The Liquidating Trustee shall be deemed the Estates' representative in accordance with Section 1123 of the Bankruptcy Code and shall have all the rights and powers set forth in the Liquidating Trust Agreement, including, without limitation, the powers of a trustee under Sections 704 and 1106 of the Bankruptcy Code and Rule 2004 of the Bankruptcy Rules (to act on behalf of the Liquidating Trust, including without limitation, the right to (1) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Plan and the Liquidating Trust Agreement; (2) liquidate the assets transferred to the Liquidating Trust Fund on the Effective Date; (3) prosecute, settle, abandon or compromise any Retained Causes of Action; (4) make Distributions as contemplated hereby, (5) establish and administer any necessary reserves for Disputed Claims that may be required; (6) object to the Disputed Claims and prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court such objections; and (7) employ and compensate professionals and other agents, *provided, however*, that any such compensation shall be made only out of the Liquidating Trust Fund) to the extent not inconsistent with the status of the Liquidating Trust as a liquidating trust within the meaning of Treas. Reg. § 301.7701-4(d) for federal income tax purposes.

### 5.      Fees and Expenses of the Liquidating Trust

Except as otherwise ordered by the Bankruptcy Court, the Liquidating Trust Expenses, including the fees and expenses of professionals retained by the Liquidating Trustee, on or after the Effective Date shall be paid in accordance with the Liquidating Trust Agreement without further order of the Bankruptcy Court. The Liquidating Trustee shall be compensated as agreed to by the Committee and the Liquidating Trustee and such agreement will be documented and executed by the Committee and the Liquidating Trustee.

### 6.      Semi-Annual Reports to Be Filed by the Liquidating Trust

The Liquidating Trust shall File semi-annual reports with the Bankruptcy Court regarding the liquidation or other administration of property comprising the Liquidating Trust Fund, the Distributions made by it and other matters required to be included in such report in accordance with the Liquidating Trust Agreement. In addition, the Liquidating Trust will file tax returns as a grantor trust pursuant to United States Treasury Regulation Article 1.671-4(a).

### 7.      Directors/Officers/Equity/Assets of the Debtors on the Effective Date

On the Effective Date, the authority, power and incumbency of the persons then acting as directors and officers of the Debtors shall be terminated and such directors and officers shall be deemed to have resigned or to have been removed without cause. On the Effective Date, all the then existing Equity Interests in the Debtors (including all instruments evidencing such Equity Interests) shall be cancelled and extinguished without further action under any applicable agreement, law, regulation or rule.

8.      **Liquidation of the Debtors**

a.      All of the Debtors shall be deemed to have been liquidated as of the Effective Date, and all Equity Interests in any Debtor shall automatically be cancelled and extinguished as of the Effective Date without the need for any further action by the Bankruptcy Court or any Entity.

b.      Notwithstanding the foregoing, as soon as practicable after the Effective Date, each of the Debtors shall: (a) file its certificate of dissolution or such similar document, together with all other necessary corporate documents, to effect its dissolution under the applicable laws of its state of incorporation or domicile; and (b) complete and file its final federal, state and local tax returns, and pursuant to Section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws. Following such actions and upon the filing by or on behalf of the Debtors of a certification to that effect with the Bankruptcy Court, the Debtors shall be dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of each of the Debtors or payments, including, without limitation, the payment of any franchise or similar taxes to the state or commonwealth of incorporation or organization of such Entity, to be made in connection therewith. The filing by each Debtor of its certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order or rule, including, without limitation, any action by the stockholders or the board of directors of each such Debtor.

c.      On the Effective Date, each Debtor shall assign, transfer and distribute to the Liquidating Trust the Liquidating Trust Assets, including all of the Debtors' books and records. For purposes of the Plan, books and records include computer generated or computer maintained books and records and computer data, as well as electronically generated or maintained books and records or data, along with books and records of any Debtor maintained by or in the possession of third parties, wherever located. All books and records shall be preserved in an orderly fashion and in their native format.

9.      **Operations of the Debtors Between the Confirmation Date and the Effective Date**

The Debtors shall continue to operate as Debtors in Possession during the period from the Confirmation Date through and until the Effective Date.

10.     **Establishment of the Administrative Bar Date**

a.      The Plan establishes the Administrative Bar Date, which was approved by the Bankruptcy Court pursuant to the Confirmation Order.

b.      Except as otherwise provided in Article IV.I.4 or Article II.A of the Plan, on or before 5:00 p.m., prevailing Mountain time, on the Administrative Bar Date, each holder of an Administrative Claim shall file with the Bankruptcy Court a request for payment of Administrative Claim (a) by mailing, hand delivering or delivering by courier service such request for payment of Administrative Claim to the Clerk of the Bankruptcy Court at 721 19th Street, Denver, Colorado 80202 or (b) by Filing such request with the Bankruptcy Court.

c.      The request for payment of an Administrative Claim will be timely Filed only if it is *actually received* by the Bankruptcy Court by 5:00 p.m., prevailing Mountain Time, on the Administrative Bar Date.

d.      Notice of the Administrative Bar Date shall be provided within seven (7) days of the Effective Date.

e.      Notwithstanding anything in Article IV.I.2 of the Plan, the Professionals shall not be required to file a request for payment of any Administrative Claim on or before the Administrative

Bar Date for Professional compensation, as such Professionals will instead file final fee applications as required by the Bankruptcy Code, Bankruptcy Rules and the Confirmation Order.

### 11.    Term of Injunctions or Stays

Unless otherwise provided, all injunctions or stays provided for in the Chapter 11 Cases pursuant to Sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date shall remain in full force and effect until the Chapter 11 Cases are closed.

### 12.    Cancellation of Equity Interests

On the Effective Date, except to the extent otherwise provided herein, all notes, stock, instruments, certificates and other documents evidencing the Equity Interests shall be deemed automatically cancelled and shall be of no further force, whether surrendered for cancellation or otherwise, and the obligations of the Debtors thereunder or in any way related thereto, including any obligation of the Debtors to pay any franchise or similar type taxes on account of such Equity Interests, shall be discharged.

### F.    Procedures for Resolving and Treating Disputed Claims

### 1.    No Distribution Pending Allowance

Notwithstanding any other provision of the Plan, the Liquidating Trustee shall not Distribute any Cash or other property on account of any Disputed Claim unless and until such Claim becomes Allowed. Nothing in the Plan, however, shall be construed to prohibit or require payment or distribution on account of any undisputed portions of a Claim. Nothing in the Plan shall preclude the Liquidating Trustee from making Distributions on account of the undisputed portions of Disputed Claims.

### 2.    Resolution of Disputed Claims

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, the Liquidating Trustee and the Liquidating Trust Committee shall have the right to the exclusion of all others (except as to the Professionals' applications for allowances of compensation and reimbursement of expenses under Sections 330 and 503 of the Bankruptcy Code) to make, File, prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court, objections to Claims. The costs of pursuing the objections to Claims shall be borne by the Liquidating Trust. From and after the Confirmation Date, all objections with respect to Disputed Claims shall be litigated to a Final Order except to the extent, subject to the approval of the Liquidation Trust Committee in accordance with the terms of the Liquidation Trust Agreement, the Liquidation Trustee elects to withdraw any such objection or the Liquidation Trustee and the claimant elect to compromise, settle or otherwise resolve any such objection, in which event they may settle, compromise or otherwise resolve any Disputed Claim without approval of the Bankruptcy Court.

### 3.    Objection Deadline

All objections to Disputed Claims shall be Filed and served upon the holders of each such Claim not later than nine (9) months after the Effective Date, unless otherwise ordered by the Bankruptcy Court after notice and a hearing.

### 4.    Estimation of Claims

At any time, (a) prior to the Effective Date, the Debtors, and (b) subsequent to the Effective Date, the Liquidating Trustee, may request that the Bankruptcy Court estimate any contingent or unliquidated Claim to the extent permitted by Section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Liquidating Trust have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection. If the

Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on the Claim, as determined by the Court. If the estimated amount constitutes a maximum limitation on the Claim, the Debtors or the Liquidating Trust, as applicable, may elect to pursue supplemental proceedings to object to the ultimate allowance of such Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

### 5.    Disallowance of Claims

Except as otherwise agreed, any and all proofs of Claim Filed after the General Bar Date or the Governmental Bar Date, as applicable, shall not be treated as creditors for purposes of voting and distribution pursuant to Bankruptcy Rule 3003(c)(2) and pursuant to the General Bar Date Order, unless on or before the Confirmation Date, the Bankruptcy Court has entered an order deeming such Claim to be timely filed. Any Claims held by Entities from which property is recoverable under Section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under Section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code, provided that such Cause of Action is a Retained Cause of Action, shall be deemed disallowed pursuant to Section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors.

### 6.    Adjustment to Claims Without Objection

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Noticing Agent at the direction of the Debtors or the Liquidating Trustee, as applicable, without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

## G.    Treatment of Executory Contracts and Unexpired Leases

### 1.    Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except for the executory contracts and unexpired leases listed on Exhibit II of the Plan, if any, and except to the extent that a Debtor either previously has assumed, assumed and assigned or rejected an executory contract or unexpired lease by an order of the Bankruptcy Court, including, but not limited to, the Sale Order, or has filed a motion to assume or assume and assign an executory contract or unexpired lease prior to the Effective Date, each executory contract and unexpired lease entered into by a Debtor prior to the Petition Date that has not previously expired or terminated pursuant to its own terms will be rejected pursuant to Section 365 of the Bankruptcy Code. Each such contract and lease will be rejected only to the extent that any such contract or lease constitutes an executory contract or unexpired lease. The entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of any such rejections pursuant to Sections 365(a) and 1123 of the Bankruptcy Code and that the rejection thereof is in the best interest of the Debtors, their Estates and all parties in interest in the Chapter 11 Cases.

### 2.    Claims Based on Rejection of Executory Contracts or Unexpired Leases

Claims created by the rejection of executory contracts and unexpired leases pursuant to Article VII.A of the Plan, or the expiration or termination of any executory contract or unexpired lease prior to the Effective Date, must be filed with the Bankruptcy Court and served on the Debtors no later than thirty (30) days after the Effective Date. Notice of the deadline for filing Claims arising from the rejection of an executory contract or unexpired lease pursuant to Article VII.A of the Plan shall be provided within seven (7) days of the Effective Date. Any Claims arising from the rejection of an executory contract or unexpired lease pursuant to Article VII.A of the Plan for which proofs of Claim are not timely filed within that time period will be forever barred from assertion against the Debtors, the Estates, their successors and assigns, and their assets and properties, unless otherwise

ordered by the Bankruptcy Court or as otherwise provided herein. All such Claims shall, as of the Effective Date, be subject to the discharge and permanent injunction set forth in Article X.E of the Plan. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as General Unsecured Claims under the Plan and shall be subject to the provisions of Article III of the Plan.

### 3. Executory Contracts and Unexpired Leases to Be Assumed

#### a. Assumption Generally

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into in connection with the Plan, on the Effective Date, pursuant to Section 365 of the Bankruptcy Code, the Debtors shall assume each of the respective executory contracts and unexpired leases, if any, listed on Exhibit II of the Plan; *provided, however*, that the Debtors reserve the right, at any time prior to the Effective Date to amend Exhibit II of the Plan to: (a) delete any executory contract or unexpired lease listed therein, thus providing for its rejection pursuant hereto; or (b) add any executory contract or unexpired lease to Exhibit II of the Plan, thus providing for its assumption pursuant to Article VII.C of the Plan. The Debtors shall provide notice of any amendments to Exhibit II to the parties to the executory contracts or unexpired leases affected thereby and to the parties on the then-applicable service list in the Chapter 11 Cases. Nothing herein shall constitute an admission by a Debtor that any contract or lease is an executory contract or unexpired lease or that a Debtor has any liability thereunder.

#### b. Assumptions of Executory Contracts and Unexpired Leases

Each executory contract or unexpired lease assumed under Article VII.C of the Plan shall include any modifications, amendments, supplements or restatements to such contract or lease.

#### c. Assignments Related to Post-Effective Date Transactions

As of the Effective Date, any executory contract or unexpired lease assumed under Article VII.C of the Plan shall be deemed assigned to the Liquidating Trust, pursuant to Section 365 of the Bankruptcy Code.

### 4. Payments Related to the Assumption of Executory Contracts and Unexpired Leases

The Cure Amount Claims associated with each executory contract and unexpired lease to be assumed pursuant to the Plan shall be satisfied, pursuant to Section 365(b)(1) of the Bankruptcy Code: (1) by payment of the Cure Amount Claim in Cash on or after the Effective Date; or (2) on such other terms as are agreed to by the parties to such executory contract or unexpired lease. Pursuant to Section 365(b)(2)(D) of the Bankruptcy Code, no Cure Amount Claim shall be allowed for a penalty rate or other form of default rate of interest. If there is an unresolved dispute regarding: (1) the amount of any Cure Amount Claim; (2) the ability of the Liquidating Trustee or any assignee to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (3) any other matter pertaining to assumption of such contract or lease, the payment of any Cure Amount Claim required by Section 365(b)(1) of the Bankruptcy Code shall be made following the resolution of such dispute by the parties or the entry of a Final Order resolving the dispute and approving the assumption.

### H. Conditions Precedent to Effective Date of the Plan

#### 1. Conditions Precedent to the Effective Date

The following are conditions precedent to the Effective Date that must be satisfied or waived:

a. The Confirmation Order has become a Final Order.

b. The Confirmation Order shall be in full force and effect.

c.      Notwithstanding the foregoing, the Debtors reserve, in their sole discretion, the right to waive the occurrence of any condition precedent to the Effective Date or to modify any of the foregoing conditions precedent. Any such written waiver of a condition precedent set forth in Article VIII.A. of the Plan may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan. Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

**I.      Release, Injunction and Related Provisions**

**1.      Compromise and Settlement**

Pursuant to Section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims and Equity Interests. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims and Equity Interests, as well as a finding by the Bankruptcy Court that such compromise or settlement is fair, equitable, reasonable and in the best interests of the Debtors, the Estates and holders of Claims and Equity Interests.

**2.      Releases**

a.      **Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for the good and valuable consideration provided by each of the Releasees, including, without limitation: (a) the satisfaction and elimination of debt and all other good and valuable consideration paid pursuant to the Plan or otherwise; and (b) the services of the Debtors' officers and directors in facilitating the expeditious implementation of the sales of substantially all of the Debtors' assets, each of the Debtors hereby provides a full release, waiver and discharge to the Releasees (and each such Releasee so released shall be deemed released and discharged by the Debtors) and their respective properties from any and all Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in law, equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date in any way related to the Debtors, including, without limitation, those that any of the Debtors or the Liquidating Trust would have been legally entitled to assert or that any holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for or on behalf of any of the Debtors or Estates and further including those in any way related to the Chapter 11 Cases or the Plan;**

b.      **Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases set forth in Article IX.B of the Plan pursuant to Bankruptcy Rule 9019 and its finding that they are: (a) in exchange for good and valuable consideration, representing a good faith settlement and compromise of the Claims and Causes of Action thereby released; (b) in the best interests of the Debtors and all holders of Claims; (c) fair, equitable and reasonable; (d) approved after due notice and opportunity for hearing; and (e) a bar to any of the Debtors or the Liquidating Trustee.**

**3.      Exculpation**

**Notwithstanding anything contained in the Plan to the contrary, the Exculpated Parties shall neither have nor incur any liability to any Entity for any and all Claims and Causes of Action arising on or after the Petition Date, including any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or consummating the Plan, the Disclosure Statement, the Liquidating Trust Agreement, the DIP Facility, or any other contract, instrument, release or other agreement or document created or entered into in connection**

with the Plan or any other postpetition act taken or omitted to be taken in connection with or in contemplation of the Sale or the liquidation of the Debtors; *provided, however*, that the foregoing provisions of Article IX.C of the Plan shall have no effect on the liability of any Exculpated Party that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; *provided, further,* that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, the above-reference documents.

        4.        **Release by Holders of Claims and Interests**

        Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, from and after the Effective Date, all Releasing Parties (*i.e.* holders of Claims voting to accept the Plan) shall be deemed to have forever released, waived and discharged all causes of action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in law, equity or otherwise, whether for tort, contract, violations of federal or state securities laws or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date in any way related to the Debtors, the Chapter 11 Cases or the Plan against the Releasees.

        5.        **Injunction**

        a.        Pursuant to Section 1141(d)(3) of the Bankruptcy Code, confirmation of the Plan will not discharge the Debtors; *provided, however*, that upon confirmation of the Plan and the occurrence of the Effective Date and Distributions under the Plan, Claimants may not seek payment or recourse against or otherwise be entitled to any Distribution from the Liquidating Trust Assets except as expressly provided in this Plan and the Liquidating Trust Agreement.

        b.        Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, all Entities are permanently enjoined, on and after the Effective Date, on account of any Claim or Equity Interest, from:

        (i)        commencing or continuing in any manner any action or other proceeding of any kind against any of the Debtors' Estates, the Liquidating Trust, their successors and assigns, and any of their assets and properties;

        (ii)        enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against any Debtor's Estate, the Liquidating Trust, their successors and assigns, and any of their assets and properties;

        (iii)        creating, perfecting or enforcing any encumbrance of any kind against any Debtor's Estate, the Liquidating Trust, their successors and assigns and any of their assets and properties;

        (iv)        asserting any right of setoff or subrogation of any kind against any obligation due from any Debtor's Estate, the Liquidating Trust or their successors and assigns, or against any of their assets and properties, except to the extent a right to setoff or subrogation is asserted with respect to a timely filed proof of claim; or

        (v)        commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim or Equity Interest or Cause of Action released or settled hereunder.

        c.        From and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner against the Debtors, their Estates, their successors and assigns, and any of their assets and properties, any suit, action or other proceeding, on account

of or respecting any claim, demand, liability, obligation, debt, right, cause of action, interest or remedy released or to be released pursuant to the Plan or the Confirmation Order.

       **6.**       **Releases of Liens**

       Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, liens, pledges or other security interests against property of the Estates shall be fully released and discharged and all of the right, title and interest of any holder of such mortgages, deeds of trust, liens, pledges or other security interest shall revert to the Debtors and the Liquidating Trustee.

       **7.**       **No Substantive Consolidation**

       Nothing in the Plan is intended or shall be deemed to be a substantive consolidation of the Debtors' separate Estates. Each of the Debtors' Estates shall continue to be separate from one another. No assets belonging to one Debtor's Estate shall be joined or otherwise consolidated with the assets belonging to any of the other Debtors' Estates and no liabilities of one Debtor's Estate shall be joined or otherwise consolidated with the liabilities of any of the other Debtors' Estates. However, nothing in the Plan is intended or shall be deemed to be a waiver of any right of the Debtors, the Liquidating Trustee, or any other party in interest to seek substantive consolidation through a separate motion with notice and opportunity to be heard.

       **8.**       **Preservation of Rights of Action**

       **a.**       **Vesting of Causes of Action**

       (i)       Except as otherwise provided in the Plan or Confirmation Order, in accordance with Section 1123(b)(3) of the Bankruptcy Code, any Retained Causes of Action that the Debtors may hold against any Entity shall vest upon the Effective Date in the Liquidating Trust.

       (ii)       Except as otherwise provided in the Plan or Confirmation Order, after the Effective Date, the Liquidating Trustee shall have the exclusive right to institute, prosecute, abandon, settle or compromise any Retained Causes of Action, in accordance with the terms of the Liquidating Trust Agreement and without further order of the Bankruptcy Court, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases.

       (iii)       Retained Causes of Action and any recoveries therefrom shall remain the sole property of the Liquidating Trust (for the sole benefit of the holders of General Unsecured Claims), as the case may be, and holders of Claims shall have no right to any such recovery.

       **b.**       **Preservation of All Causes of Action Not Expressly Settled or Released**

       (i)       Unless a Retained Cause of Action against a holder or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including the Confirmation Order), the Debtors and the Liquidating Trustee expressly reserve such Retained Cause of Action for later adjudication by the Debtors or the Liquidating Trustee (including, without limitation, Retained Causes of Action not specifically identified or described in the Plan Supplement or elsewhere or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances which may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Retained Causes of Action upon or after the entry of the Confirmation Order or Effective Date based on the Disclosure Statement, the Plan or

25

the Confirmation Order, except where such Retained Causes of Action have been released in the Plan (including, without limitation, and for the avoidance of doubt, the releases contained in Article IX.B.1 of the Plan) or any other Final Order (including the Confirmation Order). In addition, the Debtors and the Liquidating Trustee expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which the Debtors are a defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

Subject to the immediately preceding paragraph, any Entity to whom the Debtors have incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors should assume that any such obligation, transfer, or transaction may be reviewed by the Liquidating Trustee subsequent to the Effective Date and may be the subject of an action after the Effective Date, regardless of whether: (i) such Entity has filed a proof of claim against the Debtors in the Chapter 11 Cases; (ii) the Debtors or Liquidating Trustee have objected to any such Entity's proof of claim; (iii) any such Entity's Claim was included in the Schedules; (iv) the Debtors or the Liquidating Trustee have objected to any such Entity's scheduled Claim; or (v) any such Entity's scheduled Claim has been identified by the Debtors or the Liquidating Trustee as disputed, contingent or unliquidated.

## J.     Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors and the Plan as is legally permissible, including, without limitation, jurisdiction to:

a.      allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims or Equity Interests;

b.      grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

c.      resolve any matters related to the assumption, assignment or rejection of any executory contract or unexpired lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including those matters related to any amendment to the Plan after the Effective Date pursuant to Article XI.C of the Plan adding executory contracts or unexpired leases to the list of executory contracts and unexpired leases to be assumed;

d.      ensure that Distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

e.      decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving a Debtor that may be pending on the Effective Date or instituted by the Liquidating Trustee after the Effective Date, *provided, however*, that the Liquidating Trustee shall reserve the right to commence actions in all appropriate jurisdictions;

f.      decide or resolve all Avoidance Actions to be brought by the Liquidating Trustee;

g.      enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan, the Plan Supplement or the Disclosure Statement;

h.      resolve any cases, controversies, suits or disputes that may arise in connection with the Effective Date, the interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

i.      issue and enforce injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Effective Date or enforcement of the Plan, except as otherwise provided in the Plan;

j.      enforce Article IX.A, Article IX.B, Article IX.C and Article IX.D of the Plan;

k.      enforce the Injunction set forth in Article IX.E of the Plan;

l.      resolve any cases, controversies, suits or disputes with respect to the releases, injunction and other provisions contained in Article IX of the Plan, and enter such orders as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

m.      enter and implement such orders as necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

n.      resolve any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, the Liquidating Trust Agreement or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement; and

o.      enter an order and/or the decree contemplated in Fed. R. Bankr. P. 3022 concluding the Chapter 11 Cases.

### K.      Miscellaneous Provisions

#### 1.      Final Fee Applications

The deadline for submission by Professionals of applications for Bankruptcy Court approval of Professional Compensation shall be forty-five (45) days after the Effective Date.

The fees and expenses of the professionals retained by the Debtors in the Canadian Recognition Proceedings are subject to the fee application process in the Canadian Court.

#### 2.      Payment of Statutory Fees

All fees payable pursuant to Section 1930 of title 28 of the United States Code after the Effective Date, as determined by the Bankruptcy Court at a hearing pursuant to Section 1128 of the Bankruptcy Code, shall be paid prior to the closing of the Chapter 11 Cases on the earlier of when due or the Effective Date, or as soon thereafter as practicable by the Liquidating Trust.

#### 3.      Modification of Plan

Subject to the limitations contained in the Plan: (1) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy Section 1129(b) of the Bankruptcy Code; and (2) after the entry of the Confirmation Order, the Debtors or the Liquidating Trustee, as the case may be, may, upon

order of the Bankruptcy Court, amend or modify the Plan, in accordance with Section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

### 4.      Revocation of Plan

The Debtors reserve the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order and to file subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan or if entry of the Confirmation Order or the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any claims by or against, or any Equity Interests in, such Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission of any sort by the Debtors or any other Entity.

### 5.      Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

### 6.      Governing Law

Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Colorado, without giving effect to the principles of conflict of laws thereof.

### 7.      Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order. Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by a Debtor or any Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) any Debtor with respect to the holders of Claims or Equity Interests or other parties-in-interest; or (2) any holder of a Claim or other party-in-interest prior to the Effective Date.

### 8.      Article 1146 Exemption

Pursuant to Section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.

### 9.      Section 1125(e) Good Faith Compliance

The Debtors shall be deemed to have acted in "good faith" under Section 1125(e) of the Bankruptcy Code.

### 10.     Further Assurances

The Debtors, the Liquidating Trustee, all holders of Claims receiving Distributions hereunder and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

11.     **Service of Documents**

Any pleading, notice or other document required by the Plan to be served on or delivered to the Debtors shall be sent by first class U.S. mail, postage prepaid as follows:

To the Debtors:

> Atna Resources Inc.
> P.O. Box 26115
> Lakewood, Colorado 80226
> Attn: James Hesketh
>
> *with a copy to:*
>
> Squire Patton Boggs (US) LLP
> 221 E. Fourth Street, Suite 2900
> Cincinnati, Ohio 45202
> Telephone: (513) 361-1200
> Facsimile: (513) 361-1201
> Attn.: Stephen D. Lerner, Esq.

To the Liquidating Trustee:

> [_____]

12.     **Filing of Additional Documents**

On or before the Effective Date, the Debtors may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

13.     **No Stay of Confirmation Order**

The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Fed. R. Bankr. P. 3020(e) and 7062.

14.     **Aid and Recognition**

The Debtors or the Liquidating Trustee, as the case may be, shall, as needed to effect the terms of the Plan, request the aid and recognition of any court or judicial, regulatory or administrative body in any province or territory of Canada, including the Canadian Court presiding over the Canadian Recognition Proceedings, or any other nation or state.

## IV.     ALTERNATIVES TO THE PLAN

The Debtors have determined that the Plan is the most practical means of providing maximum recoveries to creditors. Alternatives to the Plan that have been considered and evaluated by the Debtors during the course of these Chapter 11 Cases include (a) liquidation of the Debtors' assets under chapter 7 of the Bankruptcy Code and (b) an alternative chapter 11 plan. The Debtors' consideration of these alternatives to the Plan has led the Debtors to conclude that the Plan, in comparison, provides a greater recovery to creditors on a more expeditious timetable, and in a manner that minimizes certain inherent risks in any other course of action available to the Debtors. An analysis comparing this Plan with a liquidation of the Debtors' assets under chapter 7 of the Bankruptcy Code is attached hereto as Exhibit B.

A.     **Liquidation Under Chapter 7 of the Bankruptcy Code**

If the Plan or any other chapter 11 plan for the Debtors cannot be confirmed under Section 1129(a) of the Bankruptcy Code, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, in which case, a trustee would be elected or appointed to liquidate any remaining assets of the Debtors for distribution to creditors pursuant to chapter 7 of the Bankruptcy Code. If a trustee is appointed and the remaining assets of the Debtors are liquidated under chapter 7 of the Bankruptcy Code, holders of certain Allowed Claims may receive lesser distributions on account of their Allowed Claims and would likely have to wait a longer period of time to receive any such distributions than they would under the Plan.

B.     **Alternative Chapter 11 Plan**

If the Plan is not confirmed, the Debtors or any other party in interest may attempt to formulate an alternative chapter 11 plan which might provide for the liquidation of the Debtors' assets other than as provided in the Plan. However, since substantially all of the Debtors' assets have already been liquidated and the Plan provides for the distribution of the proceeds of the liquidation and any non-liquidated assets in accordance with the priorities established by the Bankruptcy Code, the Debtors believe that any alternative chapter 11 plan will be substantially similar to the Plan. Any attempt to formulate an alternative chapter 11 plan would necessarily delay creditors' receipt of distributions yet to be made and, due to the incurrence of additional administrative expenses during such period of delay, may provide for smaller distributions to holders of Allowed Claims than are currently provided for in the Plan. Thus, the Debtors believe that the Plan will enable all creditors to realize the greatest possible recovery on their respective Claims.

V.     **CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

Circular 230 Disclaimer: To ensure compliance with requirements imposed by the Internal Revenue Service (the "IRS"), we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code of 1986, as amended (the "IRC"), or (ii) promoting, marketing or recommending to another party any transaction or tax matter(s) addressed herein.

The following discussion summarizes certain federal income tax consequences of the Plan to the Debtors and to holders of General Unsecured Claims. This summary does not address the federal income tax consequences to holders of Interests and to holders whose Claims or Interests (i) are paid in full, in Cash, or that are otherwise not Impaired under the Plan or (ii) that are not receiving any distribution under the Plan.

This summary is based on the IRC, the Treasury Regulations promulgated and proposed thereunder, judicial decisions and published administrative rulings and pronouncements of the IRS currently in effect. These authorities are all subject to change, possibly with retroactive effect, and any such change could alter or modify the federal income tax consequences described below.

This summary does not address foreign, state or local income tax consequences, or any estate or gift tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign companies, nonresident alien individuals, S corporations, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, investors in pass-through entities, broker-dealers and tax-exempt organizations). Accordingly, this summary should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of a Claim.

Due to the possibility of changes in law, differences in the nature of various Claims, differences in individual Claim holders' methods of accounting, and the potential for disputes as to legal and factual matters, the federal income tax consequences described herein are subject to significant uncertainties. No ruling has been applied for or obtained from the IRS, and no opinion of counsel has been requested or obtained by the Debtors with respect to any of the tax aspects of the Plan. No representations are being made regarding the particular tax consequences of the Plan to the Debtors or any holder of a Claim or Interest.

**THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH SUCH HOLDER. THIS DISCUSSION DOES NOT CONSTITUTE TAX ADVICE OR A TAX OPINION CONCERNING THE MATTERS DESCRIBED. THERE CAN BE NO ASSURANCE THAT THE IRS WILL NOT CHALLENGE ANY OR ALL OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED. ACCORDINGLY, EACH HOLDER OF A CLAIM IS STRONGLY URGED TO CONSULT WITH HIS, HER OR ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, FOREIGN OR OTHER TAX CONSEQUENCES OF THE PLAN.**

A.    **Federal Income Tax Consequences to Holders of General Unsecured Claims**

In accordance with the Plan, the Debtors' assets will be transferred by the Debtors to the Liquidating Trust for the benefit of holders of General Unsecured Claims against the Debtors (such holders are referred to in this section as "Unsecured Creditors").

The federal income tax consequences to Unsecured Creditors will differ and will depend on factors specific to each such Creditor, including, but not limited to: (i) whether the Unsecured Creditor's Claim (or a portion thereof) constitutes a Claim for principal or interest, (ii) the origin of the Unsecured Creditor's Claim, (iii) the Unsecured Creditor's holding period for the claim, (iv) whether the Unsecured Creditor is a United States person or a foreign person for United States federal income tax purposes, (v) whether the Unsecured Creditor reports income on the accrual or cash basis method, and (vi) whether the Unsecured Creditor has taken a bad debt deduction or otherwise recognized a loss with respect to the Claim.

Generally, an Unsecured Creditor will recognize gain or loss equal to the difference between the "amount realized" by such Creditor and such Creditor's adjusted tax basis in his, her or its Claim. The amount realized is equal to the value of such Creditor's Pro Rata share of the proceeds of the Debtors' assets received under the Plan. Any gain or loss realized by an Unsecured Creditor should constitute ordinary income or loss to such creditor unless such Claim is a capital asset in the hands of such Unsecured Creditor. If a Claim is a capital asset and it has been held for more than one year, such Creditor will realize long-term capital gain or loss. An Unsecured Creditor will typically recognize gain or loss on the Effective Date as a result of the transfer of Cash of the Debtors to the Liquidating Trust for the benefit of such Unsecured Creditor in accordance with the plan.

**THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX CONSEQUENCES TO EACH UNSECURED CREDITOR. FURTHERMORE, THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND IN SOME CASES UNCERTAIN. THEREFORE, IT IS IMPORTANT THAT EACH CREDITOR OBTAIN HIS, HER OR ITS OWN PROFESSIONAL TAX ADVICE REGARDING THE TAX CONSEQUENCES TO SUCH CREDITOR AS A RESULT OF THE PLAN.**

B.    **Federal Income Tax of the Liquidating Trust**

1.    **Transfer of Assets to the Liquidating Trust**

Pursuant to the Plan, as of the Effective Date, holders of Allowed Claims against the Debtors are required for all federal income tax purposes, to treat the Liquidating Trust Fund transferred by the Debtors to the Liquidating Trust as having been transferred directly to such holders (with each such holder receiving an undivided interest in the specific Liquidating Trust Fund, the proceeds of which such holder may receive provided distribution in respect of its interests in the Liquidating Trust are made), and then transferred by such holders to the Liquidating Trust in exchange for beneficial interests therein.

2.    **Classification as a Liquidating Trust**

The Liquidating Trust is intended to qualify as a liquidating trust for federal income tax purposes. In general, a liquidating trust is not a separate taxable entity, but rather is treated for federal income tax purposes as a "grantor" trust (*i.e.*, a pass-through entity). In Revenue Procedure 82-58, as modified and amplified by Revenue

Procedures 91-15 and 94-45 (the "Revenue Procedures"), the IRS set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a bankruptcy plan. The Liquidating Trust has been structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with the Revenue Procedures, all parties (including the Debtors, the Liquidating Trustee and holders of Allowed Unsecured Claims) are required to treat, for federal income tax purposes, the Liquidating Trust as a grantor trust of which its creditor-beneficiaries are the owners and grantors, and the following discussion assumes that the Liquidating Trust would be so treated for federal income tax purposes. However, no ruling has been requested from the IRS concerning the tax status of the Liquidating Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust as a grantor trust. If the IRS were to challenge successfully such classification, the federal income tax consequence to the Liquidating Trust and its creditor-beneficiaries could vary from those discussed herein (including the potential for an entity-level tax).

### 3.      Tax Reporting

For federal income tax purposes, all parties (including the Debtors, the Liquidating Trustee, and holders of Allowed Claims) will treat the Liquidating Trust as a grantor trust of which such holders are the owners and grantors. Thus, each holder (and any subsequent holders) of interests in the Liquidating Trust will be treated as the direct owner of an undivided interest, for all federal income tax purposes, in the specific assets of the Liquidating Trust, the proceeds of which such holder may receive provided distributions in respect of its interest in the Liquidating Trust are made. Accordingly, each holder of a beneficial interest in the Liquidating Trust will be required to report on its federal income tax return(s) the holder's allocable share of any income, gain, loss, deduction or credit recognized or incurred by the Liquidating Trust. The character of items of income, deduction and credit to any holder and the ability of such holder to benefit from any deduction or losses may depend on the particular situation of such holder.

The federal income tax reporting obligations of a holder of a beneficial interest in the Liquidating Trust is not dependent upon the Liquidating Trust distributing any Cash or other proceeds. Therefore, a holder of a beneficial interest in the Liquidating Trust may incur a federal income tax liability regardless of the fact that the Liquidating Trust has not made, or will not make, any concurrent or subsequent distributions to the holder. If a holder incurs a federal tax liability but does not receive distributions commensurate with the taxable income allocated to it in respect of any beneficial interests in the Liquidating Trust it holds, the holder may be entitled to a subsequent loss or deduction. In general, a distribution of Cash from the Liquidating Trust to a holder of a beneficial interest will not be subject to tax.

The Liquidating Trustee will file with the IRS returns for the Liquidating Trust as a grantor trust pursuant to Regulation § 1.671-4(a). The Liquidating Trustee will also send to each holder of a beneficial interest in the Liquidating Trust a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and will instruct the holder to report such items on its federal income tax return.

### C.      Withholding and Reporting

Payments of interest, dividends and certain other payments are generally subject to backup withholding at the rate of 28% unless the payee of such payment furnishes such payee's correct taxpayer identification number (social security number or employer identification number) to the payor. The Liquidating Trustee may be required to withhold the applicable percentage of any payments made to a holder who does not provide his, her or its taxpayer identification number. Backup withholding is not an additional tax, but an advance payment that may be refunded to the taxpayer by the IRS to the extent that the backup withholding results in an overpayment of tax by such taxpayer in such taxable year.

**THE FOREGOING IS INTENDED TO BE ONLY A SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND IN SOME CASES UNCERTAIN. SUCH CONSEQUENCES MAY ALSO VARY BASED ON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM. ACCORDINGLY, EACH HOLDER OF A CLAIM IS STRONGLY URGED TO CONSULT WITH HIS, HER OR ITS OWN TAX ADVISOR**

REGARDING THE FEDERAL, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES
UNDER THE PLAN.

## VI.        SOLICITATION AND VOTING PROCEDURES

On [__], 2016, the Bankruptcy Court entered the Disclosure Statement Order approving the
adequacy of the Disclosure Statement and approving the Solicitation Procedures. In addition to approving the
Solicitation Procedures, the Disclosure Statement Order established certain dates and deadlines, including the date
for the Confirmation Hearing, the deadline for parties to object to confirmation, the Voting Record Date and the
Voting Deadline. The Disclosure Statement Order also approved the forms of Ballots and certain
confirmation-related notices. The Disclosure Statement Order and the Solicitation Procedures should be read in
conjunction with the Disclosure Statement. Capitalized terms used herein that are not otherwise defined in the
Disclosure Statement or Plan shall have the meanings ascribed to them in the Solicitation Procedures.

### A.        Solicitation Package

#### 1.        Contents of Solicitation Package

The following materials, all of which shall be submitted to holders of Claims eligible to vote on
the Plan on a compact disc in PDF format, shall constitute the Solicitation Package, *provided, however*, that all
holders of Claims eligible to vote on the Plan shall receive a Ballot only in paper format:

- Confirmation Hearing Notice;

- appropriate Ballot and voting instructions;

- prepaid return envelope.

#### 2.        Distribution of Solicitation Package

The Debtors shall serve, or caused to be served, all of the materials in the Solicitation Package on
holders of Class 4 (General Unsecured Claims Against Atna Resources Ltd.), Class 5 (General Unsecured Claims
Against Canyon Resources Corporation), Class 6 (General Unsecured Claims Against CR Briggs Corporation),
Class 7 (General Unsecured Claims Against CR Montana Corporation), Class 8 (General Unsecured Claims Against
CR Kendall Corporation), and Class 9 (General Unsecured Claims Against Atna Resources Inc.).

The Debtors shall serve, or caused to be served, a Confirmation Hearing Notice and the
appropriate Notice of Non-Voting Status on holders of Class 1 (Priority Non-Tax Claims), Class 2 (Waterton
Secured Claims), Class 3 (Secured Claims), Class 10 (Equity Interests) and holders of Unclassified Claims.

Consistent with Bankruptcy Rule 2002, the Debtors will also serve by regular U.S. Mail a copy of
the Confirmation Hearing Notice on all creditors, the U.S. Trustee, and counter-parties to the Debtors' unexpired
leases and executory contracts that have not yet been assumed or rejected.

The Confirmation Hearing Notice shall inform parties that the Plan, the Plan Supplement, the
Disclosure Statement, the Disclosure Statement Order and all other Solicitation Package materials (except Ballots)
can be obtained by: (a) accessing the website of the Debtors' claims and noticing agent, Upshot, at
http://www.upshotservices.com/atna, or (b) requesting a paper copy from Upshot (also, the "Balloting Agent") by
emailing atnainfo@upshotservices.com and referencing "Atna Resources Inc." in the subject line or by calling
Upshot at (855) 812-6112.

The Debtors propose that in lieu of printing and mailing copies of the Disclosure Statement, the
Plan and the Disclosure Statement Order (the "Plan Documents") to all holders of claims and interests, that the
Balloting Agent shall continue to maintain its website at http://www.upshotservices.com/atna (the "Website") which
allows access to copies of the Plan Documents. Notice of the Website will be given to all holders of claims and

interests and other parties in interest in the Confirmation Hearing Notice, the Notice of Non-Voting Status and the Ballot. The Debtors believe that transmittal of the notice to the Website, in lieu of sending copies of the Plan Documents to all holders of claims and interests and other parties in interest, will result in significant savings to the Debtors' estates. In addition, the undersigned counsel for the Debtors will provide copies of the Plan Documents to any holder of claims or interests and other parties in interest upon request.

If, however, the Court declines to approve distribution of the Plan Documents through the Website, the Debtors will mail the Plan Documents or a CD-ROM containing the Plan Documents to (i) the holders of claims in the Voting Class and (ii) those parties that requested service and notice of papers in accordance with Bankruptcy Rule 2002 that have not already received service of the Disclosure Statement and the Plan.

    **B.**        **Voting Instructions and General Tabulation Procedures**

        **1.**        **Voting Record Dates**

The Bankruptcy Court has approved [__], 2016, as the Voting Record Date.

        **2.**        **Voting Deadline**

The Bankruptcy Court has approved [_____], 2016 at 5:00 p.m. (Prevailing Mountain Time), as the Voting Deadline. The Debtors may extend the Voting Deadline without further order of the Bankruptcy Court. However, the Debtors will document any such extension in the Voting Report.

For holders of all Claims or Equity Interests, the Balloting Agent will answer questions regarding the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, provide additional copies of all materials and oversee the voting tabulation. The Balloting Agent will also process and tabulate ballots for each Class entitled to vote to accept or reject the Plan.

**TO BE COUNTED AS VOTES TO ACCEPT OR REJECT THE PLAN, BALLOTS CAST BY HOLDERS AND MASTER BALLOTS CAST ON BEHALF OF BENEFICIAL HOLDERS IN CLASSES ENTITLED TO VOTE MUST BE RECEIVED BY THE BALLOTING AGENT BY THE VOTING DEADLINE, AT THE ADDRESS LISTED ON THE APPLICABLE BALLOT, WHETHER BY FIRST CLASS MAIL, OVERNIGHT COURIER OR PERSONAL DELIVERY. THE BALLOTS WILL CLEARLY INDICATE WHERE THE BALLOT MUST BE RETURNED.**

| |
|---|
| Ballots must be **actually received** by the Balloting Agent by the Voting Deadline as follows: |
| If sent by **First Class Mail**:<br><br>Atna Resources, Inc. Ballot Processing<br>c/o Upshot Services LLC<br>8269 East 23rd Avenue, Suite 275, Denver, CO 80238 |
| If sent by **Messenger or Overnight Courier**:<br><br>Atna Resources, Inc. Ballot Processing<br>c/o Upshot Services LLC<br>8269 East 23rd Avenue, Suite 275, Denver, CO 80238 |
| If you have any questions on the procedures for voting on the Plan, please call the Balloting Agent at the following telephone number:<br>**(855) 812-6112** |

| |
|---|
| **IT IS IMPORTANT TO FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON EACH BALLOT WHEN SUBMITTING A VOTE.** |

**EACH BALLOT WILL CONTAIN A PROVISION STATING THAT A VOTING CREDITOR, BY VOTING, ACKNOWLEDGES HIS, HER OR ITS CONSENT TO THE RELEASE, EXCULPATION AND RELEASE PROVISIONS OF THE PLAN, AS FOLLOWS:**

---

**If you vote to accept the Plan, you shall be deemed to have consented to the releases contained in Article IX of the Plan. YOU SHOULD CAREFULLY REVIEW SUCH RELEASES PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.**

---

| The Holder identified below votes to (please check one): | |
| :---: | :---: |
| <u>ACCEPT</u> THE PLAN ☐ | <u>REJECT</u> THE PLAN ☐ |

**FOR ANSWERS TO ANY QUESTIONS REGARDING SOLICITATION PROCEDURES, PARTIES MAY CALL THE BALLOTING AGENT VIA TELEPHONE AT (855) 812-6112.**

To obtain an additional copy of the Plan, the Disclosure Statement, the Plan Supplement or other Solicitation Package materials (except Ballots), please (a) access the website of the Debtors' claims and noticing agent, Upshot, at http://www.upshotservices.com/atna, or (b) request a paper copy from Upshot by emailing atnainfo@upshotservices.com and referencing "Atna Resources Inc." in the subject line or by calling Upshot at (855) 812-6112.

Ballots received after the Voting Deadline will not be counted by the Debtors in connection with the Debtors' request for confirmation. The method of delivery of Ballots to be sent to the Balloting Agent is at the election and risk of each Creditor, except as otherwise provided, a Ballot will be deemed delivered only when the Balloting Agent actually receives the original executed Ballot. In all cases, sufficient time should be allowed to assure timely delivery. An original executed Ballot is required. Ballots should not be sent to any of the Debtors, the Debtors' agents (other than the Balloting Agent), or the Debtors' financial or legal advisors, and any Ballots sent to such parties will not be counted. The Debtors expressly reserve the right to amend from time to time the terms of the Plan (subject to compliance with the requirements of Section 1127 of the Bankruptcy Code and the terms of the Plan regarding modification).

3.    **Tabulation Procedures**

In tabulating votes to accept or reject the Plan the following procedures (the "<u>Tabulation Procedures</u>") shall be used:

a)   Unless otherwise provided in these Tabulation Procedures, a claim will be deemed temporarily allowed for voting purposes only in an amount equal to: (i) the liquidated, non-contingent, undisputed amount of such claim as set forth in the Debtors' Schedules if no proof of claim has been timely filed in respect of such claim; or (ii) if a proof of claim has been timely filed in respect of such claim, the amount set forth in such proof of claim;

b)   If a claim is deemed allowed under the Plan or in an order of the Court entered prior to the Voting Record Date, such claim is allowed for voting purposes in the deemed allowed amount set forth in the Plan or such order;

c)   If a claim is listed in the Debtors' Schedules as contingent, unliquidated, or disputed, and as of the Voting Record Date the applicable bar date for filing proofs of claim has not passed, the holder of such Claim will be sent a Ballot marked as provisional (the "<u>Provisional Ballot</u>"). If the Provisional Ballot is voted and (i) a proof of claim is timely filed or deemed timely filed prior to the Voting Deadline, the Provisional Ballot will be tabulated in an amount consistent with the tabulation rules set forth herein; however, if (ii) a proof of claim is <u>not</u> timely filed or deemed timely filed prior to the Voting Deadline, such Provisional Ballot will not be counted and included in the tabulation;

d) If a claim for which a proof of claim has been timely filed is for unknown or undetermined amounts, or is wholly unliquidated or contingent (as determined on the face of the claim or after a reasonable review of the supporting documentation by the Balloting Agent), and such claim has not been allowed, such claim will be temporarily allowed for voting purposes only, and not for purposes of allowance or distribution and accorded one vote and valued at an amount equal to one dollar ($1.00);

e) If a claim is listed on a timely filed proof of claim as contingent, unliquidated, or disputed in part, such Claim is temporarily allowed in the amount that is liquidated, non-contingent, and undisputed for voting purposes only, and not for purposes of allowance or distribution;

f) If a holder of a claim identifies a claim amount in its Ballot that is different than the amount otherwise calculated in accordance with the Tabulation Procedures, the claim will be temporarily allowed for voting purposes in the amount calculated in accordance with the Tabulation Procedures;

g) Creditors with Claims that have been indefeasibly paid, in full or in part, shall only be permitted to vote the unpaid amount of such Claim, if any, to accept or reject the Plan;

h) Duplicate claims within the same Voting Class, whether against a single Debtor or multiple Debtors, listed in the Debtors' Schedules or in timely-filed proofs of claim, will be deemed temporarily allowed for voting purposes only in an amount equal to one such claim and not in an amount equal to the aggregate of such claims;

i) Creditors will not be entitled to vote claims to the extent such claims have been superseded and/or amended by other claims filed by or on behalf of such creditors, regardless of whether the Debtors have objected to such earlier filed claim;

j) If the Debtors have served an objection or request for estimation as to a claim at least ten (10) calendar days before the Voting Deadline, such claim is temporarily disallowed for voting purposes only and not for purposes of allowance or distribution, except to the extent and manner as set forth in such objection;

k) Claims filed for $0.00 are not entitled to vote.

The following additional procedures will apply:

a) The voter must complete each section of the Ballot, including, without limitation, certifying the amount of its claim, voting to accept or reject the Plan, completing the requested identification information, and signing and dating the Ballot. If the party executing the Ballot is signing as a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or acting in a fiduciary or representative capacity, they should indicate such capacity when signing and, if required or requested by the Balloting Agent, the Debtors, or the Court, must submit evidence satisfactory to the requesting party to so act on behalf of the holder of the claim.

b) The voter must vote all of its claims either to accept or reject the Plan. Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted. To the extent possible, the Debtors shall mail each claimant holding a claim in the Voting Class a single Ballot on account of the claims held by such claimant in the Voting Class.

c) For purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, separate claims held by a single creditor in a particular Class shall be aggregated as if

36

such creditor held one claim in such Class, and the votes related to such claims shall be treated as a single vote to accept or reject the Plan;

d) If multiple Ballots are received from the same voter with respect to the same claim prior to the Voting Deadline, the last properly executed Ballot timely received will be deemed to reflect such voter's intent and will supersede and revoke any prior Ballot received.

e) If a creditor simultaneously cases inconsistent Ballots, such Ballots shall not be counted;

f) Delivery of a defective or irregular Ballot will not be deemed to have been made until such defect or irregularity has been cured or waived by the Debtors. Any waiver by the Debtors of defects or irregularities in any Ballot will be detailed in the voting report filed with this Court by the Balloting Agent. Neither the Debtors, nor any other person or entity, will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots, nor will any of them incur any liability for failure to provide such notification.

g) In addition, the following Ballots will not be counted in determining the acceptance or rejection of the Plan:

h) any Ballot that is illegible or contains insufficient information to permit the identification of the holder;

i) any Ballot that (a) does not indicate an acceptance or rejection of the Plan, (b) indicates both an acceptance and rejection of the Plan, and/or (c) partially accepts and partially rejects the Plan;

j) any Ballot cast by a person who does not hold, or represent a person that holds, a claim in the Voting Class;

k) any Ballot received after the Voting Deadline will not be counted unless the Debtors have granted an extension with respect to such Ballot. The voter may choose the method of delivery of its Ballot to the Balloting Agent at its own risk. Delivery of the Ballot will be deemed made only when the <u>original</u> properly executed Ballot is actually received by the Balloting Agent;

l) any Ballot delivered by facsimile transmission, electronic mail, or any other means not specifically approved herein;

m) any Ballot sent to a person other than the Balloting Agent; and

n) any Ballot not bearing an original signature.

## VII.  CONFIRMATION PROCEDURES

### A.  Confirmation Hearing

The Confirmation Hearing will commence on [_____], 2016 at [_]:00 [-].m. (Prevailing Mountain Time), before the Honorable Joseph G. Rosania, Jr., United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Colorado, 721 19th Street, Denver, Colorado 80202. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

**The Plan Objection Deadline is 4:00 p.m. (Prevailing Mountain Time) on [    ], 2016.**

        All Plan Objections must be Filed with the Bankruptcy Court and served on the Debtors and certain other parties in accordance with the Disclosure Statement Order on or before the Plan Objection Deadline.

        The Debtors' proposed schedule will provide Entities sufficient notice of the Plan Objection Deadline, which will be at least the 28 days as required by Bankruptcy Rule 2002(b). The Debtors believe that the Plan Objection Deadline will afford the Bankruptcy Court, the Debtors and other parties in interest reasonable time to consider the Plan Objections prior to the Confirmation Hearing.

> **THE BANKRUPTCY COURT WILL NOT CONSIDER PLAN OBJECTIONS UNLESS THEY ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER.**

**Plan Objections must be served on all of the following parties:**

| | |
|---|---|
| **SQUIRE PATTON BOGGS (US) LLP** | **UNITED STATES TRUSTEE** |
| 221 E. Fourth Street, Suite 2900 | Office of the United States Trustee |
| Cincinnati, Ohio 45202 | for the District of Colorado |
| Telephone: (513) 361-1200 | Byron G. Rogers Federal Building |
| Facsimile: (513) 361-1201 | 1961 Stout Street, Suite 12-200 |
| Attn.: Stephen D. Lerner, Esq. | Denver, Colorado 80294 |
| *Counsel to the Debtors* | Attn.: Alison E. Goldenberg |
| | |
| **CLERK OF THE BANKRUPTCY COURT** | **ONSAGER, GUYERSON, FLETCHER AND JOHNSON** |
| United States Bankruptcy Court | 1801 Broadway, Suite 900 |
| for the District of Colorado | Denver, Colorado 80202 |
| 721 19th Street | Attn: Michael J. Guyerson |
| Denver, Colorado 80202 | *Counsel to the Committee* |

**B.**      **Statutory Requirements for Confirmation of the Plan**

        At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of Section 1129 of the Bankruptcy Code. The Debtors believe:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, will have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment: (1) made before the confirmation of the Plan is reasonable; or (2) subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after confirmation of the Plan.

- Either each holder of an Impaired Claim has accepted the Plan, or will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code, including pursuant to Section 1129(b) of the Bankruptcy Code for Equity Interests deemed to reject the Plan.

- Each Class of Claims that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class pursuant to Section 1129(b) of the Bankruptcy Code.

- Except to the extent the holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims and Other Secured Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- The Debtors have paid the required filing fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court.

- In addition to the filing fees paid to the clerk of the Bankruptcy Court, the Debtors will pay quarterly fees on the last day of the calendar month, following the calendar quarter for which the fee is owed in each of the Debtors' Chapter 11 Cases for each quarter (including any fraction thereof), to the Office of the U.S. Trustee, until the case is converted or dismissed, whichever occurs first.

### 1.    Best Interests of Creditors Test

Often called the "best interests" test, Section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property with a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code. To make these findings, the bankruptcy court must: (a) estimate the Cash liquidation proceeds that a chapter 7 trustee would generate if each of the debtor's chapter 11 cases were converted to a chapter 7 case and the assets of such debtor's estate were liquidated; (b) determine the liquidation Distribution that each non-accepting holder of a claim or an equity interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare such holder's liquidation Distribution to the plan Distribution that such holder would receive if the plan were confirmed.

In chapter 7 cases, unsecured creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior class receiving any payments until all amounts due to senior classes have been paid fully or any such payment is provided for: (a) holders of secured claims (to the extent of the value of their collateral); (b) holders of priority claims; (c) holders of unsecured claims; (d) holders of debt expressly subordinated by its terms or by order of the bankruptcy court; and (e) holders of equity interests.

The Debtors believe that the value of any Distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code would be less than the value of Distributions under the Plan because, among other reasons, (i) conversion to chapter 7 would require appointment of a chapter 7 trustee, which likely would delay and reduce the present value of Distributions; and (ii) the fees and expenses of a chapter 7 trustee would likely further reduce Cash available for Distribution.

### 2.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that confirmation is not likely to be followed by the liquidation of the Debtors or the need for further financial reorganization, unless the Plan contemplates such liquidation. Indeed, Section 1123(b)(4) of the Bankruptcy Code

permits liquidation plans that "provide for the sale of all or substantially all of the property of the estate, and the Distribution of the proceeds of such sale among holders of claims or interests" in chapter 11 proceedings and, thus, such a plan does not violate the requirements of Section 1129(a). Moreover, when a liquidating plan of reorganization is tested against Section 1129(a)(11), the feasibility standard is greatly simplified. In the context of a liquidating plan, feasibility is established by demonstrating the debtor's ability to make the payments anticipated by the plan and specifying the timing of the debtor's liquidation. Notably, there is no requirement that such payments will be guaranteed.

The Plan provides for the liquidation of the Debtors by the transfer and sale of property and payment of the debts. Further, the Debtors maintain that there is a reasonable expectation that the payments required to be made during the term of the Plan will, in fact, be made.

### 3. Acceptance by Impaired Classes

The Bankruptcy Code requires that, as a condition to confirmation, except as described below, each class of claims or equity interests that is impaired under a plan, accepts the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (b) cures any default and reinstates the original terms of such obligation; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled or any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.

Classes 4, 5, 6, 7, 8 and 9 are Impaired under the Plan, and as a result, the holders of Claims in such Class are entitled to vote on the Plan. Pursuant to Section 1129 of the Bankruptcy Code, the holders of Claims in Classes 4, 5, 6, 7, 8 and 9 must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to such Classes, and without considering whether the Plan "discriminates unfairly" with respect to such Classes, as both standards are described herein. As stated above, a Class of Claims will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of each such Class (other than any Claims of creditors designated under Section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

### 4. Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes entitled to vote on the plan have not accepted it; *provided, however*, that the plan has been accepted by at least one impaired class. Pursuant to Section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

### 5. No Unfair Discrimination

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take

into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 6.    Fair and Equitable Test

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the dissenting class, the test sets different standards depending on the type of claims or equity interests in such class.

Secured Claims: The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (1) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (2) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

Unsecured Claims: The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (1) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (2) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property.

Equity Interests: The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirement that either: (1) the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of: (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or (2) if the class does not receive the amount as required under (1) hereof, no class of equity interests junior to the non-accepting class may receive a Distribution under the plan.

To the extent that Classes 4, 5, 6, 7, 8 or 9 vote to reject the Plan, the Debtors further reserve the right to seek to modify the Plan.

The votes of holders of Class 10 (Equity Interests) are not being solicited because, under Article III of the Plan, there will be no Distribution to the holders of Class 10 Equity Interests Claims and all Class 10 Equity Interests will be deemed canceled and will be of no further force and effect, whether surrendered for cancellation or otherwise. Class 10 is, therefore, conclusively deemed to have rejected the Plan pursuant to Section 1129(b) of the Bankruptcy Code.

Notwithstanding the deemed rejection by Class 10 and any Class that votes to reject the Plan, the Debtors do not believe that the Plan discriminates unfairly against any Impaired Class of Claims or Equity Interests. The Debtors believe that the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

### C.    Contact for More Information

Any interested party desiring further information about the Plan may contact legal counsel to the Debtors by writing to Squire Patton Boggs (US) LLP, 221 E. Fourth Street, Suite 2900, Cincinnati, Ohio 45202, Attn.: Stephen D. Lerner, Esq. or Elliot M. Smith, Esq. and/or by calling (513) 361-1200, during normal business hours.

## VIII.   PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS THAT ARE IMPAIRED SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.

### A.   Certain Bankruptcy Law Considerations

#### 1.   Parties-in-Interest May Object to the Debtors' Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created seven Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class. Nevertheless, there can be no assurance the Bankruptcy Court will reach the same conclusion.

#### 2.   Failure to Satisfy Vote Requirement

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to accomplish an alternative chapter 11 plan. There can be no assurance the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Allowed Claims as those proposed in the Plan.

#### 3.   Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, including, among other requirements, a finding by the bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of Distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of Distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance the Bankruptcy Court will confirm the Plan. A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that the Disclosure Statement, the balloting procedures and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.

Confirmation of the Plan is also subject to certain conditions as described in the Plan. If the Plan is not confirmed, it is unclear what Distributions, if any, holders of Allowed Claims would receive with respect to their Allowed Claims.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for confirmation. Any such modifications could result in a less favorable treatment of any non-accepting Class, as well as of any Classes junior to such non-accepting Class, than the

treatment currently provided in the Plan. Such a less favorable treatment could include a Distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no Distribution of property whatsoever under the Plan.

### 4.        Nonconsensual Confirmation

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Debtors believe that the Plan satisfies these requirements and the Debtors may request such nonconsensual confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.

### 5.        Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated Distributions described in this Disclosure Statement.

### 6.        Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

### 7.        Contingencies Not to Affect Votes of Impaired Classes to Accept or Reject the Plan

The Distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect Distributions available to holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

## B.        Risk Factors That May Affect Distributions Under The Plan

### 1.        Debtors Cannot State with any Degree of Certainty What Recovery Will Be Available to Holders of Allowed Claims in Voting Classes

A number of unknown factors make certainty in creditor recoveries impossible. First, the Debtors cannot know with any certainty, at this time, the number or amount of Claims in Classes 4, 5, 6, 7, 8 and 9 that will ultimately be Allowed. Second, the Debtors cannot know with any certainty, at this time, the number or size of Claims senior to Classes 4, 5, 6, 7, 8 and 9 or unclassified Claims that will ultimately be Allowed. Third, the Debtors cannot know with any certainty, at this time, whether or not the Liquidating Trust will prevail and recover under any of the Retained Causes of Action.

### 2.        Actual Amounts of Allowed Claims May Differ from the Estimated Claims and Adversely Affect the Percentage Recovery on General Unsecured Claims

The Claims estimates set forth herein are based on various assumptions. The actual amounts of Allowed Claims may differ significantly from those estimates should one or more underlying assumption proves to be incorrect. Such differences may adversely affect the percentage recovery to holders of such Allowed Claims under the Plan.

### C.      Disclosure Statement Disclaimer

#### 1.      Information Contained Herein is for Soliciting Votes

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes.

#### 2.      Disclosure Statement Was Not Approved by the Securities and Exchange Commission

Although a copy of this Disclosure Statement was served on the Securities and Exchange Commission, and the Securities and Exchange Commission was given an opportunity to object to the adequacy of this Disclosure Statement before the Bankruptcy Court approved it, this Disclosure Statement was not Filed with the Securities and Exchange Commission under the Securities Act or applicable state securities laws. Neither the Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

#### 3.      Disclosure Statement May Contain Forward Looking Statements

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The Distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual Distributions to holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

#### 4.      No Legal or Tax Advice Is Provided to You by this Disclosure Statement

**This Disclosure Statement is not legal advice to you**. The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

#### 5.      No Admissions Made

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, holders of Allowed Claims or Equity Interests or any other parties-in-interest.

#### 6.      Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation Claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement. The Debtors may seek to investigate Claims, File and prosecute objections to Claims and Equity Interests, and the Liquidating Trustee may object to Claims or bring Causes of Action after the Confirmation or Effective Date of the Plan irrespective of whether the Disclosure Statement identifies such Claims, Causes of Action or Objections to Claims.

7.      **No Waiver of Right to Object or Right to Recover Transfers and Assets**

The vote by a holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors or the Liquidating Trustee to object to that holder's Allowed Claim, or to bring Causes of Action or recover any preferential, fraudulent or other voidable transfer of assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified herein.

8.      **Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

9.      **Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update**

The Debtors make the statements contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

10.     **No Representations Outside the Disclosure Statement Are Authorized**

No representations concerning or relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. In deciding whether to vote to accept or reject the Plan, you should not rely upon any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, you should promptly report unauthorized representations or inducements to the counsel to the Debtors and the United States Trustee.

D.      **Liquidation Under Chapter 7**

If the Plan is not confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for Distribution in accordance with the priorities established by the Bankruptcy Code.

IX.     **CONCLUSION**

**THE DEBTORS SUBMIT THAT THE PLAN COMPLIES IN ALL RESPECTS WITH CHAPTER 11 OF THE BANKRUPTCY CODE AND RECOMMEND TO HOLDERS OF IMPAIRED CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN THAT THEY VOTE TO ACCEPT THE PLAN. THE DEBTORS REMIND SUCH HOLDERS THAT, TO BE COUNTED, EACH BALLOT, SIGNED AND MARKED TO INDICATE THE HOLDER'S VOTE MUST BE RECEIVED BY THE BALLOTING AGENT NO LATER THAN 5:00 P.M. (PREVAILING MOUNTAIN TIME) ON OR BEFORE [____], 2016, AT THE FOLLOWING ADDRESS: IF BY FIRST CLASS MAIL, ATNA RESOURCES BALLOT PROCESSING C/O UPSHOT SERVICES LLC, 8269 EAST 23RD AVENUE, SUITE 275, DENVER, COLORADO 80238; IF BY MESSENGER OR OVERNIGHT COURIER, ATNA RESOURCES BALLOT PROCESSING C/O UPSHOT SERVICES LLC, 8269 EAST 23RD AVENUE, SUITE 275, DENVER, COLORADO 80238.**

Dated: September [__], 2016

**Atna Resources Inc.**
**(for itself and on behalf of its debtor affiliates)**


/s/ James Hesketh
By: James Hesketh
Its:  President and Chief Executive Officer